**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CARL O. WILLIAMS** | § | |
| *Plaintiff,* | § | |
| | § | **CAUSE NO. 4:20-cv-04295** |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **SHELL OIL COMPANY** | § | |
| *Defendant.* | § | |

---

**PLAINTIFF CARL O. WILLIAMS RESPONSE IN OPPOSITION TO DEFENDANT**
**SHELL OIL COMPANY'S MOTION FOR SUMMARY JUDGMENT**

---

Dated: February 2, 2022                                        Respectfully submitted,



  _/s/ Eddie Hodges Jr._____
Eddie Hodges Jr.
Texas Bar No. 24116523
S.D. ID. 3479748
Alfonso Kennard, Jr.
Texas Bar No. 24036888
S.D. ID 713316
5120 Woodway Dr. Suite 10010
Houston, Texas 77057
T: (713) 742-0900
F: (713) 742-0951
eddie.hodges@kennardlaw.com
alfonso.kennard@kennardlaw.com
**ATTORNEYS FOR PLAINTIFF**

## TABLE OF CONTENTS

Contents

SUMMARY OF THE ARGUMENT ...................................................... 1

NATURE OF THE PROCEEDINGS ..................................................... 2

MATERIAL FACT ISSUES PRESENTED ............................................ 2

MATERIAL FACTS ............................................................................ 4

   A.  PLAINTIFF JOINS SHELL IN JANUARY 2019. ................................. 4

   B.  PLAINTIFF RECEIVES POSITIVE FEEDBACK ON HIS PERFORMANCE DURING HIS FIRST-YEAR. ................................................................. 6

   C.  PLAINTIFF BECOMES INVOLVED IN RACE-RELATED ISSUES WITH SHELL'S DISTRIBUTORS; BREAUX AND O'ROURKE. ............................ 8

   D.  PLAINTIFF WAS TERMINATED BY PUVILLAND FOR "POOR-PERFORMANCE" WEEKS AFTER HE RECEIVED "GOOD-PROGRESS" AND A PERFORMANCE-BASED BONUS. ................................................. 9

   E.  SHELL'S REASONING FOR TERMINATION IS PRETEXT, GIVEN THAT PUVILLAND'S BIAS TOWARDS PLAINTIFF INFLUENCED HIS FALSE MISREPRESENTATIONS THAT PLAINTIFF'S PERFORMANCE WAS "UNACCEPTABLE." PUVILLAND'S MOTIVES TO TERMINATE PLAINTIFF CREATE CREDIBILITY ISSUES FOR A JURY TO ASSESS. ......... 10

SUMMARY JUDGMENT STANDARD OF REVIEW ......................... 12

ARGUMENTS AND AUTHORITIES ................................................. 13

   A.  PLAINTIFF CAN ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION BASED ON HIS RACE. ....................................................................... 13

      1.  *It is undisputed that Plaintiff was qualified for his position as BDM.* ............... 14

      2.  *Genuine fact issues exist as to whether Bob McLaughlin, Jeremy Strausbaugh, Kyle Eshelman, Johnson, and Gary Steele received favorable treatment compared to Plaintiff, given that Plaintiff's actual performance was similar, if not better than his Caucasian peers, yet they were not terminated for "poor performance."* ............... 16

      3.  *Genuine fact issues exist regarding Defendant's stated reasons for termination as unworthy of credence, given that Plaintiff was terminated for poor performance, yet his performance was similar, if not better than his non-African American peers.* 18

   B.  PLAINTIFF CAN ESTABLISH A PRIMA FACIE CASE OF RETALIATION UNDER TITLE VII. 20

      1.  *Plaintiff engaged in protected activity when Kerley made complaints that Breaux Petroleum's management was being racist and when he asserted that O'Rourke's management reaction was due to his race.* ........................................... 21

ii

2. *There is a question of fact as to whether Plaintiff suffered adverse employment action as a result of his protected activity.* ............................................................ 22

3. *There is a question of fact as to whether Plaintiff's termination was pretextual given that Defendant's reason for termination lacks credence.* ............................... 22

**CONCLUSION** .................................................................................................. **22**

## TABLE OF AUTHORITIES

**CASES**                                                                              **PAGE(S)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................... 12, 13

*Bienkowski v. American Airlines, Inc.*,
851 F.2d 1503, 1506 & n. 3 (5th Cir.1988) ............................................................ 14

*Bynum v. Fort Worth Independent School District*,
41 F.Supp.2d 641, 653 (N.D.Tex.1999) ............................................................... 15

*Banks v. E. Baton Rouge Parish Sch. Bd.*,
320 F.3d 570 (5th Cir. 2003) ............................................................................ 20

*Burch v. City of Nacogdoches*,
174 F.3d 615 (5th Cir.1999) ......................................................................... 12, 13

*Douglas v. DynMcDermott Petroleum Operations Co.*,
144 F.3d 364, 372 (5th Cir.1998) ................................................................ ... 21

*Glasmire v. Public Storage*, ,
2013 WL 1890363 *5 (N.D. Tex. 2013) ................................................................ 19

*Glover-Dorsey v. University of Tex. Med. Branch*,
147 F. Supp. 2d 656 (S.D. Tex. 2001) ............................................................... 12

*Laxton v. Gap, Inc.*,.,
333 F.3d 572, 580 (5th Cir. 2004) ................................................................. 18

*Lee v. Kan. City S. Ry Co.*,
574 F.3d 253, 260 (5th Cir. 2009) ................................................................ 16, 17

*Lovelace v. Sherwin–Williams Co.,*
681 F.2d 230, at 244–45 (4th Cir.1982) …………………………………………………… 14

*Nasti v. CIBA Specialty Chems. Corp.,*
492 F.3d 589, 593 (5th Cir.2007) …………………………………………………….... 13

*Nichols v. Loral Vought Sys. Corp.,*
81 F.3d 38 (5th Cir. 1996) ………………………………………………………… 14

*Okoye v. Univ. of Tex. Houston Health Sci. Ctr.,*
245 F.3d 507, 512–13 (5th Cir.2001) ……………………………………………… 13, 14

*Perez v. Tex. Dep't of Criminal Justice,*
395 F.3d 206, 213 (5th Cir. 2004) …………………………………………………..... 17

*Reeves v. Sanderson Plumbing Products, Inc.,*
530 U.S. 133 (2000) ………………………………………………………………… 13

*Turner v. Kan. City S. Ry. Co.,*
675 F.3d 887, 893 (5th Cir. 2012) ………………………………………………… 16

*Urdy v. Texas Mut. Ins. Co.,*
No. 1:18-CV-1048-LY, 2020 WL 9809988, at *6 (W.D. Tex. July 16, 2020)………………… 15

*Wallace v. Methodist Hosp. Sys.,*
271 F.3d 212, 221 (5th Cir. 2001) ………………………………………………… 18

## Rules and Statutes

Title VII of the Civil Rights Act – 42 U.S.C. 2000(e)(2) – (3)

Texas Labor Code Chapter 21

Fed. R. Civ. P. 56(c)

## SUMMARY OF THE ARGUMENT

Plaintiff established his *prima facie* case of race discrimination and retaliation, and material fact disputes exist as to the Defendant's motivating factor and pretextual termination. In January, 2019, Plaintiff was hired as an Indirect Business Development Manager ("BDM") for Shell working indirectly with Shell's customers through its distributors to sell Shell's products.

Initially, Plaintiff was hired and supervised by Eric Boydstun ("Boydstun"). In August 2019, Plaintiff was assigned a new supervisor, Xavier Puvilland ("Puvilland"), and the work environment worsened. The evidence shows Plaintiff's race and his protected complaints were a motivating factor in his termination. Moreover, the evidence shows similarly situated non-African American BDMs with similar performance were treated more favorably.

Shell's explanation for termination is unworthy of credence. Weeks after receiving high praises from Puvilland on his progress, and receiving a performance-based bonus, Plaintiff was terminated. Even though, HR representatives could not corroborate any issues with Plaintiff's performance; Plaintiff was later terminated because Puvilland fabricated subjective beliefs regarding Plaintiff's performance and was motivated to treat Plaintiff less favorably compared to other non-African-American BDMs with similar performance. The evidence shows Puvilland's subjective beliefs towards Plaintiff were harsh, and Puvilland's views on Plaintiff's performance were based on race-related incidents with Shell's distributors.

The evidence shows Plaintiff's termination was pretext given that: (1) Plaintiff was terminated for "poor performance" weeks after Puvilland stated Plaintiff had "good progress" and Plaintiff received a performance-based bonus; and (2) Shell failed to follow and adhere to the recommendation from HR to follow Shell's progressive discipline policy to give Plaintiff a verbal or written warning, or give Plaintiff set expectations on a PIP (since Puvilland made misrepresentations that Plaintiff was aware of "coaching" or "underperformance.").

Lastly, the evidence shows a causal connection between Plaintiff's protected activity (i.e., Plaintiff's involvement in race-related issues with Shell's distributors), and his termination as result of his protected activity. Based on material fact issues presented in the response below, summary judgment should be **<u>DENIED</u>**.

## <u>NATURE OF THE PROCEEDINGS</u>

Plaintiff filed suit against Defendant alleging race discrimination under the Title VII of the Civil Rights Act of 1964, ("Title VII"), 42 U.S.C. § 2000(e), et seq; and the Texas Labor Code § 21.051 and 21.055; and retaliation under Title VII. Plaintiff has filed this response timely according to Federal Rules, and the agreed extension between both parties.

## <u>MATERIAL FACT ISSUES PRESENTED</u>

1. Whether a reasonable factfinder could determine Plaintiff was discriminated against for based on his race (African American) given that Plaintiff's actual performance was similar, if not better than: *Bob McLaughlin, Jeremy Strausbaugh, Kyle Eshelman, Johnson, and Gary Steele* (all Caucasian BDMs under Puvilland); yet Plaintiff was the only BDM under Puvilland to be terminated for "poor

performance," which creates an inference of favorable treatment? These genuine factual issues preclude summary judgment.

2. Whether a reasonable factfinder could determine Plaintiff's race was a motivating factor for his termination given that the evidence creates an inference Puvilland developed discriminatory motives toward Plaintiff after receiving notice of racial issues between Plaintiff and Shell's distributors, and Puvilland relied heavily on misrepresentations of Plaintiff's performance to justify his termination? These genuine factual issues preclude summary judgment because evidence exists that Plaintiff's race was the motivating factor for his termination.

3. Whether a reasonable fact finder could determine Plaintiff was terminated based on pretextual motives given that evidence proves Plaintiff received performance-based bonuses, and comments on "good-progress" weeks prior to being terminated for "poor performance?" Defendant's failure to adhere to follow its progressive discipline policy, or at minimum HR's recommendations on discipline, raise factual issues as to whether Defendant can justify Plaintiff's termination based on "poor performance" where evidence show Plaintiff's performance was similar, if not better, than his similarly situated BDMs, which precludes summary judgment.

4. Whether Plaintiff discussing race related issues with Shell's distributors with Puvilland the contributing factor to Defendant's adverse employment actions against Plaintiff given that Plaintiff's race-related issues were not investigated internally, and Plaintiff was removed from the opportunity to work with the distributors, and subsequently terminated for "poor performance." These genuine factual issues preclude summary judgment.

5. Whether Defendant retaliated against Plaintiff for being the subject of an investigation regarding racial discrimination with Shell's distributors given that Defendant was on notice of two race-related issues with its distributors, yet Defendant failed to investigate or resolve the race-related issues, ultimately removing Plaintiff from the accounts and terminating him for "poor performance?" These genuine factual issues preclude summary judgment.

## MATERIAL FACTS

### A. Plaintiff joins Shell in January 2019.

On January 21, 2019, Plaintiff was hired by Shell Oil Company as an Indirect Business Development Management Leader. <u>Williams Depo at 62:17-25; 64:2-9</u>.[1] Plaintiff was the only African American male BDM under the supervision of Puvilland. <u>Williams Depo at 160:2-25; 161:1-6</u>. After years of working directly with potential customers at Exxon, Plaintiff began his role at Shell as an indirect lead, which meant he did not have any direct relations with the customers, only with the distributors assigned to him by management. <u>Williams Depo at 43:2:13</u>. Upon hiring, Plaintiff did not receive any onboarding documents or training for the BDM position. <u>Williams Depo at 65:5-21</u>. Instead, Plaintiff was assigned to the South Texas and Louisiana distributors, who did not have a Shell BDM representative in place for at least six-months prior to Plaintiff's hiring. <u>Williams Depo at 73:1-4; 249:6-19</u>. Plaintiff was not provided a clear transition into the BDM role, and he was told to "learn the best he could," to develop relationships with his preassigned distributors, O'Rourke Petroleum, MidTex, and Breaux Petroleum. <u>Williams Depo at 65:5-21</u>.

Within two weeks of employment, Plaintiff was targeted by one of his peers, Holly Burns ("Burns"), based on comments she made that Plaintiff came off as "too confident

---

[1] Contrary to Defendant's contention in their Motion that there is an issue as to "whether Plaintiff can establish an employment relationship with Defendant Shell Oil," it is clear from the lack of argument from Defendant, and the summary judgment evidence in the record, including a paystub with Shell's logo and Plaintiff's participation in Shell's "RESOLVE" program that an employment relationship exists between Plaintiff and Shell Oil Company. *See* P-001.

and too cocky" and that Plaintiff "needed to earn his stripes." Williams Depo at 209:1-25; 210:1-19.

It was not until June 2019, when Shell finally allowed Plaintiff to go out and meet his distributors, O'Rourke and Breaux, as the BDM, because it was necessary for Plaintiff to meet these distributors to help set up field rides, strategize sales pipeline, and give help where it was needed. Williams Depo at 71:1-18; 74:7-25; 75:1-20.

In mid-July 2019, Plaintiff was introduced to Puvilland as his new supervisor, which became effective on August 1, 2019. Williams Depo at 84:11-14. Prior to becoming Plaintiff's supervisor, it is believed that Puvilland showed preferential treatment to non-African-American employees; and that Puvilland was difficult to work with and not approachable for African-American employees. Williams Depo at 111:11-23; 113:9-14. On August 22, 2019, Plaintiff met with Puvilland during the company-wide "Sales Coaching Day" and received positive feedback under the section "what has the individual improved or done well in relation to coaching goals." P-002.

On October 9, 2019, while at a company event, Clement Delahunt forcibly grabbed Plaintiff's rear-end, and told him he has, "a nice ass." Williams Depo at123:13-25; 124:14-25; 125:1-19. Steven Stack and Damon Higginbottom witnessed Delahunt grab Plaintiff's rear-end, and alerted Boydstun, who was also present, to deescalate the situation. *Id*. Delahunt was told to go to his room for the night, and no further disciplinary actions were taken against him. *Id*. Plaintiff felt vulnerable since he had only been with the company for 10 months, and felt that he would have been targeted or threatened if he filed a HR complaint against Delahunt. Williams Depo at 125:1-19. Plaintiff's first ten months were

rocky with multiple questionable incidents that he felt that he was the target of because of his race, and these incidents made him feel very uncomfortable in his position. Williams Depo at 124:14-25; 125:1-19.

**B. Plaintiff receives positive feedback on his performance during his first-year.**

Throughout Plaintiff's employment his performance was measured solely by actual sales and having a robust pipeline, or future generation of sales. Williams Depo at 250:10-22. BDMs are given the opportunity to receive bonuses based on actual sales, which correlates to an employee's actual performance based on goals set by Shell for the year. PS-011.[2] Each month Puvilland sent Plaintiff a "snapshot" of Plaintiff's performance against Key-Performance-Indicators (KPI), which measured Plaintiff's "Actual Sales" totals compared to Shell's Sales "Plan" totals and whether he was "eligible for bonus" based on his **actual performance**. PS-008 – PS-014. Puvilland would also send out monthly emails highlighting the wins for each BDM over the past month. PS-001 – PS-007. The KPI was measured in three categories, "Volume Total;" "C3 Total;" and "Premium;" accompanied by a percentage of the "Plan" completed as verified by actual sales. PS-008 – PS-014.

At the end of September 2019, Plaintiff's completed 92% of the Plan in Volume Total; 103% of the Plan in C3 Total; and 256% of the Plan in Premium Total. Due to his performance at the end of September he was eligible for bonus. PS-009 – PS-010. Puvilland

---

[2] "The payment of sales bonus is based on the aggregated performance of the weighted KPIs (i.e., 80%/120% threshold is applied to every KPI). If aggregated performance of weighted KPIs does not meet (sic) the 80% threshold, no bonus is paid. The ceiling for each KPI individually and aggregated is 120%." *See* 001104 (explaining how bonus is based on aggregated performance of each BDM).

also highlighted Plaintiff's "6 new accounts won with O'Rourke for over 50k gallons and $150k C3," which was on par, if not better than his similarly situated Caucasian BDMs: Gary, Jeremy, Kyle, Nick. <u>PS-006</u>.

At the end of October 2019, Plaintiff's completed 90% of the Plan in Volume Total; 99% of the Plan in C3 Total; and 247% of the Plan in Premium Total. Due to his performance at the end of October he was eligible for bonus. <u>PS-008 – PS-009</u>.

At the end of November 2019, Plaintiff's completed 87% of the Plan in Volume Total; 94% of the Plan in C3 Total; and 233% of the Plan in Premium Total. Due to his performance at the end of November he was eligible for bonus. <u>PS-008</u>. Puvilland also highlighted Plaintiff's "4 new accounts won with O'Rourke for over 75k gallons and $200k C3," which was generally better than majority of his similarly situated Caucasian BDMs: Art, Bob, Doug, Gary, Jeremy, Kyle, and Nick. <u>PS-003 – PS-004</u>.

During the fourth quarter of each year, typically in October, BDMs meet with their supervisor to conduct the Annual Performance Assessment. <u>P-008</u>. BDMs are required to submit a detailed self-assessment against their GPA ("goals per annum") to Puvilland to discuss during the end-of-year (EYR) meeting. *Id*. Plaintiff submitted his detailed self-assessment and met with Puvilland for an EYR review in January 2020. <u>P-025 – P-026</u>. Plaintiff and Pullivand collaborated on a general statement regarding Plaintiff's 2019 performance to load onto Shell's HR database. *Id*. The statement submitted highlighted Plaintiff's new business gains, while also encouraging room for improvement, given that Plaintiff had a short tenure in his role. *Id*. Pullivand would later make misrepresentations

7

to HR that the EYR statement provided was evidence that Plaintiff's performance was "unacceptable." <u>P-003 – P005</u>.

At the end of December 2019, Puvilland highlighted Plaintiff's "1 new account won with O'Rourke for over 15k gallons and $40k C3," which was on par, if not better than his similarly situated Caucasian BDMs: Gary Steele, Kyle Eshleman, Nick. <u>PS-002 – PS-003</u>. At the end of January 2020, Puvilland highlighted Plaintiff's "2 new account won with O'Rourke for over 16k gallons and $50k C3," which was on par, if not better than his similarly situated Caucasian BDMs: Gary, Hugh, Kyle, MJ. <u>PS-001 – PS-002</u>.

In January 2020, Puvilland stopped sending Plaintiff a snapshot of Plaintiff's KPI results each month. On January 28, 2020, Puvilland sent Plaintiff an email stating verbatim, "making good progress," in response to discussions about performance after the EYR statement. P-006. Plaintiff was not given any indication that his performance was "unacceptable" or that he was "underperforming." <u>Williams Depo at 271:4-15</u>.

## C. Plaintiff becomes involved in race-related issues with Shell's Distributors; Breaux and O'Rourke.

As an Indirect BDM, Plaintiff was required to take initiative to analyze the market, and provide advantages to his distributors in the market area. <u>Williams Depo at 197:1-16</u>. One of Plaintiff's distributors, Breaux Petroleum, was removed from his list after Shell's Technical Advisor, Lucas Kerley, accused Breaux of not working with Plaintiff because of his race. <u>Williams Depo at 144-147; 150:1-12; 176-180</u>. Plaintiff became the subject of accusations made against Breaux, and subsequently, Breaux made complaints to Shell about Kerley accusing Breaux for being racist towards Plaintiff. *Id.* This incident is

8

believed to have occurred in the fourth quarter of 2019. <u>Williams Depo at 176-180</u>. Kerley was not reprimanded for the incident, and was allowed to continue to work with Breaux. <u>Williams Depo at148:22-25; 149:1</u>. Thereafter, in January 2019, Shell realigned Plaintiff's territory to only include, Texas and Oklahoma, which removed Plaintiff from Breaux Petroleum, which is based in Louisiana. <u>Williams Depo at 83:1-11</u>. Plaintiff's Breaux account was transferred to another non-African American BDM. <u>Williams Depo at149:2-9</u>.

In February 2020, Plaintiff met with Scott Field and Adriana, representatives from O'Rourke, to discuss pipeline review and upcoming activities at the company site. <u>P-009 – P010</u>. At some point during lunch, Plaintiff mentioned to Field that RelaDyne provided technical services for plants, which was a service that O'Rourke did not offer. *Id*. Unbeknownst to Plaintiff, Fields took offense to the mentioning of RelaDyne given that they were competitors in the industry. P-027. Fields then proceeded to state that Plaintiff was unprofessional during the visit and sent emails to Plaintiff's supervisors, however Field still accepted Plaintiff's calendar invite for the week of February 25th. <u>P-009 – P-010; P-027</u>. Plaintiff had a follow-up conversation with Puvilland, in which Plaintiff told Puvilland that Fields' reaction was due to racial bias. <u>P-021 – P-022</u>.

### D. Plaintiff was terminated by Puvilland for "poor-performance" weeks after he received "good-progress" and a performance-based bonus.

On February 18, 2020, Puvilland opened a case against Plaintiff, requesting support and guidance from HR, alleging Plaintiff was underperforming ("2019 rating was

unacceptable"), and alleging Plaintiff was under tight coaching for over three months and his performance did not sustainably improve. P-012 – P-017.

BDMs were required to have monthly "MILO" meetings with Puvilland to discuss strategies and progress with their expected revenue goals. Williams Depo at 157:3-25; 158:1-9. In November 2019, Puvilland began having weekly "WILO" meetings with BDMs. P-004. Specifically, in January 2020, after a MILO meeting Puvilland told Plaintiff he was "making good progress." P-006 – P-007. On March 3, 2020, after a WILO meeting Puvilland noted that "SalesForce was fully up to date;" "received good POPSAs;" and did not provide any indication to Plaintiff that his performance was "unacceptable" or that he was "underperforming." P-024.

**E. Shell's reasoning for termination is pretext, given that Puvilland's bias towards Plaintiff influenced his false misrepresentations that Plaintiff's performance was "unacceptable." Puvilland's motives to terminate Plaintiff create credibility issues for a jury to assess.**

On or around February 28, 2020, HR representative, Krista Encarnacion, recommended Puvilland progress Plaintiff to Verbal Warning, following the incident with O'Rourke. P-013. However, Puvilland insisted he was not accepting that recommendation, or a recommendation for Written Warning, Puvilland wanted to terminate Plaintiff as soon as possible, and remove Plaintiff from all meetings with distributors. *Id.* Encarnacion requested to partner with another HR representative, Lauren De Young, to deliver the message to Puvilland of their recommendation to progress Plaintiff to Verbal Warning. P-012 – P-017. There is no evidence in the record Plaintiff received any verbal or written warning during his employment.

On March 3, 2020, Puvilland forwarded his WILO notes to Encarnacion, stating he was hoping to hear back regarding his case against Plaintiff and that Plaintiff was "showing no improvement and more gaps in execution." P-023 – P-024. However, Puvilland's WILO notes did not provide any indication to Plaintiff that his performance was "unacceptable" or that he was "underperforming." Williams Depo at 265:3-23.

On March 5, 2020, Puvilland and Encarnacion had a meeting where they discussed Puvilland's case against Plaintiff. P-019 – P-020. Encarnacion recommended placing Plaintiff on PIP-Written Warning Level and to give him at least 30-days to improve. *Id*. Encarnacion deliberately stated that HR does not recommend going straight dismissal for Plaintiff for two reasons: (1) Plaintiff's "expectations were never set that he could possibly be placed on PIP and then termination … it would be clear if you formally place him on PIP that would serve as a notice and opportunity for him to improve;" and (2) the YE review it sounded like his rating was **NOT** "*unacceptable*." *Id*.

The following day, March 6, 2020, Jeramy Haydn Guillermo deliberated further with Encarnacion and De Young, and contradicted previous statements by stating in an email "**while the tone of the YE review is positive**; it is clear that he received an *unacceptable* rating… risk would be higher if he received a lower or strong." *Id*. Guillermo directed Puvilland to work with Encarnacion for the next steps for the termination conversation with Plaintiff on March 16, 2020. P-018 – P-019.

Subsequently on March 16, 2020, Shell terminated Plaintiff strictly on the basis of underperformance. P-011. Shell included talking points for the termination discussion, which included statements, such as, (i) Plaintiff's performance throughout last year was

unacceptable and he did not meet his targets (even though Plaintiff received a performance-based bonus for 2019 and positive year-end reviews); and (ii) Plaintiff's delivery did not improve and Plaintiff received a rating of "unacceptable" during the 2019 YE review (even though Plaintiff received a performance-based bonus 2019, and received only positive feedback from MILO and WILO meetings). *Id*.

The first time Plaintiff learned he was "underperforming" or that his 2019 rating was "unacceptable" was during his termination call with Puvilland and Encarnacion. Williams Depo at 271:4-15. Puvilland was aware of Plaintiff's bonus, aware of Plaintiff's performance amongst his peers, and failed to set Plaintiff's expectations, which would allow Puvilland to reasonably measure Plaintiff's performance. P-004; PS-001 – PS-007. The material evidence presented establish genuine issue of material facts from which a jury could conclude that: (1) Plaintiff was discriminated against based on his protected class (race, African-American); and (2) Plaintiff was retaliated against for engaging in protected activity in violation of Title VII.

## **SUMMARY JUDGMENT STANDARD OF REVIEW**

In response to summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Glover-Dorsey v. University of Tex. Med. Branch*, 147 F. Supp. 2d 656, 661 (S.D. Tex 2001); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986). Issues of material fact are "genuine" if they require resolution by a trier of fact. *Id*. Doubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party. *Burch v. City of Nacogdoches*, 174 F.3d

12

615, 619 (5th Cir.1999). The Court must accept Plaintiff's evidence as true and must draw all reasonable inferences in his favor. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000). Conversely, the Court must not weigh the evidence or make credibility determinations, for "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150-51 (*quoting Anderson*, 477 U.S. at 255).

Here, there are clearly genuine issues of material fact, which necessitate Plaintiff's claims progressing to a trial on the merits. Plaintiff is not basing his claims on "mere subjective belief" that he has been subjected to discrimination, but he is submitting factual evidence in which a reasonably juror could conclude that the actions of Defendant were pretextual and unworthy of belief. Each of the issues presented by Defendant's Motion are highly disputed and fact intensive. The evidence and testimony are disputed and dependent upon credibility determinations that cannot be made on summary judgment.

## ARGUMENTS AND AUTHORITIES

### A.  Plaintiff can establish a prima facie case of discrimination based on his race.

To establish a *prima facie* case of race discrimination under Title VII, a Plaintiff must demonstrate that: "(1) he belongs to a protected group, (2) he was qualified for his position, (3) he suffered an adverse employment action; and (4) he was replaced with a similarly qualified person who was not a member of his protected group, or in the case of disparate treatment, that similarly situated employees were treated more favorably." *Nasti v. CIBA Specialty Chems. Corp.,* 492 F.3d 589, 593 (5th Cir.2007) (citing *Okoye v. Univ. of Tex.*

*Houston Health Sci. Ctr.,* 245 F.3d 507, 512–13 (5th Cir.2001)); *see also, Septimus,* 399 F.3d at 609.

Defendant concedes Plaintiff satisfies elements (1), and (3) of the *prima facie* case, which is appropriate because the burden for establishing a prima facie case is "very minimal." *Nichols v. Loral Vought Sys. Corp*., 81 F.3d 38, 41 (5th Cir. 1996). However, Defendant asserts Plaintiff cannot establish the element (2) and (4) of his *prima facie* case for race discrimination that Plaintiff has no evidence he was qualified for his position and Plaintiff cannot show that (i) he was replaced by someone outside his protected class; or (ii) he was treated less favorably than similarly situated employees. Defendant does not contend Plaintiff cannot satisfy any other element of his *prima facie* case in its Motion. The evidence proves Plaintiff has met the burden of establishing a *prima facie* case by circumstantial and direct evidence.

      1.   <u>It is undisputed that Plaintiff was qualified for his position as BDM.</u>

Placing a plaintiff's "qualifications" in issue at both the prima facie case and pretext stages of a termination case is an unnecessary redundancy. Courts have struggled with the bifurcated analysis that results from *Loeb. See, e.g., Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, at 244–45 (4th Cir.1982). The requirement that a plaintiff prove he is meeting his employer's reasonable expectations represents an imperfect attempt at analogy with *McDonnell Douglas. See Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1506 & n. 3 (5th Cir.1988) (noting that a prima facie discrimination claim requires the plaintiff to prove that he was objectively qualified for the position, i.e., that he held the

necessary qualifications for the job he sought to hold); *Bynum v. Fort Worth Independent School District,* 41 F.Supp.2d 641, 653 (N.D.Tex.1999) (granting summary judgment for school district due to plaintiff's failure to establish a prima facia case of employment discrimination where the *plaintiff's decertification* by the Army rendered him ineligible to continue serving as a JROTC teacher) (emphasis added).

Although Defendant argues that because Plaintiff failed to meet his performance expectations, he cannot show he was qualified for his position as required under Title VII. Defendant cited *Urdy,* which in that case the Plaintiff was given a warning of "deficient performance," unlike here Plaintiff only received a performance-based bonus and did not receive any negative performance reviews. *Urdy v. Texas Mut. Ins. Co.*, No. 1:18-CV-1048-LY, 2020 WL 9809988, at *6 (W.D. Tex. July 16, 2020). Defendant also cites, *Arensodorf*, where the Court found that Plaintiff was not qualified based on ample documentation from a 90-day PIP showing deficient performance; unlike here, Defendant decided to forego placing Plaintiff on a PIP and terminated Plaintiff based on poor performance weeks after positive reviews and a performance-based bonus.

The evidence is also clear that prior to working for Defendant, Plaintiff had over ten years of experience in the industry, and Defendant ultimately hired Plaintiff based on that experience. It is undisputed that from January 2019 to March 2020, Plaintiff never received any notice that he was underperforming, his rating was unacceptable, or was Plaintiff ever given any performance improvement plan or set expectations to allow his supervisors to measure his performance. The only evidence of actual performance within Plaintiff's position is the evidence that Plaintiff received a performance-based bonus for meeting sales

quotas set by Defendant. Therefore, Defendant's position that "Williams failed to improve in continuing to be unprepared for sales calls…" is subjective and is not objective evidence that clearly demonstrates Plaintiff was qualified. Plaintiff's qualifications can be shown, objectively, by (i) his previous work history; (ii) performance related bonuses; and (iii) the fact that Defendant hired Plaintiff based on his qualifications. Therefore, it is undisputed that Plaintiff met his minimal burden to show that he was qualified for the BDM position, to satisfy element (2) of his *prima facie* case of race discrimination. Plaintiff has presented genuine fact issues as to his qualifications under Title VII.

      2.   <u>Genuine fact issues exist as to whether Bob McLaughlin, Jeremy Strausbaugh, Kyle Eshelman, Johnson, and Gary Steele received favorable treatment compared to Plaintiff, given that Plaintiff's actual performance was similar, if not better than his Caucasian peers, yet they were not terminated for "poor performance."</u>

Defendant asserts that Plaintiff cannot identify a single comparator who was similarly situated and treated more favorably. The Court has emphasized that "nearly identical is not synonymous with identical." *Turner v. Kan. City S. Ry. Co*., 675 F.3d 887, 893 (5th Cir. 2012). The Court further explains that "a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would be in the rarest circumstances that the situations of two employees would be totally identical." *Lee v. Kan. City S. Ry Co.*, 574 F.3d 253, 260 (5th Cir. 2009). Simply stated, Plaintiff needs only to show that there exist non-African American employees who were supervised by Puvilland and were treated more favorably for similar performance as Plaintiff.

Puvilland supervises roughly 8 to 10 Indirect BDMs, in both the transportation section and industrial section. During Plaintiff's employment he was the only African-American male BDM under Puvilland's supervision. As stated above, each month Puvilland would send out key performance indicators and highlighted each BDM's monthly wins. Puvilland also acknowledged that Plaintiff's performance in comparison to his peers was determined based on the monthly highlights he sent out. PS-001 – PS-007.

Each month, it was clear that Plaintiff performance was similar, if not better, than his peers each month. For example, at the end of November 2019, Plaintiff had four new accounts won with O'Rourke for over 75k gallons and $200k C3," which was generally better than majority of his similarly situated BDMs (Art, Bob, Doug, Gary, Jeremy, Kyle, and Nick). There is no evidence in the record that any other BDM was terminated or even reprimanded for poor performance, even though the material facts indicate that Plaintiff's performance was similar, if not better, during the majority of the months where Puvilland highlighted each BDMs' wins. It is clear there was not a significant difference in actual performance amongst BDMs, yet Plaintiff was terminated for poor performance, and the only difference between Plaintiff and his peers is that Plaintiff is African-American.

Accordingly, similarly situated BDMs with comparable actual performance as Plaintiff, who did not draw an adverse employment action, should be considered as "comparable seriousness" to Plaintiff's, justifying their performance as "nearly identical." *Lee*, 574 F.3d at 260–61 (quoting *McDonald*, 427 U.S. at 283 n.11, 96 S.Ct. 2574); *see also id.* at 260 ("[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew

dissimilar employment decisions." (quoting *Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004)). Because there is not a significant difference between Plaintiff's actual performance and that of his similarly situated Caucasian BDMs; the adverse action against Plaintiff accounts for the difference in treatment received from Defendant than his similarly situated BDMs: Bob McLaughlin, Jeremy Strausbaugh, Kyle Eshelman, Johnson, and Gary Steele for the purposes of an employment discrimination analysis." *Id.* (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)). Accordingly, Plaintiff has established undisputed facts that Bob McLaughlin, Jeremy Strausbaugh, Kyle Eshelman, Johnson, and Gary Steele were similarly situated Caucasian BDMs under the supervision of Puvilland with similar performance, yet Plaintiff was the only BDM terminated for "poor performance." Therefore, Plaintiff established a *prima facie* case of race discrimination, and summary judgment should be DENIED.

In the alternative, Plaintiff asserts he was replaced by a non-African American employee.

3. Genuine fact issues exist regarding Defendant's stated reasons for termination as unworthy of credence, given that Plaintiff was terminated for poor performance, yet his performance was similar, if not better than his non-African American peers.

Evidence that an employer's explanation is false or unworthy of credence, with the plaintiff's *prima facie* case, supports an inference of discrimination even without further evidence of defendant's true motive. *Laxton v. Gap, Inc.*, 333 F.3d 572, 580 (5th Cir. 2004).

The gravamen of Plaintiff's race discrimination claim is Defendant's reason for termination is unworthy of credence. Shell failed to follow its own progressive discipline policy, failed to follow the multiple recommendations for progressive discipline by HR; and other similarly situated employees, such as Bob McLaughlin, Jeremy Strausbaugh, Kyle Eshelman, Johnson, and Gary Steele, were treated more favorably given that Plaintiff's performance was similar, if not better than his similarly situated peers, yet he was the only BDM terminated for "poor performance." Defendant alleges Plaintiff was terminated for "underperformance." However, Plaintiff asserts that Defendant's reason for termination was pretext to cover up a discriminatory intent to end Plaintiff's employment.

The material facts provide inconsistencies with Puvilland's subjective motives. Puvilland's subjective motives were influenced by a discriminatory animus to target Plaintiff because of his African-American race. Puvilland was aware of the race-related issues that Plaintiff was having with his distributors, Breaux and O'Rourke, and did not want to adhere to HR recommendation for progressive discipline given that from their perspective it was unclear how Plaintiff's performance was unacceptable. Plaintiff's race related issues with distributors, and the fact that Plaintiff received performance-based bonuses and positive reviews, yet terminated for underperforming, should be considered evidence for a reasonable juror to assess that a discriminatory motive was developed against Plaintiff after key players received notice of his disability.

Evidence that Shell regarded Plaintiff's performance as good demonstrates the articulated reasons for Plaintiff's termination lack credence. *Glasmire v. Public Storage*, 2013 WL 1890363 *5 (N.D. Tex. 2013). Plaintiff received positive year-end reviews,

positive ratings, and a performance-based bonus for only working six-months in 2019. Puvilland gave assurances to Plaintiff that his performance was acceptable, yet Puvilland failed to give Plaintiff notice of: (i) any underperformance; (ii) any expectations; and (iii) the opportunity to go on a PIP. Encarnacion deliberately stated it is unclear how Plaintiff's performance was considered "unacceptable," based on her review of Puvilland's notes. Such circumstances suggest Plaintiff's performance was good. Thus, the reasons for his termination lack credence.

The evidence shows Plaintiff was making "good progress" in January 2020, and received positive feedback on March 3, 2020. Puvilland may have subjectively believed Plaintiff was underperforming, but the evidence shows Puvilland was aware of Plaintiff's success based on his own monthly highlights, key performance indicators, and WILO/ MILO notes. Puvilland developed a poor perception of Plaintiff, based on race-related issues with Shell's distributors. The fact that Puvilland failed to communicate deficiencies with Plaintiff until after Plaintiff was terminated, yet had multiple meetings with Plaintiff, thus Defendant's assertion of "underperformance," lacks credibility, and these doubts should be left for a jury to decide.

**B.  Plaintiff can establish a prima facie case of retaliation under Title VII.**

To make out a prima facie case of retaliation, Plaintiff must establish: (1) he participated in an activity protected by Title VII (2) his employer took some retaliatory action against him, and (3) a causal link exists between the protected activity and the retaliatory action. *Banks v. E. Baton Rouge Parish Sch. Bd*., 320 F.3d 570, 575 (5th Cir. 2003).

1.   <u>Plaintiff engaged in protected activity when Kerley made complaints that Breaux Petroleum's management was being racist and when he asserted that O'Rourke's management reaction was due to his race.</u>

"An employee has engaged in protected activity when he has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Douglas v. DynMcDermott Petroleum Operations Co.,* 144 F.3d 364, 372 (5th Cir.1998).

Plaintiff alleges he was terminated in retaliation for giving notice of race-related issues with his distributors, and requesting to discuss them further with Puvilland. Plaintiff's allegations were never investigated, and Plaintiff was never offered an opportunity to attempt to resolve these issues with his distributors, since it was primarily his job to work with distributors on a day-to-day basis. Plaintiff engaged in protected activity when he involved in an investigation surrounding Kerley making assertions that Breaux's management was being racially prejudice towards Plaintiff. After the incident, Breaux was removed from Plaintiff's distributors, and Shell realigned Plaintiff's position to only focus on Texas and Oklahoma. Furthermore, following the incident with O'Rourke, in February 2020, Plaintiff attempted to discuss what he believed to be race-related issues with Puvilland, but Puvilland failed to take Plaintiff's complaints into consideration, and Plaintiff became the target of the incident, ultimately causing O'Rourke to be removed as Plaintiff's distributor. The evidence is sufficient to prove that Plaintiff engaged in protected activity, which satisfies the first element of a retaliation claim.

2. <u>There is a question of fact as to whether Plaintiff suffered adverse employment action as a result of his protected activity</u>.

As stated above, Plaintiff suffered materially adverse employment action on March 16, 2020, after he engaged in protected activity in January 2020, and February 2020. Plaintiff was terminated on March 16, 2020. Plaintiff's termination should be considered direct evidence of adverse employment action, and it had one-month after Plaintiff engaged in protected activity. Plaintiff has presented sufficient evidence that establishes he suffered a materially adverse action.

3. <u>There is a question of fact as to whether Plaintiff's termination was pretextual given that Defendant's reason for termination lacks credence</u>.

As stated above, Plaintiff asserts that Defendant's reason for termination was pretext to cover up a discriminatory and retaliatory intent to end Plaintiff's employment because of the inconsistencies Plaintiff's performance review. Sufficient evidence exists to allow a reasonable jury to conclude that Defendant's reasoning for Plaintiff's termination was pretextual and contains doubts as to whether Plaintiff was retaliated after engaging in protected activity under Title VII.

## **CONCLUSION**

Accordingly, Plaintiff Carl Williams respectfully request that this Court **deny** Defendant's motion for summary judgment in its entirety, allowing Plaintiff's claims to proceed to trial.

Dated: February 2, 2022                                        Respectfully submitted,

kennard law P.C.

22

  /s/ Eddie Hodges Jr.
Eddie Hodges Jr.
Texas Bar No. 24116523
S.D. ID. 3479748
Alfonso Kennard, Jr.
Texas Bar No. 24036888
S.D. ID 713316
5120 Woodway Dr. Suite 10010
Houston, Texas 77057
T: (713) 742-0900
F: (713) 742-0951
eddie.hodges@kennardlaw.com
alfonso.kennard@kennardlaw.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that I served a true and correct copy of this document on all counsel of record, as listed

below, via the Case Management Electronic Case Filing (CM/ECF) System for the U.S. District

Court for the Southern District of Texas, on February 2, 2022.

Alfonso Kennard Jr.

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing motion for summary judgment complies with 25-page requirement in

Section 7 of the Court's Procedures because it is prepared in plain, 13-point Times New Roman

Typeface and less than 25 pages, excluding the parts of the motion exempted by Section 18(c) of

the Court's Procedures.

Alfonso Kennard Jr.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

23

**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CARL O. WILLIAMS** | § | |
| *Plaintiff,* | § | |
| | § | **CAUSE NO. 4:20-cv-04295** |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **SHELL OIL COMPANY** | § | |
| *Defendant.* | § | |

---

**PLAINTIFF CARL WILLIAMS' APPENDIX IN OPPOSITION TO DEFENDANT
SHELL OIL COMPANY'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff respectfully submits this Appendix in support of its Opposition to the

Motion for Summary Judgment.

| APPENDIX | DESCRIPTION |
|---|---|
| P-001 | Pay Stub from Shell indicating Carl Williams KPI Performance Bonus |
| P-002 | Email Dated August 23, 2019 regarding Sales Coaching Day |
| P-003 – P-005 | Email Dated February 19, 2020 from Xavier Puvilland regarding his complaint against Carl Williams |
| P-006 – P-007 | Email Dated January 28, 2020 from Xavier Puvilland stating "making good progress" |
| P-008 | Shell's Annual Performance Assessment |
| P-009 – P-010 | Carl Williams' Letter to Puvilland regarding the incident with Scott Field and O'Rourke |
| P-011 | Talking Points for Carl Williams' termination Discussion |
| P-012 – P-017 | Shell's HR (Kristia Encarnacion) messages regarding Carl Williams' |
| P-018 – P-020 | Emails leading up to Carl Williams' Termination |
| APPENDIX | DESCRIPTION |

| | |
|---|---|
| P-021 – P-022 | Email Dated March 5, 2020 from Xavier Puvilland regarding conversations with Carl Williams about racial prejudices with O'Rourke |
| P-023 – P-024 | Emails leading up to Carl Williams' Termination |
| P-025 – P-026 | Carl Williams Year-End-Review statement in collaboration with Xavier Puvilland |
| P-027 | Email Dated February 19, 2020 from Carl Williams regarding the incident with Scott Field and O'Rourke |
| P-028 – P-029 | Carl Williams Year-End-Review's detailed "self-assessment against his GPA (goals)" |

Dated: February 2, 2022                                    Respectfully submitted,



 _/s/ Eddie Hodges Jr._____
Eddie Hodges Jr.
Texas Bar No. 24116523
S.D. ID. 3479748
Alfonso Kennard, Jr.
Texas Bar No. 24036888
S.D. ID 713316
5120 Woodway Dr. Suite 10010
Houston, Texas 77057
T: (713) 742-0900
F: (713) 742-0951
eddie.hodges@kennardlaw.com
alfonso.kennard@kennardlaw.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that I served a true and correct copy of this document on all counsel of record, as listed

below, via the Case Management Electronic Case Filing (CM/ECF) System for the U.S. District

Court for the Southern District of Texas, on February 2, 2022.

_____

Alfonso Kennard Jr.



**Pay Date : 03/02/2020 - Bonus payment**

Pennzoil-Quaker State Company d/b/a SOPUS Products

Carl O Williams JR



| | | | | |
|---|---|---|---|---|
| Employee ID | ▮▮▮▮▮ | | | |
| Pay Frequency | Semi-monthly | | Period Begin Date | 03/02/2020 |
| | | | Period End Date | 03/02/2020 |

| Taxes | State Codes | Marital Status | Allowances | Additional Amounts |
|---|---|---|---|---|
| Federal | | Single | 0 | |
| Primary State | | Exempt | 0 | |
| Secondary State | | | 0 | |
| Local | | | 0 | |

**Messages**

INQUIRIES? Hours: Contact your Timekeeper. For Benefits: Fidelity 1-800-30SHELL. Pay: Contact HR-Operations@shell.com or please call them at 866-514-7135. Current Benefits Info: Click on <A href="https://login.fidelity.com/ftgw/Fidelity/NBPart/Login/Init?AuthRedUrl=https://workplaceservices100.fidelity.com/NBHome.html">Fidelity NetBenefits. <br> <br> Click Tax Form Services and scroll down to Consent if you are not already enrolled to receive your original W-2 electronically.<br> <br> Direct Deposit: Update on the <A href=" https://hronline.shell.com/"> HR Online home page choose My Data & Reports > Personal Information > Bank Details<br> <br> W-4 Tax Withholding: Update on the <A href=" https://hronline.shell.com/"> HR Online home page choose My Pay > United States Tax Withholding W-4 Form

| Earnings | This Period | YTD |
|---|---|---|
| Regular Pay - Salaried | 0.00 | 21,174.26 |
| Holiday Pay Base | 0.00 | 492.42 |
| Sales KPI Bonus (Non-Benefit Bearing) | 23,400.00 | 23,400.00 |
| Shares Cash Balance | 0.00 | 106.54 |
| Wellness Reimb | 0.00 | 250.00 |
| GESPP Exercise | 0.00 | 9.30 |
| CGLI - FICA Only | 0.00 | 37.80 |
| **Total Earnings :** | **$23,400.00** | **$45,432.52** |
| Pre-Tax | This Period | YTD |
| Medical Insurance Pre Tax | 0.00 | 644.20 |
| Dental Ins Pre Tax | 0.00 | 50.96 |
| Employee Provident Fund Pre-Tax | 0.00 | 2,329.16 |
| FSA Health Care | 0.00 | 41.68 |
| Vision Pre Tax | 0.00 | 39.84 |
| Vacation Buy Pre Tax | 0.00 | 500.00 |
| FSA Health Adj | 0.00 | -8.78 |
| **Total Pre-Tax :** | **$0.00** | **$3,597.06** |
| Taxes | This Period | YTD |
| Federal | 5,148.00 | 8,403.00 |
| EE Social Security Tax | 1,450.80 | 2,733.94 |
| EE Medicare Tax | 339.30 | 639.39 |
| **Total Taxes :** | **$6,938.10** | **$11,776.33** |
| POST-TAX | This Period | YTD |
| Employee Life Insurance | 0.00 | 9.89 |
| Group Legal | 0.00 | 19.92 |
| Dependent Life | 0.00 | 2.68 |
| Retirement Life | 0.00 | 78.08 |
| Employee Life Insurance Adj | 0.00 | 0.01 |
| Retirement Life Adj | 0.00 | 0.08 |
| Support Order | 600.00 | 3,000.00 |
| GESPP Post Tax | 0.00 | 200.00 |
| **TOTAL POST-TAX:** | **$600.00** | **$3,310.66** |
| Net Pay | This Period | YTD |
| **Total Net Pay :** | **$15,861.90** | **$26,741.93** |

**OTHER BENEFITS & INFORMATION**

| Description | Percent | This Period | Year-To-Date |
|---|---|---|---|
| Employee Provident Fund Pre-Tax | 0.00 | 0.00 | 2,329.16 |
| Employee Provident Fund After-Tax | 0.00 | 0.00 | 0.00 |
| Member Provident Fund II - ended 12/31/2014 | 0.00 | 0.00 | 0.00 |
| Company Provident Fund | 2.50 | 0.00 | 541.68 |
| Catch-up Contribution - ended 12/31/2014 | 0.00 | 0.00 | 0.00 |
| GESPP Post Tax | 0.00 | 0.00 | 200.00 |

| Summary | Earnings | pre-tax deds | Taxable Wages | taxes | post-tax deds | net pay* |
|---|---|---|---|---|---|---|
| This Period | $23,400.00 | $0.00 | $23,400.00 | $6,938.10 | $600.00 | $15,861.90 |
| YTD | $45,432.52 | $3,597.06 | $41,766.72 | $11,776.33 | $3,310.66 | $26,741.93 |

**Pay Distribution List**

| Description | Type | Amount | Account # | Bank |
|---|---|---|---|---|
| ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ |

**P-001**

Message

| | |
|---|---|
| **From:** | BNG-ECO WIS-Sales1st-Prod SBOBNG-F [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=69D8F8D06EBA43BCB605F34826DBBABF-INH350] |
| **Sent:** | 8/23/2019 12:04:51 PM |
| **To:** | Williams, Carl O SLUBE-DIU [carl.o.williams@shell.com]; Puvilland, Xavier SLUBE-DIU [xavier.puvilland@shell.com] |
| **Subject:** | Action Plan for KAM/AM/BDM/Technical Coaching on 22 Aug 19 |

Copy: Xavier Puvilland

**Sales Coaching Day**

Dear Carl Williams,

I enjoyed working with you on 22 Aug 19. After the session, we discussed your strengths and agreed on some development actions for you to work on in the coming months.

**From your session, what has the individual improved or done well in relation to the coaching goals?**
Display more leadership during plenary meetings.
Improve POPSA granularity, especially with better understanding of decision structure of customers.
Ensure key decision makers are attending meetings to improve efficiency.
Focus more on new volumes development vs. maintaining existing accounts.

**What actions has the individual agreed as a result of this coaching session:**

| Specific Actions | By When? |
|---|---|
| Follow-up actions for OCI and Veolia | 8/30/19 |
| Improve margin estimates in pipeline | 8/30/19 |
| | |

**Any Other Comments:**

Click here to see the completed Coaching Report.

I am looking forward to working with you on our next coaching session to see what progress you have made.

Best wishes,

**Xavier Puvilland**

This is a system generated email. Please do not reply.

**P-002**

Equilon _000052

Message
| | |
|---|---|
| **From:** | Puvilland, Xavier SLUBE-DIU [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C7F7A3AE9FB04F988567BDA20664E08D-FRXPU0] |
| **Sent:** | 2/19/2020 5:01:35 PM |
| **To:** | Encarnacion, Kristia P SSSCMLA-HRR/VAU [kristia.encarnacion@shell.com] |
| **Subject:** | CONF: Case 02625622 documentation |
| **Attachments:** | 2_11_17 ORourke customer German Pellet Mill Storage Visit and Lunch Summary.docx; O'Rourke support.msg; FW_ Carl Williams Interaction.msg; RE_ Field Rides Dates.msg; SalesForce cleanup _ mass upload.msg; RE_ Updated Slide on Path to $1.5M.msg; Feedback on BDMs.msg; RE_ BDM Support.msg; RE_ EYR Comments.msg; Re_ High Roller Sand (Monahans, TX) .msg; WILO Carl Jan 6.msg; WILO 1_13.msg; Re_ Updated 2020 Tactics Slides.msg; RE_ Update Sales Pipeline.msg; FW_ Carl.msg; FW_ Reminder __ RE_ Site Assessment _ DVR Link.msg; FW_ Discussion w_ Carl.msg; RE_ Request for Support __ Accelerating Sales Pipeline.msg; RE_ WILO Carl.msg; EYR Discussion Feedback.msg; RE_ ANNUAL PERFORMANCE ASSESSMENT.msg; RE_ FYI __ Updated Sales Pipeline.msg; RE_ B2B Texas Role.msg; RE_ September Pipeline.msg; RE_ Vacation Time Notification.msg; Accepted_ Carl's Vacation Day .msg; Action Plan for KAM_AM_BDM_Technical Coaching on 22 Aug 19.msg; Diala bulk for O'Rourke _ teaser for OCI.msg; RE_ Milo Opportunity Pipeline.msg; RE_ Ride-a-long Discussion .msg; Review Carl July 2019.msg; Recent wins - Indirect US #5.msg |
| **Importance:** | High |
| **Sensitivity:** | Personal |

Hi Kristia,

Carl Williams, experienced hire for about a year as a JG4 Business Development Manager for the Indirect channel in the US, has been reporting directly to me since August 1st from a system perspective, but we had a handover period in July with his previous manager and I had my first coaching discussion with him mid-July.

It appeared right away that he had significant gaps to close, which was OK as a new joiner, even though as an experienced hire, JG4 and after being in company for already nearly 6 months I had much higher expectations. We started to have regular coaching calls right away.

Some serious behavioral issues had already been documented by then:
- An incident with two female employees during his first week in the company, when he made them feel very uncomfortable. This required an intervention from two senior staff members: FW: Discussion w/ Carl.
- Previous line manager following up with a Technical Advisor "because this relationship started off very poorly due to Carl's behavior at a customer training that he was invited to at STCH": FW: Carl.
- Kenneth Aucoin (Learning) note to previous line manager: FW: Reminder // RE: Site Assessment / DVR Link

Joint sales calls on Aug 22nd in Beaumont, TX, evidencing serious gaps:
- The organization of joint sales call was very erratic from the beginning, with no consideration whatsoever for others or his line manager and very poor professionalism throughout the preparation:
  - He started by booking two full days in my calendar without any agenda or heads-up, just the week prior to some customer visits.
  - I discussed it with him and we agreed that my presence would add value only on the second day he had booked. I asked to get the preparation documentation and schedule quickly, so that I could plan my travels accordingly.
  - We agreed he would pick me up on the 22nd morning and we would ride together to Beaumont. We were scheduled to have a call to review the preparation on that Friday morning. As we traded some IM exchanges, he decided that this discussion was not needed any more and canceled this call, which I disagreed with. When I finally spoke to him on the Friday night, still requesting the agenda and preparation documents for the following week's visits, he casually informed me that scheduled was now to meet them directly in Beaumont on the Wednesday night, and did not acknowledge this was a last minute material change, see RE: Ride-a-long Discussion

**P-003**

Equilon _000053

- ○ When I joined him directly for dinner at the indicated location on the Wednesday night, he was with two employees of the distributor he's supporting, who happened to not even know who I was and what I did for Shell, another obvious example of lack of preparation
- The coaching report highlighting the need for improvement on preparation of sales calls: Action Plan for KAM/AM/BDM/Technical Coaching on 22 Aug 19
- Some actions requested (in written) after this call were not followed up, eroding significant value for Shell (last action item in attachment: Diala bulk for O'Rourke / teaser for OCI). I requested an update several times about this action later (evidenced in regular coaching call minutes after this visit) and eventually got an evasive answer that yes, this had been done and there had been no further pricing support granted. I learnt recently that this was not the case from the ICAM and could get documentation if required.

He has been very disorganized and missing important deadlines repeatedly:

- Multiple examples of lack of follow-up in weekly or monthly discussions notes listed below and attached, and EYR discussion
- I had to reschedule his EYR discussion as he did not send his input on time: RE: ANNUAL PERFORMANCE ASSESSMENT
- While at the Miami Distributors Conference, I found out during our team meeting on the last day (Thursday October 10th, when asking if he wanted to share a ride to the airport later that day as we are noth based in Houston) that he was planning to take the following day off and extend his stay in Miami over the weekend, without requesting prior approval, which I still decided to accept as an oversight (Accepted: Carl's Vacation Day), while the rules and expectations regarding booking vacation days had been made explicitly clear to him 6 weeks prior: RE: Vacation Time Notification

He tried to review the scope of his role multiple times, demonstrating a lack of understanding of his role, see following attachments:

- RE: B2B Texas Role
- RE: Request for Support // Accelerating Sales Pipeline

The EYR discussion was a key milestone to reset expectations and clarify improvement actions needed:

- Input from employee for end year review: EYR Discussion Feedback
- Input from ICAMs he works with and supports: Jarrett Enochs: RE: BDM Support and Alex Sudyk: Feedback on BDMs
- Follow up emails exchanges after EYR discussion end of October when he did not receive the feedback and coaching well: RE: EYR Discussion Feedback. This discussion outlines the gaps and actions to close them at the end of October, and contains an attempt to misrepresent some of the feedback given.

We moved from monthly coaching calls to weekly coaching calls starting end of October, showing significant gaps in capabilities and execution. Most of the minutes I could find are in the attachments listed below for reference (some being a trail covering several sessions and building off each other):

- Review Carl July 2019
- RE: Milo Opportunity Pipeline
- RE: September Pipeline
- RE: FYI // Updated Sales Pipeline
- RE: WILO Carl
- RE: Update Sales Pipeline
- WILO Carl Jan 6
- WILO 1/13

His strong underperformance, against targets or ranked against his peers, is fully evidenced by the email trail sent to the wider team and community with a recap of all the team members achievements on a monthly basis since I'm in this role: Recent wins - Indirect US #5

**P-004**

Equilon _000054

Since he's been on this strong coaching plan (end of October), on top of the elements listed above, there has been several incidents, including a major one leading to a distributor formally complaining to Shell last week:

- He has been struggling to define his strategy, from knowledge and capability gaps, even after multiple discussions and coaching time:
  - This request started mid-December as per attachment: Re: Updated 2020 Tactics Slides
  - End of January status: Updated Slide on path to $1.5M
- Incident on January 14th impacting the relationship with a distributor, a Shell direct and leading to a waste of time and resources:
  - Absolutely no preparation done ahead of customer visit is one of the causes of the February 11th incident: High Roller Sands (Monahans, TX)
  - Proper preparation of trip was already raised as an action item from WILO the week before: WILO Carl Jan 6
- We had some back and forth discussions about 2019 performance write-up, after he was communicated his rating (Unacceptable): EYR Comments
- On Jan 30th he was he missed another important deadline for a project: SalesForce cleanup / mass upload
- Incident from sales call on February 11th, leading to a complaint from the distributor partner to Shell's management, and my decision to suspend his support to this distributor to protect this important business relationship, pending further action. Note that <u>again</u> this was partially due to a lack of preparation, coupled with unprofessional behaviors:
  - Complaint received: Carl Williams Interaction
  - Summary of discussion with employee, pending further action: O'Rourke support
  - Account / answer from the employee: 2_11_17 ORourke customer German Pellet Mill Storage Visit and Lunch Summary.docx

**Based on all the elements above (misbehaviors and business incidents) and attached documentation, after investing a very significant amount of time coaching this employee for the last few months, setting expectations extremely clearly over 90 days ago, and as not only his results did not materially improve, but he has now been damaging the reputation of Shell with some key distributors partners (O'Rourke Petroleum Products) to the point where I had to pull him off the support of this distributor, which will impact the business's ability to deliver its targets, I need to dismiss this employee immediately.**

Thanks for your help and guidance about the process to follow,

**Xavier PUVILLAND**
Indirect Business Development Lead - US

**Tel:** +1 832 762 2452
**Mob:** +1 281 716 0792
**Email:** xavier.puvilland@shell.com
**Internet:** http://www.shell.com

**P-005**

Message
_____

**From**:      Puvilland, Xavier SLUBE-DIU [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
              (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C7F7A3AE9FB04F988567BDA20664E08D-FRXPU0]
**Sent**:      1/29/2020 7:00:43 PM
**To**:        Williams, Carl O SLUBE-DIU [carl.o.williams@shell.com]
**Subject**:   RE: Updated Slide on Path to $1.5M

Carl,
Thanks. I'll be more comfortable once we have the sectors view but I guess for now we'll have to go with that.
Next step would be to start comparing existing pipelines with those targets, and implement ways of working / strategy
with your distributors – could be directional for now on the pipelines, would be good to understand early from you
where you feel the top 3/5 gaps are in terms of pipeline so we can start addressing them.
Thanks,
Xavier.

---

**From:** Williams, Carl O SLUBE-DIU <Carl.O.Williams@shell.com>
**Sent:** Wednesday, January 29, 2020 10:07 AM
**To:** Puvilland, Xavier SLUBE-DIU <Xavier.Puvilland@shell.com>
**Subject:** RE: Updated Slide on Path to $1.5M

Xavier, Thanks for your feedback. I've responding to your questions and added comments below in <span style="color:red">Red</span>.

**All the Best,**

**Carl O. Williams, Jr.**
**Industrial Business Development Manager**
**Shell Lubricants**
Cell: 281-781-6096
Email: Carl.O.Williams@shell.com
**Why choose Shell? Learn more**



---

**From:** Puvilland, Xavier SLUBE-DIU <Xavier.Puvilland@shell.com>
**Sent:** Tuesday, January 28, 2020 6:05 PM
**To:** Williams, Carl O SLUBE-DIU <Carl.O.Williams@shell.com>
**Subject:** RE: Updated Slide on Path to $1.5M

Carl,

Thanks, making good progress. Please find attached some additional comments/questions below:

- Midtex being future Janus Prestige, we probably should invest more support in them and have a higher target.
  Might require some alignment on industry. Or check if they are planning to reach their growth targets
  only/mostly through Transport with the ICAM? <span style="color:red">I actually spoke to my ICAM Jarrett about this on 1/29/2020 and
  our plan is to work with marketing and the OBAM to get more IND leads to assign to Midtex and work with
  them. My efforts to provide them with a few qualified leads that I will work with them on should stimulate some
  activity.</span>
- RRS doesn't sell lubes as such, sales go through the local RD branch from a numbers perspective, but I like
  having a specific target for customers originated with the reliability services guys. Just to watch from an

<div align="center">

**P-006**

</div>

accounting perspective. I understand. I just wanted to ascertain a value that I think I can extract through them with the time that I will spend and the business I will gain from utilizing their services.

- From a planning perspective I would probably not give a target to Oil Patch yet, or start working with them (we should think about we pass the message to the ICAMs for those particular cases if there is a potential misalignment). If their merger goes through and they become Janus and aligned, can always re-allocate some of the targets and effort from other distributors to them throughout the year, but would not count on them from day 1. No idea how long this merger can take, could be fairly long... According to my conversation with my ICAM Josalin regarding Oil Patch Petroleum and Oil Patch Fuel Services, she feels they're still may be some opportunities with them because the Corpus Christi and South Texas area has not been fully targeted and explore my our Shell distributors. OPFS is currently working on setting a meeting with a 100K gal LNG opportunity. I think it will be worth supporting them if they have some sizeable opportunities. I realize that not all Janus distributors like Midtex and Quality are truly competent and focused on Industry so I think I really have to work with all of my distributors including non-Janus to hit my 2020 GPA targets.
- Can we stretch Quality a bit more? They're big but market potential and local capabilities to take into account, so this might be the right target. Just food for thought. According to my phone call wit their sales manager on 1/29/2020, they are primarily a PCMO and Transport distributor but is interested in Industry but it has not been a strong focus and strength for them, so I will be conservative on my numbers with them. Additionally, Western Marketing (Reladyne also has PAR in OK)
- Did you test the RelaDyne target with Kerry? I have not officially yet, but I will soon after I review their current Shell pipeline and after my call wit their sales managers on this Friday.

Hope it helps. Also, would be good if you could update/validate your slide 5 (the sectors) so that we can finalize the exercise. I honestly do not have any new market intelligence at the moment to further validate the sectors. The sectors that are currently depicted was determine by guidance from TAs who have worked in those markets that I am not familiar with. My thoughts is that by May/June, I can update the sector map based upon the opportunities I see during my field visits and pipeline. With that said, can we agree that this exercise is finalized? The whole objective was for me to establish a market strategy mainly regarding assigning volume target numbers and determining my time allocation with my distributors which is the most important. The sectors that will actually help me meet my numerous will be determined throughout the year.

Thanks,

Xavier.

**From:** Williams, Carl O SLUBE-DIU <Carl.O.Williams@shell.com>
**Sent:** Monday, January 27, 2020 9:40 PM
**To:** Puvilland, Xavier SLUBE-DIU <Xavier.Puvilland@shell.com>
**Subject:** Updated Slide on Path to $1.5M

Xavier,

Thank you for your coaching today. I have updated slide 3 to display that changes we discussed.

**All the Best,**

**Carl O. Williams, Jr.**
**Industrial Business Development Manager**
**Shell Lubricants**
Cell: 281-781-6096
Email: Carl.O.Williams@shell.com
Why choose Shell? Learn more

**P-007**

**At the end of the year we share in Shell's success by recognising achievements and delivery of outcomes through ratings and performance discussions that matter.**

Dear Colleagues,

As you are aware, at the start of this year we commenced the global roll out of our refreshed Performance Management approach. We are now entering the final phase, the Annual Performance Assessment.

I want to hold a year-end discussion with each of you based on the **outcomes delivered** (5+3 goals) and **how** these were delivered (behaviours).

I'll be relying also on the MYR done with your previous respective line managers, but to help me in preparing this process, please:

### KEY ACTIONS

1. **Prepare your detailed self-assessment** against your GPA (5+3 Goals) and send it to me at least two working days before our EYR discussion.

2. **Book an hour** for this EYR discussion on the **25th or 28th of October**. I blocked those two days for only this, so you'll be able to see which slots are still available in my calendar.

Any questions please let me know.

Thanks,

Xavier.

### SHELL IS THE POWER OF ITS PEOPLE. WHEN YOU OUTPERFORM, SHELL OUTCOMPETES.



**P-008**

Equilon _000153

Hello Xavier,

Per our request, I would like to share my account on what took place before and shortly after my sales call visit with O'Rourke at German Pellet Mill Storage site located at 100 W Lakeshore Dr., Port Arthur, TX 77640.

On Thursday February 6th, Scott Fields and I had a brief phone call about his desire for me to start working more with his new rep in the Beaumont area named Adrianna Pierce. During this call, Scott basically stated that he would expect Adriana and I to have more success selling Shell in the Beaumont area because Adriana knows a lot of people in industry there locally.

On Monday, February 10th, I had a scheduled pipeline review call with Jarrett and Scott regarding O'Rourke's Industry Sales Pipeline and upcoming activities. During this call, Scott mentioned that he and Adriana had a visit scheduled on tomorrow, Tuesday February 10th at the German Pellet Mill Storage location in Port Arthur Texas but he wasn't sure of the time. On this call, I asked Scott if he needed my support during this visit and if he thinks this a good opportunity for him to personally introduce me to Adriana. Scott agreed that he would like for me to attend to represent Shell and that he would like for me to meet Adriana. I then asked Scott what is our objective of the call and what will be my role during the meeting. Scott replied that we are going meet with the customer and do an informal site assessment to examine their operations and storage and handling of their lubricants. After the call, I texted Adriana around 2pm on Monday to confirm the time and address and she confirmed that it was at 9am on Tuesday. I called Adriana around 3:30pm on Monday afternoon to introduce myself and to gather more information about this customer and the guests whom we will be meeting with.

On Tuesday, February 11th, I met Scott and Adriana directly at the customer's site. We put on our PPE gear and went directly inside the customer's office to meet with Bryan Dow, the general manager for this facility and the Woodville plant location. At the same time, we also meet with the terminal manager Torye Harrison and the Operations/Logistics manager Ty Smith. Adriana led the initial conversations with the customer since she had a previous relationship with Ty. She also introduced Scott and me to the customer. After I introduced myself, I asked the customer to help me understand their individual roles at the facility. Bryan, Torye, and Ty each explained their role and what areas they could use support. Whenever the general manager Bryan spoke, he was very comical and displayed comfort in discussing their business and some non-business content to us. After all three individuals from German Pellets spoke, Scott explained that we would like to do a walk through to examine their lubricants and operations.

We were then led by Ty to examine their lubricant store area. I took pictures of about 14 different products (gear oils, hydraulic oil, greases, and axle oil) from multiple brands that they had in storage mainly in pails and some drums. Upon examining that all of their lubricants were held in a small shipment container, I stopped conducting my formal site assessment using the Lubepro app on my iPad. We then went back into the customer's office to discuss our observations and next steps. There were numerous product duplications with their gear oil and hydraulic oil, so Scott discussed product consolidation and  the possibility of providing them with a small tank and an e-tank monitoring device. The customer also expressed needs for a fuel tank/fuel island because they are getting 5 new trucks and will be added more. Scott mentioned that he could accommodate those needs as well.

At the end of the meeting, Adriana agreed to follow up with the customer with a consolidated product offer, pricing, and equipment solution options. At the conclusion of our meeting as we return to our

**P-009**

Equilon _000268

cars, Scott, Adriana, and I agreed that the meeting went very well and we decided to have lunch together at Rodair Roadhouse. During lunch, we discussed that the meeting went well and that there was no additional support need from me to transition this account. We acknowledged that although this account was small in volume ~1.5K gals, since it is an extension of the German Pellet Mill opportunity which consumes about 25 drums of grease a month, we felt the visit was worthwhile and I was glad to have the opportunity for Scott to introduce me to Adriana.

During lunch, I had asked Scott to tell me more about how O'Rourke supports industry accounts when they have service needs and he mentioned that he has about 8 different service providers that they use depending on the service needed. I then asked Scott if O'Rourke has ever considered working with RelaDyne Reliability Services especially since Shell has a national agreement with the services division. Scott was visibly perturbed that I raised this question and responded in an offensive manner that he would never work with RRS. He went on to say that RelaDyne stole the business of an O'Rourke account in the past and sometimes he said they would low ball one of O'Rourke's existing Shell accounts by switching it to Chevron and then switch it to Shell. I told Scott that I apologize for offending him in asking him that question and that I was not aware of the history between the two companies.

I also asked Scott if there was Royal Purple barrier fluid being used at the Motiva Plant where O'Rourke provides them predominantly with Shell lubricants. Scott responded defensively and stated that Motiva requested Royal Purple and that other distributors should not tell me about what non-Shell products are in an O'Rourke account.  I did not disclose to Scott where I got that information from, but I could tell that he was irritated by me raising the question altogether.

Lastly, we concluded our lunch conversation with when can Adriana and I start working together, and she mentioned that she was on vacation during the week of Feb 17-21st and would not have time to set up visits for the following week. Since this was the case, I offered to get at least two meetings set up at two accounts that I called on independently in the fall that I would like to work with O'Rourke on. I was able to secure a meeting with my contacts at Genesis Marine and Sumiden Wire for Wednesday Feb 26th and sent calendar invitations to Scott, Adriana and the customer in which they all accepted. I also explained to Scott that Xavier would be joining us on those visits that I set up on Feb 26th.

Considering the progress, new account gains, and growing relationship that I have built with Scott and O'Rourke over the past 8 months, I am utterly appalled that the discussions that were exchanged at lunch was escalated to senior managers at O'Rourke and Shell. I'm really baffled by Scott's response considering the momentum that I am building with O'Rourke's rep Robert Hernandez in the DFW area and the promising future to work with Adriana in the Beaumont area. I really wish this was handled a different way, and I hope that my relationship with O'Rourke can be restored.

**Industrial Business Development Manager**
**Shell Lubricants**
**Cell: 281-781-6096**
Email: [ HYPERLINK "mailto:Carl.O.Williams@shell.com" ]
[ HYPERLINK "https://emea01.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.lube-education.com%2Flp%2Finfocenter%2Foverview.html&data=02%7C01%7CJeremy.Strausbaugh%40shell.com%7C4374ad5345334ef0ee7f08d5ecfd3de2%7Cdb1e96a8a3da442a930b235cac24cd5c%7C0%7C0%7C636675494795140224&sdata=QO496gGuaWlZ4Vc3afcxyLN7MnncC%2BBmcEcUdKgwBXE%3D&reserved=0" ]

**P-010**

**Talking Points for Termination Discussion**

**Introduction**
- We are here today to discuss your <mark>unacceptable underperformance.</mark>

Termination Message
- <mark>Your performance throughout last year was unacceptable and you did not meet your targets</mark>. Since end of October of 2019, I have re-clarified the expectations of your role and provided significant coaching. On our weekly coaching sessions, we talked about the areas of your performance and behaviors you need to improve on, actions you need to take, and help I could give to support you.
- Your delivery has not improved, and you have failed to meet the job expectations. In several instances since then, your lack of preparation for customer calls was unacceptable, on January 14th at High Roller Sands and February 11th at German Pellets.
- <mark>For 2019 Year End, you received a performance rating of *Unacceptable*</mark> because you did not achieve your targets and the actions requested to improve your delivery were not being implemented.
- Your underperformance has a significant impact in our business as we are receiving negative stakeholder feedback from our distributors, which is negatively impacting Shell's reputation.
- Given these reasons, your employment with the Company is being terminated effective immediately.

**Pay & Benefits**
- You will be paid through today and will collect this pay on your next scheduled paycheck.
- If you have any remaining vacation, it will be paid out 2 to 3 weeks after termination. It is paid out as Year-to-Date accrual + Deferred Vacation – any vacation taken.
- In the chance that there are any monies owed (I.e. overtook vacation), they will be taken from your final pay.
- If there are any questions related to your final pay, you can call HR Operations @ 1-866-514-7135, Option 1.
- Coverage for some benefits will end on the last day of the month employment ends (medical, dental, vision, group life insurance and long-term insurance, etc.)  Coverage for other benefits end effective immediately (flexible spending accounts, IPI, LTD, etc.)
- Effective the first of next month, you will be eligible to receive health benefits through COBRA.  You will receive a letter in the mail from Fidelity with more information about COBRA benefits.  Please make sure you look for this package in the mail as it has information that is date sensitive. You are encouraged to contact Fidelity at 1-800-30-SHELL (307-4355) they will be able to explain all of your benefits regarding Medical, Dental, Pension.

**Close Out**
- We will need to collect your badge and other belongings you may have with you at this time (badge, laptop, cell phone, corporate card, company car and iPad)
- , please mail them to us.
- Do you have any personal items in the office that you will need to return?
- We will mail this Intellectual Property Form and Preservation notice form Please also sign and send them back.
- Please provide personal address and phone number for follow up?
- Do you have any questions?

<div align="center">

**P-011**

</div>

**Salesforce Case:** 02625622
**Date/Time Opened:** 18/02/2020 18:52
**Date/Time Closed:** 03/06/2020 01:43
**Subject:** GC/Underperformance Management/Dismissal

**Description:**
Hello,
One of my direct reports, Carl Williams, recent hire (about 1 year) has been underperforming (2019 rating was unacceptable) and been under tight coaching for over 3 months now, but performance did not sustainably improve and I now just received a formal complaint from a customer (sales staff).
I need to issue a written warning and am considering dismissal at this stage, and would need your support and guidance.
I'll send the documentation ahead of our call to the HR advisor who will be appointed.
Thanks in advance for your help,
Xavier.

**Contacting Customer:** (74779) Xavier Puvilland - [xavier.puvilland@shell.com](mailto:xavier.puvilland@shell.com)

 **Kristia Encarnacion**
To: Internal

 28 February 2020 at 18:16

Hi @Lauren De Young

Good day! Just want to thought-partner a case with you involving a manager that would like to terminate an employee because of performance and behavior issues. Here's a summary for reference as the manager forwarded a bulk of documentations:

**Business:** Global Commercial
**Contact/Manager:** Xavier Puvilland (245680) - Indirect Business Development Lead
**Concerned EE:** Carl Williams (288287) JG04 - Business Devt. Manager

**Issue:**
- Manager expressed that EE has behavioral and performance issues and he would like to go to straight dismissal for the employee as soon as possible
- Reason why he would like to dismiss him already is that he's starting to damage relationships with the customers and he doesn't trust him anymore in attending meetings with the distributors by himself

**Background:**
- EE's a new hire on 01/28/2019, but started reporting to Xavier on 08/01/2019
- Since's EE's demonstrating a poor performance, it reflected in his YE Performance Rating 2019, showing as Unacceptable
  - Poor performance includes:
    - lack of preparation on meetings with the distributors
    - missing deadlines
    - lack of understanding in his role
  - Behavioral issues include:
    - making other individuals feel uncomfortable *(Xavier doesn't have much information on this, but this was raised to him by a distributor via email)*
- Xavier is coaching him every week for 3+ months already since October 2019 up to present
- During their coaching sessions, Carl is acknowledging his misses but always says he doesn't need any further support on his performance and he will try to improve
- Per Xavier, the only improvement he was able to see is that Carl became more active in the field.
- Xavier mentioned that he offered to accompany Carl on meetings but he's always cancelling the meeting
- Also, he can't afford to have other BDMs to accompany Carl in the meetings as they are short on headcount in the team

<div align="center">

**P-012**

</div>

- Attached are all the documentations forwarded by Xavier that includes:
  - documentations on coaching sessions
  - Feedback from distributors
  - Proof that Carl is cancelling their meetings last minute
- What made him reach out to HR Advice is the latest incident on Feb 14th meeting with the distributors that involves behavioral issues:
  - acted unprofessionally by laughing out loud as if he's out on a social setting
  - interrupted people
  - embarrassed a new distributor's representative in the meeting
  - Discussed Shell's other customers with another distributor, in front of a distributor that's present in the meeting
  - brought up inappropriate information on discussions with the distributor (e.g. discussing Shell's other distributors)

**My Recommendation:**

- I initially got back to Xavier and said he may progress him to Verbal Warning with the recent incident on Feb 14th
- But he insisted that he's not accepting that recommendation, neither Written Warning, as he would like to proceed to Dismissal as soon as possible
- He mentioned he doesn't want him to attend more meetings with the distributors and customers as he's just damaging more relationships

I still think that he could progress him in Verbal Warning level but may I please ask for thought-partnering on this case if you agree? And on how to deliver the message to Xavier as he sounded like he's all decided to terminate his employee.

I will be happy to talk through this case via call on your available time, thank you!

 Comment

 **Kristia Encarnacion**                                                        ▼
a year ago
**Correction:** Last incident happened on Feb 11, 2020 and the 3rd party distributor, Scott E Field raised the issue via email on Feb 14th.
Like

 **Kristia Encarnacion**                                                        ▼
a year ago
Hi **@Jeramy Haydn Guillermo**
As mentioned, tagging you on this case as a heads up in advance just in case that the Manager, Xavier Puvilland will escalate as he's checking again with me via IM Skype because he would like to go straight dismissal for his employee, Carl Williams after coaching him. Lauren and I are going to continue our meeting tomorrow morning on this and I've already updated the manager on the status. Thank you! cc **@Lauren De Young**

 **Kristia Encarnacion**                                                        ▼
Edited March 3, 2020 at 9:44 PM
Hi **@Jeramy Haydn Guillermo** Lauren and I had a quick call today and she's going to meet and talk to Laura Moses (ER Advisor) to chat about this case later today.
In advance, in relation to new ER/Advice Ways of Working cascaded on Feb 15th (see attached email here), do you think we need to flag this to Stephanie Finn now since the Manager is looking more into going through Dismissal for this employee: Carl Williams (288287)? Thank you! cc **@Lauren De Young**

 FW CASCADE by 15 Feb ERAdvice WoW Changes
129KB

**P-013**

 **Kristia Encarnacion**
10 months ago
Hi **@Lauren De Young**

I was able to talk to Xavier yesterday and here are the details:

- During his YE and coaching discussions with Carl, he never talked about the possible consequences if he will not improve his performance, such as PIP or progression to dismissal. He focused more on talking about his underperformance and actions that Carl needs to do to improve.
- Meeting with the distributors and distributor's customers takes up almost 100% of Carl's role as BDMs attend meetings minimum 3x a week. If they are not on meetings, they work at home doing admin work such as sending updates and working on preparation for the meetings. If Carl won't be on meetings, there's almost nothing that he will be able to work on.
- On Feb 11th, the distributor's representative, Adriana felt *uncomfortable* in the meeting because of how Carl behaved in front of the distributor's customers (e.g. laughing out loud as if he's in social meetings and interrupting on discussions). She felt ashamed for how Shell's BDM behaved in the meeting with their customers.

- I explained that we recommend placing Carl in Written Warning and give him at least 30 days to improve because:
  - the employee's expectations on the consequences was not properly set given that never did Xavier talked to him about possible PIP or dismissal in the future if there's no improvement in his performance.
  - In terms of due diligence, it would be clear that the Manager formally placed him on PIP that serves as a notice and also an opportunity for him to improve. And if there's still no improvement or another incident happens, then it could progress to termination then.

- Xavier said that he understood the reason behind our recommendation but he still doesn't agree as he believes that this will still lead to termination even if he will give him another 30 days to improve. He mentioned that his line manager and HRM in the business are aware of their concerns on the employee.
- Xavier is asking for an email as a documentation on our recommendation, then he will discuss this with his Manager and HRM. Possibly after their discussion, they will ask for a meeting with us in HR Advice with Haydn in the call if they still believe that the employee needs to be terminated already.

 **Kristia Encarnacion**
10 months ago
Hi **@Jeramy Haydn Guillermo** and **@Lauren De Young**

Here's the 2019 YE write up for Carl for your reference:

*"Carl joined Shell in February and started his onboarding process untilhe started working with his assigned distributors in June. Carl gainedabout 125k gallons of new business that was delivered through hisdistributors during the second half of 2019. The overall volume Carldelivered in 2019 was small, but this was partially due to his shorttenure in his role; there is however room for improvement in terms ofpipeline management, planning and follow-up on actions. For 2020, Carlunderstands that he needs to quickly demonstrate improvement in thoseareas and build more trust with his aligned Janus distributors. Heneeds to develop and execute his market strategy while keeping hissales pipeline in Salesforce up-to-date. Carl's execution in theaforementioned areas, will demonstrate his progress and will help himachieve his 2020 targets."*

Attached here is also a screenshot from SP.

**P-014**



| Goals and Performance ... | Goals and Performance Appraisal 2019 | | |
|---|---|---|---|
| Status | Completed | | |
| Supervisor | Boydstun, J. Eric | | |
| Employee | Williams, Carl O | | |
| Validity Period | 01/28/2019  to  12/31/2019 | | Additional Data |
| Appraisal Date | 01/28/2019 | | |
| Body Data | | | |
| Number... Element Name | | Fin... | |
| GPA 2019 onwards | | | |
| Goals | | | |
| Performance Summary | | | |

**Kristia Encarnacion**
10 months ago
Hi @Lauren De Young

Good day! I had a quick chat with Haydn today with regards to this case and here are the details:

Xavier sent me an email today wanting to have a meeting regarding the next steps in terms of Carl's dismissal. I did set up a meeting with him for tomorrow morning and here are the items I'm planning to discuss with him:
1.) We need to secure email approval from Jesus just for reference that the 2nd Line Manager supported the decision. (I'll send approval this together with the Leaving Form to US Ops.)
2.) I'll send him the Termination Script (attached here) and ask him to complete the Termination Message in Page 1, and then ask him to send back to me for our review. This will serve as his guide in delivering the termination conversation.
  • Question: In my recollection, there should be an HR to standby on the call during the Term meeting. Can you confirm if this is correct? If so, I can be present in the meeting then. :)
3.) I'll be submitting the Leaving Form (Involuntary) in his behalf as I'll need to notify HR Operations to make sure not to send any notifications to the employee while processing this in the system. I'll ask Xavier to fill out the Leaving Form attached here also and send back to me.

Let me know if there's anything else you'd like to add, thank you! :) cc @Jeramy Haydn Guillermo
Like

**Kristia Encarnacion**
10 months ago
Hi @Lauren De Young Xavier sent me his drafted Term Message for the employee, kindly see attached file here with my notes. Xavier's notes are in red, mine are in blue texts. Appreciate your thoughts as well. :)
Also, he noted on his last email that he prefers to have an HR to come in the term meeting face to face - - Monday March 16th, 3pm at the Woodcreek office. He will book a huddle room for the meeting and security to standby.
Thank you so much!

**Kristia Encarnacion**
10 months ago
posted a file.

Like

**Kristia Encarnacion**
10 months ago
Thanks, @Lauren De Young! Sending him our draft attached in here.

**P-015**

Like



**Kristia Encarnacion**
10 months ago
Hi **@Lauren De Young** I'm good with Xavier's final draft keeping it general. Appreciate your final thoughts also, thank you! :)
Like

**Kristia Encarnacion**
10 months ago
Hi **@Lauren De Young** **@Jeramy Haydn Guillermo** **@Stephanie Finn** We're done with the termination meeting with EE: Carl Williams. The leaving form has already been sent to Country Operations via case 02692528

Thank you for the help on this! I'm closing this case now as there's no further action needed on this case.
Like



**Kristia Encarnacion**                                           18 March 2020 at 17:59
To: Internal

Hi **@Marlo Saenz**

Good day! Just want to flag that we have an employee terminated with the following details:
- **Business:** Global Commercial
- **Contact/Manager:** Xavier Puvilland (245680)
- **Employee Terminated:** Carl Williams (288287) JG04 - Business Devt. Manager
- **Terminated on:** March 16, 2020 (Monday)

Question:
May we please check on how the car services will get notified that the employee left Shell and that they need to get his Company Car back? I asked Julia Reyes and mentioned I can tag you to inform but just want to check if there's any other actions that the manager needs to do on his end?

Let me know for questions, thank you!
cc **@Lauren De Young**



**Marlo Saenz**
10 months ago
Hi Kristia/All,

The line manager or fleet focal point for the business should notify Element, the fleet administrator.

Thanks,

Marlo
Like

**Kristia Encarnacion**
10 months ago
This is noted, thanks **@Marlo Saenz** **@Lauren De Young** !
Like

# P-016



**Kristia Encarnacion**
To: Internal

17 March 2020 at 22:07

Hi @Jeramy Haydn Guillermo @Sarah Skelton

Good day! Just a few items to check in relation to Carl Williams' Termination as we can still see the employee going online on skype from time to time, not really sure if IT has fully revoked his access.

1. Will it be safe to let the manager meet him near HOU-WCK office to get his assets? I'm thinking it's not, as the employee is extremely disappointed with the decision but just want to check in with you also?
2. In other possible terminations during lockdown period, will it be advisable to proceed with virtual termination given that we don't know how fast can IT fully revoke an employee's access to Shell laptop?

Let me know if you have clarifications, thank you!

Comment

**Sarah Skelton**
10 months ago

Hi @Kristia Encarnacion  - checking in here to make sure this was resolved. I remember @Lauren De Young and I discussing this case and I thought she said that the employee has now signed off and equipment has been locked out-- is that the case? I know we are still working more specific guidelines on how to manage returning assets but in the interim, I see no concern in having the employee mail their assets into the WCK mailroom per the instructions I sent to the Ops LT (Lauren was CCed on my email too). Let me know if you have any questions there.

@Angela Nguyen -- no action but FYI -- that I gave instructions on this case earlier this week prior to our chat. It is a 'for cause' termination so I've instructed they mail in belongings in the interim as employee no longer has access to campus and LM had safety concerns.

@Jeramy Haydn Guillermo
Like

**Megan Gaines**
To: Internal

31 March 2020 at 16:26

@Jessica Barton  Tagging you in the case with the details regarding the underperformance.

Comment

**Kristia Encarnacion**
To: Internal

08 May 2020 at 00:57

Case **02725127**
Carl connected with US Ops to check why it seems like he did not receive the complete amount in his final pay
Saying that he's been promised by LM that he will be paid for the whole March even if he's termed on May 16
US Ops Advisor informed EE that he's not getting paid for the days he's not anymore working
Logging here for reference

Comment

**P-017**

Equilon _000491

Message

| | |
|---|---|
| **From**: | Finn, Stephanie SSSCMLA-HRR/VA [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=320AA78B686A46BE991DACDCB0FC1768-USSFI5] |
| **Sent**: | 4/5/2020 8:50:24 AM |
| **To**: | Encarnacion, Kristia P SSSCMLA-HRR/VAU [kristia.encarnacion@shell.com] |
| **CC**: | Guillermo, Jeramy Haydn A SSSCMLA-HRR/VAU [j.guillermo@shell.com] |
| **Subject**: | RE: RE: Request 02625622 - GC/Underperformance Management/Dismissal [ ref:_00D0Y1Jqy0._5001v1GmEbE:ref ] |

Thanks for the update Kristia, and you handled it well.  Good job!

**Stephanie A. Finn**
Country HR Operations Manager, United States
Shell Business Operations – Manila

Solaris One Building, 24-259
130 Dela Rosa St, Legazpi Village
Makati City, Philippines 1229
**Tel**: + +63 2 483 7308
**Mobile**: +1 281 513 8271
**Email**: s.finn@shell.com

Disclaimer: This e-mail may include data and attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. Whilst in your possession, it should be stored securely, not shared with unauthorized persons and deleted after its legitimate use.

**From:** HR Services <hr-services@shell.com>
**Sent:** Tuesday, March 10, 2020 3:21 PM
**To:** Finn, Stephanie SSSCMLA-HRR/VA <S.Finn@shell.com>
**Cc:** Guillermo, Jeramy Haydn A SSSCMLA-HRR/VAU <J.Guillermo@shell.com>; Encarnacion, Kristia P SSSCMLA-HRR/VAU <Kristia.Encarnacion@shell.com>
**Subject:** FW: RE: Request 02625622 - GC/Underperformance Management/Dismissal [ ref:_00D0Y1Jqy0._5001v1GmEbE:ref ]

Hi Stephanie,

Good day!

Just want to give an update that the LM is good with our recommendation supporting the dismissal of EE: Carl Williams. I had a meeting with him earlier today and guided him through the next steps such as preparing the Termination Script, and in on how EE's term will be triggered in the system.

Also, in our conversation, we also talked about some key learnings he had on his end such as:
1.   To reach out to HR Advice right away when he feels like he needs help on how to manage an employee's performance/behavior
2.   To be clear on the message that he wants to tell the employee, like when flagging issues on one's performance/behavior.

Thanks again for your help support on this! Let me know if you have questions. ☺


Regards,

Kristia Encarnacion
HR Advisor | US Operations – DS Commercial/Global Functions


--------------- Forwarded Message ---------------

**P-018**

CONFIDENTIAL

**From:** HR Services [hr-services@shell.com]
**Sent:** 10/03/2020 21:01
**To:** xavier.puvilland@shell.com
**Subject:** RE: Request 02625622 - GC/Underperformance Management/Dismissal [ ref:_00D0Y1Jqy0._5001v1GmEbE:ref ]

Hi Xavier,

Thanks for your time in the call earlier.

As discussed, here are the actions needed to do in advance:
1. Kindly reserve a huddle room for privacy
2. Have a security to standby near the huddle room
3. Let us know your preferred set up having HR in the meeting or standby with security
4. Kindly send back to me your drafted Termination Message for our review. (See attached Term Script)

On the meeting day on March 16:
1. Follow the Term Script in delivering the message to the employee
2. Get his badge and any other Shell assets that's with him (e.g. laptop, cellphone, etc.)
3. Let him sign the following (attached also):

- Confirmation of Intellectual Property Obligation
- Confirmation of Receipt of Preservation Notice

After the meeting:
1. Complete and send the attached Leaving Form to Kristia. I will request this on your behalf to make sure that everything is set up correctly in the system.

Let me know if you have questions, thanks!

Kind regards,
Kristia

--------------- Original Message ---------------
**From:** Jeramy Haydn Guillermo [j.guillermo@shell.com]
**Sent:** 06/03/2020 16:16
**To:** xavier.puvilland@shell.com; j.guerreroherrera@shell.com
**Cc:** lauren.deyoung@shell.com; miki.wilson@shell.com; kristia.encarnacion@shell.com
**Subject:** RE: Request 02625622 - GC/Underperformance Management/Dismissal [ ref:_00D0Y1Jqy0._5001v1GmEbE:ref ]

HI Xavier and Jesus,

Thank you for our call yesterday. After further deliberation, with Kristia and Lauren, I shared the summary of the case with my manager. We are supportive of progressing towards the termination of employment for Carl.

**P-019**

Equilon _000514

In an ideal setting, we would recommend 60-90 days written warning not just to follow an HR process of documentation and formal notice, but also to give him enough time to deliver and improve. Given the impacts of his negative behaviors and underperformance to your business, our initial recommendation of a 30-day PIP would not make sense as it will not give him enough time to deliver and improve.

We cannot fully eliminate risk, either terminating him now, or in 30 days. However, we acknowledge that proper and documented coaching was provided to Carl. Other factors that we've considered that lower the risk if we proceed with termination:

-Carl is a short-term employee, there is no history of performance outcomes of strong performance
-while the tone of the performance review is positive, it is clear that he received an UNACCEPTABLE rating. Risk would be higher if he received a Lower or Strong

I'm currently on my rest day but if you have further questions, we can have a follow-up call early next week. Kristia will also work with you on the next steps by next week, for your conversation with Carl on March 16.

Regards,

Haydn

--------------- Original Message ---------------
**From:** HR Services [hr-services@shell.com]
**Sent:** 05/03/2020 20:10
**To:** xavier.puvilland@shell.com
**Subject:** Request 02625622 - GC/Underperformance Management/Dismissal [ ref:_00D0Y1Jqy0._5001v1GmEbE:ref ]

Hi Xavier,

Thanks for your time in the call yesterday.

As mentioned in our meeting, after discussing this case within our team, we recommend placing Carl Williams on PIP - Written Warning level and give him at least 30-days to improve. We do not recommend going straight dismissal at this point for him with the following reasons:

- On your YE and 1 on 1 discussions with him talking about his underperformance, his expectations were never set that he could possibly be placed on PIP and then termination if he will not improve his performance or behavior.
- In terms of due diligence, it would be clear if you will formally place him on PIP that would serve as a notice and an opportunity for him to improve. And if there's still no improvement or another incident happens, then it could progress.
- As we read your YE write up for Carl, it sounded like his rating was not *Unacceptable*. We are wondering on what kind of message is being sent to the employee the conversations with him.

I have forwarded the calendar invite to my line and also to my colleague that I'm partnering with  this case. Thank you!

Kind regards,

Kristia

**P-020**

Equilon _000515

Message

| | |
|---|---|
| **From**: | Guerrero Herrera, Jesus E SLUBE-DIU [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=32BCD7AD21CE4426A485EA1E9D2CF30F-USJGV5] |
| **Sent**: | 3/5/2020 7:34:58 AM |
| **To**: | Puvilland, Xavier SLUBE-DIU [xavier.puvilland@shell.com]; Wilson, Miki R SLUBE-HRD/A [miki.wilson@shell.com] |
| **Subject**: | RE: CONF: Carl Williams |
| | |
| **Sensitivity**: | Personal |

Thanks for the update Xavier, may you please set up a call with the HR person , his/her manager, Miki and myself as soon as possible, ideally today, have in mind that I will be out next week and driving tomorrow for a long period of time. Best.

---

**From:** Puvilland, Xavier SLUBE-DIU <Xavier.Puvilland@shell.com>
**Sent:** Thursday, March 5, 2020 12:03 AM
**To:** Guerrero Herrera, Jesus E SLUBE-DIU <J.GuerreroHerrera@shell.com>; Wilson, Miki R SLUBE-HRD/A <Miki.Wilson@shell.com>
**Subject:** CONF: Carl Williams
**Importance:** High
**Sensitivity:** Personal

Jesus, Miki,

Following our previous discussions on this topic, I had another call with HR Services today. I'm trying to make a long story short here, and will provide more details if you need them, but their original recommendation was a verbal warning which I challenged for many reasons. After reviewing again the documentation provided and a week of internal debates, I had another call today with them and their recommendation would now be a written warning, giving him 30 days to improve performance before we move to disciplinary actions. I'm unclear about what those would be and I'm waiting for the written confirmation and details, which I requested today but did not get yet.

The basis for their recommendation is that I did not formally state in the different discussions with the employee that if he failed to improve this would lead to disciplinary actions, up to dismissal, even though they fully acknowledge the amount of coaching already provided and the various incidents, all of this having been heavily documented. According to them this extra step would reduce the risk of litigation/arbitration, and another incident would make our case stronger.

I'm not supportive of this for several reasons, which I'll be happy to explain more in details during a short call if required, but in summary the litigation risk is real and the more we wait the biggest our exposure grows:
- given the amount of coaching and efforts already provided, I don't foresee any improvement or why we would get to a different outcome by repeating what has been done for over three months already
- we are basically consciously opening the ground for more incidents and potential harm to the business
- I had a call last night with Carl and he started bouncing the idea that the reaction of the O'Rourke sales manager (Scott Field) might be due to racial biases, even though after a pretty lengthy discussion he recognized he had no proof or any indication of that from the previous interactions with him (since last summer)

I informed HR Services (Krista Encarnacion who's dealing with this case) that I was not supportive of this recommendation as I believe that in this specific case, following it would just increase our exposure and the risk of litigation while the employee is on our payroll. I requested their recommendation in written so that I could escalate it to you both and agree the best way forward, before potentially organizing a call between us, Kristia and her line manager. She was OK with this approach.

Happy to get any guidance. My schedule is a bit of challenge at the moment but I'll do my best to make myself available for a call if needed. I'll also forward their written recommendation as soon as I get it.

Thanks in advance for your help,

**P-021**

**Xavier PUVILLAND**
Indirect Business Development Lead - US

**Tel:** +1 832 762 2452
**Mob:** +1 281 716 0792
**Email:** xavier.puvilland@shell.com
**Internet:** http://www.shell.com

<div style="text-align:center">

**P-022**

</div>

CONFIDENTIAL                                              Equilon _000831

| Message | |
|---|---|
| **From**: | Encarnacion, Kristia P SSSCMLA-HRR/VAU [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A09FB659A2A24AB1AA6C5CE2B1430B45-PHKEN6] |
| **Sent**: | 3/4/2020 2:26:08 PM |
| **To**: | Puvilland, Xavier SLUBE-DIU [xavier.puvilland@shell.com] |
| **Subject**: | RE: Case 02625622 - Managing Underperformance - Carl Williams |

Hi Xavier,

I got an update already. I'll send you a calendar invite but also feel free to let me know your most available time. If you are online and are free to talk, feel free to ping me also.

Thank you!


Regards,

*Kristia Encarnacion*
HR Advisor | US Operations – DS Commercial/Global Functions

**From:** Puvilland, Xavier SLUBE-DIU <Xavier.Puvilland@shell.com>
**Sent:** Wednesday, March 4, 2020 10:30 AM
**To:** Encarnacion, Kristia P SSSCMLA-HRR/VAU <Kristia.Encarnacion@shell.com>
**Subject:** RE: Case 02625622 - Managing Underperformance - Carl Williams

Hi Kristia,

Thanks. What is the timeline you're looking at please?

Best regards,

Xavier.

**From:** Encarnacion, Kristia P SSSCMLA-HRR/VAU <Kristia.Encarnacion@shell.com>
**Sent:** Wednesday, March 4, 2020 7:28 AM
**To:** Puvilland, Xavier SLUBE-DIU <Xavier.Puvilland@shell.com>
**Subject:** RE: Case 02625622 - Managing Underperformance - Carl Williams

Hi Xavier,

Thanks for dropping an email. Yes, will get back to you as soon as possible as we're just getting a couple of touchpoints regarding this case within HR. I'll send another email for an update.

Thank you!


Regards,

*Kristia Encarnacion*
HR Advisor | US Operations – DS Commercial/Global Functions

**From:** Puvilland, Xavier SLUBE-DIU <Xavier.Puvilland@shell.com>
**Sent:** Tuesday, March 3, 2020 9:16 PM
**To:** Encarnacion, Kristia P SSSCMLA-HRR/VAU <Kristia.Encarnacion@shell.com>

## P-023

Equilon _000844

**Subject:** Case 02625622 - Managing Underperformance - Carl Williams
**Importance:** High

Kristia,

I was hoping to hear back from you today as discussed, I understand you have procedures to follow but unfortunately I can't wait for weeks for support.

I had another weekly coaching session with Carl Williams today (see below), showing no improvement and more gaps in execution.

This situation is putting the business at great risk and our exposure keeps growing, this is not acceptable from my perspective and I'm carrying this responsibility at the moment. Therefore I'll be escalating this matter to my GM and our HRAM tomorrow if I can't get a clear path to a quick dismissal as requested to mitigate this exposure we're having now.

I have a very heavy travel schedule for the next days/weeks but will do my best to be available for a follow-up call.

Thanks in advance for your very quick help,

Xavier.

---

**From:** Puvilland, Xavier SLUBE-DIU
**Sent:** Tuesday, March 3, 2020 8:27 PM
**To:** Williams, Carl O SLUBE-DIU <Carl.O.Williams@shell.com>
**Subject:** WILO 3/3/20

Carl,

Following our discussion this morning, some of my notes below:

- Out of the two visits cancellations last week, Genesis Marine is to be rescheduled as he was out of town. Other one is stopped for now.
- SalesForce is now fully up to date.
- For the three wins reported for February separately, there was no direct involvement. Volumes and margins haven't been checked (and should have been before reporting). Won't be accrued for until this is fully confirmed.
- This week riding in Dallas with RD reps – received good POPSAs ahead.
- Following on vacation.
- Agreed to have longer session on March 16th F2F in WCK (2 hours, already in calendars)

Thanks,

Xavier.

**P-024**

Equilon _000845

Message
| | |
|---|---|
| **From**: | Puvilland, Xavier SLUBE-DIU [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C7F7A3AE9FB04F988567BDA20664E08D-FRXPU0] |
| **Sent**: | 1/28/2020 6:05:01 PM |
| **To**: | Williams, Carl O SLUBE-DIU [carl.o.williams@shell.com] |
| **Subject**: | RE: EYR Comments |

Carl,

I had a look and made some additional tweaks based on your input, please see below (kind of a mix of both really).

Carl joined Shell in February and started his onboarding process until he started working with his assigned distributors in June. Carl gained about 125k gallons of new business that was delivered through his distributors during the second half of 2019. The overall volume Carl delivered in 2019 was small, but this was partially due to his short tenure in his role; there is however room for improvement in terms of pipeline management, planning and follow-up on actions. For 2020, Carl understands that he needs to quickly demonstrate improvement in those areas and build more trust with his aligned Janus distributors. He needs to develop and execute his market strategy while keeping his sales pipeline in Salesforce up-to-date. Carl's execution in the aforementioned areas, will demonstrate his progress and will help him achieve his 2020 targets.

I'll load into HR online at the same time I close your 2019 GPA.

Thanks,

Xavier.

**From:** Williams, Carl O SLUBE-DIU <Carl.O.Williams@shell.com>
**Sent:** Saturday, January 25, 2020 2:15 PM
**To:** Puvilland, Xavier SLUBE-DIU <Xavier.Puvilland@shell.com>
**Subject:** RE: EYR Comments

Xavier, I made a few tweaks to your comments and pasted it below. May I load the following in HR online so that we can close my 2019 GPA?

Carl joined Shell in February and started his onboarding process until he started working with his assigned distributors in June. Carl gained about 125k gallons of new business that was delivered through his distributors during the second half of 2019. The overall volume Carl delivered in 2019 was small, but this was due to his short tenure in his role. For 2020, Carl understands that he needs to continue to demonstrate improvement in the following areas: pipeline management, IVMS performance, and building more trust with his aligned Janus distributors. He needs to develop and execute his market strategy while keeping his sales pipeline in Salesforce up-to-date. Carl's execution in the aforementioned areas, will demonstrate his progress and will help him achieve his 2020 targets.

All the Best,

Carl O. Williams, Jr.
**Industrial Business Development Manager**
**Shell Lubricants**
Cell: 281-781-6096
Email: Carl.O.Williams@shell.com
Why choose Shell? Learn more

**P-025**

CONFIDENTIAL

Equilon _001189



**From:** Puvilland, Xavier SLUBE-DIU <Xavier.Puvilland@shell.com>
**Sent:** Thursday, January 23, 2020 2:53 PM
**To:** Williams, Carl O SLUBE-DIU <Carl.O.Williams@shell.com>
**Subject:** EYR Comments

Carl,

Following our discussion, please find below my write up for your 2019 performance. Let me know if you have any further comments, if not please load it in HR online (if you just copy/paste, you need to use the keyboard shortcut CTRL+V when doing so in the new version of the system…) so that we can close your 2019 GPA.

Carl joined Shell in February and started working with his assigned distributors in June. Those first few months did not yield strong results yet, with about 125k gallons of new businesses delivered through his distributors during this period. This is partially explained by fairly long cycle times in the industrial space Carl is looking after, but there is a significant room for improvement in terms of pipeline management, planning and follow-up on actions. His HSSE performance (IVMS reporting) has improved at the end of the year and this improvement trend has to be sustained going forward. Carl should be able to improve his delivery next year by also building more trust with his assigned distributors, to get more involvement and traction from their sales reps (Midtex in particular). He needs to build a robust pipeline with his distributors and be more focused in its execution to achieve a step change in 2020.

Thanks,

Xavier.

**P-026**

CONFIDENTIAL

Message

| | |
|---|---|
| **From**: | Williams, Carl O SLUBE-DIU [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=3D5E686A8B3B4534820982041B9D5431-USCWM5] |
| **Sent**: | 2/19/2020 11:20:56 PM |
| **To**: | Puvilland, Xavier SLUBE-DIU [xavier.puvilland@shell.com] |
| **Subject**: | FYI // O'Rourke Contingency Plan |
| **Attachments**: | O'Rourke Contingency Analysis_2_19_2020.pptx |

**Importance**:   High

Hello Xavier,

Please review the attached presentation which contains my comments on my analysis and experiences working with all of the O'Rourke Industry reps, the distribution volume/c3 contributions with and without O'Rourke, and my current activities with them.

All in all, it seems like that sale manager Scott Fields had a knee jerk reaction to some of the questions I raise during our lunch meeting. On our pipeline call on Monday, he commended me for the good work I'm doing and look forward to my continued support. On the next day, Tuesday, he was upset about two questions that I asked during our lunch and obviously complained to his boss who complained to John. On Wednesday, he accepted my calendar invitation for the meetings that I set up for us during the week of February 25th.

I'm not sure really what his intentions were when he complained to his boss. It's disappointing that he did not speak to me directly about it and let along Jarret. We are really in a situation where we both need to restore our relationship and work together for our mutual success.

Regarding the meetings that I set up during the week of February, I plan to continue those meetings without O'Rourke. I can re-engage O'Rourke if necessary later or another distributor depending on you and John's decision on my future support and interaction with O'Rourke.

I look forward to our discussion Friday.

Let me know if I missed or need to add anything in the deck attached.

**All the Best,**

**Carl O. Williams, Jr.**
**Industrial Business Development Manager**
**Shell Lubricants**
**Cell: 281-781-6096**
**Email: Carl.O.Williams@shell.com**
**Why choose Shell? Learn more**



**P-027**

Carl has achieved the following results after 9 months of working with Shell starting in February and 5 months of working with his distributors starting in June of 2019. The business performance data below were delivered from Jan to Sept 2019.

Business Delivery Goal No. 1

Total Volume Target = 1.688 MM Gallons.

Currently at 93% of plan at 1.381MM gallons.

Closed on 7 new accounts delivering 86K gallons within four months by collaborating effectively with distributors and taking the initiative to lead sales calls. Currently have 280K gals of business in the negotiating stage of the sales pipeline.

Business Delivery Goal No. 2

Total Premium C3 Target = $.811MM

Currently at 256% of plan at $1.563MM. This was achieved by taking personal ownership in identifying and prioritizing new opportunities with distributors.

Business Delivery Goal No. 3

Total C3 Delivery Target = $7.259MM

Currently at 103% of plan at $5.986MM. Exhibited exceptional performance strength by contributing through others and helping DSRs improve their competencies through training and leading by example.

Business Delivery Goal No. 4

Create and maintain a robust sales pipeline

After starting from scratch with no previous sales pipeline in place from his predecessor, Carl has worked arduously and have taken personal ownership to identify prospects for all 3 of his distributors. His diligence and performance driven focus positions him to continue to generate new business and demonstrate value to his distributors.

**P-028**

CONFIDENTIAL

Business Delivery Goal No. 5

Sales executions through site assessments

Carl has conducted 7 site assessment thus far with a goal to complete 10 by YE. His willingness to grow and collaborate effectively with his distributor sales reps continue to demonstrate his capabilities and the value Shell can delivered to customers.


Foundation Goal No. 1

HSSE - Goal Zero

0 MVI, 0 LTIs, 0 TRCs

Carl embraces executing safely as demonstrated by always ensuring that he and his DSRs and TAs have proper PPE while on sales calls. He also showed continuous improvement driving safely in many areas captured on the weekly in-vehicle monitoring system.


Foundation Goal No. 2

Continuous Learning

Completed all industry trainings in the Distributor Academy and Lube Coach Academy. Carl took the MLT1 certification test and is awaiting results.


Foundation Goal No. 3

Distributor Engagement

Conducted monthly distributor call with ICAMs.

Performed industry product training, promoted the use of POPSAs, discovery sheets and site assessments

**P-029**

CONFIDENTIAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

CARL O. WILLIAMS,                    )
                                     )
          Plaintiff,                 )
                                     )
VS.                                  ) NO. 4:20-cv-04295
                                     )
SHELL OIL COMPANY,                   )
                                     )
          Defendant.                 )
                                     )
                                     )
                                     )

ZOOM AND VIDEOTAPED DEPOSITION OF

CARL O. WILLIAMS, JR.

FRIDAY, OCTOBER 29, 2021

VOLUME 1

-----------------------------------

ZOOM AND VIDEOTAPED DEPOSITION OF
CARL O. WILLIAMS, JR., produced as a witness at the
instance of the DEFENDANT, and duly sworn, was taken
in the above-styled and numbered cause on Friday,
October 29, 2021, from 10:25 a.m. to 4:33 p.m., via Zoom
before Wendy S. Schreiber, CSR No. 9383, in and for the
State of Texas, reported by machine shorthand, at the
address of 5201 Memorial Drive, Apartment 310, Houston,
Texas, 77007, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.  Job No. 760688



```
 1                      APPEARANCES
 2    FOR THE PLAINTIFF:
 3         EDDIE HODGES, JR., ESQ. (Appearing Remotely)
           KENNARD LAW, P.C
 4         5120 Woodway Drive
           Suite 10010
 5         Houston, Texas 77056
           Phone: (210) 888-1393
 6         eddie.hodges@kennardlaw.com
 7
      FOR THE DEFENDANT:
 8
           KINDALL C. JAMES, ESQ.  (Appearing Remotely)
 9         LISKOW & LEWIS
           1001 Fannin, Suite 1800
10         Houston, Texas 77002
           Telephone: (713) 651-2945
11         Facsimile: (713) 651-2908
           KJames@liskow.com
12
13    Video Operator - Nate Laningham  (Appearing Remotely)
14    Also present:  Stephanie Jackson (Appearing Remotely)
15
16
17
18
19
20
21
22
23
24
25
```



Page 3

1                          INDEX

2

3

   CARL O. WILLIAMS, JR.                          PAGE
4

   Examination by Ms. James                          5
5

   Reporter's Certificate                          163
6

7                        EXHIBITS

8    NO.           DESCRIPTION                    PAGE

9    Exhibit 1     Resume                           55

10   Exhibit 2     Charge of Discrimination         84

11   Exhibit 3     Plaintiff's Responses to Defendant's   87
                   First Set of Interrogatories and
12                 Requests for Production of Documents
                   to Plaintiff

13

14

15              REQUESTED DOCUMENTS/INFORMATION

16
                            NONE
17

18                 CERTIFIED QUESTIONS

19                          NONE

20

21

22

23

24

25



```
 1                VIDEO OPERATOR:  We are now on the
 2   record.  This begins media file No. 1 in the deposition
 3   of Carl Williams in the matter of Carl Williams versus
 4   Shell Oil Company in the United States District Court,
 5   Southern District of Texas, Houston Division, Civil
 6   Action No. 4:20-cv-04295.
 7                Today is Friday, October 29th, 2021, and
 8   the time is 10:33 a.m.  This deposition is being taken
 9   remotely at the request of Liskow & Lewis.  The
10   videographer is Nate Laningham of Magna Legal Services
11   and the court reporter is Wendy Schreiber.
12                Will counsel and all parties present
13   please state their appearances and whom they represent.
14                MR. HODGES:  Eddie Hodges, Jr., on behalf
15   of Mr. Carl Williams, plaintiff.
16                MS. JAMES:  Kindall James on behalf of
17   defendants, Shell and Equilon.
18                THE REPORTER:  And how about Ms. Jackson?
19                MS. JACKSON: Yes, I'm in-house counsel for
20   Shell.
21                THE REPORTER:  Sir, can I get you to raise
22   your right hand for me, please?  Mr. Williams?
23                Do you solemnly swear or affirm that you
24   are CARL O. WILLIAMS, JR. and that the testimony you are
25   about to give shall be the truth, the whole truth and
```



Page 5

1   nothing but the truth, so help you God?

2                  THE WITNESS:  I do.

3

4                  CARL O. WILLIAMS, JR.,

5   having been first duly sworn, testified as follows:

6

7                  THE REPORTER:  Thank you.  My name is

8   Wendy Schreiber, Texas CSR No. 9383.  I am reporting the

9   deposition remotely by stenographic means from Burleson,

10  Texas.  The witness is located in 5201 Memorial Drive,

11  Apartment 310, in Houston, Texas.

12                  You may begin.

13

14                       EXAMINATION

15      Q.  (BY MS. JAMES) Mr. Williams, good morning.  As

16  I mentioned earlier, my name is Kindall James.  I'm the

17  attorney for the defendants in the lawsuit that you

18  filed in connection with the termination of your

19  employment.

20                  If you would, would you please state your

21  name for the record?

22      A.  Yes, Carl Orlando Williams, Jr.

23      Q.  What is your address, Mr. Williams?

24      A.  5201 Memorial Drive, apartment 310, Houston,

25  Texas, 77007.



Page 6

1      Q.  I'm trying to turn my volume up so I can hear
2  you a little bit better.
3                  Are you currently employed?
4      A.  Yes.
5      Q.  Who is your employer?
6      A.  Nouryon Pulp and Performance Chemicals.
7      Q.  What do you do for that company?
8      A.  I am an account manager.
9      Q.  How long have you been an account manager for
10 Nouryon you said?
11     A.  Yes, Nouryon, that's correct.  I started
12 January 18th, Martin Luther King's birthday.
13     Q.  Okay.  Have you ever given a deposition before?
14     A.  No, ma'am, this is my first time.
15     Q.  So I'll just -- I'm sure that Mr. Hodges talked
16 to you a little bit about the way this process works but
17 I'll just cover a few ground rules just to make sure
18 that we're both on the same page.
19                  So that you understand, you met the court
20 reporter.  Your testimony is going to be transcribed by
21 the court reporter which means she'll make a transcript
22 of every question that I ask and then all of the
23 responses that you give.  Since she is making a
24 transcript of my questions and your answers, it's
25 important that we allow each other to finish speaking



1   before the other one starts to speak.  So if you would

2   just allow me to completely finish asking my question

3   before you give your response, I would appreciate it and

4   so would the court reporter and I will try to do the

5   same thing.  I will try to let you finish answering the

6   question and finish speaking before I ask my next

7   question.  It's a little bit different from normal

8   conversations because usually in normal conversations we

9   kind of anticipate where the other person is going and

10  we want to jump in to speed things along but because

11  this is -- this conversation is being transcribed, it's

12  important that we be a little bit more formal and let

13  each other finish speaking before we begin speaking.

14            Now, you do understand that even though

15  we're on Zoom and we're at home you're under oath today.

16  Do you understand that?

17       A.   Yes, ma'am.

18       Q.   Okay.  So it's just like you're testifying in a

19  courtroom in front of a judge.  You've raised your right

20  hand and sworn to tell the truth and give honest and

21  complete answers to my questions.

22            And you understand that the transcript of

23  your testimony that the court reporter creates today may

24  be used at a trial or as an exhibit in a court pleading?

25  Do you understand that?



Page 8

```
 1          A.  Yes, I do.
 2          Q.  Okay.  Now, if you do not understand a
 3    question, please be sure to ask me to -- or let me know
 4    that you don't understand it so that I can rephrase it
 5    or state it in a different way to make sure that you
 6    understand it and know what you are answering.  Would
 7    you do that?
 8          A.  Yes, I will.
 9          Q.  Okay.  Are you on any medication today?
10          A.  I -- I take a daily medication.
11          Q.  Okay.  What kind of medication?
12          A.  I take, what is it, about 10 milligrams of
13    Lexapro.
14          Q.  Okay.  Anything else?
15          A.  Yes.  I take 100 milligrams of Lamotrigine.
16          Q.  And did you take those medications this
17    morning?
18          A.  Yes.
19          Q.  Any other medications that you're on this
20    morning?
21          A.  No, not at all.
22          Q.  Okay.  And you just took the regular prescribed
23    dose of those medications?
24          A.  Yes.
25          Q.  Okay.  I just have to make sure that, you know,
```



1   there's -- you're not on any kind of medication that

2   might affect your ability to answer my questions

3   truthfully.

4        A.  Okay.

5        Q.  So are you?

6        A.  I'm sorry?

7        Q.  Are you on any kind of medications that might

8   impact your ability to understand my questions and

9   answer them honestly and completely?

10       A.  No, not at all.

11       Q.  Okay.  Is there any other reason that you can

12  think of that would prevent you from understanding my

13  questions and answering them honestly and completely?

14       A.  Not at all.

15       Q.  Okay.  And you said you've never given a

16  deposition before?

17       A.  That's correct.

18       Q.  Okay.  Have you ever been involved in any other

19  lawsuits?

20       A.  No.

21       Q.  No other lawsuits?

22       A.  No, not -- not where I could give a deposition

23  or anything.

24       Q.  What about one where you did not have to give a

25  deposition?



Page 10

```
 1        A.  I mean, I had a divorce but other than that, I
 2   have a separate pending case with a car accident but
 3   that's -- that's it.  There's been no actual taken.
 4        Q.  The separate case pending related to a car
 5   accident, is that a case that you filed where you got
 6   injured as a result of a vehicle accident?
 7        A.  Yeah, it was dual.
 8        Q.  I'm sorry?
 9        A.  It was dual.  On both ends.
10        Q.  Okay.  So both parties to the accident filed
11   suit?
12        A.  For that one the driver filed and then I filed
13   in response to my insurance.
14        Q.  I'm sorry?
15        A.  The driver had filed first and in response I
16   filed with my insurance.
17        Q.  Okay.
18        A.  Can you hear me okay?
19        Q.  Yeah, I can.  I guess I'm a little bit confused
20   about your response.  So you said you have a separate
21   pending case that's filed.  Were you the passenger in
22   the car when there was an accident?
23        A.  No, I was a driver.
24        Q.  Okay.  Because I thought you said the driver
25   filed first and then I filed my claim?
```



Page 11

```
 1        A.  Of the opposing vehicle that was involved in
 2   the accident, yes.
 3        Q.  Okay.  And do you have -- have you filed a
 4   claim in -- in that lawsuit or are you just the
 5   defendant defending against the claim?
 6        A.  I filed a claim as well through my insurance.
 7        Q.  Okay.  Is that the only other litigation other
 8   than your divorce and the accident related to -- I'm
 9   sorry, the action related to the car accident?  Are you
10   involved in any other legal proceeding?
11        A.  Last year I had a case with the -- shortly
12   after I had been terminated from Shell would be
13   Montgomery County.  I was charged for resisting arrest
14   and that was in relationship to the car accident.
15        Q.  Okay.  Is that relates -- so that's related to
16   the civil lawsuit that's currently pending for the
17   vehicular accident you were involved in?
18        A.  Yes.
19        Q.  When was that accident?
20        A.  It was -- what was it?  -- May -- I think May
21   16th of 2020.
22        Q.  May 16th or May 17th of 2020 was the date of
23   the accident?
24        A.  That's correct.
25        Q.  Okay.  And then you said in connection with the
```



Page 12

1   accident you were -- there was a criminal action against

2   you for resisting arrest?

3        A.   Yes.

4        Q.   What happened -- what happened there?

5        A.   It was -- it was an extremely-scary event, one

6   of the scariest events of my life.  I mean, I've never

7   been involved in any infraction with law enforcement

8   before.  I was shaken by the incident itself.  I mean,

9   as I was driving, it was dark, it was raining.  I was on

10  I-45 heading south near The Woodlands, you know, not too

11  far from Conroe and as I was driving in my lane, a FedEx

12  truck kind of right beside me, you know, sideswiped my

13  vehicle.  So we both pulled over and, you know, we

14  called the police.  Kind of do the incident response.

15  It was like in Montgomery County.  An officer that

16  appeared on the scene and, you know, he asked the driver

17  and I to go back to our vehicles and get our license and

18  registration.  It was on the side of the highway.  I

19  couldn't quite hear him like the first time he said it

20  and then the second time, you know, after he said it

21  again I understood what he said so when I started

22  walking towards my vehicle he asked me to -- when I took

23  about ten feet or so he asked me to come back and I said

24  okay and then he told me to turn around and I -- it got

25  very scarey from there.  Before I knew it he had cuffed



Page 13

```
 1   me.  I was thrown on the ground and it was just a very
 2   traumatic experience.
 3        Q.  I'm sorry that happened to you.  It sounds
 4   like -- you know, I'm looking at you when you said that
 5   resisting arrest, it was like, you know, it shocks me.
 6   I'm sorry that happened to you.  It sounds like it -- go
 7   ahead.
 8        A.  I'm sorry, that was the charge that it was
 9   reduced to.  They wanted to charge me assaulting a
10   public servant.
11        Q.  Okay.
12        A.  And I had a lawyer and so forth and we -- we
13   had it reduced because it was Montgomery County, they do
14   things different up there, so we were just able to get
15   it reduced to arrest -- resisting arrest.
16        Q.  Okay.  Okay.  Any other legal proceedings other
17   than the legal proceedings that you just mentioned
18   related to your divorce, the car accident and the crazy
19   situation that you just told me about?
20        A.  I'm sorry, it's been tough with all these legal
21   proceedings but -- but, no.  No, ma'am.  I mean, 2020
22   was a rough year for me.  To get terminated from my job,
23   the car accident, and the police, oh, my god, the
24   pandemic, I couldn't get a job.
25        Q.  Yeah, I understand.  You know, 2020 -- I mean,
```



Page 14

1   I think maybe you've got one on me but 2020 was hard for

2   me, too.

3                So what did you do, Mr. Williams, to get

4   ready for your deposition today?

5        A.   So, you know, I looked at the -- you know, the

6   evidence and things that I provided that -- that

7   supports my case and - and my racial discrimination and

8   wrongful termination so -- so I just reviewed all the

9   facts and things that I reported to my attorneys, you

10  know, to call the witnesses, my references and, you

11  know, there was just this 1,400-page document that was

12  submitted, you know, from Shell and you guys on -- it

13  contained e-mails and some other things I guess from

14  your side justifying why you guys thought I should have

15  been terminated.

16       Q.   Okay.  I have a couple follow-up questions and

17  I'm going to come back to the 1,400-page document that

18  you just mentioned.  I'm not sure I know exactly what

19  that is but we'll get into that.  But I think I heard

20  you say that you've reviewed -- to get ready for your

21  deposition you reviewed some of the evidence that

22  supports your claim and -- and I'd like to know

23  specifically what documents you actually reviewed.  I

24  think you mentioned a chronology of events or something

25  of that nature and then just generally evidence that



Page 15

1    supports your claim.  Can you give me more details about
2    those documents that you reviewed that you believe
3    supports your claim?
4         A.  Yes.  I -- I had submitted to my attorneys a
5    spreadsheet that I put together chronologing what was my
6    experience at Shell, you know, from my start date to the
7    first questionable incident to my day of, you know,
8    wrongful termination so that was a document that I
9    reviewed and then I reviewed like -- I made some notes
10   on, you know, witnesses, those that could advocate on
11   behalf of my performance, on the caliber of my work, my
12   experience as an employee, those who knew me at Shell
13   and those who also had transitioned to Shell with
14   ExxonMobil so people who have long tenure because I had
15   only been with Shell since January -- January 28th of
16   2020 up until termination date was May 16th so that's
17   about 14 months.
18        Q.  Okay.  All right.  Any other -- so anything
19   else that you reviewed other than a chronology?  And I
20   know that you said before a 1,400-page document earlier
21   and, again, I'll -- I'm going to ask you about that but
22   other than the chronology and the notes on witnesses
23   that you mentioned, did you review anything else as far
24   as documents that you believe support your claim?
25        A.  Other than reviewing our demand letter that was



Page 16

1    it.

2         Q.  When you say "demand letter," are you talking

3    about the -- the lawsuit itself or something else?

4         A.  Yes, the lawsuit itself.

5         Q.  Okay.  The petition, jury demand and request

6    for disclosure that was filed with the Court?

7         A.  Yes.  There was that -- I hope I'm not confused

8    but there was (audio distortion) and then there was also

9    a demand letter.

10        Q.  Okay, a demand letter addressed to Shell?

11        A.  Yes.

12        Q.  Okay.  That your attorney wrote?

13        A.  Correct.

14        Q.  Okay.  And then you said the petition as well?

15   The lawsuit that was filed?

16        A.  Yes, that's correct.

17        Q.  And you kind of broke up when you were

18   explaining this last set of documents related to the

19   demand letter.  Is there anything in this last category

20   of documents, you know, other than the demand letter and

21   the lawsuit filed?

22        A.  You said is there any what?

23        Q.  Did you mention that there were -- there were

24   any other documents that you reviewed -- let me just

25   take this for what we talked about so far with respect



Page 17

1    to documents that you believe support your claim that
2    you reviewed to get ready for the deposition today.  I
3    think -- so far you've mentioned the chronology of
4    events, the notes on the witnesses, a demand letter that
5    your attorney wrote to Shell and the lawsuit that was
6    filed.
7           A.  Yes.
8           Q.  Okay.  Is that -- is that the totality of -- of
9    the documents you've reviewed that you believe support
10   your claim?
11          A.  From what I recall, yes.
12          Q.  Now, you earlier -- the chronology that you
13   mentioned, Mr. Williams, when did you put that together?
14          A.  It was when I retained my attorney so that
15   would have been in the latter part of March of last
16   year.
17          Q.  And why did you prepare the chronology?
18          A.  I wanted to, you know, chronolyze the series of
19   events that upon my experience with Shell based on my
20   experiences and that led to my appalling -- you know,
21   just shocking termination.  And, you know, I decided to
22   retain legal counsel to support me because I knew that I
23   was racially discriminated and -- and --
24          Q.  I'm going -- I'm going to ask you questions
25   about your claim of racial discrimination later in the



Page 18

1   deposition.  So I'd like to go back to the chronology.

2   You said you prepared it when you initially retained

3   your attorney.  You did so -- you prepared it so that

4   you could chronolyze the series of events that led up to

5   the termination.  Another question I have, Mr. Williams,

6   is did you -- who did you provide the chronology to?

7        A.  At the time it was my attorney, Kevin Kinney.

8   Over the past year since I've retained an attorney I've

9   had a couple transitions of attorney.

10       Q.  And when did you -- when did you initially

11  retain an attorney?  When was that?

12       A.  I think I think it was the latter part of

13  March.  I was terminated on the 16th, it was like

14  Monday, and it was virtual -- my termination was

15  virtual.  I thought it was a meeting but it ended up

16  being a termination.

17       Q.  And it was -- you said your termination date

18  was March 16th of 2020; is that correct?

19       A.  That's correct.

20       Q.  And you said you retained an attorney sometime

21  after that, between that date and the last day of March

22  of 2020?

23       A.  Sure.

24       Q.  And the attorney you initially retained was

25  Kevin Kennedy; is that correct?



Page 19

```
 1        A.   That's correct.  As far as the Kennard Law Firm
 2   which my current attorney representing today is Attorney
 3   Eddie Hodges.
 4              THE REPORTER:  I'm sorry, this is the
 5   reporter speaking.  I'm getting a lot of feedback.  Can
 6   we go off the record for a minute?
 7              MS. JAMES:  Sure.
 8              VIDEO OPERATOR:  We are off video record.
 9   The time is 10:55 a.m.
10              (Recess taken from 10:55 a.m. to 11:01 a.m.)
11              VIDEO OPERATOR:  We're back on the video
12   record.  It's 11:01 a.m.
13        Q.   (BY MS. JAMES)  All right.  Mr. Williams,
14   before we took a break to sort out technical issues that
15   we were having we were talking about your retention of
16   an attorney.  You told me that it was in the latter part
17   of March of 2020 that you retained I believe you said
18   Kevin Kennedy but I believe you also said that
19   Mr. Kennedy was with the Kennard Law Firm; is that
20   correct?
21        A.   That's correct.
22        Q.   Okay.  Did anyone ask you to prepare the
23   chronology that you mentioned?
24        A.   Not that I could recall particularly.  I would
25   have to go back and look.  I mean, I knew that it was
```



Page 20

```
 1   going to help, you know, the attorney I was retaining
 2   understand the background so it was just really a part
 3   of the background of what happened, what transpired.
 4        Q.  And did you provide that to anyone other than
 5   Kevin Kennedy or any of the other attorneys at Kennard
 6   Law Firm?
 7        A.  I did not.  I don't recall.  This is all legal
 8   stuff.
 9        Q.  And then you also mentioned notes on witnesses.
10   Is -- is that correct?
11        A.  That's correct.
12        Q.  Okay.  And when you said "notes on witnesses,"
13   are you referring to notes that you made?
14        A.  Yes.
15        Q.  Okay.  When did you make notes on witnesses?
16        A.  So -- so to make sure I clarify, basically when
17   I listed my references, my advocates, you know, I listed
18   their title, their name, my relationship with them.  I
19   mean, it was -- that was kind of like the witness sheet
20   that I created.
21        Q.  Okay.  So you're referring to the witness
22   sheet.  Is that something that you created a long time
23   ago or just recently?
24        A.  No, a long time ago.  Pretty much everything I
25   composed regarding this case was, you know, March of
```



Page 21

1  last year when I retained the Kennard Law Firm to

2  represent me.

3      Q.  Okay.  So you prepared the -- the witness sheet

4  or your notes on witnesses around the same time that you

5  prepared the chronology?

6      A.  That's correct.

7      Q.  Did anyone ask you to prepare the notes on

8  witnesses?

9      A.  When -- when I read the information that they

10  needed on the background, it might have said that on

11  there.  I do not recall particularly.

12          MR. HODGES:  Objection:  attorney-client.

13  His communications that he's referring to relates to

14  communications from his attorney and that's

15  objectionable and it's privileged information.

16          But if it's not, then you can give that

17  information, Mr. Williams.

18      Q.  (BY MS. JAMES)  Go ahead, Mr. Williams.  So I

19  don't want to hear about any communications that you had

20  with Mr. Hodges, Mr. Kennedy or anyone at Kennard Law

21  Firm.  So when I'm asking questions, I'm not asking you

22  to tell me about any conversations you had with your

23  attorneys.

24      A.  Oh, okay.  I was confused because you asked me

25  who told me and I was just sharing that, you know, these



Page 22

1   are things when I was retaining my attorney that I

2   submitted documents to and, you know, the chronology.

3   So, you know, when retaining an attorney, you have to

4   provide the background, what's your purpose and so

5   forth.

6       Q.  Okay.  Did you provide your notes to anyone

7   other than your attorneys?

8       A.  Not that I recall.

9       Q.  And then earlier, Mr. Williams, you mentioned

10  reviewing a 1,400-page document.  Can you tell me what

11  that document was or describe that document for me?

12      A.  I think that the title of it was the Equilon

13  bates.  I don't recall even actually what that means but

14  it contained an extensive, you know, photographs of --

15  and copies and scans of e-mails, of my pay stubs, of,

16  you know, conversations between HR and my manager who

17  terminated me and the reasons he thought I was

18  terminated and our interactions via e-mail.  So e-mails

19  from other employees.  It was basically like -- I mean,

20  there was a huge database file containing a lot of the

21  digital communications with myself.

22      Q.  So it sounds like that is the information that

23  my clients produced in response to discovery requests

24  that were sent to us by your attorney.

25              Eddie, is that what -- is that what he's



Page 23

1   referring to?

2                    MR. HODGES:  Yes.

3                    MS. JAMES:  Okay.

4        Q.  Other than the 1,400-page document,

5   Mr. Williams, the chronology you mentioned, notes on

6   witnesses and the demand letter and your petition, did

7   you review anything else to get ready for your

8   deposition?

9        A.  I did not.

10       Q.  Besides reviewing the documents we've

11  discussed, did you do anything else to get ready for

12  your deposition?

13       A.  Other than exercise this morning and drink

14  coffee, no.

15       Q.  Okay.  Did you meet with your attorney?  And to

16  be clear, I don't want to know of the contents of any

17  conversations with your attorney but I -- but did you,

18  in fact, meet with your attorney?

19       A.  Yes, we did meet yesterday and one thing I did

20  forget to mention is that I had watched the witness

21  deposition video so I know what to expect and how to

22  conduct myself.

23       Q.  How -- and how long did you meet with your

24  attorney?

25       A.  It was under an hour.



Page 24

```
 1        Q.  Other than the video, the attorney meeting and
 2   the document that you reviewed, did you do anything else
 3   to get ready?
 4        A.  Not that I -- not that I can recall.
 5        Q.  Did you talk to anyone other than your
 6   attorneys to get ready for your deposition?
 7        A.  No.
 8        Q.  You said you're currently employed,
 9   Mr. Williams, at Nouryon; is that correct?
10        A.  That's correct.
11        Q.  And you said you were an account manager there?
12        A.  Yes.
13        Q.  What do you do as an account manager?
14        A.  So I do not just manage accounts but I pursue
15   new business similar to what I did with Shell and with
16   Exxon for the past more than a decade of my life.  But I
17   work in a division called Engineered Polymers and the
18   product is called Expancel and we service accounts that
19   deal with plastics and rubber, thermostats, adhesives,
20   glue, package things.  We have sectors.  And so when I
21   came on board, I -- I have probably about 16 accounts
22   that I support and I frequently have gone to conferences
23   and social work to gain new accounts to purchase our
24   products.
25        Q.  I think you said that you started working for
```



Page 25

1    Nouryon on January 18th of this year?

2         A.  That's correct.

3         Q.  Prior to your employment with Nouryon who were

4    you employed with?

5         A.  It was Shell.

6         Q.  So is your position with Nouryon that began on

7    January 18th of this year, is that your -- your first

8    employment since being terminated from Shell last year

9    in March?

10        A.  That's correct.

11        Q.  And that's the first job you've had?

12        A.  That's correct.

13        Q.  Have you performed any other type of work

14   between your termination from Shell and your employment

15   with Nouryon?

16        A.  You know, aside from applying steadfastly for

17   jobs during that time period despite the hiring freezes

18   and the lockdowns and the pandemic, you know, I have an

19   extensive history of applying for jobs on LinkedIn and

20   Indeed.  In the meantime, you know, since things were

21   shut down I -- I -- I started an LLC called O. G. Sales

22   Solutions in which I attempted to do some sales

23   consulting and so forth.  I might have had like one or

24   two LinkedIn inquiries about people wanting to know

25   about the oil-and-gas industry kind of related to what



Page 26

1    my experience has been and I started doing some voice

2    acting through Fiber in which clients would pay me a

3    little bit.  I didn't make much but it kept me busy,

4    kept my mind focused on something during that tough time

5    just to kind of doing children audio books,

6    commercial-type stuff but it was all independent.

7        Q.  Okay.  So it was self -- self-employment,

8    consulting work and voice-acting projects?

9        A.  Yes, yes, extremely limited.  It probably

10   generated maybe $500 total of income but I mainly

11   survived, you know, through the Unemployment, through

12   those -- a couple of the, you know, Unemployment and I

13   had to, you know, rack up my credit cards.  I didn't

14   know how long the economy was going to be shut down.  It

15   was just a very stressful time.

16       Q.  Did you receive Unemployment between the time

17   you were terminated in March of 2020 until you became

18   employed with Nouryon?

19       A.  Yes.  Although my termination date was March

20   16th, I was paid for the next pay cycle until April 1st.

21       Q.  Okay.  When you say you were paid, you were

22   paid by Shell through April 1st of 2020?

23       A.  That's correct.

24       Q.  And then after that you applied for and

25   received Unemployment?


MAGNA
LEGAL SERVICES

```
1        A.   That's correct, as well as health insurance --
2   health, dental, you know, vision -- because as a
3   divorcee, I still have to take care of my ten-year-old
4   daughter and I'm still responsible legally for child
5   support for medical, dental and so forth.
6        Q.   How long did you receive Unemployment benefits?
7        A.   From the time April 1st up until January 16th.
8        Q.   January 16th?
9        A.   I'm sorry, the 18th, Martin Luther King's
10  birthday.  That's what I can remember that's when I
11  started with Nouryon.
12       Q.   Okay.  And what was your monthly benefit that
13  you received?
14       A.   From Unemployment?
15       Q.   Yes, sir.
16       A.   It -- it varied because there were times when
17  the State -- when the federal government issued, you
18  know, the extra stimulus.  I'm really not prepared to
19  give the exact amount.  It varied though.  It really
20  depends on -- it depended upon, you know, if there was a
21  stimulus in the last couple of months and then it went
22  away and then Congress re approved it.
23       Q.   Okay.  What was the lowest amount that you
24  received?
25       A.   I think --
```



Page 28

```
 1        Q.  Look, you can give me -- I'm not going to hold
 2   you to a specific number, Mr. Williams.  I'm just
 3   looking for a ballpark here if you can just, you know,
 4   approximate.  And it sounds like it fluctuated and maybe
 5   the swings were big because of the stimulus so if you
 6   could just give me a ballpark of the lowest amount you
 7   received and the highest amount you ever received with
 8   the stimulus.
 9        A.  I mean, it would be easy for me to reference my
10   files but the lowest end, I mean, per month I think it
11   might have been --
12        Q.  And if it's easier for you to give it to me
13   like by the week or biweekly versus a month, then that's
14   fine, too.  Just clarify, you know, what you're telling
15   me and, you know, for what kind of period it's for.
16        A.  I think per month on the lowest end it was
17   somewhere between six to 800 or something like that.
18        Q.  Okay.
19        A.  And then when the stimulus, you know, kicked
20   in, it was about double.  I think it was -- what was it,
21   up to $1,600 or so or more.
22        Q.  Other than the Unemployment benefits and the
23   limited income that you were able to generate through
24   we'll call your side hustles -- the consulting work and
25   the voice-over work -- did you have any other income
```



Page 29

1    between March 16th of 2020 and when you started your

2    employment with Nouryon in 2021?

3          A.  No, ma'am.

4          Q.  And you mentioned about -- you mentioned

5    earlier that you're responsible for medical and dental

6    and you also mentioned child support.  Can you tell me a

7    little bit more about your financial responsibilities

8    on -- in that area?

9          A.  Yes.  My child support was $1,200 a month and

10   the dental, vision and so forth, what was it, I think

11   it's around $500 a month when I was employed.

12         Q.  And did you get the dental and vision benefits,

13   was that through Cobra?

14         A.  Initially it was.  I filed and then I got

15   Blue Cross/Blue Shield of Texas.  Or at least I

16   considered it Cobra.  But I mainly remember having

17   Blue Cross/Blue Shield of Texas.

18         Q.  So are you familiar with Cobra, like the

19   continuation of the benefits that you get from your

20   employer for a certain period of time after you're

21   terminated from employment, right?

22         A.  Yes, I am.  Yes, I am.  I'm looking to that

23   because I was still covered up until, what was that,

24   three the months or so post-termination.  There was a

25   period for me to find my own health coverage insurance



Page 30

1    but, you know, the rate was the standard market rate,

2    not the employee-Shell subsidized rate.

3        Q.  So you -- it sounds like -- my understanding of

4    what you're telling me is that you applied for the Cobra

5    benefits and got those and paid the premiums for

6    benefits through Cobra but then eventually went out and

7    found other health benefits on your own?

8        A.  That's not correct.

9        Q.  Okay.

10       A.  If I remember correctly, I price shopped around

11   for health insurance and health-insurance coverage and I

12   think the Cobra if I would go the same insurance through

13   Shell it was going to cost me -- it was like upper $800

14   or so.  It might have been in the thousands.  It was a

15   lot to maintain the insurance coverage that Shell

16   offered me which I was probably paying about maybe $150

17   a pay period.  So to go from $300, you know, with their

18   help, subsidies and so forth, to up to, I don't know, a

19   thousand or so so I had to shop around.  I considered

20   the -- I guess the government health supplemental

21   insurance, the Obamacare stuff.  I eventually ended up,

22   you know, going with Blue Cross/Blue Shield.  I just --

23   I just had faith, you know, despite the pandemic and the

24   lockdown and the companies not hiring I would just get a

25   job soon and, you know, it took, what, nine months.



Page 31

1        Q.   Okay.  So you did not -- you didn't end up
2   going through Cobra because you -- you said you thought
3   the premium was too high.  You actually went out and
4   purchased health insurance independently?
5        A.   That's correct.
6        Q.   Did you purchase any insurance other than
7   health insurance?
8        A.   I mean, I -- nothing extra.  I mean, I've
9   always had life insurance for myself and my daughter and
10  I do have the life insurance, you know, through Shell
11  because when you're an employee, you know, they -- it's
12  like two and a half times your salary and then there's a
13  rider for my child so...
14       Q.   Okay.  How much was your monthly benefit for
15  health insurance through Blue Cross/ Blue Shield that
16  you purchased and paid for while you were out of work?
17       A.   It was about $550, if I remember correctly,
18  somewhere in that range.  Very close to that.
19       Q.   And you said you always had life insurance
20  through Shell.  Following your termination -- go ahead.
21       A.   I'm sorry, I said Shell being an employee, even
22  when I worked at Exxon, they provide life insurance.
23  It's normally like two -- two times your salary and so
24  that was included but you're asking me about additional
25  expenses but I was saying I also maintain my own life



Page 32

```
 1    insurance for my daughter and myself.
 2        Q.  How long have you had your own life insurance
 3    policy?
 4        A.  It's been many years or perhaps maybe that's
 5    when I got married or so, I believe.
 6        Q.  And you continued to maintain your own separate
 7    life insurance policy while you were unemployed?
 8        A.  That's correct.
 9        Q.  And I'm sorry if I'm repeating this question, I
10    just can't remember whether or not I asked it.  The
11    Blue Cross/Blue Shield health insurance, is that the
12    only health benefit that you purchased during your
13    unemployment -- period of unemployment?
14        A.  From a health standpoint, yes.  It did include,
15    you know, medical, dental and vision.
16        Q.  Did you purchase any other types of benefits
17    during the period of unemployment?
18        A.  What would be some examples?
19        Q.  Vision.  I'm just -- you know, anything else
20    that you purchased to replace any type of benefit that
21    you had while you were employed with Shell?
22        A.  Yeah, it was just medical, vision and dental.
23        Q.  And it was all through Blue Cross/Blue Shield?
24        A.  Yes, I believe so.  I believe so.
25        Q.  And the entire -- the total premium for that
```



Page 33

1    per month was $550?

2         A.   Somewhere in that range.  I think it was 500,

3    550.  I think it was maybe 300 and something for me and

4    I think about 150 or so for my daughter.

5         Q.   Approximately?

6         A.   Yes, yes.

7         Q.   So let's talk about your employment with

8    Nouryon, Mr. Williams.  What is your current salary with

9    Nouryon?

10        A.   It's $125,000.

11        Q.   Annually?

12        A.   Yes.  I'm a salary employee.

13        Q.   And $125,000 is your base salary; is that

14   correct?

15        A.   That's correct.

16        Q.   Do you receive any bonuses or other types of

17   incentive compensation?

18        A.   There's no commission or anything, it's

19   strictly salary and then dependent on how my company

20   performs, my team, we may be eligible for a bonus.

21        Q.   Is it a discretionary bonus meaning it's up to

22   your employer as to whether or not they give it to you

23   at the end of the year?

24        A.   That's correct.  It's not automatic.

25        Q.   Do you have any benefits through Nouryon like



1    health benefits, vision benefits, anything like that?

2         A.   Absolutely.

3         Q.   What benefits do you have through Nouryon?

4         A.   I have dental, vision, medical along with their

5    life insurance for myself and my daughter.

6         Q.   What are your monthly premiums for each of

7    those benefits?

8         A.   I think they add up to somewhere about -- their

9    coverage is not as good as Shell and Exxon on what they

10   offer and so forth but -- but I have to pay a lot out of

11   pocket.  But I think on a monthly basis I think it's

12   somewhere like maybe around $160 for my daughter and I.

13        Q.   $160 per month?

14        A.   I believe so.

15        Q.   And you said that's for dental, vision and

16   medical for you and your daughter?

17        A.   I guess when I include all of them, it may be

18   $175 or lower.

19        Q.   $175?

20        A.   Or lower.  But I would have to rush with my pay

21   stubs.  Somewhere between $150, $175 for all three.

22        Q.   Do you pay for the life insurance that you

23   mentioned?

24        A.   I do for my daughter and for the one that I

25   have through the company it may be included as being an



Page 35

1    employee.  I would have to -- I would have to verify

2    that.

3        Q.  Did you have life insurance for your daughter

4    when you worked at Shell?

5        A.  Yes.

6        Q.  Did you have to pay for it?

7        A.  I believe so.  Normally for the child it's

8    normally like -- yes, it's normally like very, you know,

9    low but I do believe I did have it.  I try to make sure

10   I'm covered for myself and my princess.

11       Q.  Do you just have one child, Mr. Williams?

12       A.  That's correct.

13       Q.  Does she live with you?

14       A.  No, I'm the non-custodial parent and I get her

15   three weekends of the month and today is my day to get

16   her so I know she wants me to pick her up at 4:30 so if

17   I'm late it's because...

18       Q.  I'll do my best.  How old is your daughter?

19       A.  Next month her birthday is on November the 12th

20   and she'll be 11 years old.  In the fifth grade.

21       Q.  I have one similar.  I have a fifth grader.

22   He'll be 11 in December, December 15th.

23           So she lives with her mother and visits you

24   three times a month on the weekend?

25       A.  Yes.  I have like the non-custodial parent time



Page 36

1    of possession on weekends but in the summer, you know,

2    we exchange holidays.  It's all according to our divorce

3    decree.

4            Q.  Are you remarried, Mr. Williams?

5            A.  No, I'm not.

6            Q.  Do you live with anyone?

7            A.  I do not.

8            Q.  Is your wife -- is your ex-wife remarried?

9            A.  No, she's not.

10           Q.  Does your ex-wife work?

11           A.  From what I know she does but I have no idea

12   what she does.  I have no idea her source of employment.

13   Our divorce decree say I'm supposed to know that but

14   it's a mystery and I probably never will know unless I

15   go to court or something.

16           Q.  Okay.  I think I've got us all the way from

17   time of termination through employment with Nouryon.

18   I'd like to talk a little bit about your work history

19   prior to working for Shell.  So what -- I think you

20   mentioned ExxonMobil.

21           A.  That's correct.

22           Q.  When did you -- what period of time did you

23   work for Exxon?

24           A.  From, what was it, July of 2008 up until

25   November of 2018.  Slightly over ten years.



1      Q.   Mr. Williams, I'm sorry to just go off topic

2  for a second.  One question I forgot to ask you is when

3  did you get divorced?  I didn't get the date for that

4  when we were talking earlier.

5      A.   I got married January 10th, 2010.  I filed for

6  divorce like May of 2016 and it was signed off and

7  finalized in January of 2017.

8      Q.   So you filed for divorce May of 2016 and

9  finalized January of 2017?

10     A.   That's correct.

11     Q.   So I know I just jumped topics on you so back

12 to Exxon.  You said you were employed with Exxon July of

13 2008 through November of 2018?

14     A.   That's correct.

15     Q.   What was your position with Exxon?

16     A.   I've had numerous roles.  When they first hired

17 me as a graduate from Tuskegee University with a degree

18 of mechanical engineering, you know, magna cum laude,

19 graduated with a 3.65 GPA, I -- they hired me into a

20 technical sales role and I had to go through a technical

21 sales training in Sterling, Virginia.  It started that

22 summer and it ended around November, December of 2008

23 and it was very rigorous testing, field experience but

24 I -- I -- I passed the sales training program class and

25 they assigned me to south Florida and the title of my



Page 38

1   position was the automotive territory manager and I was

2   based out of Fort Lauderdale and Miami, Florida.

3        Q.   And you left -- you left Miami?

4        A.   Well, you know, Exxon -- the head office at the

5   time was in Sterling, Virginia and then, you know, they

6   relocated in The Woodlands/Spring, Texas and so my

7   advancement was limited.  Although I was in beautiful

8   south Florida working from home, you know, working from

9   home and I did very similar work that I did for Shell in

10  regards to working with distributors.  I did that for

11  seven years in which I would go and sell oil for my

12  distributors and direct car dealerships, at quick lubes,

13  at truck stops, fleets and I was very successful at it

14  for seven years.

15       Q.   And that's what you did for Exxon while you

16  were in Miami working as the territory -- is it

17  territory sales manager that you said?

18       A.   Yeah, automotive territory -- yes, that's

19  correct, automotive territory manager.

20       Q.   So that would have been from July of 2008 until

21  when?

22       A.   Until my wife and I -- we were married at the

23  time -- we moved here about July -- we moved to Spring,

24  Texas in about July of 2015.

25       Q.   Did you continue to work for Exxon?



1      A.  Yes, yes.  I transitioned from a sales role

2  B-to-B working with distributors and customers and I was

3  in a different role that's more marketing related to the

4  fuel side of the business because it was the lubricant

5  side that I did for seven years similar to what I did

6  for Shell.  They say, "Hey, we want to grow you and

7  expand you."  So they assigned me in a position called a

8  loyalty advisor for a loyalty program on the fuel side

9  of the business.

10     Q.  Okay.  You said -- you know, you mentioned

11  the -- I think you said B-to-B earlier.  I didn't know.

12  What does that acronym mean?

13     A.  Business to business.  I mean, like retail you

14  sell directly to consumers.  Like if I worked at a

15  Verizon store, you come in for a cell phone, I would

16  sell it to you.  But business to business means if you

17  own the Verizon store and I distribute cell phones, I

18  would come in and say, "Hey, will you sell my cell

19  phones?"  So...

20     Q.  Okay.

21     A.  That's B-to-B sales in which I -- I engaged

22  with the owners of car dealerships, large companies,

23  large dealer groups, parts and service directors, owners

24  of truck stops and I train mechanics on -- on how to

25  approach when people get their oil change we call it



Page 40

1    best selling -- I had extensive training.  One -- one

2    thing about Exxon is that they have a very formalized

3    onboarding, you know, where there's a program.  You're

4    doing -- it's very structured.  You know, you're doing

5    online training, you're learning products, you spend

6    some time in the field and, you know, that -- that was

7    one of the things that I did experience at Exxon versus

8    Shell.

9         Q.  Okay.  So you said there was -- there was less

10   training at Shell?

11        A.  Yes, there was no formal onboarding.  As a

12   matter of fact, the position that I took with Shell,

13   they had vacant for many months so it was definitely

14   pull yourself up by your boot straps and figure it out.

15   And it's significantly different between selling oil

16   that goes into automotive vehicles and commercial trucks

17   and the businesses that service those vehicles versus

18   going into a power plant, a gas compression,

19   construction site, injection molding, hydraulics.  So

20   much more heavy-duty industrial equipment and so I had

21   to learn all of that on my own.  You know, I -- my

22   supervisor, he had me a couple people who were

23   experienced to do some field rides with.  You know, I

24   even took the opportunity initially to get my own

25   certification, machine lubrication technician just to



Page 41

1    understand because I've always had the commercial skills

2    with Exxon but I had to acquire the product knowledge

3    and understand the industry of industrial lubricants

4    versus automotive and commercial-vehicle lubricants.

5        Q.  Okay.  So when you were in Miami working for

6    Shell you worked --

7        A.  I'm sorry, that was Exxon.

8        Q.  I'm sorry, I just said Shell.  Sorry about

9    that.  Thank you for correcting me.

10             So when you were in Miami working for

11   Exxon, you said you were working with the lubricant side

12   of their business but it was commercial and automotive

13   versus what you were doing when you were working for

14   Shell lubricants which you explained was more

15   industrial?

16       A.  That's correct.

17       Q.  Okay.

18       A.  So much more technically focused.  It's the

19   difference between saying you put this oil in your car

20   and you can go this many miles versus a massive quarter

21   million dollar gas-compression machine that can run this

22   many operating hours if you put this fluid in there and

23   this preventative maintenance and doing site surveys.

24   It was much more technically oriented.

25       Q.  So the position with Shell lubricants was much



Page 42

1    more technically oriented because you were working with

2    industrial-type clients?

3        A.  That's correct, yes.  Just some examples would

4    be like places that process food.  You know, they have

5    equipment that do that.  Places that do packaging.  They

6    have heavy-duty equipment.  They have machines that

7    require lubricants and, you know, we have to do --

8    submit oil samples to monitor the equipment, the quality

9    of oil of the equipment, to see if there's any

10   indicators of metal shavings and contamination of water.

11   So we rely on software.  I had an assigned lubrication

12   engineer who would help me, you know, occasionally but

13   it was mainly, you know, me.  I had to be independent.

14   And one major difference is when I was with Exxon, I

15   worked with distributors helping them grow business

16   similar to what I did with Shell but I also had direct

17   customers, national accounts, OEMs, where I was

18   responsible for that business.  So I had both.  Do you

19   understand the difference?

20       Q.  So it sounds to me like you're saying that with

21   respect to some of the clients that you had when you

22   were working with Exxon lubricants there was a

23   distributor in between you and the end client, right?

24   Whereas with other clients they were your direct client.

25   Is that -- am I understanding that correctly?



Page 43

1    A.  Yes, that's correct.

2    Q.  Okay.  Now, when you were with Shell and you

3  had the industrial client, I think you said it was

4  different.  Was there always a distributor in between

5  you and the end client?

6    A.  Yes, because I was considered an indirect

7  business-development manager.  That was my title.

8  Indirect meaning everything I did to help Shell make

9  money it was through my distributor so I had to depend

10  upon my distributor to set up meetings.  You know, I was

11  mainly introducing them and I was representing Shell as

12  the expert and SME to help advance the sale but I did

13  not have direct relationship with the customers.

14    Q.  And then the end customers were the

15  industrial-type clients that you mentioned that, you

16  know, run plants, processing food or equipment that they

17  were the end client and between you two was the

18  distributor?

19    A.  That's correct.

20    Q.  Okay.  Okay, that's helpful for my

21  understanding.  So you said -- let's I guess go back to

22  your work history with Exxon.  So you've told me about

23  working for the lubricant part of Exxon in Miami and

24  then we started -- we started talking about when -- you

25  know, your job or your role when you moved to Spring,



Page 44

1    Texas to work for Exxon in July of 2015.  And I asked

2    the question about B-to-B and I think that's how we got

3    sidetracked.  So tell me what you did in your role.  I

4    think you said you were a loyalty adviser for Exxon when

5    you moved to Spring, Texas in 2015?

6          A.  That's correct.

7          Q.  What -- what did you do as a loyalty adviser?

8          A.  So I was considered the U.S. loyalty adviser

9    and my responsibilities was to help expand the launching

10   of a loyalty program called Plenti -- that's P-L-E-N-T-I

11   -- which is no longer around but essentially what it was

12   was a coalition loyalty program that American Express

13   administered that included several companies:

14   ExxonMobil, I think Rite-Aid, Macy's.  So the whole idea

15   is you get points at your Exxon gas station while

16   pumping oil or buying -- or buying merchandise at

17   Macy's.  You have multiple options on where to redeem

18   those points.  So I was responsible for creating

19   marketing programs.  This is more project

20   management-related work and marketing execution.  So I

21   created marketing campaigns and so forth to award

22   cashiers as they promote the loyalty program to

23   consumers and so the main objective was to increase the

24   loyalty of the consumers using our program.  And I led

25   several marketing campaigns to achieve that.



1  Additionally, during that timeframe Exxon did a -- a
2  re imaging of all of their Exxon-and-Mobil-branded gas
3  stations so I had to work with vendors that dealt with
4  site imaging for new signage that goes on the exterior
5  of the buildings, the pumps and even interior,
6  point-of-sale material.  It was -- so a totally
7  different line of work.  It was a growing and learning
8  assignment but I also -- I did well.
9       Q.  How long were you in that role, Mr. Williams?
10      A.  It was from, what, 2015 -- it was about -- it
11  was about -- it was about like a year and a half or so.
12  And then -- and then the next role that I was in was
13  considered a projects and process adviser which I
14  honestly didn't like.  It was more like helping the
15  business -- supporting the business with business
16  continuity plans, looking for ways to --
17      Q.  Were you still -- so you weren't a loyalty
18  adviser at that point?  Did your role change?
19      A.  Yes.  I was -- I changed to a -- I was assigned
20  a different role to a different team to a different
21  manager.  So with Exxon, you know, they tell you where
22  to work, what your next opportunity is.  There's no
23  internal job posting.  It's like, "Oh, you're going to
24  do this next."  And then if you say no, then, you know,
25  you could be out of a job or, you know, your career can



1    go downhill.  At Shell and other corporations, you have
2    more control of your career.  Where there's an internal
3    job posting, you know, you can have a career doing what
4    you want and enjoy it and self-navigate.  So -- so the
5    different roles at Exxon were not those that I applied
6    for.  These are the ones that I was told to do.
7            Q.  Okay.  And I think you said you were in the
8    U.S. loyalty role for about one and a half years so that
9    would have been, what, until mid-2016 -- or, no,
10   2017-ish -- sometime in 2017 is when you changed to the
11   new role?
12           A.  Let's, see, yeah, 2017 -- yeah, that's about
13   right.
14           Q.  Okay.
15           A.  Yep, that's right.
16           Q.  Did you move for the Exxon role that you took
17   in 2017?
18           A.  I mean, so I went through my divorce.
19           Q.  Oh, no, no, I mean, just did you relocate?  Did
20   you -- you relocated when you were with lubricants and
21   you moved to the U.S. loyalty role you relocated from
22   Miami to Spring, Texas.
23           A.  Yeah, I've always been in the Houston and
24   Spring area.
25           Q.  Okay.  So when you took the new role in 2017,



Page 47

```
 1    you stayed in the Houston/Spring area?
 2         A.  That's correct.
 3         Q.  And what was the title of the role that you
 4    took in 2017?
 5         A.  It was project and process adviser.
 6         Q.  Project and process adviser.  Was it a sales
 7    role?
 8         A.  No.  It was more --
 9         Q.  It was different?
10         A.  Yes, ma'am.  It was more like analytical, kind
11    of a business-continuity plans.  It was very like
12    ambiguous.  Like just kind of nebulous.  It wasn't
13    clearly defined and structured so I really -- yeah, that
14    was probably one of the most dissatisfactory periods of
15    my career which led me to start seeking other employment
16    opportunities which is why I applied and transitioned to
17    Shell.  Because Shell hired a lot of former Exxon
18    employees knowing that Exxon does an outstanding job
19    onboarding and training their employees and Shell, you
20    know, they mainly hired experienced employees versus
21    Exxon hiring out-of-college employees and training them
22    up so they -- they do -- I had previous peers and
23    counterparts of Exxon that worked for Shell and I was
24    referred and so they had a position that -- that could
25    get me back into commercial sales still doing business
```



Page 48

1    to business although it contained -- it did not contain

2    going to the same accounts and industries that I was

3    accustomed to which I mentioned was car dealerships,

4    automotive facilities and commercial vehicle trucks.

5    But now I'm going to -- I'm still applying my same

6    commercial sales skills but now it's power plants,

7    construction sites, gas compression, hydraulic, food

8    processing, places that produce sand, drilling out of

9    West Texas.  And my territory was huge.

10        Q.  Okay.  So we'll talk about Shell in a minute.

11   I just want to wrap up the discussion on your experience

12   with Exxon.  So I think you said the last role started

13   in or around 2017.  It was a project and process adviser

14   role.  You didn't like it as much.  You said the role

15   was nebulously defined and you worked on

16   business-continuity plans.

17        A.  That was just different project.  So the

18   business would just kind of pitch out different

19   projects.  "Well, we need somebody to review this

20   system.  We need to update this."  And so I really did

21   not see the value in my work.

22        Q.  Okay.  I just want to clarify one thing.  You

23   said that in that role you were not in a sales role.

24        A.  That's correct.

25        Q.  Okay.



Page 49

1 A. Even the previous role as a U.S. loyalty

2 adviser, that was not a sales role.

3 Q. Okay.  Did the project and process adviser

4 role, did it have any kind of marketing component like

5 the U.S. loyalty role?

6 A. No.

7 Q. Okay.  And you -- you said you were unhappy in

8 that role which is what led you to apply for the job

9 with Shell?

10 A. That's correct.

11 Q. And did you voluntarily terminate your

12 employment with Exxon or were you terminated?

13 A. No, I put in my leave.  I volunteered.

14 Q. Did you have any performance issues or

15 complaints about your performance when you worked for

16 Exxon?

17 A. In that last role that I was in as a project

18 and performance adviser they did question my performance

19 in that role.

20 Q. When you say they questioned your performance,

21 did they take any kind of action against you or write

22 you up or what does that mean, they questioned your

23 performance?

24 A. They -- they gave me -- it was a crazy thing.

25 Like my co-workers didn't think it was possible but they



Page 50

1    lowered my ranking significantly.

2         Q.  Okay.

3         A.  Where I was like in the top quintile and then

4    they kind of moved me in the bottom ten.

5         Q.  And when you -- what is your ranking?  What do

6    you mean by that?  Your company performance ranking?

7         A.  Yes, yes.  They have a forced ranking system

8    where they say, "Okay, you performed in the middle

9    percentage, you performed in the top or you performed in

10   the bottom."

11        Q.  Okay.  And in your prior roles you had been in

12   the middle or the top?

13        A.  I was in the middle to the top, that's correct.

14        Q.  And in this role you were -- your performance

15   ranking was lowered to the bottom?

16        A.  That's correct.

17        Q.  Okay.  Is there like a number assigned to the

18   ranking?

19        A.  They -- they only have it internally but they

20   do not reveal it.

21        Q.  So the only thing that's revealed to you would

22   be whether you're top, middle or low?

23        A.  Yes.

24        Q.  Okay.

25        A.  And they normally say it's impossible within



Page 51

1    one performance period to go from a middle or like 75

2    percent quintile to be dropped to like the bottom ten.

3        Q.   What do you mean -- when you say it's

4    impossible, who says it's impossible?

5        A.   Most -- most tenured employees, you know, that

6    have been with the company and understand the ranking

7    system.  Even HR.  They just said that's -- you know,

8    that normally that doesn't happen.  And I -- and I truly

9    just felt disadvantaged because, you know, when you're

10   in sales, your numbers speak for themselves.  I was one

11   of the top salespeople in the country, recognized, you

12   know, consecutively for three to five years and then

13   when I transitioned to these marketing roles and then

14   this -- this project role doing business-continuity

15   plans, there's no quantifiable measures for me to

16   demonstrate my value and contributions to the company.

17   It was -- it was very subjective.  It's like I completed

18   the project on time and then there would be times where

19   they didn't really honestly have any work for me to do.

20   No projects and no assignments.

21       Q.   Did you like the U.S. loyalty role though?

22       A.   It was enjoyable.  I did.  I did.  And that's

23   because I still interacted with vendors, with agencies.

24       Q.   Sorry about that.  Sorry.

25       A.   Yeah, I was just saying I did enjoy that role.



Page 52

1   You know, it was different.  So I forgot to mention.
2   So, you know, my -- my 2008 to 2015 years I was in the
3   lubricant side of the business so I had a strong network
4   of people that knew me within the company and so forth.
5   You know, Carl has been a top performer.  And then I was
6   transferred and assigned to work on the fuel side of the
7   business so it was like starting over again because I
8   didn't know any of the managers.  I didn't know anybody.
9   But I was able to do well enough to answer questions
10  during that role within fuels and as a U.S. loyalty
11  adviser and I enjoyed it because I still interacted with
12  the field.  I still interacted with the lubricant
13  distributors -- I mean, fuel distributors, marketing
14  agencies, signage vendors.
15      Q.  Okay.  When you say "field distributors," are
16  you talking about like the distributors that you had
17  previously -- the types of distributors you had
18  previously interacted with when you were working in the
19  lubricant sales role in Miami for Exxon?
20      A.  It was actually very limited because -- I mean,
21  because most distributors do fuels and lubricants.  You
22  know, they sell oil lubricant and they also distribute
23  the fuel but my -- but the fuel distributors that I
24  interacted with --
25      Q.  Go ahead.  Go ahead.



1      A.  -- the fuel distributors that I worked with in

2   their marketing role was related to the gas stations

3   that they owned.

4      Q.  Okay.  That makes sense.  I misheard you when

5   you initially said fuel distributors.  I thought I heard

6   field distributors.  That's why I had the follow-up

7   question.  I was a little confused.

8              And I'd like to just talk a little bit more

9   about your last role with ExxonMobil before we move on

10   to your employment with Shell, the project and process

11   adviser role with Exxon that you said was not a sales

12   role.  I guess could you give me a little bit more

13   detail about what your duties were in that role?

14      A.  That -- that role was like a support function

15   of the business.  So there's no engagement with any

16   exterior customers.  It's all internal.  It's like I was

17   serving the business within the fuels division.  So one

18   of the first projects they gave me was to update and --

19   and enhance a business-continuity plan.  If something

20   happens where the office is shut down, there's a storm,

21   there's a hurricane, what would be the chain of

22   communication?  Is the guideline document updated on who

23   would contact who in the event that something happened?

24   How would business continue?  How would communications

25   take place?  And it was a massive document that I had to



Page 54

1    go through.  I don't know, it might have been 100, 200

2    pages, but to update it and make recommendations.  And

3    like even during that assignment itself it's like,

4    "Okay, I updated it and these are my recommendations."

5    You know, so there's very -- you know, it's subjective

6    on how you, you know, judge the performance of doing a

7    task like that when you -- when you get in projects.

8        Q.  Got it.  What other types of projects did you

9    work on in the projects and process role?

10       A.  There were so many like smaller ones I would

11   really need to reference my resume to try to remember.

12       Q.  Sure.  And I think I actually pulled a copy of

13   your resume from I think it was on your LinkedIn page

14   and I'm just going to show it to you.  Let's see.

15       A.  Are you going to share your screen?

16       Q.  Yes, sir.  Did it work?

17       A.  Yes.

18       Q.  This -- I got this on I think your LinkedIn

19   page.  Is this a resume that you put together after your

20   termination from Shell?

21       A.  Yes.

22       Q.  Okay.

23       A.  Yeah, I don't even mention the projects and

24   process adviser just because it wasn't even of much, you

25   know, value to even articulate what I did.  I just -- I



Page 55

1    didn't even find that appealing to even share it with a

2    prospective employer.

3        Q.  Okay.  It wasn't something that you were

4    interested in doing again?

5        A.  I -- I tried my best to be a top performer, you

6    know, when given a task and that was something that just

7    no structure, no defined objectives, no clear scope of

8    work.  It was just like a bunch of ad hoc projects which

9    was extremely like disappointing considering the

10   contributions I made to Exxon and the amount of money

11   that I had to make during my tenure as shown on my

12   resume.

13               MS. JAMES:  The resume will be marked as

14   Exhibit 1 to the deposition.  And I'm going to stop

15   sharing.

16               (Exhibit 1 was marked for identification.)

17       Q.  (BY MS. JAMES)  And you said -- you

18   mentioned -- you mentioned the ranking in your last

19   role.  You said that they lowered your performance

20   ranking.  In connection with questioning your

21   performance or advising you that there were issues with

22   your performance, did Exxon do anything else besides

23   lowering your ranking?

24       A.  Yes, they did.

25       Q.  What else did they do?



Page 56

1      A.  They put me on a performance improvement

2   program.

3      Q.  What's that?

4      A.  It's an opportunity to demonstrate that you can

5   still bring value to the company.  It's like opposed to

6   terminating you they say, "Hey, there's some performance

7   issues but, you know, we want to give you a chance to

8   still demonstrate that you can bring value to the

9   company.  You know, these are the areas that you need to

10  improve like over a 90-day period or so and at the end

11  of this 90-day period we can reevaluate, you know, your

12  competency, you fill in the gaps and if you, you know,

13  fulfill those gaps, you're no longer on a performance

14  improvement program because at the end of that period,

15  you know, it could lead to termination."

16     Q.  If you failed to perform at the end of the

17  90-day period it would lead to termination?

18     A.  Correct.  Yeah, if you don't meet expectations,

19  correct.  That's like -- that's like a warning.  Hey,

20  you know, there's some gaps.  You know, either you

21  improve and close these gaps or you're no longer a

22  benefit to the company.

23     Q.  Okay.  When were you put on the performance

24  improvement plan?

25     A.  Let me see, I would say it was about



1   September -- August -- maybe August timeframe because

2   Exxon does their ranking and rating review like in, what

3   was it, March.  That ends our performance calendar year

4   and then several months later they do the report out.

5   So -- so -- so I remember I thought I had a standard

6   meeting with my supervisor at the time whose name was

7   like Jason and when I met with him, HR was there and

8   they said, "Carl, you know, we're concerned about your

9   performance.  We know you've done very well at Exxon

10  but, you know, this current position there's some

11  performance gaps that you need to fill.  So we are --

12  you know, are offering to allow you during this

13  evaluation period of about 90 days to demonstrate that

14  you, you know, can still bring value to the company and

15  at the end of the 90 days then we sit back down and see

16  if you met the objectives."

17          Q.  And -- so that would have been in September or

18  August of 2018?

19          A.  That's correct.

20          Q.  Now, you resigned from Exxon.  Did you complete

21  the performance improvement plan before resigning?

22          A.  I did not.  I did not because considering

23  that -- how my career at Exxon, you know, started to

24  pivot, I saw them putting me in that role and then --

25  and then having that dramatic decrease in ranking I saw



Page 58

1    that as them no longer valuing me as an employee to the
2    company even after a decade and so I started to
3    immediately seek other employment.
4         Q.   In the September or August timeframe of 2018?
5         A.   Well, I actually started to look before they
6    put me on the performance improvement program.  I was
7    very dissatisfied with the role.  I saw my career in a
8    rut because they do not have an open job posting,
9    internal job posting, and so I didn't know what my next
10   role would be.  I didn't know how long I would be in
11   that unfulfilling position and so I wanted to work for a
12   company where I have more control of my career and where
13   I can do what I enjoy doing.
14        Q.   Okay.  Now, did you work with a recruiter or a
15   headhunter to locate or to find a new position?
16        A.   I basically leveraged LinkedIn and as I
17   mentioned earlier, Shell hires a lot of experienced
18   oil-and-gas employees and so I had quite a few peers --
19   maybe six to a dozen -- that knew me during my tenure at
20   Exxon and they had transitioned to Shell so I was able
21   to get a referral for the position at Shell based on
22   someone who knew me, my overachievement at Exxon, and,
23   you know, the hiring manager interviewed me amongst
24   other candidates at Shell and they selected me for that
25   role.



Page 59

```
 1        Q.  Okay.  And who -- you said who -- who was the
 2   peer at Shell who gave you the reference?  I'm sorry,
 3   the -- I'm sorry, that was a confusing question.
 4               So I think you said someone who was
 5   employed by Shell had worked with you at ExxonMobil
 6   previously and they gave you a reference and that's kind
 7   of how you got the job with Shell.  I was wondering who
 8   that person was.
 9        A.  That person's name was Steven Stack.
10        Q.  S-T-A-C-K?
11        A.  Steven, S-T-E-V-E-N.
12        Q.  And then the last name?
13        A.  Stack, S-T-A-C-K.
14        Q.  Okay.  Is he still with Shell?
15        A.  I believe so.  I have several other peers as
16   well.
17        Q.  What -- who were the other peers that you
18   mentioned from ExxonMobil who left ExxonMobil to work
19   for Shell?
20        A.  Lucas Kerley, Tamika Greer, Randy -- I can't
21   remember Randy's last name.  I think it's Stevenson.
22   There was another guy, I think his name was Pedro but I
23   didn't know him as much.
24        Q.  I'm sorry, Paige?
25        A.  I think it was Pedro.
```



Page 60

1      Q.  Oh, Pedro.

2      A.  I believe so.  But within my circle at Exxon

3  there was a handful that I knew, some that I worked

4  closely with like Lucas, Steven and Tamika.

5      Q.  Lucas -- I think you said Lucas you believe is

6  still with Shell.  What about Lucas and Tamika?

7      A.  I'm sorry, you just said Lucas twice.  You

8  meant Steven is still with Shell?

9      Q.  That's what I meant, yeah.

10      A.  I think all of them are.

11      Q.  Okay.  So Lucas and Tamika are also still both

12  with Shell?

13      A.  I believe so.  I haven't, you know, been in

14  contact with them but it's possible that all of those

15  individuals are still with Shell.

16      Q.  As far as you know?

17      A.  Yes.

18      Q.  Steven Stack -- so the names Lucas and Tamika,

19  those names are familiar to me.  I think I've seen them

20  in some of the documents.  Maybe they worked with you in

21  the department that you worked for when you were with

22  Shell; is that correct?

23      A.  Tamika and I were on the same team reporting to

24  Xavier, yes.  We were on the same team doing the same

25  role.  And -- and I should mention that the supervisor



1    who terminated me was not the supervisor who hired me.

2        Q.  Okay.  So we'll talk about that in a minute.

3    Steven, was he in a different -- with a different group

4    or a different team at Shell?

5        A.  He was a part of the same division but he

6    reported to a different supervisor.  He did not report

7    to the same supervisor as I did.  And he was not sales.

8    He was more like a distributor business manager, coach.

9    So like I worked with the sales reps with my

10   distributors and he would be the one that will work

11   directly with the principals on products, movement,

12   sales pipeline, pricing, logistics.  That was his role.

13       Q.  Okay.  And you said Tamika -- you and Tamika

14   both had the same role and you worked on the same team

15   for the same supervisor?

16       A.  Correct.

17       Q.  Lucas, was he in the same role as you?

18       A.  He was not in the same role but he was -- he

19   was a technical adviser.  He worked with me.

20       Q.  He was -- he worked for the same division of

21   Shell?

22       A.  Yeah, the same division but he had -- he had a

23   more technical role.  He was considered a lubrication

24   engineer.  I was considered a business-development

25   manager and we worked on several business opportunities



Page 62

```
 1    and particularly in Louisiana with one of our
 2    distributors.  So we had direct commercial engagement
 3    and activities with Shell.
 4         Q.  Who was his supervisor?
 5         A.  I think it was -- I don't want to -- it was
 6    Xavier.  It might have been John McDonnell, I believe.
 7    I may be wrong.  I may be wrong.  I just know he had
 8    some issues.  He was an advocate, you know, and he
 9    understood what happened and so is Tamika because she
10    actually had some issues as well because we were the
11    only two African-Americans on the team, Tamika and I.
12         Q.  Okay.  So I'll -- I'm going to come back to you
13    about you're calling them advocates.  I'd probably call
14    them witnesses because I'm an attorney but I'm going to
15    come back and ask you about witnesses.  I made the note
16    to ask about those two.
17              So, let's see, just going back to you
18    coming onboard with Shell and starting employment with
19    Shell, when was that?
20         A.  My start date?
21         Q.  Yes, start date.
22         A.  Yes, it was January 18th, Martin Luther King's
23    birthday, 2019.
24         Q.  Martin Luther King Day again?
25         A.  Yes.
```



Page 63

```
 1        Q.  Oh, so you had like two jobs in a row --
 2   because I thought Nouryon you said you -- yeah --
 3        A.  Hold on.  You know what?  I'm sorry.  No,
 4   I'm thinking -- you're right.  I was thinking Nouryon.
 5   That's Nouryon, okay?
 6        Q.  Yes.
 7        A.  With Shell it was the week before the
 8   Super Bowl.  I think it was January 26.  I know I
 9   started a Monday before the Super Bowl.
10        Q.  Okay.  And you said you had a different
11   supervisor when you first started working for Shell.
12   Who was your supervisor when you first started working
13   for Shell?
14        A.  His name was Eric Boydstun.
15        Q.  Was your role the same when you first started
16   or did you change roles at some point?
17        A.  No, it was the same role but there was a big
18   change in January and there was a change when I
19   transitioned to Xavier.  What was it, August I think it
20   was official.
21        Q.  Okay.  So we'll talk about those changes in a
22   bit.  Let's first talk about what your role was when --
23   when you hired on.  What was the title?
24        A.  It was -- I was considered a
25   business-development manager and I was a part of the
```



Page 64

1    indirect industrial business channel.

2         Q.  And that -- and your title remained the same

3    from your start date until your termination date?

4         A.  That's correct.

5         Q.  And just to go back to your start date, it was

6    January 26 of 2019; is that correct?

7         A.  That's correct.

8         Q.  Okay.  And when you first came on, your

9    supervisor was Eric Boydstun?

10        A.  Correct.  It was the 26th or the 28th.

11        Q.  That's okay.  I'm not --

12        A.  It was before the Super Bowl.

13        Q.  That's fine.  I'm sure it's in a document

14   somewhere so we'll know the exact date.  You said your

15   supervisor when you were hired on was Eric Boydstun.

16   Can you spell that?

17        A.  Yes, B-O-Y-D-S-T-U-N.  Yeah, he hired me and

18   was a champion for me.  I did not get the chance to

19   continue to matriculate with him.

20        Q.  When you say he was a champion for you, what do

21   you mean?

22        A.  I just -- our relationship -- you know, he just

23   believed in me.  He was very positive.  You know, he

24   wanted to see me do well.  You know, he was just -- you

25   know, he was glad to have me on the team.  He believed



Page 65

1   in me.  He believed in the people that referred me like

2   Steven Stack.  You know, typically ExxonMobil hirees

3   that transition to Shell do very well.  He really had

4   high hopes and good expectations for me.

5       Q.  Okay.  And did you have a good working

6   relationship with him?

7       A.  I did.  I did.  I will say although I started

8   January like 28th, my actual -- so there was no

9   onboarding, right?  It was like, "Carl, like here's your

10  computer, here's your car.  You know, you can go onto

11  the training website and, you know, learn about the

12  products.  I'll try to get you set up with a couple of

13  people to go visit some of these accounts."  You know,

14  it was very like back of the napkin type of, you know,

15  like "Learn the best you can.  You'll get it."  And so I

16  really did not start even engaging with customers like

17  until like June.  Up until then it was getting used to

18  Shell, doing all -- doing company trainings, some field

19  rides here and there.  So I actually did not start my

20  sales role even meeting my distributors until June of

21  2020.

22      Q.  So between --

23      A.  Sorry, June of 2019.  Excuse me.

24      Q.  Yeah.  So between January of 2019 when you

25  started and June of 2019 you said it was getting used to



Page 66

1    Shell, doing some training.  What kind of -- what kind

2    of training were you doing during that time?

3         A.  I was reading about the products.  I was doing

4    online trainings on all the industrial machinery from

5    pumps to gears to hydraulic systems, gas compression, to

6    compressors, natural gas engine, the oil analysis system

7    so I was learning the Shell product lineup because

8    there's a lot of products because industrial is so huge,

9    you know, anything from servicing windmills to turbines,

10   it was a whole new world from a technical debtness,

11   learning the products and understanding the

12   applications.

13        Q.  Did you -- was that training provided by Shell?

14   Like it was something they did online?

15        A.  I did attend I think at least one -- I know I

16   attended at least one in-person training because we did

17   have a training -- a learning adviser and I was able to

18   attend a training, I recall, in person that lasted a few

19   days.

20        Q.  And what was -- what was the subject matter of

21   that training?

22        A.  It was related to my role.  It was -- it also

23   included some external customers so -- but, yeah, it was

24   related to the equipment, maintenance, I believe some of

25   the products.  That's -- that's what I recall.



Page 67

1     Q.  Okay.  And you said that was an in-person

2  training.  I think you mentioned that in addition to the

3  in-person training you also did some online training?

4     A.  Correct.  And I consulted with our training

5  adviser about, you know, what different modules should I

6  take, different videos should I watch in addition -- as

7  well as some of the experienced business-development

8  managers like talking on the phone with them, getting

9  advice from them.  And then I had a couple field rides

10  where I would go on site and visit some of these places,

11  these plants, industrial accounts to understand how to

12  approach them.

13     Q.  Did somebody assist you or go with you for

14  these field rides?

15     A.  No.  Well, I joined alongside the experienced

16  employee so it wasn't independent.

17     Q.  Okay.  So it was like a ride-along?

18     A.  Right.

19     Q.  Yeah.  So you went with another employee who

20  was doing the job to see how they did it?

21     A.  Correct.

22     Q.  Do you recall who took you for the field ride?

23     A.  I remember Gary -- what was his last name? --

24  Worley, I think.  He was up in Chicago.

25     Q.  Okay.



Page 68

```
 1        A.   I remember spending time with Gary.  It was
 2   about -- what was it, about a week?  We started in
 3   Chicago and then went up to Green Bay, visited a couple
 4   of accounts, got to witness an in-person training on
 5   maintaining the equipment and optimization and I did a
 6   field ride in Texas with the guy who used to be in my
 7   role but he had left and he was doing something totally
 8   different.  I remember his name was Jess, J-E-S-S.  I
 9   don't remember his last name.
10        Q.   Okay.
11        A.   I do remember spending time with Gib Wheatley.
12   He was a lubrication technician similar -- same role as
13   Lucas Kerley.  We visited some accounts and did some
14   training.  Those are like the main three that I can
15   recall.
16        Q.   Okay.  I'm sorry, I'm taking notes.  Bear with
17   me.
18             MR. HODGES:  I was going to say on the
19   record, we are going on two hours now.  Mr. Williams, if
20   you need a break, just let her know.
21             MS. JAMES:  Yeah, and we're -- I was
22   thinking I was going to pause maybe 12:30, 12:45 so that
23   we could all just grab a quick bite to eat.  Does that
24   sound reasonable?
25             MR. HODGES:  That works.
```



Page 69

1      Q.  (BY MS. JAMES)  Okay.  And did -- Mr. Williams,

2  with respect to the field rides, I know that you said

3  one of them was with an individual in Chicago and then

4  there were others that you did with Jess who had the

5  role before you as well as Gib Weebley?

6      A.  Gib Wheatley.

7      Q.  Weekly?

8      A.  I think it's W-H-E-A-T-L-E-Y.

9      Q.  Wheatley.  Okay.  Did you actually -- did you

10  go to any accounts that you began to work with once you

11  actually started performing the role on your own in

12  June?

13      A.  No.  I was just exposed to some of the

14  applications that I could possibly encounter.

15      Q.  And did anyone -- I mean, did Eric, your

16  supervisor at the time, or anyone else ask you to attend

17  those field rides with these individuals?

18      A.  No, these were recommendations made by Eric.

19  He had sent e-mails saying, you know, "Carl is a new

20  person on the team.  Let's get him -- you know, do some

21  field rides with him in his field to expose him to the

22  industry, some of the applications so he can see it

23  live."

24      Q.  What about the in-person training that you

25  mentioned and the online training which I think you



1    described as learning about the external customers, the

2    equipment, the maintenance and the products?  For that

3    training, I mean, did Eric ask -- you know, ask you to

4    do that or how did that come about?

5                    MR. HODGES:  Objection to form.  Can you

6    rephrase the question?

7                    If you understand the question,

8    Mr. Williams, you can answer.  If not, she can rephrase.

9                    THE WITNESS:  Please rephrase.

10        Q.   (BY MS. JAMES)  How did the training -- the

11   online training and the in-person training that you

12   mentioned earlier, how did that training come about?

13        A.   My supervisor, Eric, connected me with a

14   training adviser whose name was Kenneth Aucoin and

15   Kenneth made me aware of an in-person training that he

16   was doing and he recommended online modules that I

17   should take.

18        Q.   Okay.  And these are the activities that you

19   performed or were involved with between your hire date

20   in June of 2019, correct?

21        A.   You said my hire date?

22        Q.   Yes.  I think -- I think you said between your

23   hire date and June of 2019 you did not start your sales

24   role; that you were doing the online training and the --

25   and the ride-alongs in the field.  Is that correct?



Page 71

```
 1       A.  That's correct.
 2       Q.  Okay.  In June of 2019 that's when you actually
 3  started going out and doing your role as a
 4  business-development manager?
 5       A.  I started to meet my distributors.  So it
 6  wasn't even -- it wasn't like I was selling day one.  It
 7  was like, "Carl, this is the owner of this distributor
 8  of O'Rourke and MidTex and Breaux Petroleum.  These are
 9  the distributors that you will support and do
10  ride-alongs."  And so even then it was like
11  introduction.  I had to, you know, meet these people,
12  get to know them and then start to set up field rides
13  with them, see what the sales pipeline is, see where
14  they need help.
15       Q.  Okay.  So who -- who introduced you to the
16  distributors?
17       A.  The -- the distributor we'll call him icons,
18  the one that we had his name was Jarrett Enochs.
19       Q.  Okay.
20       A.  He was one that introduced me to MidTex and
21  O'Rourke Petroleum.  And then I had Alex Sudyk who
22  introduced me to Breaux Petroleum.
23                 THE REPORTER:  I'm sorry, it was what
24  Petroleum?
25                 THE WITNESS:  They're located in Lake
```



Page 72

1  Charles, Louisiana.  They're called Breaux.  That's

2  B-R-E-A-U-X.

3                THE REPORTER:  Thank you.

4                THE WITNESS:  Thanks.

5       Q.  (BY MS. JAMES)  And I think -- what was the

6  name of the individual that you said introduced you to

7  MidTex?  I'm sorry, I missed that.

8       A.  His name was Jarrett, last name Enochs.  I

9  think it's like E-N-O-C-H.

10      Q.  What was Jarrett Enochs' role with Shell?

11      A.  The same role as Steven Stack.  He manages the

12  relationship with the distributor from a

13  product-acquisition standpoint, product portfolio, sales

14  goals.  Overall more of a high-level business strategy

15  review management.  Not directly sales related but

16  more -- more strategy, implementation, goals, yeah.

17      Q.  And did Jarrett in that role, did he have an

18  assigned -- specific assigned accounts that he was

19  working with?

20      A.  So Jarrett was only responsible for the

21  distributors and the distributors had accounts --

22  existing customers that they were working with,

23  prospects that they were pursuing.

24      Q.  Okay.

25      A.  Now, he might have helped here and there, you



Page 73

1    know, to kind of fit in because, like I said, my

2    territory was vacant so many times when an employee is

3    hired there's usually a transition period between an

4    incumbent and the new but I didn't have that.

5         Q.  Okay.  Was -- you mentioned earlier somebody in

6    the name of Jess who maybe had filled your role

7    previously?

8         A.  Yes.

9         Q.  Who -- do you recall his last name?

10        A.  I do not.  I know they called him Jess,

11   J-E-S-S.

12        Q.  When you say he filled your role previously --

13   well, I'm a little bit confused because you said the

14   role was vacant and then you had mentioned Jess as he

15   filled your role completely.  Can you explain what --

16   clear that up a little bit for me?

17        A.  So prior to me being hired, Jess had moved on

18   to a different role, different responsibilities.

19   More -- I think it's like more national account

20   management or account specific so he was no longer

21   supporting the distributors, the accounts that I

22   supported, and I think the role was vacant for eight

23   months or more.  I can't remember the exact timeframe.

24        Q.  Oh, okay.  Got it.  Other than Jarrett and

25   Enochs -- sorry, Jarrett and Alex, did anybody else take



Page 74

1   you out to introduce you to the distributors?

2       A.  No, because they were responsible.  And this is

3   only during this transitory period --

4       Q.  Okay.

5       A.  -- during that time because in January of 2020

6   things changed up.  I had more accounts, a larger area.

7       Q.  So tell me about your -- when you started

8   visiting accounts in June of 2019, what was -- what was

9   your area at that time?

10      A.  So I mainly worked with the three distributors

11  that I mentioned which is MidTex, O'Rourke Petroleum and

12  Breaux Petroleum.  And so MidTex they were located in

13  San Antonio so they covered like the San Antonio,

14  Austin, South Texas area.

15                  O'Rourke has coverage mainly everywhere

16  from Dallas to, what, south of Houston.  I guess Corpus

17  Christi all the way to Beaumont.

18                  And then Breaux Petroleum in Lake Charles,

19  Louisiana, Baton Rouge and the maybe 250-mile radius or

20  200-mile surrounding area there in Louisiana.  But they

21  also have a distribution office and facility in Lake

22  Charles and New Orleans and that's Breaux Petroleum that

23  I'm speaking of so...

24      Q.  Got it.  And what about MidTex?

25      A.  Yeah, they're the ones based out of San



Page 75

1    Antonio.

2         Q.  Okay, got it.

3         A.  O'Rourke has an office in Dallas as well as

4    Houston -- Houston.  I guess Beaumont, too, yeah.

5         Q.  So was your territory -- did -- is it -- is it

6    accurate to call it a territory?  Did you have a

7    territory when you were in the business-development role

8    with Shell?

9         A.  Yes, it was everywhere my distributors went.

10   Those three distributors I mentioned, their area of

11   coverage.

12        Q.  You were actually assigned to three specific

13   distributors and your area tracked whatever area they

14   serviced?

15        A.  That's correct.

16        Q.  I'm almost to a stopping point.

17             So when you started performing the sales

18   role in June, Mr. Williams, of 2019, did you have any

19   other assigned accounts besides MidTex, O'Rourke and

20   Breaux?

21        A.  I did not.

22        Q.  Okay.  All right.  I think for now we can take

23   a break so everybody can grab some lunch.  I'm flexible.

24   I know that you want to get finished as early as

25   possible so do we want to try to get back on the record



Page 76

1    for about 1:30?

2          A.   Can we just -- what about 1:15?

3                    MS. JAMES:  Sure.  Sure.  Absolutely.

4                    MR. HODGES:   That works.

5                    VIDEO OPERATOR:  We are off video record.

6    The time is 12:40 p.m.

7                    (Recess taken from 12:40 p.m. to 1:20 p.m.)

8                    VIDEO OPERATOR:  We are back on the video

9    record.  The time is 1:20 p.m.

10         Q.   (BY MS. JAMES)  All right.  Before the break,

11   Mr. Williams, we were talking about your position with

12   Shell from your start date until June of 2019 and then

13   we started getting into the accounts that you were

14   assigned to.  You mentioned to me some individuals who

15   worked in different roles from you that were more of a

16   technical role.  I have a couple of questions about

17   those individuals.

18                    Their names are Jarrett Enochs and Alex

19   Sudyk; is that correct?

20         A.   That's correct.

21         Q.   Can you tell me what their title was?

22         A.   It was indirect channel textile manager.

23         Q.   Was that the same title as Lucas Kerley that we

24   talked about earlier?

25         A.   No.



Page 77

1      Q.   Did you have a good relationship with Alex and
2  Jarrett?
3      A.   Yeah, I would say it was good.  You know, it
4  was a good working relationship.  We supported the same
5  distributors.  The difference is is that I was on the
6  boots on the ground working directly with the account
7  reps and they were mostly only engaging with the sales
8  managers.
9      Q.   And who did Alex -- did Alex and Jarrett report
10  to the same person?
11      A.   They did not.
12      Q.   Who did they report to, each of them?
13      A.   It might have been -- I don't recall.  I think
14  it was John.  I know my supervisor -- all of the
15  business-development managers reported to him.  So I was
16  about one of seven or so and then we had to hire some
17  more people.
18      Q.   John -- was it John McDonnell?
19      A.   I think so.
20      Q.   And is that who your manager reported to as
21  well?
22      A.   No, he reported to Jesus.
23      Q.   Okay.  So you think Alex and Jarrett may have
24  reported to John McDonnell?
25      A.   I would say.



Page 78

```
 1        Q.  Okay.  What was Lucas Kerley's position?
 2        A.  Let's see, he was considered a technical
 3   adviser.
 4        Q.  Who did Lucas report to?
 5        A.  I know it was a senior technical guy.  I do not
 6   recall the name.
 7        Q.  It wasn't Eric or Xavier?
 8        A.  No.
 9        Q.  And you said he -- Lucas was a technical
10   adviser; is that correct?
11        A.  Yes.
12        Q.  So he was not in a business-development role
13   like yours?
14        A.  Correct.  He was a technical adviser who would
15   assist me as he and I went on several calls together
16   supporting my distributor in Lake Charles.  He was out
17   at Breaux Petroleum.
18        Q.  What kind of assistance or support did he
19   provide with respect to your sales calls?
20        A.  So we had a couple visits with an account, at
21   least we were trying to get at least one set up where we
22   would walk the plant, we would look for opportunities,
23   check what -- check what type of lubrication they're
24   using.  We would look and check how they stored their
25   lubricant, if it's properly stored, if it's labeled so
```



Page 79

1    there's no cross-contamination.  If they have any oil

2    monitoring systems.  We would look and see if they have

3    a maintenance log and, you know, how do they maintain

4    their equipment, is it systemized or do they just create

5    a manual log?  So we would find ways to increase

6    efficiencies and reduce costs at these plants.

7         Q.  And that would then help you I guess service

8    the client or service the distributor in growing its

9    client base?

10        A.  That's correct.

11        Q.  Okay.

12        A.  Please remind me to share a story with you -- a

13   testimony about Lucas I guess later, unless you want me

14   to share it now.

15        Q.  Is that -- I think -- is that one of the

16   incidents mentioned in your -- I think it might be your

17   Complaint or your EEOC charge?  I do recall that his

18   name comes up in one of your filings.

19        A.  That's correct.

20        Q.  I absolutely will ask you about that,

21   Mr. Williams.

22        A.  Okay.

23        Q.  Now, was Lucas assigned to certain accounts or

24   did he help business-development individuals like

25   yourself just as needed with different accounts?



Page 80

```
1          A.  It was both.  He would support national
2    accounts directly that Shell had and he would also
3    assist business-development managers like myself.  But
4    they all have a territory.  And I think he lives in
5    Arkansas so he would drive down to Louisiana whenever I
6    needed his support with Breaux Petroleum.
7          Q.  Do you know who his national accounts were?
8          A.  I think they were accounts perhaps like
9    International Paper.  I remember him calling on some
10   paper mills.  I kind of remember some of the industries
11   but not necessarily the -- the names.  I remember -- I
12   don't -- I remember some of the technical advisers
13   calling -- calling on ArcelorMittal.  They produce
14   steel.  They were like a national account.
15   International Paper, Schlumberger was one.  Not that he
16   called on but some of our direct accounts.
17         Q.  Sure.  All right.  So before the break we were
18   talking about the three client accounts that you were
19   working with including MidTex, O'Rourke and Breaux and
20   where those were located.  You said that your role and
21   responsibilities changed at some point in January of
22   2020?
23         A.  My -- my -- my role was the same but my --
24         Q.  Okay.
25         A.  I went from supporting, what, three
```



Page 81

1    distributors to seven and my geography changed from, if

2    you remember, mid to South Texas to western Louisiana.

3    I no longer had Louisiana but I -- January I now had the

4    whole State of Texas and the whole State of Oklahoma.

5         Q.  And what caused that change?

6         A.  They did a realignment.  They hired some --

7    some other people.  They moved some experienced

8    employees around so they just -- kind of like a market

9    realignment.  It dramatically increased my territory,

10   you know, time on the road, because they expect us to be

11   on the road four days a week, every week.

12        Q.  Did other people -- you said there was a

13   realignment.  Who all was impacted by the realignment as

14   far as you know?

15        A.  The business-development managers.  So in my

16   business we had industrial business-development managers

17   like myself and we also had transportation.  And so that

18   transportation is the same role that I did at Exxon,

19   calling on commercial truck dealers, truck stops and

20   fleets, but there's a team of about I think it was eight

21   or nine of us that represented to Xavier.

22        Q.  Oh, and it was both industrial and

23   transportation business-development managers that

24   reported up to Xavier?

25        A.  That's correct.



Page 82

1      Q.  The realignment that you mentioned, did that
2  impact both the industrial and transportation
3  business-development managers or just one group?
4      A.  Yes, it did.  Yeah, it impacted everything.
5      Q.  Impacted both groups?
6      A.  Yes.
7      Q.  So before the realignment you had
8  responsibilities in Texas, Louisiana and Oklahoma?
9      A.  No, just Texas and Louisiana.
10     Q.  Oh, just Texas and just Louisiana.
11     A.  And it wasn't the whole state.  Right, it was
12  not the whole state.  It was just the area of coverage
13  for Breaux, for MidTex and for O'Rourke.
14     Q.  Got it.  The realignment, did that change the
15  territories for business-development managers such that
16  they were responsible for the entirety of a region as
17  opposed to select accounts?
18     A.  Yes.
19     Q.  Select distributors, excuse me.
20     A.  Yes, that's absolutely correct.
21     Q.  Okay.  So instead of being assigned to --
22  directly to specific distributors, now all the
23  business-development managers after the change were
24  assigned to specific areas?
25     A.  Well, it was distributors but within a state,



Page 83

1   of your assigned state.

2         Q.  Right.  So every distributor within that state?

3         A.  Yes.

4         Q.  Okay.  Did you continue working for the same

5   account after the realignment?

6         A.  All of them except Breaux.

7         Q.  Did you pick up any new accounts?

8         A.  About five.

9         Q.  And you mentioned that your territory was all

10  of Texas and all of Louisiana after the realignment?

11        A.  No, ma'am, all of Texas and all of Oklahoma.

12        Q.  Okay.  Sorry about that.  All of Texas and all

13  of Oklahoma.  I'm glad I asked.  Who got the Louisiana

14  territory, do you know?

15        A.  I don't remember his name.  He was new to the

16  team and he's the one who started working with Breaux

17  Petroleum.  I cannot recall his name.

18        Q.  What other states did he have besides

19  Louisiana, if you remember?

20        A.  It was either two to three states.  It might

21  have been -- I would be guessing like big time.  Yeah,

22  there was --

23        Q.  So you don't know specifically?

24        A.  I do not recall exactly his geography.

25        Q.  And you can't remember this individual's name?



Page 84

```
 1        A.  Unfortunately I cannot.
 2        Q.  I was going -- I'm going to show you a
 3   document.  I'm just getting to it but my computer is
 4   moving slowly.  I was going to pull up your EEOC charge.
 5              Oh, one thing to follow up and confirm.  I
 6   know you mentioned that at some point after your hire
 7   date your manager changed from Eric Boydstun to -- I
 8   call him Xavier Puvilland but it sounds like it's not
 9   the right way to say it.
10        A.  In French they say Xavier.
11        Q.  Xavier.  Okay.  So Xavier became your manager
12   on or around July 1st of 2019.  Does that sound right?
13        A.  We met around the middle of July.  I was
14   introduced and it was effective August 1st.
15              (Exhibit 2 was marked for identification.)
16        Q.  (BY MS. JAMES)  Let's see.  All right, I'm
17   going to share my screen and this will be Exhibit 2.
18   Oh, I have to push "Share."  So this is the EEOC charge,
19   Mr. Williams, that you filed against Shell Oil.
20        A.  It's a little small.
21        Q.  Oh, it is.  Okay.  Let's see.
22        A.  There you go.
23        Q.  I was going to let you read through it and then
24   I was going to ask you some questions about the content.
25   So if you want to let me know when you're ready for me
```



Page 85

1    to scroll down.

2         A.  You can scroll down.

3         Q.  And just so you can see the top, I think when I

4    scrolled in for some reason it zoomed in.

5         A.  I'm good.

6         Q.  Okay.  You're good?

7         A.  I see there --

8         Q.  Is this -- go ahead.

9         A.  I just said I see there -- what was it?  The

10   next page -- I guess I'll wait until we get to it but it

11   says eight distributors as opposed to seven.  I would

12   have to go back and recount -- and count because I know

13   I previously had three and then I -- I think there was

14   like one that was assigned to me but they -- they really

15   were not aligned so it was a total of eight.  I see that

16   there.  I thought it was seven.

17        Q.  You told me seven earlier.

18        A.  I might have left one out.

19        Q.  That's okay.  All right.  So we'll mark this.

20   This will be Exhibit 2, your EEOC charge.  And I just

21   want to confirm that that is your signature.

22        A.  Yes.

23        Q.  Is this a true-and-correct copy of the charge

24   you filed with the Equal Employment Opportunity -- I'm

25   sorry, Equal Opportunity -- Equal Employment Opportunity



1    Commission, the EEOC?

2         A.  Yes.

3         Q.  Okay.  And the unlawful actions that you are

4    claiming Shell engaged in include race discrimination

5    and retaliation.  Is that -- is that correct?

6         A.  That is correct.

7         Q.  And you're claiming that for purposes of this

8    lawsuit those are the two unlawful actions that you're

9    claiming Shell engaged in, correct?

10        A.  That's correct.

11        Q.  Okay.  While we're at it, I'd like to get you

12   to take a look at your discovery responses.  Let's see,

13   I'm wondering if it would be easier for me -- this is

14   kind of a long document and I'm wondering if it might be

15   easier for me to send it to you via Chat so that you

16   have control over scrolling it through -- scrolling

17   through it on your own.  That way -- you know, that way

18   you can just review it.  What I'd like you to do is

19   review the interrogatory responses and just confirm for

20   me that they are complete and accurate.

21        A.  You said as opposed to looking at them on your

22   screen?

23        Q.  Yes, because it's kind of long and I think it

24   would just be easier so that you, you know, had control

25   over the mouse and could scroll down and review it.



Page 87

```
 1    This is -- these are your written responses to my
 2    client's interrogatory requests, the questions that we
 3    sent in written discovery where we asked for certain
 4    information and you provided the response.
 5         A.  Okay.  So we're going to go through all of
 6    these?
 7         Q.  No.  What I'd like you to do is just read
 8    through them and confirm -- confirm that the responses
 9    are complete and accurate.
10         A.  Okay.  All 24 pages, right?
11         Q.  Actually, it would just be the responses to
12    interrogatories which is on the first, let's see, 16
13    pages.
14         A.  Okay.
15              MS. JAMES:  And this -- this will be
16    Exhibit 3.
17              (Exhibit 3 was marked for identification.)
18         Q.  (BY MS. JAMES)  And -- and, Mr. Williams, just
19    so you know, the interrogatory questions and the
20    responses start on page 5.  So it would be pages 5
21    through 16.
22         A.  Okay.
23         Q.  The first couple of pages are the title and
24    just some other things.  So I'm going to -- did you see
25    anything come through?
```



Page 88

1      A.  Yes.

2      Q.  You did?

3      A.  Yes, I did.

4      Q.  Okay.  Good.  So just for the record in case I

5  forgot to say it the EEOC charge will be Exhibit 2 and

6  Plaintiff's Responses to Written Discovery will be

7  Exhibit 3.

8      A.  Okay, Response to Interrogatory 1 looks

9  correct.

10      Q.  Okay.  Thank you.

11      A.  Interrogatory No. 2 looks correct.  I see it

12  had the unemployment amount that I had tried to figure

13  out earlier.

14          Interrogatory 3 I see that it's missing

15  Nouryon so I guess we need to make a note of that

16  because I received an offer from Nouryon who is my

17  current employer.

18      Q.  Is that the only information that's missing

19  from No. 3?

20      A.  Yes.  So I would just like to add to

21  Interrogatory 3 -- I mean, I applied, I don't know, 80

22  or 100 times.  I mean, a lot, but the ones I listed here

23  are those that I actually had interviews with and went

24  through the process and whether an offer was extended or

25  not extended.



Page 89

```
 1          Q.   Okay.  So just to clarify, Interrogatory No. 3
 2     asked you about all employers from whom you sought
 3     employment following your termination from Shell in
 4     March of 2020.  Just to make sure I understand, your
 5     Response to Interrogatory No. 3 includes employers that
 6     you actually interviewed with but you're telling me that
 7     it does not include a number of employers where you
 8     applied but there was no further steps?
 9          A.   Correct.
10          Q.   Okay.
11          A.   Now, I don't know if it's important but I do
12     believe I have a list -- I can get references of all
13     those other companies I applied to.
14          Q.   Okay.
15          A.   Interrogatory 4 looks correct.
16               Interrogatory 5, everything looks correct
17     except Ashley Phelp's last name is misspelled.  And
18     Bradlee Adams was not a customer, he was a distributor.
19     He's a distributor rep.
20          Q.   Okay.
21          A.   No. 6 looks correct.
22               No. 7 looks correct.
23               No. 8 looks correct.
24               I'm trying to make sure I understand
25     Interrogatory No. 9 that I responded correctly at the
```



Page 90

1    time.  "Identify each person with the knowledge of any

2    facts or circumstances and all documents supporting the

3    allegations set forth."

4        Q.  If you mind, do you have a copy of the lawsuit

5    handy?

6        A.  I would have to find it.

7        Q.  I can share it.

8        A.  The one from T&T?

9        Q.  No, the lawsuit that you filed in court.  So

10   what that interrogatory asks, Mr. Williams, is what, you

11   know, witnesses -- well, let me get back to it to make

12   sure that I'm -- I'm thinking of the right one.  So

13   Interrogatory 9, okay, it asks for each person with

14   knowledge of any facts or circumstances and documents

15   supporting the allegations set forth in paragraph 16.

16   So we're asking you to identify witnesses and any

17   documents that you have to support your allegations that

18   you made in paragraph 16 of the lawsuit that you filed

19   in court.

20       A.  Okay.  And where is paragraph 16?

21       Q.  I'm going to get to that for you.  Let's see.

22   So this is the -- this is the lawsuit.

23       A.  Okay.  Can you give me a copy of that in the

24   Chat as well?

25       Q.  Sure.



Page 91

1         A.   Thank you.   A lot of these people are not

2    correct.   I don't know if this was misinterpreted at the

3    time or what.   But to rely on some of the individuals we

4    spoke about earlier, Lucas Kerley definitely.   Tamika

5    Greer is missing.   Steven Stack is missing.   Yeah, those

6    others -- Connie Griffin, Staci Hendon, Paige Chenier,

7    Yinka and Holly Burns -- none of those should be listed.

8    There's some other names that should be added.

9         Q.   Okay.

10        A.   Tracie Haygood, and that's T-R-A-C-I-E,

11   H-A-Y-G-O-O-D.

12        Q.   Damon?

13        A.   Damon Higginbotham.

14        Q.   Got it.

15        A.   Yeah, I guess those would be the main ones kind

16   of like internally with Shell, you know, that can kind

17   of attest to my allegation.

18        Q.   Okay.

19        A.   So I guess from a witnessing, there were others

20   that I mentioned who could account to my performance and

21   professionalism but I don't know necessarily if that

22   needs to go in here as well.

23        Q.   Okay.

24        A.   Now, does it?

25        Q.   Who -- well, why don't you tell me who you



Page 92

```
 1   think are witnesses who would testify that -- I think
 2   what you're telling me is these are witnesses who would
 3   testify that your performance was good and that you
 4   exhibited professionalism in doing your job?
 5        A.  Yes.  Yes, that's correct.
 6        Q.  Okay.  Who are those witnesses?
 7        A.  Lucas Kerley.
 8        Q.  Okay.
 9        A.  I would say Gib Wheatley.
10        Q.  Okay.
11        A.  Okay, let's see, some of the actual distributor
12   reps like Bradlee Adams.
13        Q.  Who did Bradlee work for?
14        A.  He worked for O'Rourke.  He's no longer with
15   them.  Ashley Phelps was another.
16        Q.  Who does -- who did she work for?
17        A.  O'Rourke.
18        Q.  Is she still with them?
19        A.  Perhaps.  I believe so the last time I spoke
20   with her.  And there's one more guy from O'Rourke in
21   Dallas -- I can't think of his name -- that I spent time
22   with.  Oh, Robert Hernandez.
23        Q.  Is he still with O'Rourke?
24        A.  I think so.  Yeah, I think so.
25        Q.  So these individuals that you just listed, they
```



Page 93

1    are individuals that you believe would testify as to

2    your good performance and professionalism while you were

3    employed with Shell?

4         A.  That's correct.  I mean, there's others, too.

5    Like I didn't name any from MidTex.  I worked quite a

6    bit with Tiffany Self.  She's a rep for MidTex.  Let's

7    see, Todd Pitts, he's like a senior salesperson with

8    RelaDyne.  Tom Nicholas, he's also with RelaDyne.

9         Q.  Was that -- was RelaDyne a distributor,

10   Mr. Williams?

11        A.  Yes, it was one of the new distributors that I

12   spent a lot of time with in January.

13        Q.  Okay.

14        A.  January -- the first quarter of 2020.  Jane --

15   Jane Tumlinson, she's a sales manager for MidTex.

16        Q.  MidTex?

17        A.  Yes, M-I-D-T-E-X.

18        Q.  And that's the account that moved to another

19   individual after this realignment occurred?

20        A.  No, that was Breaux Petroleum.

21        Q.  Oh, I'm sorry.  You kept MidTex?

22        A.  Yes, because they're in San Antonio, Texas.

23        Q.  All right.

24        A.  Quality Petroleum was another one.  I did quite

25   a bit of work, I starting to, with L. J. Kangas.  That's



1    K-A-N-G-A-S.  He's the sales manager of Quality.

2        Q.  I'm sorry, can you tell me the MidTex -- the

3    individual with MidTex?

4        A.  The sales manager's name is Jane, J-A-N-E,

5    Tumlinson.  That's T-U-M-L-I-N-S-O-N.

6        Q.  Okay.

7        A.  And the other rep that I've mentioned that I

8    spent quite a bit of time, her name is Tiffany Self.

9    And I was just talking about Quality Petroleum.  L. J.

10   Kangas and I started working extensively with these guys

11   in -- this distributor January or the first quarter of

12   this year, and really started making good progress.

13       Q.  Okay.

14       A.  And they had a few reps that I spent time with,

15   too.  Kevin -- Kevin Simple, Rick Riley, Cody Brewer, I

16   just started to, like...  I also want to mention with

17   Breaux Petroleum I spent a lot of time with one of their

18   sales reps named Clayton Rougeou.  That's R-O-U-G-E-O-U.

19   I spent extensive time with Clayton.

20       Q.  With Breaux Petroleum?

21       A.  Yes.  Between him and the sales manager -- his

22   name was Michael Mike -- if I remember his last name

23   correctly.  I don't -- what was it?  I may have him

24   confused with somebody else, Hinderliter or something,

25   but I know the sales manager there was Mike and he was



Page 95

```
1    with Breaux Petroleum.  There's another Shell employee I
2    want to mention that can also attest to my
3    professionalism and performance.  His name is Jim
4    Engleskurkin.  He's similar to Lucas Kerley being a
5    technical adviser.  And the last one that I would
6    mention who is also a technical adviser is John
7    McGhay.  Or John McGhay.
8         Q.  Okay.
9         A.  So with those corrections, those additions and
10   those removals of removing Connie Griffin, Staci
11   Henderson -- Hendon, Paige Chenier, Yinka, Holly Burns I
12   would question all of those.
13        Q.  Okay.  And tell me about -- tell me about the
14   reason for removing the individuals that you just
15   identified from this response.
16        A.  I -- I guess my relationship -- I don't -- I
17   don't recall who some of these are even listed,
18   especially like Yinka, Paige.  I mean, I know Connie,
19   Stacy, Paige and Yinka they're all African-American
20   employees but I didn't work directly with them.
21        Q.  Okay.
22        A.  Yeah.
23        Q.  Who did -- who did those three employees work
24   for or with?
25        A.  They were part of total different division
```



Page 96

1    lines.

2          Q.  Okay.  What division was that?

3          A.  I have no idea.  It varies.

4          Q.  Were they with lubricants or --

5          A.  No.

6          Q.  Okay.

7          A.  They could have been with fuels, bio --

8          Q.  Okay.

9          A.  -- IT.

10         Q.  Okay.  So neither Connie, Paige or Yinka worked

11   with lubricants?

12         A.  Correct.  We would definitely remove Holly

13   Burns.

14         Q.  And why do you want to remove Holly Burns?

15         A.  I guess in my statement she was -- you know,

16   that first document you had me to read from the EEOC the

17   activity -- highlighted there, you know, highlights her

18   behavior and accusations.

19         Q.  Okay.  So you don't believe she would be a

20   witness who would be supportive of your claims?

21         A.  That's correct.

22         Q.  Okay.

23         A.  So with that that completes Interrogatory 9.

24         Q.  Okay.  Thank you.

25         A.  So I would say exactly -- I'm noticing a carbon



Page 97

1    copy of names from Interrogatory 9 is the same as

2    Interrogatory 10 so, yeah, we need to remove, Connie,

3    Staci, Paige, Yinka and Holly again.

4         Q.  Okay.  So it would be the same changes?

5         A.  Yeah, but I'm trying to see.  So the first

6    Interrogatory 9 supports, you know, those who can speak

7    on behalf of my like professionalism.  And, let's see,

8    Interrogatory 10 says, "Please describe in detail all

9    the facts and circumstances supporting your claim that

10   Defendants discriminated against you 'in connection with

11   the compensation, terms, conditions, and privileges of

12   employment or limited, segregated, or classified [you]

13   in a manner that would deprive or tend to deprive' you

14   of an employment opportunity or adversely affected your

15   status because of your opposition based on race, as

16   alleged in paragraph 17 of your Complaint.  Identify

17   each person with knowledge of any facts or circumstances

18   and all documents supporting the allegations in

19   paragraph 17."

20              Did you put that in the Chat?

21        Q.  I did.

22        A.  So, yeah, with this one, let's see, the

23   individuals will be Lucas Kerley, Tamika Greer, Steven

24   Stack, Tracie Haygood.

25        Q.  It sounds like the same additions that we



Page 98

1    talked about in connection with the last one.  So far it

2    does.

3        A.  Okay, will you repeat the names we mentioned on

4    the last one?

5        Q.  Sure.  So you mentioned Tamika Greer, Steven

6    Stack, Tracie Haygood, Damon Higginbotham, Lucas Kerley,

7    Wheatley and you also mentioned -- I'm not going to name

8    each individual but various individuals -- some of the

9    distributors like O'Rourke.  Those included -- I'll list

10   the individuals for O'Rourke.  You said Robert

11   Hernandez, Bradlee Adams, Ashley Phelps.  MidTex you

12   mentioned Jane Tumlinson.  And then Quality Petroleum

13   you mentioned L. J. Kangas.  And you also -- go ahead.

14       A.  I see.  So, yeah, all those individuals that

15   can support my position on professionalism and

16   performance that defends my case of wrongful

17   termination, racial discrimination, retaliation.  Okay.

18               So Interrogatory 10 it pertains

19   specifically to each person related to -- that I guess

20   can attest to race to support discrimination, correct?

21   That can support my -- is that how you interpret the

22   difference between the two?

23       Q.  So you're on 10 versus 11?

24       A.  No, I'm on 10 versus 9.

25       Q.  Okay.  So in both of them I'm -- the question



Page 99

1    is for you to identify witnesses who can support the

2    allegations made in that particular paragraph of the

3    Complaint that's referenced in the question.

4         A.  Okay.

5         Q.  So it depends on what -- I have to pull up the

6    Complaint.

7         A.  So 17 is the Complaint against -- let's see, 16

8    says defendant engaged in unlawful employment practices

9    against plaintiff on the basis of race.  Okay.  Then 17

10   says, "Defendant discriminated against plaintiff in

11   connection with the compensation terms..." --

12        Q.  I think paragraph 17 is -- well, it's another

13   paragraph that states that you were discriminated

14   against based on your race.

15        A.  Okay.  So they're pretty much the same.

16        Q.  Okay.

17        A.  Right?

18        Q.  Yeah.  I mean, both 16 and 17 allege race

19   discrimination.  So you just want to -- I just need to

20   know all the witnesses, who would be witnesses who would

21   be able to testify in support of your claim of race

22   discrimination.

23        A.  Okay.  So when I look at those individuals all

24   that are listed in 9, you know, some of them can attest

25   to race related and then others, you know, race



Page 100

```
1    concerns, unfair treatment whether it was just my
2    situation or including their own the few
3    African-Americans that are listed and then some of the
4    others support the performance and professionalism.
5         Q.  Right.
6         A.  Yeah, so we can just do a carbon copy of both
7    of those.
8         Q.  Okay.
9         A.  So we would do the same thing for Interrogatory
10   11.
11        Q.  Okay.
12        A.  Then that will be complete.  Now I'm looking at
13   the next one.
14        Q.  Okay.
15        A.  It's referencing Complaint I guess it was 21
16   "Plaintiff good faith engaged in -- engaged in protected
17   activity, an example making protected complaints
18   regarding differential treatment based on race and sex."
19   So I'm supposed to list -- now on Interrogatory 12, can
20   you just clarify this -- this interrogatory statement
21   and what -- what is it really asking here?
22        Q.  I would like -- so you -- it asks for a couple
23   of different things, Mr. Williams.  Your attorney what
24   they ultimately provided was a list of witnesses and I
25   just want to make sure I have a complete list of
```



Page 101

1    witnesses to any wrongful conduct whether it's, you
2    know, race discrimination, retaliation or any other
3    wrongful conduct that your claims are based on.
4         A.  Okay.  So it would be that same list.
5         Q.  Okay.
6         A.  All right.  If that's what that's saying.  I'm
7    just -- I don't know why it just seems perplexing to me
8    as I read --
9         Q.  Well, because probably -- I've asked that
10   question with respect to each individual allegation or a
11   lot of the individual allegations.  So it probably seems
12   repetitive but I just need to make sure that I have a
13   complete list of any witness that you would rely on to
14   support your claims of any wrongful action that you are
15   alleging against Shell in the lawsuit.
16        A.  Okay.  Now I'm reading Interrogatory 13.  Yeah,
17   it would be the same.  Same group of people, the
18   extensive list.
19        Q.  Okay.
20        A.  The only thing I would add to Interrogatory 14
21   in regards to my response to the mental anguish and pain
22   was like I sought like extensive massage treatment
23   because my neck and -- like the stress from the incident
24   caused my neck and muscles to like really be inflamed.
25        Q.  So you said you would add that you sought



Page 102

1   treatment from a massage therapist for neck-and-muscle
2   tension?
3       A.  Yeah, to help alleviate stress.  One of the
4   things about me is when I get in very stressful
5   situations, my muscles tend to tense up and I feel
6   tightness in my neck and traps and all that.
7       Q.  Okay.
8       A.  So with that said I would consider
9   Interrogatory 14 complete.
10          Now I'm looking at Interrogatory 15.  So I
11  consider Interrogatory 15 complete.
12          On Interrogatory 16 in my response I would
13  remove Jarrett Enochs.  And I'm not sure if it's fair to
14  keep the HR adviser in there.  I just didn't like how
15  she withheld information from me from some of the
16  documents that I was requesting.  So I guess that's --
17      Q.  The HR person would be Kristia?
18      A.  Kristia, yes.  And that 1,400-page document she
19  was e-mailing her supervisor somebody and they were
20  telling her to not send me -- e-mail certain things, to
21  wait until I call.  You know, just kind of intentionally
22  withholding.  I think I was asking for like the employee
23  handbook and some other questions and I didn't like how
24  she was compliant.
25      Q.  Okay.



Page 103

1        A.   So now I'm on Interrog -- that completes
2    Interrogatory 16.
3             Now, Interrogatory 17.  I don't recall.  I
4    don't recall the name of the individual with the EEOC.
5    I just have to assume that that's right unless I can
6    verify that.  All representatives from the EEOC, I would
7    have to investigate if that was the person.
8        Q.   Okay.
9        A.   I don't know if you want me to search through
10   my e-mails and look it up?
11       Q.   Well, so this is -- this is -- let me ask you
12   about that, Mr. Williams.  So Interrogatory 17 asks that
13   you identify all representatives of the EEOC with whom
14   you or your counsel communicated in connection with your
15   charge or the lawsuit.  Your recollection is that there
16   was one individual and you don't recall specifically
17   their name.  Is that what you're telling me?
18       A.   Yes.
19       Q.   Did you personally communicate with someone
20   from the EEOC or did your lawyer do that on your behalf?
21       A.    I think my lawyer did it on my behalf because
22   I know they submitted it and in the process I put out
23   some paperwork.  I really vaguely remember.
24       Q.   Okay.  There's one thing -- so I do have a
25   question about one of the interrogatory responses,



Page 104

1    Mr. Williams, your response to Interrogatory No. 4.  We

2    asked you for any and all statements whether written

3    tapes, videotapes or otherwise recorded that you

4    obtained in connection with the claims in this lawsuit

5    and your response in Interrogatory No. 4 states that you

6    are in possession of statements made by Tracie Haygood,

7    Tamika Greer, Lucas Kerley and Kristia Encarnacion.

8        A.  Yes.

9        Q.  What statements do you have from each of those

10   individuals?

11       A.  I have e-mails for some.  I'll have to check

12   and see what I submitted.  I think I have an e-mail or

13   two and a phone conversation.

14       Q.  Okay.  So this specific interrogatory,

15   Mr. Williams, was actually really just asking about any

16   written statements that you have, you know, where a

17   witness types up a statement and then signs it as, you

18   know, their statement about facts that happened with

19   respect to your claim.  Do you have anything like that

20   from any of these witnesses listed in response to

21   Interrogatory No. 4?

22       A.  I do believe I recall submitting an e-mail that

23   I was given permission to share but I don't -- it wasn't

24   formally signed the way you described it.

25       Q.  Okay.  But it was an e-mail from some -- one of



Page 105

1    these individuals?

2         A.   Tracie Haygood.

3         Q.   And did she send you the e-mail?

4         A.   Yes, I believe so.  Yeah, I'm pretty sure she

5    did.  I would just have to, I mean, find it.

6         Q.   Do you recall when she sent you the e-mail?

7         A.   It would have been in the March or so

8    timeframe.  I remember sending it.  Let me see if I can

9    find it.  Let's see, statement of support.

10        Q.   Do you have a copy?

11        A.   I do.

12        Q.   Did you provide that to your attorneys?

13        A.   I think I did.  Yeah, it should have been in

14   the repository.

15        Q.   I don't think that was produced to us.  Would

16   you mind sharing it with your attorney so that he can

17   take a look at it and get it to me?  Because this is my

18   only chance to ask you questions in connection with your

19   lawsuit and I have noticed that Response to

20   Interrogatory No. 4 stated that you were in possession

21   of statements and we asked not only that you identify

22   any statements, that you also produce statements.

23   Remember following the interrogatories we provided

24   requests for production where we asked that you provide

25   certain documents.  One of the categories of documents



Page 106

1    that we requested, Mr. Williams, were any statements

2    that were identified in the interrogatory responses and

3    we did not see a statement from Ms. Haygood.  I did

4    write to your attorneys last week and I did not receive

5    anything in response and since this is my only

6    opportunity to talk with you before, you know, any trial

7    in this case, I'm hoping that I can get a copy of what

8    you're talking about before we conclude this deposition

9    so that I can ask some questions about it.  So if you

10   wouldn't mind -- but I would like for you to just send

11   the statement to your attorney so that he can take a

12   look at it and make sure that there's no privileged

13   information in it and that it can be produced to me.

14              But what you've described to me,

15   Mr. Williams, you said that you -- you have an e-mail

16   from Tracie Haygood.  Is the subject line "Statement of

17   Support"?

18       A.  Yes, it is.  And, Attorney Hodges, I sent it to

19   you, sir.  You should have it.

20              MR. HODGES:  I have it here.  I'm looking

21   over it.  Then I'll send it over to you shortly.

22              MS. JAMES:  Thank you.

23              THE WITNESS:  May I have a five-minute

24   break?

25              MS. JAMES:  Sure.



Page 107

1          VIDEO OPERATOR:  We're off video record.

2  The time is 2:29 p.m.

3          (Recess taken from 2:29 p.m. to 2:46 p.m.)

4          VIDEO OPERATOR:  We're back on the video

5  record.  It is 2:46 p.m.

6     Q.  (BY MS. JAMES)  All right.  So I do have a copy

7  now, Mr. Williams, of the statement that you obtained

8  from Ms. Haygood.  And it looks, Mr. Williams, like an

9  e-mail that she sent you on June 22nd, 2020, with the

10  subject line "Statement of Support" and she says at the

11  end -- Mr. Williams, I have a question about the

12  statement.  She says, "Best wishes in your arbitration

13  next week."  What -- what is she referring to by

14  "arbitration"?

15     A.  We had a mediation meeting through Shell's

16  Resolve program.  I guess you didn't know that?

17     Q.  Well, I thought that's what it meant but I was

18  just confirming.  Yes, I did realize there was a

19  mediation through the Resolve program but the reference

20  to arbitration threw me off so I just wanted to make

21  sure that that's what it was referring to.

22     A.  Okay.

23     Q.  Tracie Haygood, Mr. Williams, how do you know

24  her from Shell?

25     A.  Let me -- we met at Shell.  They have affinity



Page 108

```
 1    groups and we're both African-American and she actually
 2    used to work with my manager who terminated me, Xavier,
 3    and so she -- she kind of sympathized with me with his
 4    actions because she's seen, I guess, questionable
 5    behavior by him and how he treats other employees.
 6         Q.  Okay.  Now, was Xavier Ms. Haygood's
 7    supervisor?
 8         A.  I don't -- I don't -- I don't recall if she
 9    reported to him or she just kind of supported him.  You
10    know, sometimes you kind of work with people on a
11    project or something but I do not -- I'm not sure if she
12    was a direct report or not but I know she had quite a
13    few commercial business engagements with Mr. Xavier and
14    there was just questions about his leadership style, you
15    know, the way he'd treat employees that -- that -- that
16    she saw consistent.
17         Q.  Okay.  Can you be more specific about what
18    those questions were?
19         A.  I would -- I would have to look at her
20    statement but right now, I mean, I would be trying to
21    recall a verbal conversation I had with her and it would
22    be unfair for me to misquote her but I do know that
23    there was questionable leadership, maybe unfairness.
24    Even -- even my peers like Tamika Greer she had managers
25    that were similar to Xavier in other roles before he got
```



Page 109

1    in position like my predecessor -- his predecessor Eric,

2    the guy who hired me, Eric Boydstun, and there was

3    questions amongst management and tenured employees about

4    Mr. Xavier's qualification to have that position.

5        Q.  Okay.  So I think the question that you

6    mentioned that Ms. Haygood had about Xavier you said

7    that you do not recall the exact questions; that you and

8    her discussed them in verbal conversations; is that

9    correct?

10       A.  That's correct.  I do not have a written

11   statement from her detailing her concerns and

12   interactions with him.

13       Q.  Okay.

14       A.  I obtained a statement of support that she

15   wrote.  As you can see, it -- it details similar

16   discriminatory treatment that she encountered at Shell.

17       Q.  Okay.  So about Xavier, do you recall any

18   specific circumstances or complaints that Ms. Haygood

19   expressed to you about Xavier?  Xavier, excuse me.

20       A.  Because I used to say Javier -- I used to live

21   in Miami so I would say Xavier, I would say Xavier and

22   I'm not used to French so I had to practice it.

23       Q.  Yeah.

24       A.  But I recall her saying things like lack of

25   trust.  You know, you've got to be on your toes with



Page 110

1    this guy.  He don't seem like he has your -- my best

2    interests in mind.  You know, kind of stern, difficult

3    to work with, not -- not personable, not approachable.

4    Those are some of like the characteristics in which she

5    described her interactions with him.

6         Q.  Okay.  Can you recall any other description of

7    Xavier that Ms. Haygood gave Xavier specifically?

8         A.  I don't remember like specific names or

9    anything but there were comments made about his -- his

10   management style and how he treat people and there were

11   elements of unfairness in there from her comments.  Kind

12   of like preferential towards certain employees.  That

13   type of behavior.

14        Q.  Okay.  Any other criticisms that Ms. Haygood

15   expressed to you about Xavier or his management style?

16        A.  From her interaction that was the main one is

17   just really, you know, seems like a person who could,

18   you know, I guess kind of throw you under the bus, you

19   know, your Ps and Qs.  You know, she's seen him just

20   kind of I guess take advantage of people I guess to get

21   to where he got to but -- and even that was a question

22   within itself.  For example, my other counterpart,

23   Tamika Greer, you know, she was former Exxon on the same

24   team as I reporting to Xavier.  You know, she made

25   comments about, you know, his style, his sternness, some



1    of the -- some of the last-minute requests, unreasonable

2    expectations to be on the road for four days a week,

3    because all that was a change, you know, even time on

4    the road but even Tamika herself similar to the

5    sentiments -- the statement of support you read from

6    Ms. Haygood, Tamika also shared with me that she was

7    passed over from -- from -- for some positions and even

8    denied bonuses and as a result I believe it was in 2019

9    she had filed a complaint to HR and an EEOC complaint

10   and she shared that with me.

11        Q.   Okay.  So I want to make sure that for

12   Ms. Haygood, Mr. Williams, I'd like to make sure that

13   you've told me about all the complaints or issues that

14   Ms. Haygood raised with you and then we can talk about

15   Tamika.

16             My understanding is Ms. Haygood told you

17   that she had questions about Mr. -- Xavier's treatment

18   of some people, his management style.  She mentioned

19   things like lack of trust; that she had to be on her

20   toes, he was difficult to work with, not approachable,

21   and that there was preferential treatment for some

22   individuals.  Is that correct?

23        A.   That's correct.

24        Q.   And you said -- do you recall the role that

25   Ms. Haygood worked in?



Page 112

1          A.   I don't recall the exact role.

2          Q.   Was she on -- was she in -- within your -- did

3     she work within your group?

4          A.   Not when she worked with Xavier.   This is

5     before she was in the role.

6          Q.   So she was not one of the business-development

7     managers reporting to Xavier?

8          A.   That's correct.

9          Q.   Okay.   Tamika, on the other hand, was one of

10    the business-development managers who also reported to

11    Xavier like you did?

12         A.   That's correct.

13         Q.   Was Tamika on the transportation side or on the

14    lubricant side?

15         A.   Well, all of it is lubricants.

16         Q.   Oh, I'm sorry, transportation or industrial,

17    excuse me.

18         A.   Industrial.   Yes, she was.

19         Q.   She was industrial just like you?

20         A.   Yes.

21         Q.   Okay.

22         A.   She just had been doing it for about four

23    years, you know, before -- you know, I was a newbie in

24    industrial.

25         Q.   Okay.   Got it.   Other than Tamika and



Page 113

1    Ms. Haygood, did anyone else raise any issues about

2    Xavier?

3         A.  I mean, other than the other direct reports

4    that -- that reported to him, the other team members,

5    there was Bob McDonald who reported to him, some name

6    some other -- we had a new guy named Eugenio --

7         Q.  Okay.

8         A.  -- who reported to him.

9         Q.  Is Tracie Haygood the only one outside of the

10   business-development -- business-development managers

11   who reported to him that raised concerns that she had

12   about him with you?

13        A.  Yes, that they had other previous engagements

14   with him, yes.

15        Q.  Okay.  And the examples that you just -- that

16   you gave me that she raised as far as questions about

17   Xavier, they were all, you know, I guess general

18   questions or issues like, you know, you mentioned lack

19   of trust, have to be on your toes, he's difficult, not

20   personable, not approachable, she had questions about

21   his management style.  Did she ever give you any

22   specific examples of any of those issues?

23        A.  Not -- that was over a year and a half ago.

24        Q.  Okay.  I understand.

25        A.  I can't recall.



Page 114

1      Q.  So you don't recall any specific examples that
2  she shared with you with respect to any of these issues?
3      A.  Not like -- not like employee names but she
4  remembered incidences.  You know, she stated incidences
5  the way that he acted and behaved and responded to
6  situations and even to her that was -- that was very
7  difficult.
8      Q.  Do you recall any specific examples that she
9  shared with you?
10      A.  I do not recall the exact situation.
11      Q.  Okay.  Did she ever share any examples of
12  preferential treatment with you?
13      A.  That's supported in her statement.
14      Q.  Okay.  I -- so I did not read her statement to
15  be directed at Xavier.  I thought it was more about her
16  role and potentially people she reported to.
17      A.  Uh-huh.
18      Q.  Do you know whether any of the issues she's
19  raising in her statement has to do with Xavier?
20      A.  I do not know that particular in her statement.
21  I wish I would have requested that statement in specific
22  to Xavier.  That would have been easier.
23      Q.  Now, you mentioned that Tamika also raised
24  concerns about Xavier and that it's your belief that she
25  charged an EEOC charge and HR complaint in 2019?



Page 115

1          A.   It might have been 2019 or 2018 because she had

2     been in the role for several years.  I think she

3     actually filed, you know, before Xavier.

4          Q.   Okay.

5          A.   Yeah.  I think she filed before Xavier.

6          Q.   Okay.

7          A.   For doing the same thing.

8          Q.   Just to clarify, the EEOC charge and HR

9     complaint that you believe she filed were things that

10    she filed before she reported to Xavier or Xavier,

11    excuse me?

12         A.   I do believe that's correct, yeah, but I think

13    her experiences -- I mean, you know, Xavier is the

14    direct manager or supervisor but I guess there was just

15    a line of perhaps a management question of unfair

16    treatment, you know, even upper management to

17    well-performing African-American employees.  And Tamika

18    explicitly told me that her previous supervisor who was

19    a lady stated that -- who was in the same position as

20    Xavier came into as a manager that there was questions

21    about management, about his qualifications in that job

22    to be a manager.  They didn't think he was qualified.

23         Q.   Okay.  And I'll come back to that in a minute.

24    One more question about the EEOC charge.  Tamika told

25    you that she had filed an EEOC charge in either 2018 or



Page 116

1    2019?

2         A.  That's correct.  I think it was 2018.

3         Q.  Okay.  She also told you that she filed an HR

4    complaint in 2018 or 2019?

5         A.  Yes.

6         Q.  Okay.  Did you ever see a copy of the EEOC

7    charge or the HR complaint that she told you about?

8         A.  I did not.  That's -- that's confidential.  I

9    mean, she wouldn't -- she wouldn't -- yeah, I didn't

10   even ask.

11        Q.  Okay.  Did she tell you what specifically she

12   complained about in either the HR complaint or the EEOC

13   charge that she filed?

14        A.  It was related to being passed over for

15   promotions and bonuses which -- which according to her

16   sales goals and metrics she had obtained but then

17   somehow the calculations they did or something didn't

18   correspond to her performance so she said, you know,

19   other -- other white male counterparts was getting

20   different roles and advancements over her despite her

21   performance and her being an experienced employee.  You

22   know, taught well at Exxon.  Performed well.  Yeah,

23   those were her complaints.  That's what it was due to.

24   I mean, even up until the time before my termination she

25   was complaining about not potentially achieving her



Page 117

1    bonus and, you know, was still kind of disgruntled by

2    that and she had many complaints about Xavier herself.

3         Q.  Okay.  Now, the HR complaint and the EEOC

4    charge related to being passed over for promotions and

5    bonuses, you said that -- that was filed before Xavier

6    was her supervisor, correct?

7         A.  Yes.

8         Q.  Okay.  Now, tell me, did she -- did she ever

9    have any discussions with you about what she considered

10   to be unfair treatment by Xavier?

11        A.  She expressed to me that he was like

12   inconsiderate and insensitive about the requirements of

13   the travel expectations and the administrative requests

14   that he imposed upon the business-development managers.

15        Q.  Okay.  Any other specific complaints that

16   Ms. Greer raised with you about Xavier?

17        A.  Other than that he was strict and stern and

18   difficult to -- to work with and kind of like that last

19   of trust kind of consistent with what Ms. Tracie Haygood

20   said, you know, similar sentiments.

21        Q.  Okay.  I want to turn now to your claims.

22   We'll come back to your witnesses and talk a little bit

23   more about those later in the deposition but I'd like

24   to -- if you could look again at the EEOC charge and

25   I'll share my screen with you.



Page 118

1              So you filed the charge it looks like
2   August 25th of 2020 and you checked off where it asked
3   you to check off "Discrimination based on:" you checked
4   off race and retaliation.  Do you see that?
5       A.  Yes.
6       Q.  You did not check off discrimination based on
7   sex.  Do you see that?
8       A.  Yes, I do see that.
9       Q.  Okay.  Did you ever file any other EEOC charges
10  of discrimination or any charges with the Texas
11  Workforce Commission where you claimed discrimination
12  based on sex?
13      A.  I do not recall.
14      Q.  You don't recall?
15      A.  No, I do not believe I've done it.  This is the
16  only time I've filed an EEOC.
17      Q.  So this is the only charge that you've filed
18  with the EEOC?
19      A.  Yes.
20      Q.  Okay.  I'm just going to go to Interrogatory
21  No. 16.  We had asked you -- so your EEOC checked off
22  race and retaliation as the basis of the unlawful
23  actions you are alleging against Shell.  So in
24  Interrogatory No. 16 we asked you to identify any and
25  all persons that you claim engaged in discrimination or



Page 119

1   retaliation against you and we talked about your
2   response to Interrogatory No. 16 a little bit earlier in
3   your deposition but you listed in response the following
4   individuals:  Jesus Guerrero Herrera, Kristia
5   Encarnacion, Jarrett Enochs, Clement Delahunt and Holly
6   Burns.  Do you see that?
7       A.  Yes.  I notice Xavier is missing.
8       Q.  Okay.  So you would add Xavier to that list?
9       A.  Most certainly would.  Right at the top.
10      Q.  Okay.
11      A.  And as I mentioned before, I would remove
12  Jarrett Enochs.
13      Q.  And what about Kristia Encarnacion?
14      A.  I had mentioned -- I was kind of questioning
15  him about it like she's HR but I read in that 1,400-page
16  document that she kind of withheld, you know, some
17  information from me that she could have produced like
18  the handbook and so forth but I don't -- I'm kind of
19  torn between whether or not she should be there or not
20  but...
21      Q.  Okay.  Is the only basis for including her in
22  this list the fact that she did not provide you with
23  copies of the employee handbook when you asked for them?
24      A.  Yeah, there's like a employee handbook and
25  another question I asked and her supervisor, whoever she



Page 120

1   spoke to, they told her to withhold that information, to

2   wait for me to ask for it again and then if I asked for

3   it and if I called, then she'll provide it.  I just -- I

4   don't know.

5       Q.  Okay.  Can you remember any other documentation

6   that you asked Ms. Encarnacion for other than the

7   employee handbook?

8       A.  Yeah, there was -- there were several things.

9   Another one was like when they terminated me, they told

10  me that I would get paid for all of my unpaid vacation

11  days and they didn't do that.  And I asked for a record

12  of that and, you know, why and Xavier told me himself

13  that he would do that; that I would get that, but then

14  they said, well, because you were terminated -- because

15  I get -- all my vacation days are prorated.  I get -- I

16  had like four weeks, 20 days of vacation, and so I think

17  I had used like three or something and I had like 17

18  vacation days and I had asked her about the policy or

19  whatever on that and there was nothing produced on it

20  and she said, well, despite Xavier said I would get paid

21  on it she said that, "Well, I guess there's something

22  about since you were terminated, you -- then your

23  vacation defaults to how many hours that was accrued."

24      Q.  So you had asked for a policy related to

25  payment of vacation after termination of employment and



Page 121

1    she did not provide you with the policy?  Is that what

2    you're stating?  I understand that the -- you're also

3    telling me about not getting paid for the vacation time

4    you thought that you were going to get paid for but

5    remember, Mr. Williams, my question was what documents

6    or information did Ms. -- did you ask for that

7    Ms. Encarnacion withheld from you.  Remember?  So I'm

8    just trying to find out what documents she did not

9    provide or didn't -- withheld when you asked for them?

10        A.  It was mainly the employee handbook.

11        Q.  Okay.

12        A.  Yeah, yeah.  That's the main one.

13        Q.  So that's -- that's the one -- that's the only

14   document you can recall asking Ms. Encarnacion for?

15        A.  Yes.

16        Q.  And this was in connection with I believe you

17   were communicating with her after you were terminated;

18   is that correct?

19        A.  That's correct.

20        Q.  Okay.  And she never provided you with a copy

21   of the handbook?

22        A.  Yes, yes.  She was told I guess by her manager

23   or something they said it's available online on the

24   intranet but when you're terminated you no longer have

25   access to the company internal system.



Page 122

1      Q.  Okay.  And is Ms. Encarnacion withholding of

2  the employee handbook when you asked for it, is that the

3  only reason that you have her included in this list of

4  individuals in response to Interrogatory No. 16?

5      A.  That is the only reason.

6      Q.  Okay.  So let's -- let's talk about the list.

7  I think I'm going to go from the bottom up.  So let's

8  talk about Holly Burns.  What did Holly Burns do to you

9  that you believe was discriminatory or retaliatory

10  treatment?

11      A.  Did you see the statement?  I guess that was --

12  maybe that was the top of the EEOC complaint.  I saw the

13  description.

14      Q.  Okay.  I do recall that the -- the EEOC

15  complaint and your lawsuit refers to an incident with

16  Ms. Burns that occurred soon after you began your

17  employment with Shell.  Is that what you're referring

18  to?

19      A.  Yes.  Yes, ma'am.

20      Q.  Okay.  Are there any other reasons other than

21  that incident that you included Ms. Burns in this list

22  of individuals in response to Interrogatory No. 16?

23      A.  No, that -- that was the only reason.

24      Q.  Okay.  So that -- that incident is the only

25  reason that you've identified her as someone who



Page 123

1    discriminated against you or retaliated against you?

2         A.  That's correct.  Do I need to re -- to recount

3    what took place?

4         Q.  We'll talk.  I'm going to ask you about that

5    for sure, yeah.

6         A.  I wasn't sure because you brought up her name

7    so...

8         Q.  Yep, I'm going to ask you about that.  I'm

9    going to just continue to go through these names and

10   then we'll talk a little bit more about the incident in

11   just a bit.  Okay?

12        A.  Understood.

13        Q.  All right.  So Clement Delahunt, why did you

14   include Mr. Delahunt in this list of individuals who you

15   believe discriminated or retaliated against you?

16        A.  That's also listed as well in the lawsuit and

17   the EEOC.

18        Q.  Okay.  I do recall that there -- you describe

19   an incident with Mr. Delahunt in either the lawsuit, the

20   EEOC charge or both.  I think he -- that is the

21   individual that you claim grabbed your backside; is that

22   correct?

23        A.  That's correct.

24        Q.  Okay.  Is the basis for including Mr. Delahunt

25   in this list of individuals who discriminated against



Page 124

1    you or retaliated against you the incident that's

2    discussed in your Complaint and the EEOC charge?

3         A.   Yes.  It's his action and more so even

4    management's reaction to that.

5         Q.   Okay.  Well, we'll get to that in a second.

6    Are there any other reasons that you can include

7    Mr. Delahunt in this list of individuals who you allege

8    discriminated or retaliated against you outside of his

9    involvement in the incident where he grabbed your

10   backside?

11        A.   I cannot.

12        Q.   So no other reason, correct?

13        A.   That's correct.

14        Q.   Now, you said management's reaction to the

15   incident with Mr. Delahunt.  Who are you referring to

16   within management that you claim reacted in a way to the

17   incident with Mr. Delahunt that was either

18   discriminatory or retaliatory?

19        A.   So I had two employees who witnessed the

20   incident and they were Steven Stack and Damon

21   Higginbotham.  And they saw when Mr. Delahunt, you know,

22   grabbed my behind and they saw me turn around

23   infuriated, you know, confronting Mr. Delahunt about it

24   and -- yeah.  He -- he grabbed me and said I had a nice

25   ass.  And I, you know, pretty much told him not to put



Page 125

```
1    his hands on me and this and that and so my co-workers
2    just kind of moved me to the side.  They told my hiring
3    manager, Eric Boydstun, about what happened because he
4    was right there.  He was advised what happened and he
5    simply told Mr. Delahunt, you know, what -- to go to his
6    room; that he's done for the night.  There was no other
7    action or engagement of disciplinary actions taken.  I
8    felt, you know, kind of vulnerable, you know, about the
9    whole situation and I really felt kind of threatened to
10   file an HR complaint.  You know, I'd only been with the
11   company, what, ten months, nine months and then, you
12   know, I had that first incident with Holly and that
13   wasn't a good look so early with the company and then
14   having this incident and, you know, I'm more focused on
15   trying to perform because this happened like in October
16   and I really just started working, I mean, with my
17   customers like in June so it was just -- you know, just
18   trying to establish a good reputation at Shell but --
19   yeah, that just really made me feel uncomfortable.
20       Q.  Okay.  And -- so let's -- let's talk about that
21   for a minute.  You said that you told Mr. Boydstun about
22   the incident; is that correct?
23       A.  I did but my peers -- Steven Stack, you know,
24   did as well.  Steven Stack, Damon Higginbotham.  They
25   say, "Hey, man, you know, the guy..." -- Clyde --
```



Page 126

1   Clement said, "You know, you touched Carl on his rear

2   end.  You know, Carl was upset.  You know, it was

3   unnecessary.  You know, Carl did not, you know,

4   strike -- you know, engage in any physical activity with

5   Mr. Delahunt."  And so the action taken by management

6   was simply to tell him to go to his hotel room.

7        Q.  Okay.  Was that -- I think -- was that -- I

8   think there was a celebration mentioned in connection

9   with that incident.  Was that -- I mean, were employees

10  drinking and having a good time at that incident or at

11  that -- when that incident occurred?

12            MR. HODGES:  Objection:  form.

13       Q.  (BY MS. JAMES)  You can still answer the

14  question.

15       A.  I guess -- I don't understand the basis.

16  What's the reference of the question?

17       Q.  So in your description of the incident with

18  Mr. Delahunt in your EEOC charge you describe the event

19  at which the incident occurred as a company celebration

20  event in Miami.  And this is from your EEOC charge.  And

21  so my question, Mr. Williams, were employees drinking at

22  that event?

23       A.  Yes, there was alcohol served at that event.

24       Q.  Okay.  Do you think Mr. Delahunt was at all

25  impaired by alcohol when that incident occurred?



Page 127

```
1                    MR. HODGES:  Objection:  speculation.
2                    You can answer to the best of your ability,
3     Mr. Williams.
4                    THE WITNESS:  I'm sorry, what did you say?
5                    MR. HODGES:  You can answer to the best of
6     your ability.
7                    THE WITNESS:  Okay.  And -- and, Attorney
8     James, you said do I think alcohol is a factor?
9          Q.  (BY MS. JAMES)  Yeah.  Was Mr. -- did
10    Mr. Delahunt appear to you to be at all impaired or
11    impacted by alcohol?
12         A.  I mean, I don't know his tolerance level or
13    anything.  I didn't see him grope anybody else -- you
14    know, no other men or women -- so I cannot account for
15    his level of sobriety but I can only tell you what
16    happened -- what I experienced.  There were no other
17    complaints about his behavior that night.
18         Q.  Okay.  And you mentioned in describing the
19    incident that occurred you said that he grabbed your
20    butt and told you you had a nice ass.  Did he do
21    anything else that offended you or that you considered
22    offensive besides grabbing your butt?
23         A.  That was about it and that was enough on his
24    own.
25         Q.  Okay.  So no other physical action by Mr.
```



Page 128

```
 1   Delahunt that you were offended or insulted by?
 2        A.  Well, just -- just -- just his action and the
 3   way he said it and looked at me.
 4        Q.  Right.  Yeah.  So I was just curious about any
 5   other physical action but I was going to ask you about
 6   the comment in a minute.  But as far as any other
 7   physical action besides grabbing your butt, were there
 8   any other physical actions by Mr. Higginbotham that you
 9   were offended or insulted by?
10        A.  That was Mr. Delahunt and, no, there was no
11   other action by Mr. Delahunt.
12        Q.  Okay.  And then as far as the comment that he
13   made, were there any other comments that he made during
14   that incident that you were offended or insulted by?
15        A.  It was just when I turned around and saw what
16   happened and who did it and he saw me looking infuriated
17   at him trying to figure out what was going on, what
18   happened, he simply looks at me and says, "What?  You
19   have a nice ass."
20             And I'm like, well, as though that's
21   justifiable to behave that way in a corporate
22   environment, you know, to violate another man because I
23   know if that happened to a female employee, he would be
24   terminated and the female employee would not have to
25   file an HR complaint.  I'm sure the manager would take
```



Page 129

1    care of that.

2        Q.   Okay.   Did Mr. Delahunt make any other comments

3    besides what --

4        A.   No.

5        Q.   -- you have a nice ass during the incident in

6    question?

7        A.   No.   He was just disgruntled that he was asked

8    to leave as though he didn't understand what he did.

9        Q.   How do you know he was disgruntled?

10       A.   Because Eric Boydstun escorted him away and,

11   you know, he kind of did it reluctantly with a

12   disgruntled look on his face.

13       Q.   And you're referring to Mr. Delahunt or

14   Mr. Boydstun?

15       A.   No, no, no, Mr. Delahunt --

16       Q.   Okay.

17       A.   -- my previous supervisor, was made aware by

18   Mr. Stack and Mr. Higginbotham what he did and

19   Mr. Boydstun escorted him away from the area.

20       Q.   Okay.   But it was Mr. Delahunt that had the

21   disgruntled look on his face?

22       A.   Yes.

23       Q.   And what do you mean by that?   He -- he looked

24   angry?   Upset?

25       A.   Yeah, he was upset as though he didn't do -- as



Page 130

1    though he didn't do anything wrong.

2         Q.  So Mr. Boydstun told him to leave and go to his

3    room?

4         A.  Yes.

5         Q.  Okay.  And this was at a hotel, I'm assuming?

6         A.  Yes, it was, in Miami.

7         Q.  Okay.  Did you raise this incident with any

8    other member of management besides Mr. Boydstun?

9         A.  I did not.

10        Q.  Did you have any further conflicts with

11   Mr. Delahunt?

12        A.  I did not.  It was just a little awkward seeing

13   him in passing.  There was no apology or anything

14   either.

15        Q.  Okay.  Did you have any discussions with

16   Mr. Boydstun about what discipline you believed

17   Mr. Delahunt should receive?

18        A.  I recall talking to Mr. Boydstun about the

19   incident, you know.  He asked me if I was, you know,

20   okay at the time, you know, afterwards.

21        Q.  What did you tell him?

22        A.  I told him that I was upset about the entire,

23   you know, incident.  You know, that I just felt

24   vulnerable and threatened and I really felt helpless

25   kind of being a new employee with the fear of


MAGNA
LEGAL SERVICES

Page 131

1    retaliation what would happen if I filed an HR

2    complaint.

3         Q.   Did you tell Mr. Boydstun that?

4         A.   I did not verbalize that opinion, those

5    thoughts, to Mr. Boydstun.

6         Q.   Okay.  So you didn't tell Mr. Boydstun that you

7    were afraid of retaliation if you filed an HR complaint,

8    correct?

9         A.   That's correct.

10        Q.   But you told him that you were upset and you

11   felt vulnerable and threatened?

12        A.   That's correct.

13        Q.   Did you tell Mr. Boydstun any -- anything else

14   when he asked you whether you were okay?

15        A.   Not that I can recall.  I just, you know,

16   recall, telling him I was upset.  You know, I just felt

17   violated and that's, you know, basically what I told

18   him.  And it was a humiliating feeling.

19        Q.   What did Mr. Boydstun tell you in response?

20        A.   He just wanted to make sure that I was okay

21   like -- like emotionally and just almost -- almost like,

22   you know, just -- you know, just -- you know, just kind

23   of shake it off.  He sent, you know, Mr. Delahunt to his

24   room and, you know, kind of just like, you know, almost

25   like go back to -- to enjoy your evening.  You know,



Page 132

1   kind of like don't let this chill your spirit.

2        Q.  Did you stay at the event after that?

3        A.  I recall the event concluding shortly

4   thereafter.  It wasn't -- that was at the tail end of

5   the event.  I mean, I didn't leave immediately.  You

6   know, I recall talking to Steven Stack and Damon

7   Higginbotham about what happened and, you know, how I

8   felt about it and, you know, eventually that was -- that

9   was it.  I was just in total disbelief.  Just totally

10  appalled.

11       Q.  Did you raise the incident with -- ever again

12  with Mr. Boydstun after that night?

13       A.  I do not recall contacting Mr. Boydstun.  You

14  know, at that time he was no longer my manager, it was

15  Xavier, you know, like I said, my focus was to try to

16  have a good impression with Shell with my first year of

17  employment.

18       Q.  Okay.  And I think -- I asked you earlier about

19  why you believe the incident was motivated by

20  retaliation and -- or discrimination or retaliation and

21  you mentioned management's reaction was what was

22  motivated by discrimination or retaliation.  Is that

23  correct?

24       A.  Which event are you referring to?

25       Q.  The event with Mr. Delahunt.  The incident with



1   Mr. Delahunt in which he grabbed your butt.

2          A.  Yes.  I -- it's twofold in which I think there

3   were demonstrations of, you know, discrimination --

4   discriminatorial kind of racial treatment, you know.

5   First of all, you have an older white male that thinks

6   it's okay to grab a new, younger employee -- male's --

7   derriere, you know, and then you have another, you know,

8   white male similar age manager that takes, you know,

9   very casual, no harsh action report despite -- despite

10  seeing the discontentment of what happened with the

11  employee who should know the rules when it comes to like

12  sexual harassment in the workplace.  So I would expect a

13  manager to, you know, address those things, bring those

14  things, offer some type of suggestions and some support

15  but that -- that did not take place.  So that's kind of

16  where that preferential, discriminatory behavior comes

17  from -- from the corporate --

18          Q.  Did you -- go ahead.

19          A.  I was just going to say so the action from

20  Mr. Delahunt himself and the actions from management.

21          Q.  Okay.

22          A.  The response, rather.  Because if that was a

23  white employee, any female regardless of the race, the

24  response would have been much harsher.

25          Q.  How do you know that?



Page 134

1        A.   It's consistent with the culture of

2   experiences, you know, that I had, you know, that Tracie

3   Haygood had, that Tamika Greer had, other, you know,

4   just, you know, kind of black employees, you know, it's

5   just -- and their personal experiences.  It's almost

6   like -- it's almost like a code, you know, in Corporate

7   America.  You know, you're kind of lucky to be there

8   being black and, you know, some things you have to put

9   up and be happy you got a job.

10       Q.   Do you know if -- do you know if any older

11  white male employee ever grabbed Tamika Greer on the

12  butt?

13       A.   Absolutely not.  I do not know that.

14       Q.   Do you know of any situation where any other

15  Shell employee was grabbed on the butt by either

16  Mr. Delahunt or any other older white male employee?

17       A.   I -- I have no knowledge on that.

18       Q.   Do you have knowledge of any situation where

19  Mr. Delahunt or any other older white male grabbed

20  another African-American employee on any other part of

21  their body?

22       A.   I do not.  I have no knowledge or recollection

23  of any other Shell employee regardless of their

24  background experiencing what I experienced.

25       Q.   Okay.



Page 135

```
 1        A.   Excuse me one second.  I have to let in pest
 2   control.
 3        Q.   Okay.
 4             VIDEO OPERATOR:  Recording stopped.
 5             (Recess taken from 3:36 p.m. to 3:47 p.m.)
 6             VIDEO OPERATOR:  We're back on the video
 7   record.  It is 3:47 p.m.
 8        Q.   (BY MS. JAMES) Okay.  Mr. Williams, before the
 9   break we talked about the incident with Mr. Delahunt and
10   we were going through the list of employees that you had
11   listed in response to Interrogatory No. 16.  So I'm
12   going to go back to that and ask you about two
13   additional individuals on the list.  So you talked about
14   Holly Burns, Kristia Encarnacion, Clement Delahunt and
15   the next one is Jesus Herrera.  Am I pronouncing that
16   right?
17        A.   Yes.
18        Q.   Okay.
19        A.   I just put him down because he was complicit.
20   You know, Xavier reports to him so he had to endorse and
21   push for this wrongful racial termination.
22        Q.   Okay.  So Mr. Herrera is Xavier's manager?
23        A.   Yes.
24        Q.   And the reason you included him in this list is
25   because you believe he would have approved or
```



Page 136

```
 1    participated in the decision to terminate your
 2    employment?
 3         A.  Yes.
 4         Q.  Is there any other conduct or action on behalf
 5    or on the part of Mr. Herrera that you relied on to
 6    include him in this list of individuals who you believe
 7    discriminated or retaliated against you?
 8         A.  If I heard you correctly, you said were there
 9    any other actions or behaviors of Mr. (Simultaneous
10    speaking) --
11         Q.  Yes.
12         A.  Not that I can think of other than he gave me a
13    strange look one day.
14         Q.  And do you know for a fact that he participated
15    in the decision to terminate your employment or -- or
16    are you assuming that he did because he's Xavier's
17    manager?
18         A.  Yes, he had to sign off on it and from that
19    1,400 page document they sent over, he was involved
20    because Xavier --
21         Q.  Let me ask this.  Before getting our document
22    production did you have any discussions with anyone with
23    Shell or learn of any other information that led you to
24    believe that Mr. Herrera participated in the decision to
25    terminate your employment?
```



Page 137

1       A.  There was no other discussions that were -- no.

2       Q.  Okay.

3       A.  But I knew for such a drastic action to take

4   place he had to approve it.  That's -- you know, a

5   first-level line manager like Xavier doesn't have the

6   authority to do that.

7       Q.  Okay.  Are you saying that just based on your

8   experience in Corporate America?

9       A.  And what I know.  I understand.

10      Q.  Yeah.  Not that you have some specific

11  knowledge it was Shell policy that said Mr. Herrera

12  would have to approve it, it's just that you're saying

13  that your experience working for a corporation usually

14  when you had a termination someone's line manager would

15  have to approve their decision to terminate?

16      A.  It goes all the way up the management chain.

17      Q.  Okay.  Do you know -- do you know whether any

18  other members of management participated in the decision

19  to terminate your employment?

20      A.  Not that I'm aware of.

21      Q.  Are you aware of specifically of any other

22  members of management who approved the termination of

23  your employment other than Mr. Herrera?

24      A.  From looking at that 1,400-page document there

25  was someone in HR that approved it.  There was a lot of



Page 138

1   back and forth between Kristia and indecisiveness with

2   Xavier saying, "Well, maybe I should issue a written

3   warning, a verbal warning."

4           Then HR said, "Well, we recommend you put

5   him on a performance improvement program."

6           So there's a lot of dialogs in e-mails

7   exchanged.  And then Xavier all of a sudden says, "Well,

8   I just want him terminated immediately."

9       Q.  Okay.  And did you have any conversations with

10  anyone at Shell about that or are you just talking about

11  information that you saw in our document production?

12      A.  That's what I saw in the document production.

13      Q.  Okay.  And you said someone -- other than

14  Mr. Herrera, there was someone else in the HR group who

15  approved your termination?

16      A.  Yes.

17      Q.  Do you recall that person's name?

18      A.  I wonder if I have his name.  Not off the top

19  of my head.  I would have to look for it.

20      Q.  Okay.  Anyone else that you believe was either

21  involved in the decision to terminate your employment or

22  approved your termination?

23      A.  From a management perspective?

24      Q.  Or HR.  And -- and I want to know about your

25  independent knowledge just to be clear, Mr. Williams,



Page 139

```
 1    not necessarily your knowledge based on what's in our

 2    documents.  I want to know about your individual

 3    personal knowledge because I know what's in our

 4    documents.  This is my opportunity to ask you questions

 5    before trial so it's for me to learn anything that you

 6    might -- information that you might have that I don't

 7    have.

 8         A.  Understood.  There's no personal knowledge that

 9    I have.

10         Q.  Right.  Okay.  And you mentioned earlier when I

11    was asking you about actions or conduct by Mr. Herrera

12    other than his involvement in the decision to terminate

13    your employment, you mentioned something about him

14    giving you a look is the only other conduct or action by

15    Mr. Herrera.  Will you explain that for me what you mean

16    he gave you a look?

17         A.  Being home-based employees we have printers

18    provided by the company.

19         Q.  Uh-huh.

20         A.  And mine wasn't working and I have this little

21    wagon that I sometimes bring groceries into my apartment

22    and stuff in.  It's a little pull behind.  And I had my

23    printer in my wagon taking it on campus to the IT

24    department.  And in passing I saw Mr. Herrera and he

25    goes -- he was like, "We give you guys printers?"
```



Page 140

1          I'm like, "Yes.  You know, we work from

2     home.  Like is that okay?"

3               And he just shakes his head like, I don't

4     know, it was kind of weird.

5     Q.  Okay.  And did he say anything else or do

6     anything else that you thought was weird?

7     A.  No, no, there's nothing else.  I just -- I

8     don't know, I was just like, wow, really?

9     Q.  I mean, he didn't accuse you of like -- I mean

10    he wasn't accusing you of theft or anything like that?

11    A.  Of course not.

12    Q.  Okay.  Okay.

13    A.  Like they spoil us or give us too much I don't

14    know how you can work from home without a printer.

15    Q.  Oh, okay.  So you -- you don't really know what

16    his intent was in saying this but you suspect or believe

17    that he may have been insinuating that, you know, Shell

18    spoils its employees by giving them printers?

19    A.  We need it for work.

20    Q.  Right.

21    A.  Yes.

22    Q.  But did you think that was his -- was it your

23    appreciation that that was his reaction and why he said

24    what he said about the printer and your wagon?

25    A.  Yeah, that was my interpretation.



Page 141

1          Q.  Okay.

2          A.  I just thought his facial expression was kind

3     of strange and I was surprised to hear that comment.

4     But there's nothing, you know, that I've experienced

5     from him that is, you know, racial discrimination.  You

6     know, no actions other than endorsing my wrongful racial

7     termination.  I mean, I've actually had lunch with him

8     and different interactions and, you know, I've always

9     felt, I don't know, positive like from him personally

10    but...

11         Q.  Okay.  All right.  So let's talk about Xavier

12    who I think is the last person you identified as being

13    someone who engaged in discrimination or retaliation

14    against you.  So tell me what action Xavier took against

15    you that you believe to be discriminatory or retaliatory

16    in nature.

17         A.  Do you want me to go directly to it or give you

18    the background?

19         Q.  So let's -- tell me the action -- you know, the

20    specific conduct or the action and then we can talk

21    about the background and the reasons why you believe it

22    was either discriminatory or retaliatory.

23         A.  I mean, he terminated me.

24         Q.  Okay.

25         A.  He -- what was it, in February, the end of



Page 142

1    February 2020, he said, "Hey, Carl, we're going to meet

2    on March 16th, Monday, and have a meeting to discuss

3    your strategy and the pipeline and how you're going to

4    grow."  And then like COVID happened and started to come

5    and we started working remote and so it ended up being a

6    Zoom call.  I get on the Zoom and I see him and HR and I

7    was like -- what is -- you know, my heart started

8    palpitating.  I was, oh, this is not good.  What's going

9    on?

10             And he's like, "Carl, effective today

11   you're immediately terminated due to your performance."

12             And I was like, "Excuse me?  What do you

13   mean my performance?  You guys just paid me a

14   performance bonus last month.  How is this a

15   performance-related issue?  My performance review was

16   back in October and it was somewhat positive for the

17   most part considering my short tenure with the company."

18             And so in February I was working with my

19   distributor O'Rourke and the sales manager, Scott Field

20   and I, a new employee named Adrianna Pierce, we had a

21   customer visit in Port Arthur, Texas at a customer named

22   German Pellet, we were doing like a site assessment.

23   Everything went well during the visit.  You know, the

24   customer was very like colloquial and social.  In our

25   discussion it was very kind of light hearted.  We had



Page 143

```
1    lunch and I had asked Mr. Scott Fields with O'Rourke
2    Petroleum, the sales manager, questions about, you know,
3    strategy, employee sales force as far as resources,
4    extra -- extra support from some of Shell's aligned
5    technical services and Shell had recently -- I had
6    mentioned RelaDyne earlier, one of my distributors that
7    I started working with in January.  And Shell had
8    recently -- RelaDyne has a separate division called
9    Reliability Services and Shell endorsed them to be a
10   nationwide service provider for technical service at
11   plants.  And that was a service that O'Rourke did not
12   offer.  And I asked Mr. Fields if he had considered
13   utilizing RelaDyne Reliability Services for their
14   technical support.  And he got infuriated with me and at
15   lunch with his new employee he even stepped outside and
16   had a smoke and I was like, "Wow, like I didn't realize
17   that there was friction between him and RelaDyne, the
18   other oil distributor company."  But I knew that
19   RelaDyne Reliability Services was a separate company on
20   its own.  And so, you know, he didn't like the questions
21   that I asked during lunch.  He alleged that I was
22   unprofessional during the visit which was untrue and he
23   told -- he sent an e-mail to his boss Ryan who sent an
24   e-mail to John McDonnell who is over the distributors
25   and they said that they don't -- they did not want to
```



1  work with Carl anymore.  He said I was no longer of

2  value to them.  The same guy who for the past six, seven

3  months who thanked me for helping his employee up in

4  Dallas, Robert Hernandez, helping him grow business for

5  an account in Dallas.  He thanked me for helping Ashley

6  Phelps in Beaumont area, Houston area, rather.  And he

7  also thanked me previously for working with Bradley

8  Adams who is no longer with O'Rourke and he told me that

9  we had a good relationship, Mr. Fields and I.  I -- I

10  spent the most time with them out -- out of, you know,

11  even the other two distributors I had, MidTex and

12  Breaux.  And I really felt we had a good synergy which

13  is why I was comfortable asking him questions about the

14  business.  And he didn't like the questions I asked and

15  he basically threw me under the bus.  And because Shell

16  was in contract negotiations with O'Rourke to renew the

17  distribution agreement to buy more product, for more

18  sales, and because O'Rourke said they -- because this

19  incident happened and they missed that negotiation,

20  Xavier decided to terminate me opposed to looking at

21  this incident as something that was unfair to me for

22  doing my job.  And that type of response, you know, I --

23  from talking to my white counterparts like Lucas Kerley,

24  he said he's only seen that -- he said that only

25  happened because I was black and he said that I should



Page 145

1    file a lawsuit.  Lucas Kerley told me he's seen an

2    incident with another white male who did similar work in

3    California who had an issue with the distributor like

4    O'Rourke and he said that they simply assigned him

5    another distributor; that there was no retaliatory

6    action like what I experienced.

7                Mr. Lucas also said although he was helping

8    me with Breaux Petroleum in Louisiana when I was working

9    with them, Breaux Petroleum had a senior experienced

10   employee who had a lot of knowledge of the market and

11   the accounts but he would not invite us to do field

12   rides with him to help pursue the business.  He would

13   call Lucas Kerley directly.

14        Q.  The Breaux Petroleum, you cut out Mr. Williams.

15   I just want to make sure I heard what you said.  You

16   said there was a senior employee at Breaux Petroleum who

17   would not call you to do field rides and would call

18   Lucas directly?

19        A.  Yes, yes, as the business-development manager

20   distributors are supposed to work with me directly and

21   then if more technical support is needed, then I can

22   bring in Lucas or even some other guys that have

23   specialties in different industrial applications.  So

24   opposed to working with me, they -- they would skip over

25   me and Lucas would ask them, "Breaux, like, Petroleum,



Page 146

1    why aren't you guys inviting Carl to these meetings?

2    Why aren't you guys inviting Carl to join in these

3    visits?"

4            And they would say stuff like, "Well, you

5    know, Carl doesn't know enough," or something.  "You

6    know, he's a new employee."

7            And Lucas was like, "Well, Carl is a sharp

8    guy.  You know, I've known Carl since Exxon.  We both

9    worked at Exxon.  You know, Carl is working with these

10   others.  You guys should give Carl a chance."

11           And they would -- they would never come

12   around.  Especially the senior sales director.  I can't

13   remember his name anymore.

14       Q.  I was going to ask you that.  You can't

15   remember his name?

16       A.  At the moment.  But when January came and I was

17   no longer assigned to Breaux, Lucas told Breaux's

18   management that they no longer had to worry about

19   working with Carl and that their new support person is

20   white.

21           And the managers at Breaux Petroleum there,

22   "What do you mean?  You're saying we're racist?"

23           And Lucas said, "Well, you know, I don't --

24   I guess you must be.  You didn't want to work with Carl.

25   He was black.  He was experienced."


MAGNA
LEGAL SERVICES

Page 147

```
 1              And so -- and so Breaux Petroleum
 2   complained to senior management, to Lucas' boss about
 3   his comments accusing them of being a racist for not
 4   wanting to work with me and Lucas was just simply told,
 5   you know, "You cannot say stuff like that to
 6   distributors."  There was no, you know, reprimanding or
 7   any other thing like no extra coaching or, you know.  It
 8   was just like kind of like a warning.
 9       Q.  Okay.
10       A.  And we continued to work for them and as you
11   may recall I was reassigned.  I was no longer working
12   with them, for Breaux.
13       Q.  Okay.  Now -- yeah, you were there longer --
14   Breaux -- you were no longer working with Breaux once
15   the realignment happened, right?
16       A.  That's true, but --
17       Q.  I'm conflating -- I just want to make sure I'm
18   not conflating the two different distributors because --
19   so Breaux Petroleum and O'Rourke are both distributors
20   who at one time or another were distributors that you
21   serviced, correct?
22       A.  That's correct.
23       Q.  Okay.  O'Rourke is the distributor that you
24   told me about just before we were discussing Breaux.
25   They're the distributor that -- I'm sorry, well, you
```



Page 148

1    said Mr. Fields -- where Mr. Fields got infuriated by a

2    comment you made and told -- well, told his boss who

3    then told someone at Shell that they no longer wanted

4    you working on the account, correct?

5        A.  Correct, working with Breaux.

6        Q.  Okay.  There -- the Breaux Petroleum -- no one

7    at Breaux Petroleum actually directed Shell to remove

8    you off of their account, correct?

9        A.  That's correct.

10       Q.  Okay.  In the O'Rourke incident -- and we can

11   talk more specifically about dates later -- but the

12   O'Rourke incident is the incident that was close -- that

13   incident was closer in time to when you were terminated,

14   right?

15       A.  That's correct.

16       Q.  Okay.  Whereas I think you mentioned Breaux

17   Petroleum was in Louisiana and that's one of the

18   distributor accounts that you stopped working with in

19   January of 2020 when they does the realignment and put

20   you over Texas and Oklahoma?

21       A.  That's correct.

22       Q.  Okay.  So you were saying Breaux complained

23   about Mr. Kerley accusing them of being racist and he

24   was not reprimanded and he continued to work on the

25   Breaux account; is that correct?



Page 149

```
 1        A.   That's correct.
 2        Q.   Who was the -- I think we talked about this
 3   earlier and you couldn't remember the name of the
 4   individual but the business-development manager who took
 5   over the Breaux account after the realignment was a
 6   newly-hired individual; is that correct?
 7        A.   Yeah, I think his last name might have been
 8   Johnson.  I can see if I can find a business card or
 9   something.  I think it might have been Johnson.
10        Q.   Okay.  Did Mr. Kerley ever tell you of any
11   basis for the accusations he made against Breaux?
12        A.   You said the basis?
13        Q.   Yes.  Because I think -- I believe you're
14   telling me that Lucas or Mr. Kerley accused Breaux of --
15   or I guess the employees at Breaux of being racist and
16   not wanting to work with you.  Did -- did Mr. Kerley
17   ever tell you any reason or circumstances that led him
18   to believe any of the individuals at Breaux Petroleum
19   had a discriminatory animus or, you know, were racially
20   motivated?
21        A.   And what was the question?  Did he tell me?
22        Q.   Mr. Kerley.
23        A.   Right, did he -- did he --
24        Q.   Did he tell you of any reasons why he
25   believed --
```



Page 150

```
 1        A.   Okay, I'm with you now.

 2        Q.   -- that Breaux didn't want to work with you

 3   because you were black?

 4        A.   Yeah.  He said the reasons for that because he

 5   persisted in asking them to invite me along with the

 6   calls and, firstly, to not contact me directly and to

 7   work with me and they continued to do that and he came

 8   to the conclusion knowing my work experience, my

 9   performance and capabilities at Exxon, even when I was

10   going with Shell with my other distributors that it must

11   be due to me being black.  That's what he gathered.

12   That's what he felt.  And that's what he told them.

13        Q.   Did he specifically identify any individuals at

14   Breaux Petroleum that he believed were racist?

15        A.   I don't know particularly his comments were

16   directed directly toward the senior sales rep and his

17   name slips my mind at the moment.

18        Q.   Now, no one at Breaux ever asked Xavier or any

19   other management at Shell to take you off of their

20   account, did they?

21        A.   No.  I've never had any issues with my

22   distributors until the O'Rourke incident happened.  So I

23   realize, you know, we were discussing, you know, why I

24   believe Xavier Puvilland engaged in discriminatory and

25   retaliatory behavior.
```



Page 151

1      Q.   Yeah.

2      A.   And you know just to kind of recap, it was due

3    to his response situation with O'Rourke and -- and also

4    seeing -- I'm sure you know because upper management got

5    involved with Breaux and what happened there he knew

6    there was some racial element he knows -- I'm assuming

7    that he was aware of Lucas Kerley's activities and the

8    comments that were made because managers talk.  But that

9    is an assumption.  But even more so that -- to me that's

10   even more like damaging to tell me that I was terminated

11   for my performance?  When my numbers allowed me to

12   generate a bonus considering that I had only really

13   started working in the field for like eight months

14   because I started meeting my customers in June.  And

15   when -- when he did my performance review, it was -- it

16   had a positive tone to it and he did not tell me that he

17   rated me unacceptable; that my performance was

18   unacceptable.  He did not say that.  He just said,

19   "Carl, you know, you've got some things to work on.  You

20   know, 2020 is going to be a year for -- you know, to

21   really make great strides."  So I was just totally

22   flabbergasted which is why I had heart palpitations,

23   almost went into a damn panic attack when I get on a

24   call thinking that we are about to go over a growth

25   strategy and it was a termination call.  It just almost



Page 152

1   whiplashed me to go from getting a $23,000 bonus in

2   February to a month later being terminated?  I mean,

3   that just doesn't happen.

4        Q.   Okay.  Okay.  I appreciate the recap because I

5   was going to ask you to recap.  You're getting used to

6   me.

7             So all right.  So for Xavier, you know, the

8   grounds for your belief are -- just to make sure I

9   understand because I wrote it all down -- the -- the

10  situation with Breaux Petroleum that you believe he was

11  aware about -- and I want to talk a little bit more

12  about that in a minute -- the situation with O'Rourke

13  that we discussed in detail earlier.  The fact that your

14  performance generated a bonus in February which was I

15  guess a month or so before you were terminated and that

16  you had a performance review I guess where you said

17  there was a positive tone to the performance review?

18       A.   Uh-huh.

19       Q.   Okay.  And you mentioned also that the call was

20  initially -- or that Xavier represented to you that the

21  call that turned into the termination meeting was

22  originally set up -- or Xavier told you he was setting

23  it up to discuss growth strategy for the rest of the

24  calendar year?

25       A.   Yeah, for my market, my plan to grow the



Page 153

1    business.

2        Q.  Yeah, okay.  Are there any other reasons you

3    believe the decision to terminate -- or Xavier's

4    decision to terminate your employment was, you know,

5    racially motivated?

6        A.  Due to Tracie Haygood's comments about him, due

7    to Tamika Greer's comments about him who Tamika reported

8    to him and she did not have positive comments to say,

9    you know, about -- about him and her interactions with

10   him.  And Tracie Haygood I think another

11   African-American woman did not as well.  And it's

12   just when I look at the string of events that occurred

13   to me in my short 14-month tenure at Shell, it just --

14   despite me really starting to -- January and so forth

15   formulate good relationships and demonstrate growth, I

16   was gaining accounts all throughout the fall, all

17   throughout my tenure I was helping my distributors grow,

18   my stint was cut short.  When I started to look at, you

19   know, the string of events, right, the one in February

20   within a week of being Holly Burns -- I don't think I

21   really taught on that.  We said that I was too confident

22   and cocky and confronted me at --

23       Q.  Yeah.  I know we haven't talked about that.

24   It's on my list and I did want to talk with you about

25   it.



Page 154

1      A.   Yeah.  Because, you know, I did a chronology

2   and I was just sharing my -- you know, the onboarding,

3   the incident with Holly being a white female confronting

4   me for being too confident and all this and that.

5             And then -- then Eric Boydstun and another

6   black manager, they kind of coached me, they pulled me

7   aside in the room, you know, the first -- second week

8   with the company to say, "Carl, you know, what's going

9   on?  It's not a good look.  You got this employee Holly

10  Burns white female saying that you said some things to

11  her, whatever."

12            I'm like, "What?"  And then --

13     Q.   I think -- you mentioned Eric.  Did you say

14  that Mr. Boydstun is a black man?

15     A.   No.

16     Q.   Okay.  I didn't -- I thought I heard you say

17  another black man.

18     A.   There was another black manager named Damon --

19  I think it's Damon Williamson.

20     Q.   Damon -- or Damon Higginbotham or no?

21     A.   No.  No.

22     Q.   No?  Okay.  So -- just so you know, I don't --

23  I haven't met Eric so I don't know what he looks like so

24  if that seems like a dumb question, sorry, about that.

25     A.   Yeah.  No, Eric is a cool guy.  He's got like



Page 155

1    long hair.  He plays the guitar.  I think he owns a bar.

2    He's really -- he's really very personable.

3         Q.  Is he still with Shell?

4         A.  The last time I recall he was.  But I'd have to

5    check.

6         Q.  All right.  And I think you said Tamika Greer

7    is still with Shell, correct?

8         A.  The last of my knowledge.  You cannot hold me

9    any of these still with the company.  Please don't.

10        Q.  No, no, to the best of your knowledge.

11        A.  Yes.

12        Q.  And then Tracie Haygood, she's no longer with

13   Shell?

14        A.  Correct.

15        Q.  Okay.  And I know we talked a little bit about

16   her earlier.

17             So I understand that, you know, your

18   conclusions about Xavier's conduct and the motivations

19   for his conduct include some of the information that you

20   learned from Tamika and Tracie but as far as your

21   personal experience with Xavier your reasons for

22   believing go that his conduct was discriminatory in

23   nature include the Breaux situation, the way he handled

24   the O'Rourke situation, the fact that you had received a

25   performance bonus and you said also a performance review



1    that had a positive tone to it and then also you also

2    mentioned the fact that he set up the termination

3    meeting as a call to discuss growth for the coming year.

4    Am I leaving anything out with respect to your personal

5    experience with Xavier and the reasons why you believe

6    he treated you -- his termination -- your termination or

7    his decision to terminate your employment was racially

8    motivated?

9         A.   You didn't leave anything out but I did.

10        Q.   Okay.

11        A.   So I had forgot to add like every since I met

12   him when I started -- you know, we really started to

13   work together in August and when I was working with Eric

14   Boydstun, like my growth strategy and growth plan and

15   objective was clear and it just seemed like there wasn't

16   a good transaction -- transition, rather, on

17   expectations from my previous supervisor to Xavier.

18   And, you know, Xavier like he has a very brash, you

19   know, style, right?  Not personable.  Like just dry.

20   But, you know, I adjusted to him, right?  I mean, it's

21   business.  Why does he got to be your friend?  So it's

22   just when we would engage in interactions on our

23   business and so forth, he just kind of always left me

24   with an uncomfortable feeling the way he would talk to

25   me, the comments he would make.  They weren't



Page 157

1    constructive.

2         Q.  Okay.

3         A.  And -- and one of the things that Xavier did

4    with all of his team members is we used to have what's

5    called this MILO, M-I-L-O, and that stands for Month in

6    the Life.

7         Q.  I saw that.  MILO in the subject line of some

8    e-mails.

9         A.  Yes, yes.  So -- so -- but MILO is something

10   that all his direct reports did to tell him what are we

11   working on for the month.  What are our objectives?  Who

12   are we going to spend time on?  What distributors?  What

13   customers?  Who are our targets?

14             And then the company -- Xavier said, "Okay,

15   guys, we're not -- no longer just going to do a monthly

16   MILO, an account of what you have had planned and taking

17   place, now we're going to do it weekly."  So then it

18   turned to a WILO, week in the life of, W-I-L-O.

19             And so here we are every single week, every

20   Monday, myself, my peers, like all seven of us, his

21   calendar loaded every week and the thing about my line

22   of business being an industrial salesperson, it can take

23   a year, two years, three years to gain the business.

24   The sales cycle is long.  It's not like going to a car

25   dealership, quick little truck stop where they can tell



Page 158

1    the trucks to stop delivering this week and then a week

2    later they got your oil in there to put into a car.

3    When you're dealing with heavy-duty machinery and

4    equipment, it requires extensive testing, oil analysis.

5    You know, they have a huge 10 -- 10,000-gallon tank.  It

6    takes a long time to go through their inventory.  They

7    have to get so many approvals because, you know, you can

8    imagine the ramifications of a heavy-duty piece of

9    equipment going down.  That shuts down the whole plant.

10        Q.  Okay.  Let me ask you this.  I mean, did Xavier

11   ever make any discriminatory comments or statements

12   towards you?

13        A.  What's an example?  What would that look like?

14        Q.  Like did he ever call you a derogatory name,

15   like the N word?

16        A.  Of course not.

17        Q.  Okay.  Any other -- did he ever call you any

18   names that you considered to be racist or derogatory?

19        A.  No.  He didn't call me Boy or, you know,

20   anything of the jargon and stuff like that.

21        Q.  So no name calling?

22        A.  Yeah, nothing totally blatant like as far as

23   name calling but just his tone, his demeanor, the way he

24   treated me.  Like -- like at first his review of mine

25   was very harsh and -- and we had a -- I said, Xavier,



Page 159

1    hold on a second like."  We did the review in October

2    and I really just started working with my distributors

3    like in July or so.  Like, I mean, we had a month or two

4    of introduction.  I'm like it's only been a couple

5    months?  How you going to hold my performance up to the

6    same level of my peers who have been in the role for

7    five, six years?  So it was not a -- a warm or like

8    inviting relationship from the beginning.  You know, my

9    previous supervisor, Eric Boydstun, is like, "Carl, you

10   know, you're on the right path.  Keep doing what you're

11   doing.  You know, you're going to get ahold of this new

12   position.  I know the sales cycle is long.  You know, I

13   know this is different than what you've done before but,

14   you know, we believe in you.  You have a history of

15   working well with distributors."

16              And, you know, Xavier just had -- just had

17   a very harsh, you know, style and then the way he would,

18   you know, talk to me it would just be kind of -- kind of

19   rough.

20       Q.  Okay.  And I know you've already said he didn't

21   call you any racist or derogatory names.  I mean, he

22   never -- he never told you directly, "Hey, I don't like

23   you because you're black," or, you know, anything like

24   that?  I know it's a silly question but I have to ask

25   it.  I'm just doing my job.  I'm sorry.



Page 160

1      A.   No, it's -- I saw Mr. Hodges.

2      Q.   Yeah, he's probably getting ready to go.  And I

3  have one more question before we get off the record and

4  then we can wrap up.  But he never told you directly

5  specifically, "I just don't like you, Mr. Williams,

6  because you're a black man"?

7      A.   Those words did not explicitly come out of his

8  mouth.  I can only account for my interaction with him

9  being the only black male on the team and one of the

10 newest employees versus the other employees outside of

11 Ms. Tamika Greer who was an experienced black female

12 having been with the company at least four or five

13 years.  But other than that I seemed to have the hardest

14 time with him.

15     Q.   Okay.  And were there other, you know, white

16 males, white females or employees of other races that he

17 treated more fairly or more positively than he did you?

18     A.   Absolutely.

19     Q.   Who were those employees?

20     A.   They were more senior employees that had been

21 with the company ten years, 20 years.  I remember Bob

22 McDonald, he's like an all star.  There's no other way

23 to say that.  I'm trying to remember the names of some

24 other guys.  I'm more of like a facial memory person.

25 The names kind of get cloudy after awhile.  Yeah, there



1    were a handful of -- Gary, who I had, you know, worked

2    with some and did some onboarding with, you know, he

3    favored Gary.  Gary said Xavier still gave him a tough

4    time here and there but he said for the most part he

5    respected the tenured employees, the older white males

6    and he really -- I mean --

7         Q.  Before you move on from that, other than Bob

8    McDonald and Gary, are there any other employees you

9    would include in the list of employees who he treated

10   more fairly or more favorably than you?

11        A.  Art Keneally was another one.

12        Q.  Art?  Okay.

13        A.  Art Keneally and Doug Peterson.

14        Q.  Anyone else you can think of besides Bob, Gary,

15   Art and Doug?

16        A.  Those four stand out.

17        Q.  And you were about to say something about

18   Tamika?  I thought I heard you say something about

19   Tamika but we can -- we can pick up with that when we --

20        A.  I was just saying that she articulated, you

21   know, some abrasive conversations and stuff with him as

22   well but her experiences were still not as contentious

23   as mine were.  Mine -- mine just seemed to be the

24   harshest.

25        Q.  Okay.  All right.  Okay.  Well, we will resume



Page 162

1    this deposition.  Mr. Williams, I'm going to leave off

2    there because we agreed to stop at 4:30.  So the plan is

3    we're going to leave your deposition open and we will

4    resume next Friday, November 5th, at -- let's see, 11:00

5    a.m. Central Time which will 9:00 a.m. Vegas time for

6    you.

7                    THE WITNESS:  That's correct.

8                    MS. JAMES:  Okay.  Mr. Hodges, did you have

9    anything you wanted to add?  I saw you took your mute

10   off.

11                   MR. HODGES:  I wanted to speak with you off

12   the record just about some other matter.

13                   MS. JAMES:  Okay.

14                   VIDEO OPERATOR:  That concludes our

15   deposition today.  The time is 4:33 p.m. and we are now

16   off record.

17                   (Deposition adjourned at 4:33 p.m.)

18

19                   Reporter's Note:  According to Federal

20   Rule 30(e)(1), the request for review of the deposition

21   by the witness is accomplished "on request by the

22   deponent or a party before the deposition is completed."

23                   Since this was not done, signature is

24   considered waived for this transcript.

25



Page 163

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION
 3
    CARL O. WILLIAMS,            )
 4                               )
            Plaintiff,           )
 5                               )
    VS.                          ) NO. 4:20-cv-04295
 6                               )
    SHELL OIL COMPANY,           )
 7                               )
            Defendant.           )
 8                               )
                                 )
 9                               )
                                 )
10                               )
11
              REPORTER'S CERTIFICATION
12        DEPOSITION OF CARL O. WILLIAMS, JR.
                  OCTOBER 29, 2021
13
14       I, Wendy Schreiber, Certified Shorthand Reporter in
15  and for the State of Texas, hereby certify to the
16  following:
17       That the witness, CARL O. WILLIAMS, JR., was duly
18  sworn by the officer and that the transcript of the oral
19  deposition is a true record of the testimony given by
20  the witness;
21       That examination and signature of the witness to
22  the deposition transcript was waived by the witness and
23  agreement of the parties at the time of the deposition;
24       That the original deposition was delivered to
25  KINDALL C. JAMES, ESQ.;
```



Page 164

1       That the amount of time used by each party at the
2    deposition is as follows:
3        KINDALL C. JAMES, ESQ. - 04 HOURS:49 MINUTE(S)
         EDDIE HODGES, JR., ESQ. - 00 HOURS:00 MINUTE(S)
4
5       That $_____ is the deposition officer's
6    charges to the Party for preparing the original
7    deposition transcript and any copies of exhibits;
8       That pursuant to information given to the
9    deposition officer at the time said testimony was taken,
10   the following includes all parties of record:
11   FOR THE PLAINTIFF:
12       EDDIE HODGES, JR., ESQ. (Appearing Remotely)
         KENNARD LAW, P.C
13       5120 Woodway Drive
         Suite 10010
14       Houston, Texas 77056
         Phone: (210) 888-1393
15       eddie.hodges@kennardlaw.com
16   FOR THE DEFENDANT:
17       KINDALL C. JAMES, ESQ.  (Appearing Remotely)
         LISKOW & LEWIS
18       1001 Fannin, Suite 1800
         Houston, Texas 77002
19       Telephone: (713) 651-2945
         Facsimile: (713) 651-2908
20       KJames@liskow.com
21
22      That a copy of this certificate was served on all
23   parties shown herein on _____ and filed
24   with the Clerk pursuant to Rule 30(e)(1).
25      I further certify that I am neither counsel for,



Page 165

1    related to, nor employed by any of the parties or
2    attorneys in the action in which this proceeding was
3    taken, and further that I am not financially or
4    otherwise interested in the outcome of the action.
5         Certified to by me this 9th day of November, 2021.
6
7
                              _Wendy Schreiber_____
8                             Wendy Schreiber, Texas CSR 9383
                              Expiration Date:  05/30/22
9                             MAGNA LEGAL SERVICES
                              Magna Registration No. 633
10                            7 Penn Center
                              1635 Market Street
11                            8th Floor
                              Philadelphia, Pennsylvania 19103
12   Job No. 760688           (214) 207-9657
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 166

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


CARL O. WILLIAMS,                    )
                                     )
          Plaintiff,                 )
                                     )
VS.                                  ) NO. 4:20-cv-04295
                                     )
SHELL OIL COMPANY,                   )
                                     )
          Defendant.                 )
                                     )
                                     )
                                     )

ZOOM AND VIDEOTAPED DEPOSITION OF

CARL O. WILLIAMS, JR.

FRIDAY, OCTOBER 29, 2021

VOLUME 2

------------------------------------

ZOOM AND VIDEOTAPED DEPOSITION OF
CARL O. WILLIAMS, JR., produced as a witness at the
instance of the DEFENDANT, and duly sworn, was taken
in the above-styled and numbered cause on Friday,
November 5, 2021, from 11:07 a.m. to 3:37 p.m., via Zoom
before Wendy S. Schreiber, CSR No. 9383, in and for the
State of Texas, reported by machine shorthand, at Las
Vegas, Nevada, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.
Job No. 765405

```
                                                        Page 167
 1                        APPEARANCES
 2    FOR THE PLAINTIFF:
 3         EDDIE HODGES, JR., ESQ. (Appearing Remotely)
           KENNARD LAW, P.C.
 4         5120 Woodway Drive
           Suite 10010
 5         Houston, Texas 77056
           Phone: (210) 888-1393
 6         eddie.hodges@kennardlaw.com
 7
      FOR THE DEFENDANT:
 8
           KINDALL C. JAMES, ESQ.  (Appearing Remotely)
 9         LISKOW & LEWIS
           1001 Fannin, Suite 1800
10         Houston, Texas 77002
           Telephone: (713) 651-2945
11         Facsimile: (713) 651-2908
           KJames@liskow.com
12
13    Video Operator - Nate Laningham  (Appearing Remotely)
14    Also present:  Stephanie Jackson (Appearing Remotely)
15
16
17
18
19
20
21
22
23
24
25
```

Page 168

```
 1                            INDEX
 2
 3   CARL O. WILLIAMS, JR.                           PAGE
 4   Examination by Ms. James                  171, 305
 5   Examination by Mr. Hodges                  248, 326
 6   Reporter's Certificate                          327
 7
                             EXHIBITS
 8
     NO.            DESCRIPTION                        PAGE
 9
     Exhibit 4      Acknowledgement of Receipt of the  171
10                  Code of Conduct, Equilon_000534 -
                    Equilon_000535
11
     Exhibit 5      E-Mail dated 2/19/19 to Burns from 215
12                  Williams, Equilon_000433
13   Exhibit 6      E-Mail dated 2/17/10 to Williams   217
                    from Puvilland, Equilon_000059
14
     Exhibit 7      E-Mail dated 2/17/20 to Puvilland  218
15                  from Williams, Equilon_001283 -
                    Equilon_001286
16
     Exhibit 8      E-Mail Chain dated 1/14/20 to      221
17                  Puvilland from Williams,
                    Equilon_000165 - Equilon_000166
18
     Exhibit 9      E-Mail Chain dated 11/1/2019 to    228
19                  Williams from Puvilland,
                    Equilon_001068 - Equilon_001071
20
     Exhibit 10     E-Mail Chain dated 1/28/2020 to    230
21                  Williams from Puvilland,
                    Equilon_000073 - Equilon_000074
22
     Exhibit 11     E-Mail Chain dated 1/28/2020 to    236
23                  Williams from Puvilland,
                    Equilon_001184 - Equilon_001185
24
     Exhibit 12     E-Mail dated 3/19/20 titled "Case  240
25                  Details", Equilon_000525,
```

```
                                                     Page 169
 1                         INDEX   (Continued)
 2   NO.            DESCRIPTION                        PAGE
 3
     Exhibit 13    E-Mail Chain dated 3/20/20 to       243
 4                 Puvilland from Encarnacion,
                   Equilon_001295 - Equilon 0001297
 5
 6                 EXHIBITS MENTIONED BUT NOT MARKED
 7   PLAINTIFF'S   DESCRIPTION                         PAGE
     NO.
 8
     Exhibit 1     Equilon_000097 (Not Attached -      251
 9                 Retained by Counsel)
10   Exhibit 2     Equilon_001104 - Equilon_001107     257
                   (Not Attached - Retained by Counsel)
11
     Exhibit 3     Equilon_001033 (Not Attached -      261
12                 Retained by Counsel)
13   Exhibit 4     Equilon_112 (Not Attached - Retained 263
                   by Counsel)
14
     Exhibit 5     Equilon_858 - 859 (Not Attached -   264
15                 Retained by Counsel)
16   Exhibit 6     Equilon_1152  (Not Attached -       275
                   Retained by Counsel)
17
     Exhibit 7     Equilon_488  (Not Attached -        279
18                 Retained by Counsel)
19   Exhibit 8     Equilon_00053 - 55 (Not Attached -  284
                   Retained by Counsel)
20
     Exhibit 9     Equilon_830 - 831  (Not Attached -  287
21                 Retained by Counsel)
22                  REQUESTED DOCUMENTS/INFORMATION
23                          NONE
24
                        CERTIFIED QUESTIONS
25
```

NONE

Page 170

```
 1              VIDEO OPERATOR:  We are now on the video

 2   record.  This begins media file No. 1 in the deposition

 3   of Carl Williams in the matter of Carl Williams versus

 4   Shell Oil Company in the U. S. District Court, Southern

 5   District of Texas, Houston Division, Civil Action No.

 6   420-cv-04295.

 7              Today is Friday, November 5th, 2021, and

 8   the time is 11:07 a.m.  The deposition is being taken

 9   remotely at the request of Liskow & Lewis.  The

10   videographer is Nate Laningham of Magna Legal Services

11   and the court reporter is Wendy Schreiber.

12              Will counsel and all parties present

13   please state their appearances and whom they represent.

14              MR. HODGES:  Eddie Hodges, Jr. on behalf of

15   plaintiff, Mr. Carl Williams.

16              MS. JAMES:  Kindall James on behalf of

17   defendants, Shell Oil Company and Equilon.

18              THE REPORTER:  Okay.  My name is Wendy

19   Schreiber, Texas CSR No. 9383.  I am reporting the

20   deposition remotely by stenographic means from Burleson,

21   Texas and the witness is located in Las Vegas, Nevada.

22              Sir, please raise your right hand.

23              In the deposition about to begin, do you

24   solemnly swear or affirm that you are CARL O. WILLIAMS,

25   JR. and that the testimony you are about to give shall
```

Page 171

1    be the truth, the whole truth and nothing but the truth,

2    so help you God?

3              THE WITNESS:  You left off the Junior.

4              THE REPORTER:  Oh, okay.  Yes, that you

5    are CARL O. WILLIAMS, JR. and that you will tell the

6    truth, the whole truth and nothing but the truth, so

7    help you God?

8              CARL O. WILLIAMS, JR.,

9    having been first duly sworn, testified as follows:

10              THE REPORTER:  You may begin.

11

12                   EXAMINATION

13    Q.  (BY MS. JAMES)  Good morning, Mr. Williams.

14    A.  Good morning.

15    Q.  Thank you for reconvening with us on your

16    vacation.  I do appreciate it.  I will try to move

17    through the rest of my questions for you as quickly as I

18    can.

19              One thing I wanted to confirm is I'm going

20    to share my screen with you and show you a copy of a

21    document that we will mark as an exhibit but I do need

22    the court reporter to remind me of which number we're

23    on, if you can do that, Wendy.

24              THE REPORTER:  Yes, we are on Exhibit 4.

25              (Exhibit 4 was marked for identification.)

Page 172

1      Q.   (BY MS. JAMES)   Mr. Williams, I've just shared

2      my screen with you, I hope.

3      A.   Well, you please zoom in?

4      Q.   I just -- I just want to confirm that this is a

5      copy of an acknowledgment that you signed when you began

6      your employment with Shell related to your receipt of

7      the various Shell policies referenced on this document.

8      A.   So what's the question?

9      Q.   I just want to confirm that this is a

10     document -- it looks like your -- you put your initials

11     at the bottom.  I just want to confirm that that is your

12     initials at the bottom and this is a copy of the

13     acknowledgment that you initialed in connection with

14     your receipt of the Shell policies that were provided to

15     you when you began your employment with Shell.  And I

16     can send it through Chat if you want to look at it.

17     A.   That would be nice.  It would be better.  I

18     mean, honestly, I do not recall signing this.  It looks

19     like it might have been day one of my employment or

20     something, if so, and I guess it was all electronic.

21     Q.   Yeah, I mean, that's I think how they normally

22     do it when you onboard.  They get you to sign off on

23     various things.  How do I make this bigger?

24     A.   There's a plus sign at the top.

25     Q.   Well, mine has disappeared so I have my screen

Page 173

1    that I've shared and then I've got a little small screen

2    now with all of you all's pictures in it.  Let's see.

3                VIDEO OPERATOR:  If you go over the window

4    and you push "Control" and plus, it should zoom in.

5                MS. JAMES:  Well, what it's not doing it's

6    not showing me anymore the -- oh, it's over here.

7    That's why.  Okay.  I'll try it again.

8        Q.  Okay, I've just, I think, sent over a PDF copy

9    through the Chat function of the acknowledgment

10   document.

11       A.  It says Equilon?

12       Q.  Yes, Equilon 534 is the Bates label on this

13   document.

14       A.  What does that word mean?

15       Q.  That's the company's name.

16       A.  Oh.  Shell Equal Opportunity policy.  I guess

17   -- so where is like discrimination?  Like is that

18   Harassment?  Like I'm trying to see which area is

19   applicable to my case.

20       Q.  Okay, so this is just a copy of the document

21   you signed when you began your employment with Shell

22   acknowledging that, you know, these are the Shell

23   policies and that you've been given access to them.

24       A.  Okay.  You know, I do not recall but, you know,

25   it's been a while ago, my first day of employment, so

Page 174

1    that is my initial and, you know, it looks familiar that

2    I've seen this content before.  It is kind of standard

3    corporate stuff with Exxon and Shell so, you know, I

4    mean, yeah, it's familiar but, yeah.

5         Q.  Okay.  And you -- I mean, you don't dispute

6    that -- Shell provided you access with copies of all of

7    the various employment policies that applied during your

8    employment with Shell that are listed here in this

9    document, do you?

10        A.  I know we are on the Internet but when I look

11   at this Code of Conduct, I don't see where, you know,

12   like I guess discriminatory treatment info is -- you

13   know, how to deal with that or -- I don't know.  But

14   perhaps the only one I guess -- I guess is some type of

15   harassment like if you're a woman and, you know, if,

16   your male supervisor is advancing towards you or saying

17   sexual innuendoes or, you know, a minority employee or,

18   you know, somebody criticizing your religion, I guess

19   that's harassment.  Other than that I'm not sure.

20        Q.  So my question is do you agree that you

21   received or were provided access to a copy of the Shell

22   Code of Conduct?

23        A.  I did not receive but this stuff is normally on

24   the intranet, on the company's intranet while you are

25   employed with the company.  So I do recall having access

Page 175

1    to this information while being employed.

2        Q.  Okay.

3        A.  All right?  Okay.

4        Q.  And you don't dispute that you also were given

5    access to the policies listed under Nos. 2 and No. 3 of

6    this document that you initialed?

7        A.  Two and three?

8        Q.  Yes.

9        A.  I don't see a number 3.

10        Q.  Oh, it's on the second page.  I'm sorry, it's

11    -- it's numbered 1 on the second page.

12        A.  And you want me -- yeah, I had access when I

13    was employed with the company.

14        Q.  To the -- to the policies that are listed on

15    the second page of Exhibit 4?

16        A.  Yeah, it looks familiar.  I would -- yeah, I

17    would say I had access to this.  It just looks like it's

18    missing the one that's applicable to my situation

19    though.  I would have had to search somewhere -- it

20    looks like they left it out of that Code of Conduct.

21        Q.  So the Code of Conduct I think is mentioned on

22    the first page at the top.

23        A.  I mean, all this -- all this -- all this

24    content is inside of the Code of Conduct.

25        Q.  So if you look on the first page, Mr. Williams,

1    the Code of Conduct is referenced there.  Do you see

2    that?

3          A.  I do.

4          Q.  Okay.  And then on the second page it talks

5    about receipt of other policies and there's a list of

6    other policies that you were given access to.  Do you

7    see that?

8          A.  Okay, yes, yes.  So, yes, I had access to

9    these -- you know, these documents, the Code of Conduct

10   and these other documents.  I had access on the company

11   intranet.

12         Q.  Okay.  And just to be clear, you're talking

13   about the Code of Conduct and the other policies

14   referenced in Exhibit 4 when you say you had access to

15   the other policies?

16         A.  That's correct.

17         Q.  Okay.  Let's see stop Share.  Now it goes back.

18             When we spoke last week, Mr. Williams, you

19   told me about a situation involving Breaux Petroleum and

20   Lucas Kerley.  Do you recall that?

21         A.  I'm sorry, it had froze a second.  Breaux

22   Petroleum and was it Lucas Kerley?

23         Q.  Yes.  Do you recall last week we discussed --

24         A.  Yes, I do.

25         Q.  -- a situation involving Breaux Petroleum and

Page 177

1    Lucas Kerley?

2        A.  Yes, ma'am, I do.

3        Q.  Okay.  You told me that Mr. Kerley accused

4    Breaux Petroleum of not wanting to work with you because

5    you were not white and I was curious how did you know

6    that Mr. Kerley made that comment to Breaux Petroleum?

7        A.  I'm sorry, you said how did I do what?

8        Q.  How did you know that Mr. Kerley made that

9    comment to Breaux Petroleum?

10       A.  He told me personally.  He said it over the --

11   over the phone while we were -- because we were at an

12   event.  I guess it was the one -- was it shortly after

13   Miami and he told me what happened and he said he was

14   reprimanded because he had met with Breaux in January --

15   or somewhere in that timeframe I believe the first

16   quarter because that's when we found -- found out like

17   in December or so, in the fourth quarter, there were --

18   we had new territory managers, new other what we call

19   ICAMs similar to Steven Stack's role and Jarrett Enochs

20   so we -- we added more team members and that's -- now

21   that I think about it, I think the guy's last name is

22   Johnson that -- the other white employee who resumed my

23   role for Shell and who was assigned to Breaux Petroleum,

24   if I'm not mistaken.

25       Q.  Okay.  So you're -- okay, so I think we're

Page 178

1    talking about a couple of different things here.  So

2    earlier -- last week when we were talking about your

3    role with Shell you mentioned that there was a

4    realignment where the accounts were redistributed cross

5    the business-development managers that worked under

6    Mr. Puvilland; is that correct?

7        A.  That's correct.

8        Q.  Okay.  So the individual that took over the

9    Breaux Petroleum account in connection with when the

10   accounts were reassigned, that -- that individual's name

11   or last name is Johnson?

12       A.  I think so.  I think so.  I may be incorrect

13   but I think.  I'm trying -- I'm just trying to remember.

14       Q.  Do you recall his first name?

15       A.  Not at the moment I do not.

16       Q.  And Mr. Johnson, he -- he was new to the role

17   with Shell, the business-development role, and new to

18   the team that worked under Xavier; is that correct?

19       A.  Yeah, he had did some of the work but he had

20   many years at Shell.

21       Q.  Okay.  But he -- so -- so is it your

22   recollection that the re -- that the accounts were

23   reassigned around December of 2019 timeframe?

24       A.  Yes, in the fourth quarter.  It might have been

25   November or so, yes.

1      Q.   Okay.  And I understand that Mr. Johnson had

2   previously worked for Shell but he was new to the group

3   that reported to Xavier; is that correct?

4      A.   Yes, yes, he came from another team, that's

5   correct.

6      Q.   And he came from another team around the

7   December of 2019 timeframe.

8      A.   Yes, fourth quarter.  Please don't hold me to

9   December, it might have been November, but I know it was

10   fourth quarter.

11      Q.   Okay.

12      A.   But --

13      Q.   I'm sorry.

14      A.   -- to your initial question, Lucas told me

15   about the incident when my successor -- like I said, I

16   think his last name was Johnson -- when he was assigned

17   to Breaux Petroleum because of territory realignment.

18   Lucas Kerley told him, "Hey, guys, you know, I just want

19   you to know your -- you know, you'll no longer be

20   working with Carl and that, you know, the new guy is

21   white."

22           And they were like, "What's that has to do

23   with anything?"  They said, "White?"

24           He said, "Well, you know, you know, you

25   guys were not supportive and willing to work with Carl.

1    You know, he was assigned to you guys as your

2    business-development manager."

3                    Lucas Kerley was my technical assistant

4    sales engineer and the process -- the protocol when

5    distributors work with business-development managers

6    they do everything through them and then it's the BDM's

7    responsibility to engage other technical resources

8    within the company that's needed depending on the

9    opportunity.  So they would -- they would consistently

10   circumvent me and just talk directly to Lucas.

11                   And Lucas would say, "Hey, you know, you

12   guys got to call Carl.  You got to, you know, go through

13   Carl.  You know, invite Carl."

14                   And they -- they wouldn't do that.  And so

15   when the new employee was assigned he said -- you know,

16   like I say, "The new guy is white."

17                   They said, "Well, what are --are you saying

18   we're racist?"

19                   He was like, "Perhaps you are."  He was

20   like, "Perhaps you are and I think you are," or

21   something like that, "because you didn't -- you didn't

22   want to work with Carl.  He's a smart guy, you know.

23   I've known him at Exxon.  He's a go-getter, smart,

24   articulate, and the only thing," he was like, "it must

25   be because he's black."

Page 181

1            And, you know, they -- that caused a

2    stir-up in them.  You know, they were -- you know, they

3    were infuriated by his comments and they reported that

4    to his boss.

5        Q.  Okay.

6        A.  And he simply -- he told me -- he told me he

7    just got a coaching.  They just told him, "Hey..."  you

8    know, I don't know verbatim but he said, you know, he

9    was just reprimanded and told, you know, do not --

10   you've got to respect the commercial relationship with

11   our distributors and, you know, things like that and you

12   can't make those type of inflammatory comments.

13       Q.  All right.  So Lucas -- did Lucas tell -- I

14   think you were telling me earlier my initial question

15   was, Mr. Williams, how did you learn about this incident

16   in which Mr. Kerley accused Breaux Petroleum of not

17   wanting to work with you because you were black?  And I

18   think you were telling me that you learned of this at

19   the event that we talked about last week in Miami; is

20   that correct?

21       A.  I know we talked in Miami but I think he might

22   have told me that over the phone post the event.

23       Q.  So Lucas told you about his comments to Breaux

24   Petroleum over the phone?

25       A.  I believe so, yeah, because we were talking and

Page 182

1    somehow it came up.  He mentioned it.

2         Q.  Okay.  And was anybody else on the call besides

3    you and Lucas?

4         A.  No, ma'am.

5         Q.  Okay.  And your telephone call with Lucas is

6    how you learned that he made a comment about Breaux

7    Petroleum not wanting to work with you because of your

8    race --

9         A.  That's correct.

10        Q.  -- for Breaux Petroleum?

11        A.  That's correct.

12        Q.  Okay.  How do you know that Breaux Petroleum

13   reported Mr. Kerley's comments to his boss?

14        A.  He told me.

15        Q.  Mr. Kerley told you that?

16        A.  Yes.

17        Q.  Okay.  Is Mr. Kerley the only person that told

18   you that?

19        A.  Yes.  That was a private matter to him so he

20   was willing to share that.

21        Q.  And he -- and Mr. Kerley also told you that he

22   was coached by his boss about the incident?

23        A.  Correct.  He told me --

24        Q.  I'm sorry.

25        A.  He told me he was scared.  He was like -- and I

Page 183

```
 1   don't know if it's okay to use profanity but he said he

 2   was scared at shit and he said he thought he might was

 3   going to lose his job but he said he was just kind of,

 4   you know, reprimanded.  He was really scared.

 5        Q.  Did you ever have any conversations with Breaux

 6   Petroleum about Mr. Kerley's comments --

 7        A.  No.

 8        Q.  -- to Breaux Petroleum?

 9        A.  No.  No, ma'am.

10        Q.  Did you ever have any discussion with

11   Mr. Kerley's boss --

12        A.  No.

13        Q.  -- about Mr. Kerley's comments to Breaux

14   Petroleum?

15        A.  No, ma'am.  That stayed between Mr. Lucas

16   Kerley and I.  I did not share that private matter with

17   any other employees.

18        Q.  Okay.  So you didn't discuss the incident

19   related to Breaux Petroleum and the comments Mr. Kerley

20   made to Breaux with any other Shell employee?

21        A.  That is correct.

22        Q.  And you're not aware of Breaux Petroleum ever

23   asking Mr. Kerley's boss to remove Mr. Kerley from its

24   accounts, are you?

25        A.  I'm not knowledgeable of that.
```

Page 184

1      Q.  And you're not aware of Breaux Petroleum ever

2   asking Xavier or any other -- anyone else at Shell to

3   remove you from its account, are you?

4      A.  I'm not aware of that.

5      Q.  And just to confirm, the Breaux Petroleum

6   account, that account moved over to Mr. Johnson as a

7   result of the realignment that affected the entire

8   group, correct?

9      A.  That's correct.

10     Q.  Did you know why -- well, let me ask you this.

11  You mentioned Mr. Kerley or you mentioned a situation or

12  situations where Breaux Petroleum went around you and

13  dealt with Mr. Kerley directly with respect to certain

14  issues.

15     A.  Certain business opportunities, commercial

16  engagement, yes.

17     Q.  What business opportunities did Breaux

18  Petroleum go directly to Mr. Kerley on as opposed to

19  you?

20     A.  There were several that we worked on.  One was

21  Sasol, S-A-S-O-L, right there in Lake Charles,

22  Louisiana.  I mean, that's where Breaux Petroleum was

23  located.  I mean, I did a plant walk-through once but

24  then they left me out of some other business and I think

25  another one was called Cameron LNG.  I recall they were

Page 185

1    doing like a new startup gas -- natural-gas plant there

2    in -- well, south of Lake Charles right there kind of in

3    the bayou.  But there were several and Lucas said it

4    happened on multiple occasions.

5        Q.  Multiple occasions where Breaux Petroleum would

6    go to Lucas with new business opportunities as opposed

7    to you?

8        A.  Correct.

9        Q.  And Mr. Kerley told you about these situations?

10       A.  Yes.

11       Q.  Did you ever have any discussion with Breaux

12   Petroleum about any of these situations where they went

13   to Mr. Kerley instead of you?

14       A.  I do recall re enforcing our rules of

15   engagement, I believe, with the sales manager and their

16   senior technical rep and I on numerous occasions, you

17   know -- you know, requested, you know, say, "Hey, can I

18   join you?  Can you put something on your calendar?  Do

19   you have anything you know coming up in the next couple

20   weeks?  How are these accounts going?"  Because they

21   shared the sales pipeline so I knew the opportunities

22   that we would focus on, most of them.  Sometimes they

23   don't share.  So I knew what they were pursuing but I

24   would just never get invited --

25       Q.  Okay.

1      A.   -- on some opportunities.  I mean, one of their

2    sales reps -- what was his name?  -- Clayton -- Clayton

3    Rougeou.  Clayton and I worked very well.  He was one of

4    their newer sales reps and he -- and he commended me.

5    He said I helped them do quite a bit of good

6    opportunities.  We did a couple visits.  I did spend

7    some time with Clayton.  He was newer.  He was willing

8    to work with me, Clayton was, one of the sales reps.

9      Q.   Which representatives of Breaux Petroleum were

10    not willing to work with you in your opinion?

11      A.   I'm trying to think of their names.  They have

12    like one senior rep who's been in the industry and so

13    forth for like 30 years or so and he was the main top

14    sales guy and, oh, my goodness, I can't think of his

15    name but he was -- he was the one that would leave me

16    out and -- and the manager -- you know, the sales

17    manager was aware of it at Breaux.  His name is Mike.

18    And, you know, he didn't do any enforcement or take any

19    action.

20      Q.   So there was one -- to your recollection there

21    was one senior sales representative at Breaux that would

22    not invite you to go along with him to visit new

23    accounts?

24      A.   Correct, correct.  He was the main like --

25      Q.   Was there anyone else besides him that you

Page 187

1  recall at Breaux Petroleum that would not invite you

2  along to visit new potential accounts?

3       A.  Well, yeah, yeah, the others from what I recall

4  they had about seven, eight sales reps and I was -- only

5  one of them worked with me and was active in

6  communications and opportunity and that was Clayton

7  Rougeou.  All the others, you know, despite requests

8  they would never invite me or try to secure anything XX.

9  It was really one that was willing to work with me and

10 all the others there was no traction.  And the sales

11 manager and I guess the VP, I mean, they were aware of

12 everything and they just -- they didn't take any action.

13 They felt that -- yeah.

14      Q.  And let me ask you this.  Were the sales reps

15 for Breaux Petroleum required to bring a Shell

16 business-development manager with them every time they

17 visited a new potential account?

18      A.  I mean, it's a part of our distribution, you

19 know, business agreement to pipeline review, to engage

20 with Shell resources to go in business so I wouldn't say

21 it's an expectation to every account because they

22 service accounts and they sell multiple brands.  Not

23 every account they sell lubricants to is Shell related.

24           I'm sorry, I can't hear you.  I cannot hear

25 you.  Is it just on my end?

Page 188

1                    MR. HODGES:  I can't hear her as well.

2                    VIDEO OPERATOR:  Yeah, we can't hear you,

3       ma'am.  I'm going to pause the record real quick here.

4       It's 11:35 a.m.  We're off record.

5                    (Recess taken from 11:35 a.m. to 11:37 a.m.)

6                    VIDEO OPERATOR:  We're back on the video

7       record.  It's 11:37 a.m.

8            Q.  (BY MS. JAMES)  Okay, Mr. Williams, sorry about

9       that.  I had technical difficulties with my microphone.

10                   So earlier I was asking just about the

11      relationship between Breaux Petroleum and Shell and I

12      think my understanding, and tell me if I'm correct about

13      this, last week when we were talking you were describing

14      that, you know, Shell, you know, worked with

15      distributors and then there were end clients who were

16      serviced by the distributors; is that correct?

17           A.  That's correct.

18           Q.  So Breaux Petroleum would have been a

19      distributor who sold Shell product to various end

20      clients; is that correct?

21           A.  Yes.

22           Q.  Okay.  And as a business-development manager,

23      you would provide resources and assistance to Breaux

24      Petroleum as a distributor and in helping them sell

25      Shell products to end clients?

Page 189

1      A.   That's correct.

2      Q.   Okay.  Now, you're not aware of any kind of

3   agreement between Shell and Breaux Petroleum where

4   Breaux Petroleum was required to include you in every

5   sales call that its sales managers went on, are you?

6           MR. HODGES:  Objection:  asked and

7   answered.

8           MS. JAMES:  I didn't hear the answer.

9           MR. HODGES:  Okay.  You can state your last

10  answer if you remember what you stated or you can answer

11  the question how you know, Mr. Williams.

12          THE WITNESS:  You know, they promote Shell

13  and so I don't know the language in the distribution

14  agreements but they're normally like three-year

15  agreements or so.  They have sales goals, revenue goals

16  and things where they get bonuses and if they don't

17  perform, then they would not be a renewed licensed Shell

18  distributor.  So that's many things that they must do

19  and it does include working with the

20  business-development manager along with -- along with

21  the ICAM.  But I don't know the language.  They may say

22  every call -- sales call doesn't show lubricant.  I

23  don't think that's reasonable.  I don't know.

24     Q.  Have you ever seen a copy of the agreement

25  between --

Page 190

```
1        A.   No, because I'm a sales rep.  I'm a sales rep.

2   Yeah, being a sales rep I do not.  Only the indirect

3   account managers -- indirect channel -- ICAMS, indirect

4   channel account managers, they manage that.

5             MR. HODGES:  I was just going to say just

6   let her finish her question.  I don't know if you were

7   finished with your answer, I'm sorry about that, but

8   just let her finish her question so the record can be

9   clear.

10       Q.   (BY MS. JAMES)  So my question was you never

11  saw the agreements between Breaux Petroleum and Shell,

12  correct, Mr. Williams?

13       A.   That's correct, yes.

14       Q.   Okay.  And Breaux Petroleum, as far as you

15  know, didn't have an exclusive distribution agreement

16  with Shell where it was exclusively distributing Shell

17  products, did it?

18       A.   I do not recall like the content.  I do not

19  know it in the agreement but I do recall them selling

20  other lubricants.

21       Q.   So Breaux Petroleum did sell other brands of

22  lubricants besides Shell products?

23       A.   Yes, that's correct.

24       Q.   Okay.  And you said earlier -- you mentioned

25  earlier that the sales manager at Breaux Petroleum was
```

Page 191

1    aware that not all the sales reps were in -- were asking

2    you to attend certain client-account meetings?

3         A.  Yes, that's correct.

4         Q.  How -- how -- how was the sales manager aware

5    of that?

6         A.  I mean, we had one-on-one calls.  You know, we

7    would have sales pipeline calls.  Alex Sudyk, he was the

8    interim account manager for Breaux while I was -- so he

9    and I we had meetings with Breaux.  I've done training

10   with them on lubricants so I've had in-person engagement

11   with them.  You know, we've taken customers out to

12   lunch.  So -- so there -- there was some engagement but

13   on most of like the new opportunities, those that really

14   come to market that actually closed that we went into

15   that would impact my numbers in the pipeline, I would

16   not get invited to those.

17        Q.  And you mentioned earlier that there were two

18   specific meetings that you're aware of that you did not

19   get invited to.  You mentioned that there was a

20   walk-through at the Sasol plant in Lake Charles and then

21   that there was --

22        A.  I did that one.

23        Q.  I'm sorry?

24        A.  I did do a walk-through at Sasol.  I did.

25        Q.  Okay.  What -- what meetings are you aware of

Page 192

1    where a sales representative with Breaux did not invite

2    you to the meeting with a new client?

3         A.  Are you asking which accounts?

4         Q.  Yeah.  Are you aware of any -- the sales

5    representatives, you know, on any particular occasion

6    going to visit some of these new accounts that you just

7    mentioned and not bringing you with them?

8         A.  Yes.

9         Q.  Okay.  Which new accounts are you talking

10   about?

11        A.  I think -- I think -- I think Cameron LNG was

12   one.  Let's see, I may be able to reference a map or

13   something.

14        Q.  You may be able to what?

15        A.  I said I may be able to reference a map.  I'm

16   trying to remember.  I think Enlink was another one,

17   E-N-L-I -- E-N-L-I-N-K.  I remember Cameron LNG.

18        Q.  So the two that come to mind now --

19        A.  There's another one -- there's another one that

20   comes to mind called Cheniere.  That's C-H-E-N-I-E-R-E.

21        Q.  I'm sorry, can you repeat that?

22        A.  It's called Cheniere.  Yes, C -- let's see,

23   C-H-E-N-I-E-R-E.

24        Q.  Can you recall any other accounts?

25        A.  McDermot, M-C-D-E-R-M-O-T.

Page 193

```
 1        Q.  Are there any others you can recall?

 2        A.  I mean, if it comes to me later, I may be able

 3   to answer.

 4        Q.  Those are -- those four are the ones you can

 5   remember as of right now?

 6        A.  Yes, ma'am.

 7        Q.  As for Cameron LNG, who was the Breaux

 8   Petroleum sales representative that was working on that

 9   account?

10        A.  That's the one whose name I cannot remember at

11   the time.

12        Q.  And how were you aware that there was a meeting

13   or a visit with Cameron LNG between that sales

14   representative or involving that sales representative

15   where you weren't invited to the meeting?

16        A.  Lucas Kerley told me.

17        Q.  Did you ever have any discussions with Breaux

18   Petroleum about the sales representatives' failure to

19   invite you to that particular meeting with Cameron LNG?

20        A.  Yes, ma'am, I've had several.

21        Q.  Who did you have several conversations with at

22   Breaux Petroleum?

23        A.  In particularly it was Mike, the sales manager,

24   and his boss as well whom I believe was like -- was he

25   the VP or something?  But they pretty much -- oh, the
```

Page 194

1    guy's name was George.  I do remember his first name was

2    George, the senior sales rep.

3        Q.  So the senior sales rep who did not invite you

4    to a meeting with Cameron LNG his name was George?

5        A.  Yes, I do remember that.

6        Q.  Okay.  And Lucas Kerley is the person who told

7    you about that meeting with Cameron LNG?

8        A.  Yeah, that was one of many.

9        Q.  Okay.  But Lucas is the one that told you about

10   the meeting with Cameron LNG?

11       A.  That's correct.

12       Q.  And that's how you learned of it?

13       A.  Yes.

14       Q.  Okay.

15       A.  Because, like I said --

16       Q.  George.  I'm sorry, go ahead.

17       A.  As I said earlier, they share their sales

18   pipeline so I knew the account that they were working on

19   in pursuing but I -- I was not privy to the activities

20   that was going on in private.

21       Q.  And you said you had a conversation with Mike

22   who was the sales manager for Breaux Petroleum and his

23   boss, George -- I'm sorry, and Mike's boss?

24       A.  Correct.

25       Q.  Is that correct?

Page 195

1      A.   That is correct.

2      Q.   Did they give you any explanation as to why

3  George, the sales representative with Breaux, did not

4  invite you to the meeting or visit with Cameron LNG that

5  Lucas told you about?

6      A.   I think he -- they said -- I think they said

7  he's old school.  I don't know what that means like

8  being old school.  I mean, I have heard that jargon

9  before a lot of times when older white males are

10 considered old school that typically means conservative,

11 like good old boy club and like kind of a -- I guess

12 euphemism for I guess prejudiced.

13     Q.   But Mike, the sales manager for Breaux, he

14 simply said he's old school?

15     A.   Yeah, that he likes to work alone.  You know,

16 he's old school and, you know, George he does what he

17 wants to do and I have no control over that.

18     Q.   Did you have any conversations with any other

19 employees at Shell about not getting invited to the

20 Cameron LNG meeting besides Lucas Kerley?

21     A.   I did mention it to -- I think, if I recall

22 correctly, Xavier, my sales manager.

23     Q.   Anybody else that you believe you mentioned the

24 situation to?

25     A.   I think I might have mentioned it to Alex as

Page 196

1   well, Sudyk, that, you know, he's responsible for

2   helping me grow the business.  And I do recall one more

3   account called Westlake Chemical.

4        Q.  Okay.  So you said you mentioned not getting

5   invited by Breaux Petroleum to the visit with Cameron

6   LNG.  You said you mentioned that situation to Xavier?

7        A.  I don't recall if I mentioned that exact one.

8   It was like overall engagement with distributors and

9   activities and, you know, I was expected to help them

10  grown their business and I expressed to Xavier that, you

11  know, I was not getting invited and despite multiple

12  requests and so forth on the growth opportunities.

13       Q.  So you expressed to Xavier that you were not

14  getting invited to go along with distributors with

15  respect to various different oppor -- growth

16  opportunities and new-client visits?

17       A.  That's correct.

18       Q.  But you didn't specifically mention the Cameron

19  LNG visit or George to Xavier?

20       A.  I believe I did because we talked about my

21  engagement with all distributors, what's working, what's

22  not working, what can be improved because it got to the

23  point where Xavier would say, "Well, Carl, you know, you

24  can't, you know, wait on them so go out and do your own

25  hunting and then you..." -- and I did that.  I went and

Page 197

1   did my own prospecting in that market cold calling and

2   sometimes -- because they wouldn't work with me and so

3   sometimes I would go to some accounts that I didn't even

4   know they were working on our customers because they

5   don't always share, you know, their customers or current

6   accounts.  So although, you know, my role is indirect

7   business development manager meaning my distributors

8   they managed the direct relationship with the end

9   customer, they do the billing, you know, they handle the

10  product.  You know, we're not aware of -- yeah, so what

11  I would do I would take it upon myself the initiative to

12  analyze the market to go do my own calls and try to get

13  face time, get meetings set up on my own and then I

14  could tell Breaux like, "Hey, you know, I got an

15  advantage at this account."  And I did it with my other

16  distributors as well.

17       Q.   In other words, trying to identify end clients

18  that Breaux Petroleum could meet with?

19       A.   That's correct.

20       Q.   Okay.  I'd like to just talk right now though

21  about your conversation with Xavier where you expressed

22  to him that you were not getting invited to certain

23  sales calls with the distributors.  Did you -- I mean,

24  did you specifically mention Breaux Petroleum and the

25  Cameron LNG situation to him?

Page 198

1        A.   I don't recall the exact details and I -- I

2   notice you keep saying Cameron LNG but it's really the

3   multiple accounts that I mentioned.

4        Q.   Right.  I mean, I'm just wondering did you

5   mention to Xavier Breaux Petroleum not inviting you to

6   meetings with any of the clients that you mentioned

7   whether it be Cameron LNG, Enlink, Cheniere, McDermot or

8   Westlake Chemical?

9        A.   I knew -- yes, because Xavier and I he would

10  have these weekly meetings with all of his sales team

11  members.  It was called a week in the life, W-I-L-O,

12  week in the life of and so we would talk about

13  activities and so forth.  So I highlighted, you know, my

14  concerns and things, you know, with Breaux Petroleum.

15       Q.   Okay.  What concerns -- besides not getting

16  invited to the meeting with the various clients that you

17  mentioned earlier, what other concerns did you mention

18  to Xavier during your weekly or monthly meetings with

19  him?

20       A.   I'm sorry, you said what concerns other than --

21       Q.   Yeah.  I mean, you said you mentioned your

22  concerns to Xavier about not getting invited to these

23  meetings --

24       A.   Yes.

25       Q.   -- with Breaux Petroleum and some of the end

Page 199

1   clients, right?

2        A.  Yes.

3        Q.  Okay.  When you say you mentioned your concerns

4   to Xavier, what specifically did you tell Xavier with

5   respect to what your concerns were?

6        A.  I mean, I don't remember, you know, verbatimly

7   but it was, you know, just that the challenge of working

8   with them because, you know, we had very aggressive

9   sales goals, we really got to hit our numbers, and I was

10  just very open about the lack of traction and engagement

11  that I had with them.

12       Q.  Okay.  Do you remember any other subject matter

13  that you discussed with Xavier in connection with Breaux

14  Petroleum not inviting you to sales meetings with

15  Cameron LNG, Enlink, Cheniere, McDermot, Westlake

16  Chemical or any other Breaux Petroleum clients?

17       A.  I'm sorry, what was the first question -- what

18  was the question?  Did I recall?

19       Q.  What concerns did you discuss with Xavier with

20  respect to Breaux Petroleum's failure to invite you to

21  some of these client meetings, right, and you said you

22  do not remember specifically but you spoke in general

23  with Xavier about the challenge in working with them and

24  about the lack of traction with them.

25       A.  Yes.  And I did specifically, you know, state

Page 200

```
 1    George -- you know, I recall his last name was Leiato,

 2    L-E-I-A-T-O.

 3         Q.  Okay.

 4         A.  And I do remember not the sales manager but the

 5    guy I guess right -- right above the sales manager who

 6    report to, his name was Mike Pryor, and that's P-R-Y.

 7    He's the vice president in my department.

 8         Q.  And these are both employees of Breaux

 9    Petroleum?

10         A.  Yes.

11         Q.  Okay.  And you were telling me about your

12    conversations with Xavier about concerns with Breaux

13    Petroleum.

14         A.  That's correct.  And --

15         Q.  Do you recall having -- discussing any other --

16    so when I asked you what conversations did you have with

17    Xavier about your concerns with Breaux Petroleum, you

18    said you didn't remember specifically but you told

19    Xavier that you were having challenges working with them

20    and that there was a lack of traction?

21         A.  Yes, on opportunities that would matter.  On

22    ones that would move the needle, you know, really help

23    from a performance standpoint to getting new business

24    and so the advice was like, "Well, you know, pretty much

25    you don't have..." --
```

Page 201

1        Q.   Let's just back up, Mr. Williams.  Are you

2   now -- so do you recall discussing anything else with

3   Xavier about your concerns with Breaux Petroleum besides

4   what you just described?

5        A.   No, outside of business engagement and gaining

6   new business, I don't recall any other incidents or

7   activities.

8        Q.   Okay.  That -- that you discussed with Xavier

9   with respect to Breaux Petroleum?

10       A.   Correct.  Yeah, other than the activities,

11   other than the challenges working with the senior rep

12   George Leiato.  And if I recall, his feedback was

13   something like, "Well, you know, you can, you know, kind

14   of go do it yourself."

15       Q.   So when you say "his feedback," are you talking

16   about Xavier's feedback?

17       A.   Yeah, like the way to overcome it.  You know,

18   so they're not, you know, willing to bring you in on

19   opportunities and so then you go knock on your doors

20   yourself.

21       Q.   In terms of challenges with -- with George

22   Leiato, did you mention to Xavier anything that you

23   perceived to be challenges specifically with respect to

24   Mr. Leiato?

25       A.   Yes.

Page 202

1      Q.   What did you tell Xavier specifically about

2   Mr. Leiato?

3      A.   If I recall correctly, I think, you know, just

4   expressing that the difficulties of, you know, me

5   talking directly, you know, to him.  You know, I've

6   spoken to him on the phone.  We met in person and, you

7   know, I can't make the guy invite me but, you know, I

8   personally asked him and it's just -- it just -- it

9   didn't happen.

10      Q.   And that's what you told Xavier about

11   Mr. Leiato?

12      A.   Yes.  I do recall along those lines, you know,

13   expressing specifically my engagement with that employee

14   with Breaux.

15      Q.   Okay.  And earlier you mentioned that Mike, the

16   sales manager at Breaux Petroleum, that you had a

17   conversation with him about George not inviting you

18   along to visit with new client opportunities or new

19   client accounts and you said that Mike said, well, he's

20   old school and he likes to work alone.  Do you recall

21   that -- telling me that?

22      A.   I do -- I do understand the term "old school"

23   and that, you know -- I mean, obviously he didn't always

24   like to work alone because he would invite Lucas Kerley

25   without inviting me so he's, you know, I guess

Page 203

1  selective.

2      Q.  Okay.  Let me ask you this.  You said that you

3  believe that the term "old school" was a euphemism for

4  being prejudiced?

5      A.  It can.  Conservative.  Yeah, that's normally

6  kind of what it denotes.

7      Q.  Did Mike ever tell you that George Leiato was

8  prejudiced?

9      A.  No.  No, of course not.

10     Q.  Okay.  He just said he's old school?

11     A.  I believe he said that because I know -- you

12  know, he said, "George has been doing this awhile, 30

13  years.  You know, I can't tell him what to do.  You

14  know, he's going to do what he wants to do."  You know,

15  he's like -- yeah.  It was almost like "Although he was

16  a manager like I let George do what he wants to do."

17     Q.  Okay, but Mike never told you that Mr. Leiato

18  was prejudiced?

19     A.  Correct.  No, of course not, no.

20     Q.  Okay.  Did you ever complain to Xavier or

21  anyone else at Shell that Breaux Petroleum was

22  prejudiced against you?

23     A.  Are you saying I said that?  Now you're saying

24  prejudiced.

25     Q.  Did you ever complain to Xavier or anyone else

Page 204

```
1    at Shell that you believed George Leiato or anyone else

2    with Breaux Petroleum was prejudiced against you or was

3    discriminating against you?

4        A.  I never used those terms.  I just kept it

5    commercial.  I just said they wouldn't work with me on

6    the opportunities that can grow.  I never said anything

7    about they're discriminating against me, they're

8    prejudiced against me, none of that stuff.

9             Lucas Kerley, on the other hand, you know,

10   told them to their face that perhaps they are because

11   they weren't willing to invite me on certain calls and

12   so forth.

13       Q.  You're talking about Lucas Kerley telling

14   Breaux Petroleum as you described earlier?

15       A.  Yes.

16       Q.  Okay.  Do you recall the name of any other

17   sales representative with Breaux Petroleum who failed to

18   invite you to client meetings other than George Leiato?

19       A.  I mean, I've requested -- like I said, Clayton

20   Rougeou was pretty much the main one that I worked with.

21       Q.  And you said you had no problems working with

22   him or having him invite you along to visit with new

23   opportunities, correct?

24       A.  That's correct.

25       Q.  Okay.  So my question is sitting here today,
```

Page 205

1   and I know it's, you know, been a year or two, can you

2   recall the names of any other sales representatives with

3   Breaux Petroleum besides George Leiato that did not

4   invite you along to meet with new opportunities or to

5   visit with clients?

6        A.   Let's see, I think -- there were a couple

7   others.   I remember --

8        Q.   Can you remember any of their names?

9        A.   I do remember, let's see, the guy's name was

10  Tony.   What was Tony's last name?   I can't remember

11  Tony's last name.   There was also a Dale Leftwich.

12       Q.   Adelle?   Is that a female?

13       A.   No, I'm sorry.   I'm saying there is a Dale.

14  It's D-A-L-E, just Dale.

15       Q.   Dale Leftwich?

16       A.   Yeah, Leftwich.

17       Q.   Besides George Leiato, Tony whose last name you

18  can't remember and Dale Leftwich, can you remember the

19  names of any other Breaux Petroleum sales reps who did

20  not invite you to attend meetings with -- with new

21  opportunities or client accounts?

22       A.   There were another one or two.   I don't recall

23  their names.

24       Q.   Did you have any discussions with Mike about

25  any of the other sales representatives not inviting you

Page 206

1    along to meet with new oppor -- new client accounts or

2    new opportunities?

3        A.  Yes.  Yeah, I did talk to Mike, the sales

4    manager, about it and he would, you know, share with me

5    the focus of different reps or the challenges -- their

6    chal -- their incompetencies but --

7        Q.  Did Mike ever give you any explanation with

8    respect to Tony or Dale or any of his other sales reps

9    as to why they did not bring you along to meet with new

10   clients or new opportunities?

11       A.  I don't remember verbatim.

12       Q.  Do you remember generally Mike -- you know, any

13   explanation that Mike gave you with respect to reasons

14   that Tony, Dale Leftwich or other sales representatives

15   weren't bringing you along to those meetings?

16       A.  I would have to hypothesize, you know.  Like

17   they might have said something, I don't know, like you

18   know they have a lot of priorities.  The sales cycle is

19   very long.  That is one thing about my line of business

20   when you do industrial lubricants, it can take two to

21   three years -- you know, long time to -- long sales

22   cycle to gain the business.  It's a long process.

23       Q.  Okay.

24       A.  I didn't know if you knew that but that's --

25   yeah, it takes a long time for a plant to make a

Page 207

1    decision.

2         Q.  Okay.

3         A.  Yeah.

4         Q.  So, you know, you told me earlier about Mike

5    making a comment about the reasons why George Leiato

6    wasn't bringing you along and that Mike's explanation

7    was that he was old school.  I guess what I'm trying to

8    ask, Mr. Williams, is do you recall any other

9    conversations with respect to these other Breaux

10   Petroleum sales reps where Mike, you know, gave you an

11   explanation as to why these individuals weren't bringing

12   you along for sales calls?

13        A.  It was just general commercial language.  Like,

14   you know, they have a lot of priorities.  They're trying

15   to hit their goals.  You know, it takes awhile to land

16   business so they're focused on selling fuel and other,

17   you know, additives to make money.

18        Q.  Okay.  Mr. Mike with Breaux Petroleum never

19   stated that these individuals were old school or were

20   prejudiced or were discriminating against you, did he?

21        A.  No, no.  No.

22        Q.  Okay.  I'd like to talk briefly about the

23   situation you mentioned last week with Holly Burns.

24        A.  Okay.

25        Q.  I think you told me that Holly Burns is an

Page 208

1    individual who you believe discriminated against you

2    during your employment with Shell?

3         A.   That's correct.

4         Q.   And I think you said your belief about that was

5    based on an incident that you described in your EEOC

6    charge where you were at a reception or a meeting

7    shortly after you began working for Shell?

8         A.   Yes.

9         Q.   Can you tell me about that situation, please?

10        A.   Absolutely.  I had started working with Shell

11   the week prior to this like sales kick-off meeting that

12   was in Houston.  I recall, you know, with my new

13   supervisor, Eric Boydstun -- it was February, Black

14   History Month, and, you know, being an African-American

15   mechanical engineer from Tuskegee University, a

16   historical black college university, I was sharing -- we

17   were having dinner the night before and I was sharing

18   about black inventors like George Washington Carver, the

19   peanut and sweet potato, all his inventions.  Garrett

20   Morgan and the gas mask, traffic light.  Lonnie Johnson

21   with the Soap Soaker.  He was like, "Wow, man, I didn't

22   realize African-Americans invented all these things."

23        Q.   And who were you sharing this with?

24        A.   My supervisor, Eric Boydstun.

25        Q.   Okay.

Page 209

1      A.   Yeah, yeah.  And there were a couple others at

2    the table.  So the next day when I -- they have me

3    introduce myself in front of the -- you know, the sales

4    audience, "This is Carl Williams, new to Shell.  Spent

5    ten years with Exxon."  You know, and -- and during that

6    introduction -- introductory period I -- I said, "Hey,

7    you know, I was asked to share since it's Black History

8    Month, little known facts about some prominent

9    African-American inventors."  And I shared, you know,

10   kind of what I shared with you.  And it was like very

11   well received the way I presented myself and so forth.

12            And also there was another event where

13   Jesus asked the audience, he said, "We need to come up

14   with a theme song.  Choose a song to kind of capture the

15   spirit of the new growth and what we want to change for

16   this year."  And myself and Steven Stack and another

17   young lady we selected like "Ain't No Mountain High

18   Enough" and we all got up and sung.

19            So I was very comfortable, you know, out of

20   the gate with Shell.  You know, I knew people that were

21   there from Exxon.  I felt very welcomed, you know, as a

22   an experienced sales professional.  And within my first

23   week I wasn't the typical timid employee.  I was giving

24   Black History facts, up there singing, like I've been

25   there and just, you know, like family almost.  It's was

Page 210

1   very comfortable.

2                   And so because of that that evening Holly

3   Burns and there was another lady like -- as I was

4   standing around talking with others she's like, "Hey,

5   you know, you're very cocky.  Like arrogant.  Like

6   cocky, arrogant."

7                   I was like, "Excuse me?"

8                   She said, "Yeah.  Like you just started

9   with the company and you got to earn your stripes."

10                   I said, "Earn my stripes?  What?  Excuse

11   me?"

12                   And she got really loud and I was asking

13   questions.  I'm like oh, my God and it caused a scene.

14   It caused, yeah, a scene and it did not look good for me

15   within my first week of employment.

16       Q.  You said -- so other than her -- Ms. Burns

17   saying you were very cocky, you were very arrogant,

18   you've got to earn your stripes, do you recall her

19   saying anything else during that incident?

20       A.  Not verbatim.  Like I don't recall any racial

21   epithets or anything like that, you know.

22       Q.  She didn't call you any kind of racial names

23   or, you know, use the N word or anything like that?

24       A.  No, I do not recall her doing that.

25       Q.  Okay.  Do you recall her saying anything else

Page 211

1    besides the cocky, arrogant and earn-your-stripes

2    comment?

3         A.  I don't recall what else she said during that

4    -- during that period.

5         Q.  Okay.

6         A.  I just know --

7         Q.  You started asking questions.  Do you recall

8    what questions you asked her?

9         A.  I was just like -- like when she made that

10   comment I said, "Excuse me?  I don't understand."

11   Like -- and then, you know, she got really loud and then

12   -- and then I walked away.

13              And the next day my supervisor, Eric

14   Boydstun, and Damon who is a black sales manager they

15   pulled me aside into a room.  "Carl, you know, we heard

16   about the incident last night.  You know, the incident

17   with you and Ms. Holly Burns and, you know, she said

18   something that you said."

19              And I was like, "I didn't say anything.

20   Like she confronted me and said I was, you know, cocky

21   and arrogant, need to earn my stripes and all this and

22   that and she got really loud."

23              And, yeah, they were like, "Well, Holly and

24   the other, you know, white female employee, you know,

25   they said this and that."

Page 212

1              And it was just -- I was like man, just

2    throw me under the bus my second week here at Shell

3    because I was an experienced employee I guess, you

4    know...

5         Q.  So she accused you of saying something to her

6    that offended her?  And I'm talking about Holly when I

7    say "her."

8         A.  I don't recall what she said but she made it

9    seem like I instigated or like -- I didn't even approach

10   her.  You know, I didn't really know -- I didn't know

11   her.  I was a new employee.

12        Q.  Okay.

13        A.  Yeah.  So she -- she tried to say that I said

14   something or something like that but she was

15   (inaudible).

16        Q.  So she said that you said something to her that

17   offended her?  Is that -- is that what she claimed about

18   the incident?  I'm sorry, did you hear me?

19        A.  Yeah, I did.  I don't recall verbatim what she

20   said she just said like, "Carl, you know, said

21   something" or -- I don't remember they said something

22   about my phone but -- I really don't recall her excuse

23   but I just know she tried to blame me for the verbal I

24   guess confrontation.

25        Q.  Okay.  And you said that your manager, Eric

Page 213

1  Boydstun, spoke with you about the incident the next

2  day?

3       A.  Yeah, it was Eric, my immediate supervisor, and

4  another African-American supervisor, his name was Damon.

5  They -- they both pulled me aside, pulled me in a room

6  and just like, "Carl, you know it doesn't look good.

7  You know, you just started with the company.  You know,

8  you've really got to be careful.  You know, you want to

9  make a good impression with the company, get people to

10 know you.  It's not a good look coming out the gate."

11      Q.  What did you tell Eric and Damon when they

12 pulled you aside?

13      A.  I told them what -- what transpired, what Holly

14 and how she engaged me, the comments that she made and,

15 you know, got really loud and caused a scene.

16      Q.  Did you tell them anything else besides the

17 comments that we discussed earlier that she made and

18 that she got loud and made a scene?

19      A.  Yes -- no, I didn't -- I don't recall saying

20 anything else other than her behavior and the words that

21 she expressed.

22      Q.  Okay.  Those words were that you were cocky,

23 arrogant and needed to earn your stripes?

24      A.  That's what I remember.

25      Q.  Okay.  And that's what you remember telling

Page 214

1    Eric and Damon as far as what Holly's comments were?

2         A.   That's correct.

3         Q.   Okay.  What did -- what did Eric and Damon tell

4    you?

5         A.   I -- I just said that.  They were like -- they

6    said, "Carl, you know, it's just -- it's not a good

7    look.  You know, you want to make a good impression.

8    We're really glad to have you on board.  You know, we're

9    really excited, you know, you helping the business grow,

10   and you're going to deliver for us but, you can't have

11   any more incidents like this.  You know, it's not a good

12   impression.  You want to make a good impression.  This

13   is your first year with the company to, you know, really

14   showcase your experience, your intelligence, your

15   personality and just, you know, don't let something like

16   this happen again."

17        Q.   Did they say anything else?

18        A.   Not that I recall.

19        Q.   Did you have any conversations or discussions

20   with anyone else at Shell about this -- this incident

21   with Holly Burns?

22        A.   I shared it.  You know, I was close to Steven

23   Stack.  I might have shared it with another person or

24   two.

25        Q.   Do you recall sharing it with anyone -- anyone

Page 215

 1    else?

 2         A.   I know I shared it with Steven Stack.  I might

 3    have mentioned it to Tamika, I don't recall.  But that's

 4    all I can really recall on that.

 5         Q.   Did you ever make any complaints to HR or any

 6    other members of Shell management about the incident

 7    with Holly Burns?

 8         A.   Absolutely not.

 9         Q.   Okay.  And it's my understanding that you sent

10    her an apology after the incident; is that correct?

11         A.   I -- I believe I might have.  I don't remember

12    if it's immediately after the incident but I tried to

13    come to good terms with her.

14         Q.   Okay.

15         A.   I do -- I do think there was an e-mail.

16         Q.   Okay.

17         A.   There was an e-mail and a phone conversation.

18              (Exhibit 5 was marked for identification.)

19         Q.   (BY MS. JAMES)  And we're going to mark this

20    document labeled as Equilon 433 as Exhibit 5.  And I

21    just want you to take a look at that and let me know if

22    that's a copy of the e-mail apology that you sent to

23    Ms. Burns after the incident.

24         A.   Okay.

25              VIDEO OPERATOR:  Sorry, you just sent this

Page 216

1    to me directly.  This is the videographer.

2                    MS. JAMES:  Oh, okay.  Oh, me to everyone.

3    I don't know why -- okay.  Thank you for that.  I just

4    sent it again.

5                    THE WITNESS:  Yes.  This -- I would have --

6    this does look like an e-mail that I sent.

7         Q.  (BY MS. JAMES)  Okay.  And earlier last week

8    when we talked, Mr. Williams, you mentioned a lady by

9    the name of Tracie Haygood and I just want to recall,

10   you're not able to recall what her specific role was

11   with Shell when she worked for Shell, are you?

12        A.  It may come to me.

13        Q.  And you -- okay.  Do you recall who her manager

14   was?

15        A.  I do not.

16        Q.  All right.  Well, just let me know if you're

17   able to think about -- if you are able to remember what

18   her role was at this point during the deposition.

19                   And last week you -- you provided a copy of

20   an e-mail that Ms. Haygood sent you after your

21   employment with Shell ended that looks like it was sent

22   to you around the time you had the resolve mediation

23   with Shell.  Do you have any other e-mails or written

24   statements by any other individuals you would consider a

25   witness with respect to the allegations you're making

Page 217

 1    against Shell in this litigation?

 2         A.  I do not have any other e-mail from any of the

 3    Shell employees.

 4         Q.  Do you have any other like, you know, typed up

 5    or written statements that any witness has signed in

 6    connection with this case?

 7         A.  I -- I do not recall having any other written,

 8    no.

 9         Q.  Okay.  Go ahead.

10         A.  I was going to say, I just checked LinkedIn.

11    Tracie Haygood, her title is North America commercial

12    manager.

13         Q.  Okay.

14         A.  With the agriculture sector.

15         Q.  Okay.  And you're getting that off of LinkedIn?

16         A.  Yes, ma'am.

17         Q.  Okay.  I want to just show you -- you earlier

18    you told me about a situation with O'Rourke Petroleum

19    where O'Rourke -- and I believe this was last week we

20    discussed this -- O'Rourke made a complaint about you to

21    Mr. Puvilland; is that correct?

22         A.  That's correct.

23         Q.  Okay.  I just want to confirm.

24              (Exhibit 6 was marked for identification.)

25         Q.  (BY MS. JAMES)  Let me show you what I'm

Page 218

1    marking as Exhibit 6.  Let me know if you've got it.

2    It's Bates-labeled Equilon 59.

3         A.  Okay, I do recall this e-mail.

4         Q.  So Exhibit 6 is a copy of an e-mail that

5    Mr. Puvilland sent to you following this incident with

6    O'Rourke Petroleum?

7         A.  Yes.

8         Q.  Okay.  And it looks like Mr. Puvilland is

9    giving you a couple of instructions following that

10   incident.  One of them is that he tells you that until

11   further notice you're not to have any further

12   communications with O'Rourke; is that correct?

13        A.  That's correct.

14        Q.  Okay.  It also looks like he's asking you for

15   an account -- or your account of what happened that

16   upset O'Rourke that caused them to make a complaint

17   about you to Shell; is that correct?

18        A.  That's correct.

19        Q.  And you recall providing that written

20   statement?

21        A.  Yes.

22             (Exhibit 7 was marked for identification.)

23        Q.  (BY MS. JAMES)  I just want to show you a copy

24   of what we'll mark as Exhibit 7 and just confirm for me

25   if this is a copy of the written statement that you

Page 219

1      provided to Mr. Puvilland pursuant to his request.

2          A.   It's not showing my comments.  Oh, it was a

3      Word document.

4          Q.   So I think -- so I think maybe -- let's see.

5      Okay, so I think I just sent you the e-mail.

6          A.   Right.

7          Q.   This is the Word document attached to the

8      e-mail, Exhibit -- I'm sorry, the document marked as

9      Equilon 1284 through 1286.

10              THE REPORTER:  Did you want that to be

11     Exhibit 8?

12              MS. JAMES:  So what I was going to do is I

13     was going to say, Wendy, this -- that exhibit is all

14     Exhibit 7.  It's going to be Equilon -- for the record

15     Equilon 1283 through 1286.  Equilon 1283 is an e-mail

16     and then Equilon 1284 through 1286 is an attachment to

17     the e-mail and all of that would be Exhibit 7.

18              THE REPORTER:  Thank you.

19         Q.   (BY MS. JAMES)  So, Mr. Williams, can you just

20     confirm for me that what we've marked as Exhibit 7 is

21     the e-mail and the Word attachment that you prepared in

22     response to Mr. Puvilland's request that you send him

23     your account of what occurred at O'Rourke?

24         A.   I'm sorry, what was the question?

25         Q.   So I've just sent you a couple of documents in

Page 220

1   the Chat.

2        A.  Yes.

3        Q.  And those documents are marked Equilon 1283

4   through 1286 at the bottom.

5        A.  Okay, I'm looking for 1286.  Is that a part of

6   84?

7        Q.  Yes.

8        A.  Okay, yes, yes.  I did craft this e-mail

9   document.  I do confirm it.

10       Q.  Okay.  Equilon 1283 through 1286 which we've

11  marked as Exhibit 7 is a copy of the e-mail you sent and

12  the Word document you drafted giving your account of

13  what happened with O'Rourke?

14       A.  That's correct.

15       Q.  My understanding was that O'Rourke's

16  complaint was that -- part of its complaint was that you

17  had brought up another distributor during a client

18  meeting; is that correct?

19       A.  It wasn't during the client meeting.  We had

20  lunch and I was -- we were debriefing, myself and

21  another employee, Adrian na, we were just talking about,

22  you know, how the meeting went, you know, next

23  opportunities, working together and I was sharing that

24  Shell had a new campaign and approach to expanding the

25  industrial lubricants business by utilizing RelaDyne

Page 221

1   Reliability Services which is -- which is a separate

2   company an entity that RelaDyne Lubricants Distribution.

3   And so Shell was really promoting, you know, to utilize

4   them nationwide.  They were -- so the way reliability

5   worked is they provide technical support and they can

6   work alongside any distributor:  you know, Shell and

7   whomever.  And so they're a support service function.

8   They're not like competitors.

9              So I was asking Mr. Scott Field, I said,

10  "Hey, you know, Shell has this new campaign and

11  agreement with RelaDyne Reliability Services with their

12  technical expertise and what they can offer."  And I

13  said, "You know, I understand they're a service

14  division.  They're a stand-alone company which is

15  different than their lubricants business and which

16  O'Rourke competes against."

17             And he said, "Carl, I would never like, you

18  know, work with them.  You know, they stole some of my

19  business," and this and that and, you know, he was

20  really ticked off about it.  He did not mention -- I'm

21  sorry?

22             (Exhibit 8 was marked for identification.)

23     Q.   (BY MS. JAMES)  Okay.  Now, I wanted to show

24  you a copy of an e-mail that I'm going to show you

25  marked as Equilon 165 and 166 which we'll attach as

Page 222

1    Exhibit 8.  Are you familiar with the e-mail that's

2    marked as Exhibit 8 which is Equilon 165 and 166?

3                     VIDEO OPERATOR:  Looks like we lost him.

4    Would you like to go off the record?

5                     MS. JAMES:  Yes.

6                     VIDEO OPERATOR:  Recording stopped.

7              (Recess taken from 12:31 p.m. to 12:31 p.m.)

8                     VIDEO OPERATOR:  We're back on the video

9    record.  It's 12:31 p.m.

10                    THE WITNESS:  Okay, what was the question?

11        Q.  (BY MS. JAMES)  I was just asking -- well,

12   first off, is Exhibit 8 which is Equilon 165 through

13   166, is that a copy of an e-mail that you sent with

14   respect to O'Rourke Petroleum?

15        A.  Yes, this is an e-mail that I had sent in

16   regards to visiting an account, that's correct.

17        Q.  And the account that you visited with O'Rourke

18   Petroleum, is that High Roller Sand?

19        A.  Yes.

20        Q.  Okay.  So that -- High Roller Sand would have

21   been a potential client of O'Rourke Petroleum and an end

22   client of Shell; is that correct?

23        A.  Yes, that would have been -- that's correct.

24        Q.  Okay.  And you attended a meeting with O'Rourke

25   and High Roller Sand in or around January of 2020

1    according to this e-mail; is that correct?

2         A.   That's correct.

3         Q.   Okay.  What is POPSAS, P-O-P-S-A-S, that's

4    referenced in this e-mail?

5         A.   It's a -- it's an acronym but it is basically

6    you complete a document -- it's like the purpose,

7    opportunity, solutions -- you basically write down what

8    you know about the account, who are the stakeholders,

9    it's like background information on the account, what

10   are you looking to achieve, what do you anticipate being

11   the obstacles, what do you think your value proposition

12   is.  So it's like a questionnaire that helps prep you on

13   the account and opportunity based upon what you can find

14   out.

15        Q.   Okay.  The incident described in this e-mail

16   chain, Mr. Williams, this is different from the incident

17   that we just discussed that resulted in O'Rourke asking

18   that you no longer be on their account?

19        A.   Yeah, this is a different account.  Different

20   time period.

21        Q.   Okay.  It's still -- it's still working with

22   O'Rourke but it's for a different end client, High

23   Roller Sand?

24        A.   Yes.

25        Q.   Okay.  And is -- it looks like you're saying

Page 224

1    that you didn't -- that you're accepting responsibility

2    to make sure that you have better POPSASs and pre-call

3    information with all of my distributors moving forward.

4    Do you see that?

5         A.  Yes, that's correct.

6         Q.  Okay.  So was there a visit with High Roller

7    Sand where you didn't have complete pre-call information

8    before you went out to visit the account?

9         A.  So I was working with a new sales manager,

10   Scott Fields, you know, it would have been his

11   counterpart out of West Texas.  Well, he's actually

12   based out in Dallas.  And so I had phone conversations.

13   Before I made this -- this visit -- because this is in

14   the Midland-Odessa area -- I guess it was back in

15   December Jarrett Enochs, you know, who also works with

16   O'Rourke, he -- you know, he works for Shell.  He

17   supports O'Rourke from a business standpoint.

18                He said, "Carl, you know, O'Rourke has this

19   opportunity that they want you to join them out of West

20   Texas, you know, early next year."  And he's like, "You

21   know, they want your support.  You know, engage with the

22   sales manager to, you know, uncover, you know, the

23   opportunity and see how you can support them."

24                So this is during the holiday period, like

25   December, and this is my -- this is my first time

Page 225

1    working with -- what's the name of this guy?  I think

2    it's in the e-mail.  Let's see, High Roller -- I don't

3    see his name.  I think his name is Justin, if I'm not

4    mistaken.  So he was a new sales manager and we spoke on

5    the phone -- yeah, it is Justin -- to -- about

6    opportunities to kind of maximize my visit because I

7    guess one of the things you kind of -- you have to

8    consider is that they -- they know the marketplace.

9    They have a local sales rep out there, you know, who

10   calls on these accounts and so they have the background

11   information.  I was tagging along with them.  So I

12   didn't have a direct relationship with this account

13   so --

14        Q.  You're talking about High -- the High Roller

15   Sand?

16        A.  Yes, yes.  So, you know, if they don't tell me

17   -- if they're not willing to share -- you know, it's --

18   I'm the assistant, you know, that comes along to help

19   whoever is representing Shell so it's kind of

20   challenging for me to really, you know, take lead on

21   when I have to depend on them because they have the

22   connection.  They're the ones that manage the relation,

23   I'm just a support person.  But in this e-mail I just,

24   you know, wanted to say, "Hey, you know, I take, you

25   know, responsibility for making sure that I help my

Page 226

1    distributors do a better job at helping me because this

2    is my first time working with the sales manager, working

3    in this market."  And I was asked to go and support them

4    and -- by -- by Jarrett to support this new sales

5    manager but they -- they didn't really have a good

6    footprint analysis on their marketplace.  I mean, the

7    account that we went to, like one of the them was an

8    existing Shell account that they didn't -- they didn't

9    even know so it was -- it was probably one of the

10   poorest visits I've ever engaged with a distributor

11   throughout my career.  I mean, including Exxon and

12   Shell.

13        Q.  Okay.

14        A.  Yeah.

15        Q.  But it looks like Xavier is saying in the

16   middle of the page that, you know, it was his belief

17   that there was some improvement that you guys could make

18   on your end, too, as far as being better prepared for

19   these meetings; is that correct?

20        A.  You said he made a suggestion that we could be

21   better prepared?

22        Q.  Yeah.  I mean, it looks like in his e-mail,

23   Xavier's e-mail --

24             MR. HODGES:  Objection.  He can read the

25   e-mail verbatim as to what it's speculating.

Page 227

```
1              THE WITNESS:  Yeah, can you please read the
2    exact sentence?
3         Q.  (BY MS. JAMES)  Yeah, I'm looking at Xavier's
4    e-mail right underneath yours.  "Carl, Clearly a miss on
5    our end as well, the right quality of POPSAS would have
6    caught this mismatch ahead of time, we need to improve
7    this on our end too."  Do you see that?
8         A.  I do see that.
9         Q.  Okay.  And your response to him was that you
10   would make sure that you were better prepared for the
11   meetings and engagements before moving forward.
12              MR. HODGES:  Objection:  misstating
13   testimony.
14        Q.  (BY MS. JAMES)  Is that your response,
15   Mr. Williams?
16        A.  I missed what you said.  Attorney Eddie was
17   speaking as well.
18        Q.  Okay.
19              MR. HODGES:  Yeah, the objection
20   (simultaneous speaking) --
21        Q.  (BY MS. JAMES)  I'll re ask it.  So your
22   response at the top of the page, Mr. Williams, your
23   e-mail there is in response to Mr. Xavier's e-mail just
24   below it, correct?
25        A.  Let me see.  Because mine is at the top so mine
```

Page 228

1    was the 14th at 7:00 at night and Mr. Xavier's it looks

2    like his was before mine.  Yes, so this would have been

3    my response to his e-mail which, I mean, if you look at

4    it, it looks -- we had a discussion about it.  There was

5    shared responsibility between myself and Jarrett who is

6    an experienced Shell employee who managed the

7    relationship with O'Rourke and, you know, Xavier is

8    saying, "Carl, a miss on our end as well."  So it was

9    like shared responsibility between O'Rourke, Jarrett and

10   myself, like a collective miss, and, you know, I being a

11   person who takes ownership of my -- my business and

12   account and doing the best that I can do, I just, you

13   know, chose to take ownership of the situation.

14        Q.  Okay.

15        A.  Opposed to say, "Hey, it ain't my fault.  They

16   did it.  Jarrett told me," and all that, you know,

17   he-she stuff finger pointing.

18        Q.  Okay.

19            (Exhibit 9 was marked for identification.)

20        Q.  (BY MS. JAMES)  I'm going to show you a copy of

21   what's marked as Equilon 1068 and we'll mark this as

22   Exhibit 9 to your deposition.

23            MR. HODGES:  Can I request the time -- how

24   much time is left?

25            MS. JAMES:  We can go -- let's go off the

Page 229

 1   record.

 2               VIDEO OPERATOR:  We are going off video

 3   record.  The time is 12:41 p.m.

 4         (Recess taken from 12:41 p.m. to 12:52 p.m.)

 5               VIDEO OPERATOR:  On the video record.  It

 6   is 12:52 p.m.

 7       Q.  (BY MS. JAMES) Mr. Williams, did you have an

 8   opportunity to look at Equilon -- with the documents

 9   that's Bates-labeled Equilon 1068 through 1071?

10       A.  I'm almost finished.  I think if you give me

11   about two minutes, I'll be done.

12       Q.  Okay.  We're going to mark that as Exhibit 9.

13       A.  Okay, I'm ready.

14       Q.  I just -- I wanted to confirm that Exhibit 9

15   includes e-mails that you exchanged with the manager,

16   Mr. Puvilland, in connection with performance feedback

17   that he had provided you in the fall of 2019 it looks

18   like.  Is that correct?

19       A.  That's correct.

20       Q.  Okay.  And if you look, there's an e-mail from

21   Mr. Puvilland to you dated October 31st, 2019, that

22   starts at the bottom of Equilon 1068 and goes on to the

23   next page and concludes on Equilon 1069.  Do you see

24   that?

25       A.  On 1069.  Okay, I see it.

Page 230

1      Q.  Okay.  And this is an e-mail that Mr. Puvilland

2   sent to you on October 31st of 2019?

3      A.  Yes, that's what the e-mail shows.

4      Q.  Okay.  In this e-mail he's discussing various

5   issues and topics related to your performance; is that

6   correct?

7      A.  That's correct.

8      Q.  Okay.  And you don't dispute that this is an

9   e-mail that Mr. Puvilland sent to you?

10     A.  I do not dispute it.  I concur that this is an

11  e-mail that he sent to me.  I mean, the chain also

12  contains the e-mails that I sent to him.  I mean, it's a

13  chain of various e-mails and dates all in regards to the

14  EYR.  That stands for end-year review.  So this is like

15  a performance feedback.

16     Q.  The end-year review is what EYR stands for in

17  the subject line you said?

18     A.  Yes, ma'am.

19     Q.  Okay.  And in your review the review refers to

20  a review of your performance; is that correct?

21     A.  Yes, ma'am.

22         (Exhibit 10 was marked for identification.)

23     Q.  (BY MS. JAMES)  And then I'm going to show you

24  what we'll mark as Exhibit 10 which is labeled as --

25  Bates-labeled as Equilon 73 and 74.  Did you get that,

Page 231

 1    Mr. Williams?

 2         A.   The one, 73?

 3         Q.   Yes, sir, Equilon 73 and 74 which we'll mark as

 4    Exhibit 10.

 5         A.   Yes.

 6         Q.   Are you familiar with that e-mail?

 7         A.   Let me take a look at it.  Yes, I do recall.

 8    Yep, looks good.

 9         Q.   What is Exhibit 10, Mr. Williams?

10         A.   I'm sorry, you said what is Exhibit 10?

11         Q.   Yes.

12         A.   Oh, okay, I see.  So Exhibit 10 was this

13    document Equilon, yeah, 73 so --

14         Q.   Yes, 73 and 74.

15         A.   -- this represents a collaborative effort

16    between Xavier and myself on what information he's going

17    to put into the system that articulates his views on my

18    performance.

19         Q.   So this is his, Mr. Xavier's, comments on your

20    performance in January of 2020, correct?

21         A.   Uh-huh.

22         Q.   Is that correct?

23         A.   Yeah, this -- yeah, this is indicative of my

24    performance for 2019.

25         Q.   Okay.

Page 232

1          A.   And the time stamp is from I guess my start

2     date which was, what, I think Martin Luther King's

3     birthday, January 18th of 20 -- yeah, '19 up until

4     November 1st.  So 11 months with the company this is my

5     performance I guess review.  Not even like a full year.

6     Like I said, as you saw we had the year-end review like

7     at the end of October.

8          Q.   Okay.  So this review -- this review in Exhibit

9     10 was provided in January of 2020?

10          A.   That's correct.

11          Q.   Okay.  And it looks like Mr. Puvilland the

12     first e-mail which is on the last page, Equilon 4,

13     Mr. Puvilland sent you his comments on your performance

14     for the 2019 year.  Do you see that?

15          A.   Which -- which page or what did you say, the

16     bottom?

17          Q.   Equilon 74.

18          A.   Let me maximize the screen.

19          Q.   It's the second page.

20          A.   I see it now.  Yes.

21          Q.   Okay.  So Equilon 74 is an e-mail Mr. Puvilland

22     sent to you with his comments for your performance in

23     2019; is that correct?

24          A.   That's correct.

25          Q.   Okay.  And then it looks like at the bottom of

1    Equilon 73 you suggested some changes to his comments;

2    is that correct?

3         A.   That's correct.

4         Q.   Okay.  And at the top of page 73 it looks like

5    he sent you an e-mail back where he accepted some of

6    your changes and made some additional changes to his

7    comments on your performance for the 2019 year; is that

8    correct?

9         A.   That's correct.

10        Q.   Earlier, Mr. Williams, you mentioned that when

11   you first started working with Mr. Puvilland you guys

12   had monthly meetings called MILOs; is that correct?

13        A.   Yeah, when I first got started, as -- as a

14   team, Xavier had all of the BDMs to book time on his

15   calendar where we would check in once a month and that

16   was like the first couple of months and then I guess by

17   the third month of working with him or so or somewhere

18   in that timeframe it became opposed to checking in once

19   a month it became every week and this is something that

20   all employees did.

21        Q.   Okay.  And what were y'all -- what was he

22   checking in on with you about in these MILO and then

23   ultimately that changed to the WILO meeting?  What

24   things were y'all discussing?

25        A.   All account managers, he did this with all of

Page 234

1    us and so we would share where the opportunities are,

2    where we're going to be spending time for the week, what

3    we're looking to achieve for the week, where we need

4    support.  But it was more so like, "What are you working

5    on?  What are you doing to gain business?  You know, how

6    can I support you?"

7        Q.  Now, he would have these meetings one on one.

8    I understand that you're saying that he -- Mr. Puvilland

9    met with other business-development managers in the same

10   fashion having these MILO and WILO meetings with them

11   but with respect to you he had these meetings with you

12   one on one; is that correct?

13       A.  Yeah, all of these are one on one.  I guess my

14   point is like this was standard.  Like this is not

15   individual performance coaching and I find that

16   misleading.  "Oh, I gave Carl coaching."  No, this is a

17   standard business practice that you do with all

18   employees.

19       Q.  Okay.  So did he discuss with you in those

20   meetings opportunities or his expectations for, you

21   know, areas where you needed to improve and what you

22   needed to work on?

23       A.  Yeah, there were -- there were -- in doing some

24   of them, you know, there were things to work better and

25   others, you know, there was -- you know, there was some

Page 235

1    good stuff.  "Hey, Carl, you're doing well in these

2    areas.  You know, keep up the work here.  I'm noticing

3    improvement."  You know, even when you read the end-year

4    review, you know, one --

5        Q.  Well, so you're talking about what we just

6    talked about a few minutes ago, Mr. Williams, the

7    end-of-year review?

8        A.  Yeah.

9        Q.  Okay.  Well, I just wanted to ask you about the

10   MILO and the WILO meetings which were the monthly

11   meetings where Mr. Puvilland sat down with you and

12   talked to you about areas in which you were doing good

13   and then areas for improvement and opportunity.  And

14   it's my understanding that at first those meetings were

15   happening on a monthly basis and they were called MILO,

16   M-I-L-O.  Is that correct?

17       A.  That's correct.

18       Q.  And then those meetings were happening on a

19   weekly basis and they were called YILO, Y-I-L-O; is that

20   correct?

21       A.  That's correct.

22       Q.  Did Mr. Puvilland like often send you e-mails

23   following up those meetings just like a little recap of

24   what was discussed during those meetings?

25       A.  Yes.  So --

Page 236

1      Q.  Okay.  Let me -- so I only have a few minutes,

2   Mr. Williams, left so I just want to make sure I get all

3   of my questions in.

4            My understanding is that Mr. Puvilland

5   expressed to you -- well, let me -- I'm going to show

6   you an e-mail that we'll mark as Equilon 1184.  I'm

7   sorry, we'll mark it as Exhibit 11 but it's labeled

8   Equilon 1184.

9            (Exhibit 11 was marked for identification.)

10     Q.  (BY MS. JAMES)  Did you get a copy of what I

11   sent in the chat that's marked Equilon 1184 and then

12   there's a second page marked 1185?

13     A.  Yes, it's opening now.  "Thanks, making good

14   progress.  Midtex..."  Okay, yeah, I'm ready.

15     Q.  Are you familiar with Exhibit 11 which is

16   Equilon 1184 and 1185?

17     A.  I mean, it looks familiar.  It looks like

18   something we discussed and shared.

19     Q.  The subject line is "Path to $1.5M."

20     A.  Yes.

21     Q.  What is that referring to?

22     A.  That's like a sales goal, a revenues to grow

23   the business for me as an individual.

24     Q.  Okay.  So it's like a revenue goal for new

25   business?

Page 237

```
 1        A.  Yeah, like a target.

 2        Q.  Business revenues?  Okay.  And was that a goal

 3   that you and Mr. Puvilland discussed at you being able

 4   to grow new business or bring in new business revenues

 5   of $1.5 million?

 6        A.  I don't recall like if that was my specific

 7   objective.  I would have to look at my objectives but I

 8   know it was to grow and, you know, of course perform and

 9   have the company made money but...

10        Q.  Yeah, and bring in new business as part of

11   that?

12        A.  Yeah, that's correct.

13        Q.  Now, earlier you talked about you received a

14   bonus from Shell in February of 2020?

15        A.  That's correct.

16        Q.  The bonus you received, would that have been

17   based on business in 2019?

18        A.  Yes.

19        Q.  Okay.  Are you familiar with bonus amounts that

20   were received by other business-development managers in

21   your department?

22        A.  We don't share.  You know, that's personal.

23   It's not like public knowledge.  I just know Tamika

24   Greer, she -- she was struggling to get her bonuses and

25   she was making complaints and I think she had to dispute
```

Page 238

1    it and I think she ended up getting her bonus but...

2         Q.  You don't know the amount of any bonus she got?

3         A.  I do not.  I just know that mine was $23,000

4    for -- for -- for my performance in 2019 because I --

5    you know, I exceeded my sales objectives.  You know,

6    that's one thing I like about sales is that the numbers

7    speak for themselves.

8         Q.  Did the bonus -- I mean, the bonus that you

9    received, was that based, Mr. Williams, on the total

10   volume of business --

11        A.  That's correct.

12        Q.  -- your accounts did?

13        A.  Yes, and the growth.  The growth in revenue and

14   volume.  I think I saw I think it was 125,000 gallons I

15   think of new business.  It was -- it was stated in one

16   of the --

17        Q.  Okay.  But the bonus was made on total volume

18   of business, not just new business, correct?

19        A.  No, it's based on new business.

20        Q.  Okay.

21        A.  Yeah, yeah, you get paid based upon how you

22   perform and I had gained 125,000 gallons of new business

23   and that was just during the second half of 2019, you

24   know.  I didn't start working with my distributors until

25   June so there's really like just six months of work.

1    Q.  Okay.  And other than -- other than your

2  hearing that Tamika Greer had complaints about her

3  bonus, you didn't discuss any amounts that other

4  employees received in terms of their bonuses, did you?

5    A.  I did not discuss any amounts.  I'm not privy

6  to what other incentives others received.  I just know

7  that these are individual performance bonuses, they're

8  not teams and you had to perform as an individual and I

9  performed well enough within my short tenure to get a

10  $23,000 bonus.

11    Q.  Okay.

12    A.  So the one thing --

13    Q.  Now -- well, let me ask you this, Mr. Williams.

14  Did you ever make any complaints about discriminatory

15  treatment or retaliation by Mr. Puvilland or anyone else

16  at Shell?

17    A.  I did during the Resolve -- well, when I was

18  terminated I filed a complaint.

19    Q.  Okay.  So after your termination?

20    A.  Uh-huh.

21    Q.  Yes?

22    A.  Yes, ma'am.

23    Q.  Okay.  So prior to your termination you never

24  made any complaints about discriminatory or retaliatory

25  treatment by Mr. Puvilland or anyone else at Shell, did

Page 240

```
 1   you?

 2        A.  No, there were no like formal -- yeah, nothing

 3   formal that I submitted to HR.  You know, I would just

 4   chat with my peers about, you know, what's going on, how

 5   we're being treated, are we getting treating the same,

 6   especially the other black employees.

 7        Q.  Okay.  But did you complain -- make any

 8   complaints to anyone with management or anyone with HR

 9   prior to termination?

10        A.  No, ma'am.

11        Q.  And then after -- you said after your

12   termination you submitted a complaint?

13        A.  Yes.

14            (Exhibit 12 was marked for identification.)

15        Q.  (BY MS. JAMES)  Okay.  And I just wanted to

16   show you a copy of a couple of documents that we'll mark

17   in global as Exhibit 12 and they are Equilon 517 and 525

18   and 526.  I just wanted to ask, Mr. Williams, if this is

19   the copy of the Complaint you submitted after your

20   termination that you mentioned earlier?

21        A.  I'm just reviewing it.  Okay, I do agree to

22   sending this.

23        Q.  When you said you made complaints about

24   Mr. Puvilland after you were terminated, is this what

25   you -- are these documents what you're referring to?
```

Page 241

1        A.   Yes.

2        Q.   Okay.

3        A.   Yeah, this was the written complaint that I

4   submitted to like I guess the HR system e-mail.  You

5   know, I also shared with them over the phone but...

6        Q.   Okay.  So you spoke with individuals in Shell

7   HR about the contents of what's in Exhibit 12 after your

8   termination as well as submitting these written

9   complaints to Shell HR?

10       A.   Yes.  My question -- so when you say Exhibit

11  12, I don't see exhibit numbers.  I just see the --

12       Q.   We'll mark that as Exhibit 12 but just so you

13  are aware, it's Equilon 517 and then 525 and 525 that

14  we'll mark as Exhibit 12.

15       A.   Oh, I see.  Okay, yes.  I just want to make

16  sure.

17       Q.   Okay.  And just so I'm clear, what I've showed

18  you 517 and then 525 and 526, those are copies of the

19  complaints that you submitted to Shell HR after you were

20  terminated?

21       A.   I see 526, 525, yes.  Did you say 517?

22       Q.   Correct.  It should have been right before 525

23  and 526.

24       A.   In that same document?

25       Q.   No, I sent it just before.

Page 242

```
 1        A.  It didn't open up.  It's downloading.  That's

 2    the largest file you've sent.

 3        Q.  It's only a page or two.

 4        A.  It's seven megabytes.  Must be pictures or

 5    something in there unless you put some graphics in

 6    there.

 7        Q.  I don't think so.

 8        A.  It's opening.  I see.  Yep, I agree that I

 9    submitted that.

10        Q.  Okay.  And is that a copy of the -- you

11    mentioned earlier that you made a complaint after your

12    termination to Shell HR about Mr. Puvilland.  Is that a

13    copy of the complaint that you made or are those

14    documents a copy of the complaint that you made, Equilon

15    517 and then 525 and 526?

16        A.  Yes, yes, this is documentation -- written

17    documentation of complaints that I've made about

18    Mr. Xavier Puvilland.

19        Q.  Did you make any other complaints to HR after

20    your termination other than the two written complaints

21    or the two documents that I've just showed you that

22    we've marked as Exhibit 12?

23        A.  Yes, I did.  So there was this one to HR and

24    then there was another one to the Resolve group.

25    There's -- what do they call it?
```

1      Q.  Oh, are you talking about you submitted a

2   request to mediate your disputes through the Shell

3   Resolve program?

4      A.  No, I'm sorry, I misconstrued.  It's actually

5   they have an ombudsman, like Shell ombudsman.  They're

6   like independent.  I think the person's name was Miki, I

7   believe.  I made a complaint about the way I was treated

8   and what took place and -- because they were supposed to

9   report stuff like that to I guess the country manager or

10  a very high-level person because he --

11     Q.  Okay, go ahead.

12     A.  He just -- he just expressed what happened to

13  me like -- was like he kind of agreed it's unfair and

14  that's not typically how Shell treats employees and

15  he's -- you know, he just said he was going to I guess

16  kind of, what, document like what took place.

17          (Exhibit 13 was marked for identification.)

18     Q.  (BY MS. JAMES)  I just shared with you a copy

19  of what is marked as Equilon 1295 to 1297 and we'll mark

20  it as Exhibit 13 and I just wanted to know if this is --

21  so you mentioned Miki.  Is that the ombudsman that you

22  were referring to?

23     A.  Yes.

24     Q.  And is this a copy of the complaint that you

25  submitted to Miki in Exhibit 13 which is Equilon 1295

Page 244

1    through 1297?

2        A.   Give me one second.  Let me just read through

3    it.  Okay, now what was the question?

4        Q.   Is this a copy of the complaint that you

5    submitted to Miki that you were referring to?

6        A.   Yes, that's correct.

7        Q.   Okay.  And this is dated March 19th of 2020 so

8    that would have been after your termination on March

9    16th; is that correct?

10       A.   That's correct.

11       Q.   And, Mr. Williams, do you have a copy of the

12   documents you produced in this litigation?

13       A.   Which -- which document?

14       Q.   The documents that are Bates labeled as

15   Williams 1 through 168.

16       A.   Is that something that's on the screen or --

17       Q.   No, they're -- I can -- I can send these to you

18   but let me just send them and then let's go off the

19   record because it might take you a minute to open them.

20   I just want to confirm that they're documents that you

21   produced to us in the litigation.  They're the 100 or so

22   pages.  The majority of it looks to be medical record so

23   I just wanted to confirm that these are records that you

24   produced.  Just one second and I'll send them to you.

25   Let's just go off the record while that downloads and

Page 245

1    give Mr. Williams time to download it on his end and

2    then we'll go back on.

3               VIDEO OPERATOR:  Would you like to go off

4    right now?  Okay.  We are off the record.  The time is

5    1:21 p.m.

6          (Recess taken from 1:21 p.m. to 1:26 p.m.)

7               VIDEO OPERATOR:  We are back on the video

8    record.  It is 1:26 p.m.

9          Q.  (BY MS. JAMES) Mr. Williams, did you get a copy

10   of the documents that you produced I sent you, Williams

11   1 through 168?

12         A.  Yes, I did.

13         Q.  It looks like those documents contain medical

14   records for you from Kingwood Psychiatry.  Do you see

15   that?

16         A.  Yes.

17         Q.  Can you tell me why you produced these records

18   in this litigation?

19         A.  I'm trying to remember.  I think I was asked by

20   my attorney at the time or something I guess related to

21   health.  I do know that there was emotional stress and

22   so forth.  I think this is perhaps chronology, you know,

23   kind of during the time period it looks like as I was

24   employed by Shell just for my health perspective.

25         Q.  Okay.  So these are copies of records related

Page 246

1    to psychiatric treatment that you received in connection

2    with emotional distress that you claim was caused by

3    Shell?

4        A.  There's some of that in here and some, you

5    know, before the termination.

6        Q.  Okay.  So some of the records relate to

7    psychiatric treatment that you received I think prior to

8    even working for Shell, correct?

9        A.  You say prior?  I'm looking -- wait a minute.

10       Q.  Yeah, so there's records related to treatment

11   received in 2016, 2017 and, you know, 2018 and I just

12   want to confirm that that treatment occurred prior to

13   the time that you were working for Shell, correct?

14       A.  Yes, if those are the dates on them, yes.

15       Q.  Okay.  I mean, what dates of treatment -- what

16   -- what are the dates of the psychiatric treatment that

17   you received in connection with the emotional distress

18   that you claim was attributable to anything that Shell

19   did?

20       A.  I have to go through each one and see.  Hold

21   on.

22                   MR. HODGES:  This will be the last

23   question.

24                   THE WITNESS:  So specifically the day -- I

25   see a record -- from looking at this file -- let's see,

Page  247

1    it's page 26 of 153 -- that's what's on top of the

2    document, the medical notes from my consultation.

3        Q.   (BY MS. JAMES)   What page is at the bottom?

4    What number is at the bottom, Mr. Williams?

5        A.   Okay, in the PDF it states 41 out of 168 and at

6    the bottom Williams 41.  0041.

7        Q.   Okay.  Any other treatment records in here that

8    relate to treatment you received for emotional distress

9    you claim to be attributable to anything that Shell did?

10       A.   Let me take a look.  I mean, I know that one is

11   definitely.  I mean, that was just like two days after I

12   was terminated.  And there's even comments about me

13   experiencing anxiety.  Let's see.  They even had to put

14   me -- yep, had to be on extra medication for anxiety and

15   medicine to help me sleep which is not a part of my

16   normal medical intake so this is demonstrative -- so I

17   realize this is demonstrative of emotional distress and

18   things that I had to overcome due to what happened to

19   me.

20       Q.   Sure.  I was asking you though were there any

21   other treatment records in here other than the one, that

22   Williams 0041?  Are there any other records related to

23   treatment you received for emotional distress that you

24   attribute to anything that Shell did?

25       A.   Not that I can see at this time.  Just the one

Page 248

1    that I highlighted.

2              MS. JAMES:  Okay.  Pass the witness.

3              MR. HODGES:  Thank you.  Mr. Williams, do

4    you need a break or anything or do you want to just go

5    straight through?

6              THE WITNESS:  Let's go straight through,

7    man.

8                        EXAMINATION

9        Q.  (BY MR. HODGES)  All right.  Just as, you know,

10   we already mentioned before, if you could just allow me

11   to answer -- or to ask my question before you answer.  I

12   know sometimes I may talk too fast.  If you can't get a

13   question or if you need me to clarify, just ask.

14              So just to start it off, when was your hire

15   date again?

16       A.  On Martin Luther King's birthday, January 18th,

17   2019.

18       Q.  Okay.  And your position throughout your

19   position through -- what was your position throughout

20   your employment?

21       A.  I was considered the indirect panel

22   business-development manager.

23       Q.  And as the business development manager or BDM

24   what was your -- your role?

25       A.  My role was to help my distributors grow their

Page 249

1    business.  You know, their customers selling Shell

2    lubricants.  So they managed the relationship, you know,

3    they'd do the invoicing and all that and I'm there as a

4    support person.

5         Q.  So who were your customers?

6         A.  My distributors.  Oh, that would be O'Rourke,

7    Breaux, MidTex, Reladyne, Quality.  I had about nine or

8    so distributors.  So the distributors are my customers

9    and I help them sell Shell lubricants to their end-use

10   customers which, you know, can be power plants,

11   construction sites, gas compression, injection molding,

12   manufacturing facilities.

13        Q.  Okay.  And how were you assigned these

14   distributors/customers when you were employed?

15        A.  Management, they'd decide.  My initial manager

16   because the territory was vacant for about six months or

17   so and so the previous rep, you know, moved on and his

18   name is Jess and so I came into the area and that was

19   pre-defined upon my employment, before it.

20        Q.  And you said that you were hired on Martin

21   Luther King day 2019?

22        A.  Yes.

23        Q.  And who was your manager when you were hired?

24        A.  Eric Boydstun.

25        Q.  And when did Xavier Puvilland -- do you mind if

Page 250

1    I just call him Xavier?  You know what I'm talking

2    about?

3         A.  It's actually Xavier.

4         Q.  When did Xavier become your manager?

5         A.  Official day was like August 1st.  That's the

6    official.  I met him at the end of July, we met like an

7    intro, but officially and so forth like August 1st.

8         Q.  And who was in charge of -- or scratch that.

9    Strike that.

10              How was your performance measured during

11   your employment?

12        A.  You said how was it measured?

13        Q.  Yes.

14        A.  I had growth objectives from a sales

15   performance.  You know, I was expected to -- so the

16   numbers speak for itself which is why, you know, I was

17   able to get the bonus so, you know, my sales was good,

18   you know, despite my shorten your and the company -- you

19   know, so -- so sales and there were other things like,

20   you know, maintaining safety, having a robust pipeline.

21   Those -- you know, the intangibles.  You know, doing

22   reports on your sales and stuff like that.

23        Q.  And what does a bonus have to do with

24   performance?

25        A.  The bonus meant that you exceeded your

Page 251

1    objectives; that your performance was valid, strong

2    enough to award you for a strong performance.

3         Q.  And who ultimately measured your performance?

4         A.  My immediate manager.

5         Q.  And who was your immediate manager?

6         A.  Well, it transitioned to Xavier so it was his

7    decision.

8         Q.  And so I want to -- I'm going to be showing

9    some exhibits.  I'm going to be sharing my screen and I

10   just want to get some clarification from you.  Just give

11   me one second while I share my screen.  This is going to

12   be marked as -- and I'm going to get to the court

13   reporter I'm going to give you the exhibit list at the

14   end but I'm going to give you the total list at the end.

15   So this is going to be marked as Defendant's Exhibit 1

16   and it's --

17                   MS. JAMES:  You mean Plaintiff's Exhibit?

18                   MR. HODGES:  Sorry, I'm sorry.  I've been

19   working on something else.  Yes, Plaintiff's Exhibit 1.

20   I'm sorry.

21        (Plaintiff's Exhibit 1 was mentioned and

22        retained by counsel.)

23        Q.  (BY MR. HODGES)  So can you see this?

24        A.  I'd like if we can make it larger, please.  Oh,

25   yeah, that's nice.

1        Q.   Okay.  And this is -- for the record this is

2   labeled Equilon 000097.  And so for the record,

3   Mr. Williams, can you tell me what this is?

4        A.   A business performance scorecard for the year

5   and this is just the first half of -- I see January 19

6   through -- was that May?  So --

7        Q.   It's 6/30.

8        A.   Yes.  Is it six?  Okay, okay.  Yeah, until the

9   end of June.  So this is indicative of performance --

10  this is showing 2018 versus 2019.  I was hired in 2019.

11  So you're seeing growth.  Volume, you know, 138 percent

12  versus prior year.  C3, that stands for contribution

13  margin, so that's, you know, profitability or margin.

14  Unit C3 unit margins.  And then premium volume.  So what

15  you're seeing is, you know, increases in performance.

16       Q.   And -- and is this increase of performance

17  between the time of -- as it states, here January 1st,

18  2019 through June 30th, 2019?

19       A.   That's correct.

20       Q.   And can you explain to me what this F 2018 FY

21  percentage means?

22       A.   I think -- I think full year.

23       Q.   And -- go ahead.

24       A.   Yeah, that stands for the full -- the full year

25  percentage of those metrics and then the -- the YE means

1    year end and then the LE means later estimate.

2         Q.   And so in -- can you say again what LE means?

3         A.   So 2019 year-end -- year-end estimate.

4         Q.   What does the L stand for?  I keep cutting out

5    so I can't hear?

6         A.   Latest estimate.  Latest estimate.

7         Q.   Latest.  Okay.  And so can you explain that as

8    you were going to?

9         A.   So what we're looking at, on the left side,

10   that's the performance, you know, versus plan.  Yeah,

11   yeah, so versus plan, the 2019 plan, so -- so you have

12   2018 actual results, what was sold, how much money was

13   made.  And then we have a growth plan, right?  We have

14   objectives.  So 2019 plan.  This is showing you the

15   increase -- this is showing that my performance

16   objectives increased that percent.  So you look at 2018,

17   1.7 million -- 1.7 million gallons and then the goal --

18   the growth goal increase by 38 percent -- 138 percent.

19   So, yeah, that's what we're seeing 2018 results and then

20   2019 plan.  So that's showing some very strong growth

21   measures.  Extremely high.  Okay, so then -- so then as

22   I look at the right side -- I'm sorry?

23        Q.   I didn't say anything.  Go ahead.

24        A.   I was just explaining -- you know, kind of

25   remembering what we're looking at here.  So then as we

1    look at the right side we see all of this -- oh, okay.

2    So year to date for let's see 2018 -- so I think when it

3    says year to date I think that means from January 2018

4    through June 30th, 2018.  So you're looking at a

5    six-month period there in 2018 year to date versus year

6    to date and results in 2019.  So that's showing a year

7    over year six-month growth period of 13 percent higher,

8    25 percent higher.  So there's growth in performance.

9    And then that 2019 year-end estimate, as you can see

10   because it's half of the year, this is projecting how we

11   would finish in a year if things continue on the path of

12   where the business currently is.  So you're pretty much

13   just double.  So that's what -- that's what it's showing

14   that 2018 that the leaders estimate, the percent of

15   growth would be like 106 percent of last-year's volume,

16   120 percent greater volume.  So everything is greater

17   than 100 percent.  That's indicative if things continue

18   on the path -- you know, unless there's other, you

19   know -- which should be other account gains for the

20   second half of 2019, you know, these numbers would be

21   higher but it's just saying if nothing has changed, you

22   gained no more new business versus 2018 as things are --

23   this is what we estimate your -- your performance volume

24   to be.

25              And then the one on the right is showing

Page 255

1    that latest estimate versus the plan and as you can see

2    that plan is very aggressive.  It's like almost --

3    almost like ungodly aggressive.  I mean, when you look

4    at 138 percent growth plan, you know, and then versus

5    106 percent, you know, versus last year, I mean, you

6    grow the business 6 percent there and 20 percent, I

7    mean, that sounds pretty good, right?  But, no.  They're

8    like, no, you need to grow at 32 percent -- 100.  So

9    that's interesting.

10       Q.  Is this business performance scorecard, is this

11   specific to you?

12       A.  Yes, sir.

13       Q.  Do you know if any other BDM received business

14   performance scorecards?

15       A.  Yes, we all received it.  It's like company

16   required.  As a matter of fact, this is a part of my

17   midyear review and management, they're required to do a

18   midyear review, a midyear performance review.

19       Q.  Okay.  And based on this document here does it

20   have -- based on your opinion, does it describe or give

21   any evidence of what your performance was at that time?

22       A.  Yes, this is showing for the first half of 2019

23   my employment.  You know, the numbers are good, you

24   know, versus last year, versus 2018 you see the growth

25   in volume so performance there and then when you look at

Page 256

1    the bottom chart, you know, you see green, you know,

2    which is good, you see yellow that's, you know,

3    opportunity to make improvement but there is no red.

4    There's nothing that indicates failure, you know, or

5    poor performance.

6        Q.  And how many of these business performance

7    scorecards would you say you received throughout your

8    employment?

9        A.  Just -- I believe just two, a midyear one and

10   end-of-the-year one.

11       Q.  And did you ever receive any of the red marks

12   which you just referred to?

13       A.  I -- I would have to take a look at the

14   end-year review one.  I do not recall.  I would have to

15   take a look.

16       Q.  But did you -- but you didn't receive any for

17   the midyear?

18       A.  No, sir, this is exactly what was presented.

19       Q.  Okay, I'm going to stop sharing here.

20           I'm going to open up another document.  So

21   this is going to be Defendant's -- I'm sorry, I keep

22   saying Defendant's.  (Simultaneous speaking.)

23           MS. JAMES:  Can you tell me -- Eddie, can

24   you tell me what the Bates range was for your first

25   exhibit?

Page 257

```
 1                  MR. HODGES:  Yes, it was 97, 00097.

 2                  And this one is going to be -- Plaintiff's

 3     Exhibit 2 is going to be ranging from 001104 through

 4     001107.

 5           (Plaintiff's Exhibit 2 was mentioned and

 6           retained by counsel.)

 7      Q.  (BY MR. HODGES)  All right.  Mr. Williams, can

 8     you see this document?

 9      A.  Yes, sir, but if you can zoom in, that would

10     help, please.

11                  MS. JAMES:  Eddie, I'm sorry to interrupt

12     again.  You said the first one was Equilon 94?

13                  MR. HODGES:  7.

14                  MS. JAMES:  97?  Okay.

15      Q.  (BY MR. HODGES)  Mr. Williams, can you see this

16     document now?

17      A.  Yes, sir.

18      Q.  And do you know what this document is?

19      A.  This says, "2019 KPI Results."  Okay.  Yeah, it

20     looks like the results of my performance.

21      Q.  What does "KPI" stand for?

22      A.  Key performance indicators.

23      Q.  And this e-mail here was sent on -- what's the

24     date here that's from you?

25      A.  You said what is the date?
```

Page 258

1      Q.   Yeah, what's the date on this e-mail?

2      A.   Oh, it states February 24th, 2020.

3      Q.   All right.  And this is -- is this an e-mail

4   from you to Luke Toshiff (phonetic) and Xavier

5   Puvilland?

6      A.   That's correct.

7      Q.   What -- what was the purpose of this e-mail?

8      A.   So Luke is like a business analyst.  He helps

9   confirm the numbers for performance and I wanted to make

10   sure I understood what bonus amount I received and how

11   the calculation works based upon my volume and margin

12   and so he confirmed I think the amount that I received

13   due to my strong performance.

14      Q.   And so were you able to get -- it appears you

15   received the e-mail from Monica saying that they don't

16   have the details to calculate.  You have to connect to

17   HR.  Did you ever connect with HR as to your bonus?

18      A.   I don't recall connecting with HR.  I remember

19   getting a confirmation.  There's -- there's an exhibit,

20   I guess a document showing the bonus amount and that --

21   how the calculation went so I don't recall reaching out

22   to HR but I do recall getting the information.

23      Q.   Okay.  As I scroll down here is this basically

24   what you were referring to as to how it was calculated?

25      A.   Yes, sir.

Page 259

1      Q.  As I keep scrolling down -- this is 1105.

2  Going now to 1105, is this an e-mail from Luke Toshiff

3  on Monday 24th, 2020, to you and Xavier and Monica?

4  Subject says, "2019 KPI Results."  Do you see that?

5      A.  Yes, sir.

6      Q.  And was this your KPI performance results

7  that's pasted right here?

8      A.  Let me see.  As I look at it, it looks like the

9  performance with my distributors.  So these are the key

10  performance indicators for the distributors that I

11  supported.  2019 results for accounts tied to your KPI

12  performance.  So, yeah, my performance is linked to my

13  distributors.

14      Q.  And so based on this information here, is this

15  how your bonus is calculated?

16      A.  It's -- it's a part of the ratio.

17      Q.  Can you explain the ratio?

18      A.  It's a -- it's the previous slide with the

19  premium and then the volume.  Yeah, yeah, yeah, that's

20  -- that's like the ratio.  It was kind of like -- so in

21  order to get the standard bonus, you know, you've got to

22  meet the green.  You've got to have premium.  So the

23  standard bonus means that you exceed your volume and

24  then exceed your margin so -- for product.  So the goal

25  is to sell not just more oil, it's like you got to sell

Page 260

1    the higher-margin product where you make more money for

2    synthetics.  You know, it's just like tires.  You can

3    buy a Goodyear tire or Firestone or you can go to

4    Michelin.  So we want to sell more higher grade, higher

5    profitable lubricants.  This is just showing the ways

6    that the bonus can be earned.  And in this case like the

7    top one shows the percentages of volume versus

8    high-margin product and then the second one shows -- so,

9    yeah, these are just the calculations that shows you the

10   possibilities to get a bonus.  It has to lead to you

11   selling more product or a combination thereof of

12   higher-margin product.

13        Q.  So based on the information that you just

14   stated, would -- would you be able to calculate a bonus

15   from this table right here?

16        A.  I think -- I think there's another table.

17   There's another exhibit I believe that shows -- it says

18   this is your final numbers and this is your bonus

19   amount.  But this is -- this right here is a component

20   of my distributors' performance and we would have to

21   look at the aggregate to see -- so I would really have

22   to compare this versus my -- that Exhibit 1 that shows

23   like eligible for bonus, yes, and it shows the exact

24   numbers.

25        Q.  Okay.  Just give me one second.  I think I may

Page 261

1    have that.

2                   THE WITNESS:  Attorney James, are you

3    having lunch?

4                   MS. JAMES:  Yeah, sorry.

5                   THE WITNESS:  I didn't get an invite.

6              (Plaintiff's Exhibit 3 was mentioned and

7         retained by counsel.)

8         Q.  (BY MR. HODGES)  So this is going to be labeled

9    Plaintiff's Exhibit 3, Bates-labeled doc 1033, Equilon

10   1033.  Is this the document that you were referring to

11   that -- (audio distortion)?

12        A.  Yes, sir.

13        Q.  Okay.  And it says right here "Eligible for

14   Bonus" and under that "Yes."  Is that referring to your

15   2019 performance?

16        A.  Yes, sir.

17        Q.  Okay.  And so this table right here consists of

18   your distributors; is that correct, this table that

19   says --

20        A.  Yes.

21        Q.  And this says -- right down here it says,

22   "Thanks, Xavier."

23        A.  Uh-huh.

24        Q.  So is this something that you sent Xavier?

25        A.  No, sir, Xavier sent that to me.

Page 262

1       Q.   Okay.  So Xavier was aware that you received a

2  bonus?

3       A.   Yes, sir.

4       Q.   And -- okay.  Okay.  Mr. Williams, what do you

5  consider to be coaching?

6       A.   I guess there's two ways to look at it.  I

7  mean, coaching is like, you know, a manager, you know,

8  who wants to offer you advice to be successful, like

9  give you pointers and so forth and want to put you in

10  the best position to do well.  That's typically what

11  coaching is and it's -- you know, it's just like having

12  an active relationship with an employee, you know, for

13  their development.

14       Q.   Is there a difference in your opinion -- is

15  there a difference in your --

16       A.   I'm sorry, go ahead.

17       Q.   Is there a difference in your opinion between

18  coaching and, what is it, the WILO -- or the MILOs and

19  the WILOs, the monthly meetings?  Is there a difference

20  between those two?

21       A.   They're kind of the same.  You kind of review

22  what you're doing and then you get advice on, okay, this

23  is good.  Let's focus on priorities.  It's like

24  interactive.  So coaching, just to make clear, it

25  doesn't mean that you're underperforming or you're

Page 263

1    failing.  It's like, hey, you know, we're a team.  This

2    is -- you're telling me you're working on this.  I'm in

3    agreeance with you that, you know, this should be your

4    priorities, if you could focus your time and these

5    efforts.  So, yeah, coaching itself and then in

6    association with the WILOs and MILOs that's normal

7    business-engagement conversation between an employee and

8    a manager to ensure that they are working on the right

9    initiatives to help the company make money.

10          (Plaintiff's Exhibit 4 was mentioned and

11          retained by counsel.)

12       Q.  (BY MR. HODGES)  Okay.  And I'm going to pull

13    up -- this is going to be labeled as Plaintiff's

14    Exhibit -- actually, I think this is 4 -- 4 now.  And

15    this is going to be Bates-labeled Equilon 112.

16                Can you see this, Mr. Williams?

17       A.  Yes, sir.

18       Q.  And do you know what this is?

19       A.  Let me see.  Scroll to the top.  Coaching day.

20    And it has -- this is in August.  Okay.  (Reading

21    outloud) Dear Carl Williams, it has been discussed...

22    for you to work on in coming months from your session

23    what has the individual improved or done well in

24    relation to display more leadership to the coach and

25    improve policy granularity meetings especially

Page 264

1   understanding of decision structure, ensure key decision

2   makers attending focus on new volumes.

3             Okay, yeah, so this is a documented

4   coaching and this was standard, I believe, by all

5   employees, I believe.  Sales -- yeah, sales coaching.  I

6   think it was something like generated in the system

7   where I think the managers, you know, like sales

8   coachings like whether he was good or bad, you know,

9   they have to like state like this activity.  I remember

10  it being system generated.

11      Q.  Okay.  And so you said that this is a sales

12  coaching day so all the BDMs from your knowledge were

13  coached that day as well?

14      A.  Yes, sir.

15          (Plaintiff's Exhibit 5 was mentioned and

16          retained by counsel.)

17      Q.  (BY MR. HODGES)  Okay.  Let me share another

18  document.  I'm going to share with you Plaintiff's

19  Exhibit 5 -- marked Plaintiff's Exhibit 5.  This

20  document is Bates-labeled Equilon 858 through 859 and

21  I'm going to start at the bottom of this e-mail.

22          Do you see this e-mail right here?

23      A.  Yes.

24      Q.  Can you tell me who it's from?

25      A.  So that's from Xavier to myself on March 3rd,

Page 265

1    2020.  I guess it's a couple of weeks before my

2    termination.

3        Q.  And so it says you're -- you're just following

4    up on your discussion from the morning and your notes --

5    these are the notes.

6        A.  Uh-huh.

7        Q.  Or he's following up from a discussion you had.

8    So you guys had a discussion that morning?

9        A.  Yes.  So the weekend -- yeah, every morning

10   like he does with all the other BDMs we would -- we

11   would talk about what's going on and then he would

12   insert notes.

13       Q.  And so just going through these notes hitting

14   these bullet points, out of two visits -- excuse me --

15   scratch that.

16            Out of all these bullet points here, do

17   these bullet points in your opinion give off to you that

18   you were underperforming?

19       A.  No, not at all.  Not at all.

20       Q.  And so when you read this e-mail on March 3rd,

21   2020, did you -- did this e-mail make you believe that

22   you were underperforming?

23       A.  Not at all.

24       Q.  So when you read this e-mail on March 3rd,

25   2020, you didn't have no reason -- did you have any

Page 266

1    reason to question whether you were underperforming or

2    performing?

3        A.  No.  I was never informed about under

4    performance.

5        Q.  And would you consider this e-mail --

6            MS. JAMES:  On the record, I was on mute

7    and I objected to the form of the last question.  Go

8    ahead.  Sorry.

9            MR. HODGES:  Can you -- Reporter, can you

10   just restate my last question for me, please?

11           MS. JAMES:  Eddie, I'm just making a record

12   of my objection to the form of the last question.

13           (Record read as requested.)

14           MR. HODGES:  Thank you.

15       Q.  Mr. Williams, when you read this e-mail and you

16   read the bullet points that are established by Mr.

17   Xavier, did you have reason to believe that you were

18   underperforming?

19       A.  No, sir.

20       Q.  Okay.  And, again, the date of this e-mail

21   is -- what is it?

22       A.  March 3rd, Tuesday, 2020.

23       Q.  And, for the record, how -- on what day you

24   terminated -- what day were you terminated?

25       A.  Monday, March 16th.

Page 267

1     Q.  And would you consider this e-mail that

2   includes these bullet points, would you consider that to

3   be coaching?

4     A.  Coaching?  I guess it's standard -- like this

5   is a summary of our call.  It's just a summary about it.

6   It's not really, I guess, coaching.  It's just this is

7   what we talked about.

8     Q.  So until this point -- up until this point,

9   March 3rd, 2020, you had no record -- or you had no

10  knowledge that you were underperforming?

11          MS. JAMES:  Object to the form.

12          THE WITNESS:  Right.

13    Q.  (BY MR. HODGES)  So you didn't know on March

14  3rd, 2020, that you were underperforming?

15    A.  That's correct.

16          MS. JAMES:  Object to the form.

17    Q.  (BY MR. HODGES)  And -- okay, I'm going to take

18  this Exhibit 5.  Actually, we're going to go here, up to

19  this -- up to -- scroll up a little bit.  Do you see

20  where -- this e-mail right here?

21    A.  Yes, sir.

22    Q.  And can you tell me what date this was sent?

23    A.  March 3rd, 2020, 9:16.  It looks like it was

24  sent the same as the other one, just a little bit later.

25    Q.  And this one was -- the other one was sent at

Page 268

1    8:27 to you, p.m.  Do you see that?

2         A.  Yes, sir.

3         Q.  And this one you said was sent on -- at 9:16

4    p.m.?

5              MS. JAMES:  I'm going -- I'm just going to

6    object to the form.  I don't -- this isn't an e-mail

7    that Mr. Williams is on, is it?  No, I'm not seeing

8    that.  This is an e-mail between two other individuals.

9              MR. HODGES:  Understand.

10        Q.  And so, Mr. Williams, based on this e-mail, it

11   does state that you were -- it was an e-mail sent from

12   Xavier to Kristia Encarnacion?

13        A.  That's correct.

14        Q.  And do you know who Kristia Encarnacion is?

15        A.  Yes, ma'am, she's an HR representative.  She

16   was the person who was on the phone -- was on Skype when

17   I was terminated.

18        Q.  And do you see that it says, "I had another

19   weekly coaching session with Carl Williams today.  See

20   below"?

21        A.  Yes.

22        Q.  And scrolling through these e-mail from the

23   notes that we just discussed from Xavier to you,

24   correct?

25        A.  Yes, sir.

Page 269

1      Q.  And he states that he's showing no improvement

2  and more gaps in execution.

3      A.  Yeah, I don't see that in the e-mail.

4      Q.  Right here.

5      A.  Yes, sir.  I mean, I see that statement but I

6  don't see the language -- the bullet points.  They don't

7  support his statement.

8      Q.  So is it your belief that at the time that you

9  received the e-mail from Xavier on March 3rd, 2020, that

10  there was no evidence of him believing that you weren't

11  improving or there were more gaps in execution?

12              MS. JAMES:  I'm going to object to the form

13  of the question.  Go ahead.

14      Q.  (BY MR. HODGES)  Did you understand the

15  question, Mr. Williams?

16      A.  I'm sorry, one more time.

17      Q.  Did you understand the last question I asked?

18      A.  The objection threw me off.

19      Q.  Okay.  So the question is when you received the

20  e-mail on March 3rd, 2020, from Xavier that had the

21  bullet point -- these bullet point notes that he sent to

22  you, is it your belief or understanding that that e-mail

23  showed signs that you were not improving and that there

24  were gaps in your execution based on your belief?

25              MS. JAMES:  Object to the form.

Page  270

1       Q.  (BY MR. HODGES)  You can answer the question if

2    you understand it.

3       A.  Yeah, based upon my belief and from what was

4    discussed and in even just reading the e-mail, there's

5    nothing in that e-mail that demonstrates gaps in

6    performance and poor performance.

7       Q.  Okay.  I'm going to open -- this is going to be

8    labeled as Plaintiff's Exhibit 6.  Do you see this

9    document?  This is Bates-labeled Equilon 1106 through

10   110 -- I already did this one.  I already labeled this

11   one.  Did I?  No, I did 1104 to 1106.  So y'all want to

12   go back?  I think this has already been marked as

13   Plaintiff's Exhibit 2.  But this is a continuance of

14   Exhibit 2 that we didn't go over.

15            And so down here do you see this e-mail

16   that's dated Wednesday, January 29th, 2020?

17      A.  Yes, I do.

18      Q.  And your -- and this is an e-mail in which

19   you're responding to feedback you received from Xavier;

20   is that correct?

21      A.  Yes.

22      Q.  And we scroll down here in this e-mail of you

23   marked -- first of all, first, this is an e-mail from

24   Xavier to you originally, correct?

25      A.  Yes, that's correct.

Page 271

```
1        Q.  And that was sent on January 28th, 2020, at
2   6:05 p.m.?
3        A.  Yes.
4        Q.  All right.  And can you read the first
5   sentence?
6        A.  It says, "Carl, Thanks, making good progress.
7   Please find attached some additional comments/questions
8   below."
9        Q.  And what was your belief or understanding as
10  what he meant when he said "good progress"?
11       A.  That I am performing, you know, meeting
12  expectations.
13       Q.  Did "good progress" mean to you that you were
14  underperforming?
15       A.  Absolutely not.
16       Q.  And where you indicated -- are these your notes
17  here in red?
18       A.  Yes.  I am responding to his question or
19  comment.
20       Q.  And -- and that's all this information here in
21  red, correct?
22       A.  Yes, sir.
23       Q.  And his response to your comments is the e-mail
24  that he sent on the same -- or -- excuse me -- yes, on
25  the Wednesday the 29th at 7:00 p.m.?  Is that -- is that
```

Page 272

1   your understanding that he sent a response to your

2   comments on that date on this top e-mail?

3                    MS. JAMES:  Object to the form.

4                    THE WITNESS:  Yes.

5        Q.  (BY MR. HODGES)  Do you understand the

6   question, Mr. Williams?

7        A.  Please repeat the question.

8        Q.  Yes.  So is this response here from Xavier to

9   you on January 29th, 2020, at 7:00 p.m., is this a

10  response from Xavier in response to your feedback in

11  which you highlighted in red below?

12       A.  Yes, sir.

13                   MS. JAMES:  Object to the form.

14                   THE WITNESS:  That's correct.

15       Q.  (BY MR. HODGES)  Okay.  And so in his response

16  here above at the top is there any indication to you or

17  based on your belief or -- excuse me, is there any

18  indication to you that you were underperforming based on

19  this e-mail on top?

20       A.  No, sir, absolutely not.

21       Q.  And can you explain what his response meant to

22  you?

23       A.  I see, "Carl, Thanks.  I'll be more comfortable

24  once we have sectors view but I guess for now we'll go

25  with that.  Next step would be to start comparing

Page 273

1  existing pipelines with those targets, strategy could be

2  directional.  Would be good to understand why -- would

3  be good in you from where fell the top/gaps are in terms

4  of pipeline so with start addressing them."

5              So it looks like he's responding I guess to

6  my comments?  Yeah, yeah, yeah.  Overall is what I gave

7  in red.

8       Q.  But from your under -- from your belief and

9  your opinion that this e-mail didn't indicate that you

10  were underperforming?

11      A.  That's correct.

12      Q.  Okay.  And how often did you have meetings with

13  Xavier?

14      A.  Myself and all employees, BDMs, we all met with

15  him individually every week.

16      Q.  And -- and so you've worked with Xavier since

17  March -- March of -- sorry, August of 2019; is that

18  correct?

19      A.  Yes, sir.

20      Q.  And so from August 2019 through the time you

21  were terminated you would have monthly and weekly

22  meetings with Xavier?

23      A.  Yes, sir.

24              MS. JAMES:  Object to the form.

25      Q.  (BY MR. HODGES)  And during -- okay.  During

Page 274

1    your time being supervised by Xavier you had monthly and

2    weekly meetings, correct?

3         A.   Yes.

4         Q.   Okay.  And in any of those --

5              MS. JAMES:  Object to the form.

6         Q.   (BY MR. HODGES)  In any of those -- in any of

7    those meetings, weekly meetings, monthly meetings, did

8    Xavier ever indicate to you that you were

9    underperforming?

10        A.   No, sir.

11             MS. JAMES:  Object to the form.

12        Q.   (BY MR. HODGES)  And so throughout your

13   employment you never heard that you were underperforming

14   from anybody; is that correct?

15             MS. JAMES:  Object to the form.

16        Q.   (BY MR. HODGES)  Have you ever heard that --

17   have you ever heard that you were underperforming while

18   working at Shell?

19        A.   No, sir, I have not.  I was never told that I

20   was underperforming.  We would have coaching and they

21   say, "Hey, you know, here's some things to improve on

22   and you're making progress."  But, yeah, it was never

23   stated that you're not meeting expectations.  You know,

24   if this continues you're going to go on a performance

25   improvement program and terminated.  Yeah, none of that.

Page 275

 1            (Plaintiff's Exhibit 6 was mentioned and

 2       retained by counsel.)

 3       Q.   (BY MR. HODGES)   Okay.  All right.  I want

 4  to -- this is going to be Plaintiff's Exhibit 6 and it's

 5  going to be Bates-labeled Equilon 1152.

 6            THE REPORTER:  That's Exhibit 7.

 7            MR. HODGES:  Well, my Exhibit 6 was

 8  actually Plaintiff's Exhibit 2 and I'm going to send

 9  that to you but I think if not, I can just split it up.

10  But the way I had it it was combined.

11            THE REPORTER:  I'll figure it out.

12       Q.   (BY MR. HODGES)   So this -- do you see this

13  document?

14       A.   Yes, sir, I can.

15       Q.   Have you ever seen this document before?

16       A.   Who is this addressed to?  I have to see the

17  top.

18       Q.   Yeah, this is from HR Services and it appears

19  to be March 5th, 2020.  I think the date is combobulated

20  that way but it's March 5th and it's to Xavier.

21       A.   Yes, sir.

22       Q.   And it's "Subject:  GC/under performance

23  management."  Have you ever seen this document?

24       A.   Not when I was with the company but I saw it --

25  I guess this is, what, the discovery?  It was in that --

Page 276

1   that 1,400 -- yeah, this -- yeah, I have seen this.

2       Q.  Okay.  And are you familiar with performance

3   improvement plans?

4       A.  I am overall from a corporate standpoint.

5       Q.  Are you aware of anybody that was a

6   business-development manager that was placed on a

7   performance improvement plan during your time at Shell?

8       A.  No, sir, I'm not aware.

9       Q.  And -- okay.  And do you see here that -- yes,

10  you see that it says, "We read your YE writeup for

11  Carl"?  Do you see that?

12      A.  Yes, sir, year-end review.

13      Q.  Okay, so that's what that "YE" stands for?

14      A.  Yes, sir, year-end performance review.

15              MS. JAMES:  Object to the form.  And just

16  to clarify, this -- Mr. Williams, you said you received

17  this e-mail in discovery in this litigation; that this

18  is not an e-mail you received during your employment,

19  correct?

20              THE WITNESS:  Correct, this e-mail was not

21  sent to me.  It's not addressed to me.

22              MS. JAMES:  This is specific to other Shell

23  employees and you were not included or copied on it?

24              THE WITNESS:  This -- this is Xavier and,

25  you know, HR is recommending it looks like putting me on

Page 277

1    a PIP, giving me the original warning, giving me 30 days

2    to improve and they said we would --

3         Q.  (BY MR. HODGES)  Mr. Williams, you are the

4    subject of this e-mail though, correct?  This e-mail is

5    a response to you?

6         A.  Yes, sir.

7         Q.  Okay.  And so you see it says Y end write-up?

8         A.  Yes, sir.

9         Q.  Were you ever presented the YE write-up by Mr.

10   Xavier?

11        A.  You say was it presented?

12        Q.  Yeah, was the YE write-up ever presented to

13   you?

14        A.  Yeah, that -- that was a -- a write-up that

15   Xavier and I collaborated on and he end up -- the

16   language that he gave me to put into the system, that's

17   what they're -- that's what they're referring to.

18        Q.  And you see that the HR request says, "it

19   sounded like the rating was not unacceptable"?

20        A.  Correct.

21        Q.  And so from your understanding when you're

22   referring to the year-end write-up that you

23   collaboratively completed with Xavier, was it your

24   understanding then that your rating was unacceptable?

25                 MS. JAMES:  Object to the form.

Page 278

```
 1              THE WITNESS:  No, not at all.  It was
 2   exactly as it states.  It sounded like my rating -- I
 3   mean, it kind of sounds confusing the way they have it,
 4   like not unacceptable.  But essentially they're saying
 5   based upon his write-up from what they read that my
 6   performance from the tone of and what he wrote that it
 7   was acceptable, that it was on par; that there's no
 8   indications of under performance or being unacceptable.
 9   So they asked we are wondering on what kind of message
10   was being sent to the employee in conversation with him.
11        Q.  And so -- okay, go ahead.  Finish.
12        A.  They're basically saying they don't -- they
13   don't see based on his write-up how my -- his
14   recommendation for a dismissal at least for under
15   performance.
16        Q.  So based on your knowledge when you were
17   collaborating with Xavier on the YE write-up, you had
18   no under -- you didn't believe that your performance was
19   unacceptable, did you?
20        A.  No, sir.  Not only did I believe but I knew
21   that my performance was not unacceptable.  I knew that
22   my performance was -- for someone that had only been
23   working for the company actually doing actual work for,
24   what, eight months, I mean, because I really started
25   with my distributors in June so as he stated, within my
```

1    short tenure like, you know, I'm moving, I'm growing,

2    you know, my performance is on par and his review was

3    very promising.  He's like, "Carl, in 2020 you're going

4    to make great strides and it's going to execute well."

5         (Plaintiff's Exhibit 7 was mentioned and

6         retained by counsel.)

7         Q.  (BY MR. HODGES)  Okay.  All right.  So now I'm

8    going to share my screen and this is going to be marked

9    as Plaintiff's Exhibit 7, Bates label doc 488.  And do

10   you see this document right here?  Or do you see this

11   right here on your screen?

12        A.  Yes, sir.

13        Q.  And you see that what it states here is "2019

14   YE write-up for Carl for your reference"?

15        A.  Yes, I do.

16        Q.  You said Kristia Encarnacion is HR?

17        A.  Yes.

18        Q.  Okay.  And if you could just read this

19   paragraph that I've just highlighted and just confirm

20   that this is the write-up which you received for your

21   year-end write-up.

22        A.  Okay.  "Carl joined Shell in February..." --

23        Q.  You don't have to read it for the record.  You

24   can just read it to yourself.

25        A.  Okay.  Okay.

Page 280

1      Q.   Just let me know when you're finished.

2      A.   I'm finished.

3      Q.   And so is this the year-end write-up in which

4   you're referring to that you collaborated with Xavier?

5      A.   Yes.

6      Q.   And, again, does this "2019 year-end write-up,"

7   does this indicate to you that you were underperforming?

8      A.   No, sir, not at all.

9      Q.   What does it indicate to you?

10      A.   It indicates to me that within my short tenure

11   with -- with the company that -- that my performance is

12   on par; that it's promising and that, you know, I

13   understand for the 2020 that there's some objectives and

14   things that I need to hit, you know, pretty much to help

15   the business grow.  But, you know, it clearly states I

16   gained 125,000 gallons of new business through my

17   distributors despite my short tenure.  So -- so it's --

18   you know, that -- that within itself states that, you

19   know, there's some good things that Carl is executing

20   on.  And then it states, you know, there's also some

21   areas for him to grow and improve.  But nothing in this

22   demonstrates unacceptable or under performance.

23      Q.   Are you familiar with your metrics as it

24   relates to new business in comparison to other BDMs?

25      A.   Our goals are individual based upon a market,

Page 281

1    not distributors.  I'm trying to think.  So what was the

2    question?  Am I aware of my goals versus my peers?

3         Q.  Are you aware of your -- it says here that you

4    gained 125 gallons of new business.  Are you aware of

5    how much new business other BDMs accrued during your

6    time at Shell?

7         A.  I am.  I can tell you that I was not at the

8    bottom.  Despite I was the newest employee I was

9    somewhere -- what were there like ten of us?  -- I was

10   kind of like in the middle or like quintile.  I mean,

11   there was those that had less numbers and so forth than

12   me that, you know, had been with the company longer.  We

13   had a couple rock stars under -- Art Kenealy, Bob

14   McDonnell.  Those guys were really, really good.

15        Q.  And the ones that you mentioned performance

16   that you may have believed that you are aware that was

17   below yours, do you know who those individuals are?  Can

18   you name anybody?

19        A.  I'm thinking.  And I guess -- let me see.  I

20   guess some of it -- there were new employees that joined

21   that I recall but -- for example, you know, one of my

22   experienced peers like Tamika, Tamika Greer, I would say

23   our numbers and so forth was comparable.  You know,

24   she's -- she's an experienced employee that's been in

25   the role for like four years.  I think another guy that

Page 282

1    I was comparable with is Gary.  What was Gary's last

2    name?

3         Q.  You don't necessarily have to -- if you don't

4    know their last name, you don't have to tell me the last

5    name.  So you said Gary?

6         A.  Yeah, yeah, because --

7         Q.  Do you know who Gary Brinks was?

8         A.  He was Caucasian, older male, about in his

9    mid-fifties.

10        Q.  And is there anybody else that you can

11   remember?

12        A.  That what?

13        Q.  That was a BDM that -- whose new business

14   levels weren't as high as yours?  You stated that you

15   were in the middle somewhere.  I was asking if you know

16   any other -- any more that you were (audio distortion)

17   top above.

18        A.  So I guess also -- let me interject and say

19   Xavier was sent out a monthly win report.  He would send

20   that to the team and I think they're in that 1,400 file.

21   So he would say for like the month of June or the month

22   of January 2020 to February and even starting in

23   December he would do these highlights and wins and you

24   would see my name on there with wins.  You would see

25   other people.  And so when I look at my performance

Page 283

1    versus -- and particularly Tamika and Gary because we

2    both did industrial lubricants.  Remember, industrial --

3    these plants they don't -- they don't -- they take a

4    long time to close.  It's a two-year sales cycle.  And

5    we have other reps like Art Keneally -- what's the name

6    of the other guy?  -- Doug Peterson, they were

7    transportation so, I mean, you put oil in a truck and

8    you can close that business within two -- two -- a month

9    or so.

10                  So my point is when I look at the sales

11   cycle of how long it takes to gain an account, when I

12   look at my short tenure with the company and when I look

13   at those monthly win highlights versus my peers', you

14   know, my name was on there as far as, you know, having

15   wins.  So I guess that's what I meant.  Like I wasn't

16   necessarily at the bottom.  My performance was kind of

17   on par, you know, with my peers who had much more

18   experience than I was.

19        Q.  And so you mentioned that there are two

20   divisions, industrial and transportation.  So in the

21   industrial -- you were in the industrial side, correct?

22        A.  Yes, sir.  Yes, sir.

23        Q.  And how many BDMs were on the industrial side?

24        A.  Like -- what was it?  Four.

25        Q.  And out of those four BDMs do you by chance

Page 284

1    know what their -- what their race was?

2         A.  You had Tamika and I who are black and then you

3    have -- this is just industrial -- and then you had Bob

4    McDonnell and Gary, they were Caucasian.  And all the

5    other like transportation reps and so forth they were

6    Caucasian.  And so I think there was like a total of

7    like nine of us, eight or nine.  Nine and there was like

8    two blacks.

9              (Plaintiff's Exhibit 8 was mentioned and

10             retained by counsel.)

11        Q.  (BY MR. HODGES)  Okay.  I want to open up

12   another exhibit.  Give me one second.  This is going to

13   be Plaintiff's Exhibit 8, Equilon 00053 through 55.

14   This is an e-mail from Xavier to Kristia Encarnacion and

15   subject in regards to a case documentation.  Have you

16   ever seen this document, Mr. Williams?

17        A.  Yes, sir, I have.

18        Q.  And when did you -- when did you see this

19   document?

20        A.  That was post-termination.

21        Q.  And was this something that was reviewed to you

22   by Shell or something that you received in discovery?

23        A.  Discovery.

24        Q.  And so have you had a chance to look at this

25   document before?

Page 285

1          A.  I have.

2          Q.  And you see that in this document it states

3      that incident -- some serious behavioral issues that had

4      been documented.  There's an incident between two

5      females employees during the first week of the company.

6      Is that first bullet point there, is that referring to

7      the incident you were -- you explained to the Shell

8      attorney in regards to Holly Burns?

9          A.  Yes, sir.

10         Q.  And then this says, "Previous line manager

11     following up with a technical advisor because this

12     relationship started off very poorly due to Carl's

13     behavior at a customer training."  Do you know what

14     that's referring to?

15         A.  Previous line manager is following up with a

16     technical advisor because this relationship started off

17     very poorly due to Carl's behavior at a training that

18     he -- so I remember Eric Boydstun -- I mean, I guess

19     that feedback wasn't given to me but this is Xavier's

20     comment but basically I attended a sales training -- an

21     in-person sales training.  We had a technical advisor, a

22     Kenneth Aucoin, that he led and we had other customers

23     there and while I was there during the meeting I think

24     he said I was asking too many questions.

25         Q.  Who said that?

Page 286

1      A.  Kenneth Aucoin.

2      Q.  Okay.

3      A.  Yeah, so, I mean, I guess that's -- I mean,

4  that's his comments.  I don't know but...

5      Q.  Go ahead.  I didn't mean to cut you off.

6      A.  I mean, I thought technical adviser and all,

7  Kenneth Aucoin, he seemed to be very -- he appreciated

8  my curiosity and willingness to learn so, yeah, I

9  don't -- I don't even know why that's in there.

10      Q.  And do you see this is from Xavier that he had

11  his first coaching discussion with you in mid-July?

12      A.  He misuses the term "coaching."  We had an

13  introductory meeting in the middle of July.

14      Q.  What do you believe that he's trying to convey

15  here when he says "coaching"?

16              MS. JAMES:  Object to the form.

17              THE WITNESS:  They're performance issues.

18      Q.  (BY MR. HODGES)  And -- and you stated

19  previously that he's never conveyed to you or told you

20  that you were underperforming; is that correct?

21              MS. JAMES:  Object to form.

22              THE WITNESS:  That's correct.  That is

23  absolutely correct.

24      Q.  (BY MR. HODGES)  Why is it important to you --

25  for you to know that you are underperforming?

Page 287

1          A.   So that I can close the gaps.  You know, so

2     that I can stay employed.  So that I can take care of my

3     daughter, you know, as a single father.  And if -- you

4     know, if the company and I were not a good fit and I

5     could see what's happening, then I would, you know, have

6     sought other employment or tried to change a position or

7     something.  So, you know, I -- you know, you got a

8     high-caliber, 13, you know, year corporate guy do very

9     well at Exxon.  I wanted to go to Shell, you know, to

10    get back into sales because Shell has an internal job

11    posting.  I have control of my career.  And, you know, I

12    was very excited to work for them.  This just

13    blind-sided me.

14         Q.   And -- okay.  We're going to move on from that.

15              (Plaintiff's Exhibit 9 was mentioned and

16              retained by counsel.)

17         Q.   (BY MR. HODGES)  This is going to be No. 9,

18    Plaintiff's Exhibit 9, Equilon 830 through 831.  Do you

19    see this document, Mr. Williams?

20         A.   Yes, sir.

21         Q.   Do you -- can you tell me the date that this

22    document was sent?

23         A.   March 5th, 2020.

24         Q.   Yes.  And do you see this e-mail here --

25              MS. JAMES:  I'm going to just object to the

Page 288

1   form.  You're asking him -- is this an e-mail that he's

2   on, Eddie?

3           MR. HODGES:  I'm just asking him dates.

4   I'm asking him what's -- you know, I haven't gotten to

5   the point where I ask him if he's seen this e-mail yet.

6   I just want to just confirm what the dates are on this

7   e-mail.

8           MS. JAMES:  But this -- just to confirm,

9   this isn't -- he doesn't have personal knowledge of when

10  this e-mail was sent because he's not on it, right?

11  This would have been -- so he's just testifying what the

12  date appears to be on the document, right?

13          MR. HODGES:  That is correct, he is

14  testifying what the dates are on the document.

15          MS. JAMES:  Okay.

16      Q.  (BY MR. HODGES)  So, Mr. Williams, do you see

17  that this document there is an e-mail here sent from

18  Xavier to Jesus Guerrero-Herrera and Miki Wilson?

19      A.  Yes.

20      Q.  Okay.  And in this document it states -- Xavier

21  states that he had a call with you and you started

22  bouncing the idea that the reaction of the O'Rourke

23  sales manager may be due to racial biases.  Do you see

24  that?

25      A.  Yes, sir.

Page 289

```
1        Q.  And it says, "Even though after a pretty

2   lengthy discussion he recognized he had no proof or any

3   indication from previous interactions with him."  Do you

4   see that?

5        A.  Yes, sir.

6        Q.  So do you remember having a conversation with

7   Xavier in regards to Scott Field?

8        A.  Yes, sir.

9        Q.  And do you recall mentioning racial biases?

10       A.  Yes.

11       Q.  And do you remember what was said?

12       A.  Yes, I do.

13       Q.  Can you tell me what -- what you told

14  Mr. Xavier that day when you had the conversation?

15       A.  Yes, sir.  So basically, you know, I had

16  numerous interactions with Mr. Scott Field, the sales

17  manager at O'Rourke, and, you know, as Xavier mentioned

18  in that last sentence, you know, previous interaction

19  with him.  So I started working supporting Scott and his

20  sales team members starting in June.  We had a really

21  good relationship.  I mean, good engagement.  He thanked

22  me for supporting Bradley Adams, one of his right reps

23  in Beaumont, Ashley Phelps right there in Houston.  He

24  had another guy named Robert Hernandez in Dallas.  And

25  so he said, "Carl, you know, you're doing great work
```

Page 290

1    with my team.  I appreciate your support."  And then all

2    of a sudden, what, eight months or seven months later

3    after we had that meeting with German Pellet in Port

4    Arthur, after that good meeting that we had with the

5    customer we had -- yeah, yeah, it was a new call, new

6    sales call, and when we had lunch and I was asking him

7    questions about, you know, distribution, areas of

8    improvement, RelaDyne Reliability Services.  I asked

9    him, you know, about, you know, does he think they have

10   like enough sales team members to support the Texas

11   marketplace.  He got heavily offended and took that as

12   me like, you know, questioning his management and stuff

13   and he went off.  He went off.  And I -- and I felt

14   like -- and what I experienced the way he was talking to

15   me and his tone it was like, "Carl, like -- like you've

16   crossed the line.  Like, like..." -- it was almost like

17   one of those boy -- like boy, you know, types of

18   demeaning gestures.  It's like things were fine until I

19   started asking questions about business improvement and

20   he didn't like I guess the questions that I asked and he

21   -- he retaliated.  He got very loud at lunch and then he

22   walked out, smoked, came back and kind of like

23   apologized and I thought we were going to, you know, be

24   back on good terms but then that's when he proceeded to

25   tell his boss Ryan and Ryan called like McDonnell -- Bob

Page 291

1    McDonnell and some others.  They said, "You know, we

2    don't want to work with Carl anymore.  He's of no value

3    to us."  So I was just very devastated and misled and

4    hurt by that.

5         Q.  Do you believe you did anything wrong with

6    having that conversation?

7         A.  I'm sorry, you said do I think I did anything

8    wrong?

9         Q.  With having that conversation with Scott Field.

10        A.  Absolutely not.  No, sir, absolutely not.

11   That's -- they -- they -- they would teach us to have

12   business conversations and sometimes what they call

13   challenging conversations where you can sometimes ask

14   questions, you know, that they get people to talk and

15   think and some of them can be a little uncomfortable

16   about, you know, there is honesty on their business

17   strategy, if they have enough people to support but, you

18   know.

19        Q.  Does Shell have -- sorry.  You can finish.  I

20   didn't mean to cut you off.  I thought you were

21   finished.

22        A.  I said, I mean, that's -- that's what they

23   teach us to do in the industry.  They call it a

24   challenge your sales model.  You're supposed to ask, you

25   know, difficult questions and, you know, still being --

Page 292

1    as long as it's business related and everything that we

2    discussed was all about business.

3         Q.  Do you know -- oh, sorry.  Do you know if Shell

4    has any policy that prohibits that type of conduct?

5              MS. JAMES:  Object to the form.

6              THE WITNESS:  No, there's no policy, I

7    mean, for talking about business.  That's what I'm

8    supposed to do.  I'm supposed to sell.  You know, I was

9    expected to produce -- to sell fast, quick, load up the

10   pipeline despite it can take two years to get an account

11   to close after introduction.

12        Q.  (BY MR. HODGES)  So what was the purpose of

13   your -- your communicating new business with Scott

14   Field?

15        A.  You said what was the purpose of me

16   communicating new business?

17        Q.  Yeah.  What was the purpose of you

18   communicating new business opportunities to Scott Field?

19        A.  Oh, the purpose of that conversation is to

20   start out we can continue to grew, to gain business.  So

21   I can have them make money, they have me make money.  So

22   I can continue to perform well and get my bonuses.

23        Q.  And another thing it says here Xavier stated

24   that -- sorry, I just lost it.  Yes.  It says here that

25   he was not supported by the recommendation by HR and

1    that that would only increase our exposure and risk to

2    litigation while employee is on their payroll.  Was it

3    your understanding or belief that the actions -- or,

4    excuse me, scratch that.

5              Did you ever make any complaints to Xavier

6    that would make him believe that there would be an

7    increased risk of litigation exposure?

8              MS. JAMES:  Object to the form.

9         Q.  (BY MR. HODGES)  Yeah, let me rephrase that.

10             Did you make any -- did you give any

11   indication to Xavier through words or e-mail or anything

12   that would make him believe that terminating you would

13   increase exposure and risks of litigation?

14             MS. JAMES:  Object to the form.

15        Q.  (BY MR. HODGES)  Did you understand the

16   question?

17        A.  One more time.

18        Q.  Yes.

19             MS. JAMES:  And I'm just going to object to

20   the form just to let you know so it doesn't throw you

21   off, but go ahead, Eddie, ask the question.

22        Q.  (BY MR. HODGES)  Yes.  Is it -- did -- did you

23   give any information to Mr. Xavier that would make him

24   believe terminating you immediately would -- terminating

25   you would increase Shell's exposure and risk to

Page 294

1    litigation?

2              MS. JAMES:  Object to the form.

3              THE WITNESS:  No, actually, no, I did not

4    provide any information.  You know, I never even thought

5    about that -- any type of litigation activity.  I -- you

6    know -- you know what's so crazy?  I thought that

7    meeting that we had on March 16th, that was supposed to

8    be a business-strategy meeting.  I had took the time to

9    come up with my PowerPoint, with my plan and here I am

10   thinking, you know, things are looking good this year.

11   I've got new distributors that -- that have reps that

12   want to work with me on like Breaux Petroleum.  I'm like

13   things are looking good and I sincerely thought that we

14   were meeting to discuss continuous commercial activities

15   that I'm doing and going to continue to do and just talk

16   about my strategy.

17              And I get on that doggone Skype call and

18   when I saw an HR rep, my heart immediately started

19   palpitating.  I knew something wasn't right.  I'm like,

20   Lord, hope I'm not going through no damn panic attack.

21   And I just knew -- I just knew because of the incident

22   with O'Rourke and Shell in the process of negotiating a

23   new agreement with them to -- to better commercial

24   terms, pricing, buying more product, you know, I just

25   knew he was ready just to throw me under the bus and

Page 295

 1   not, you know, support me despite my strong performance.

 2   And, man, I've never been so blind-sided in all my life.

 3   You talk about not seeing something come.

 4       Q.  And is it your opinion that Xavier had racial

 5   bias --

 6       A.  Absolutely.

 7       Q.  -- toward African-Americans?

 8       A.  Absolutely.

 9       Q.  And what would you base your opinion -- how

10   would you -- excuse me.

11             What is the basis of your opinion?

12       A.  Based upon the way that he treated me, you

13   know, the way he talked to me, our interactions, like --

14   there was like -- there was just like this -- this

15   uncomfortableness.  Like it was like harsh, his feedback

16   since day one.

17       Q.  Can you provide some examples?

18       A.  I'm sorry?

19       Q.  Can you provide some examples?

20       A.  It's just like I felt like he -- I felt like he

21   was trying to hold me to the same standards of people

22   that had been with the company 30 years.  I did not have

23   a formal on boarding.  You know, when I got into the

24   job, there was -- my predecessor had moved on.  My

25   distributors were not having to work with a rep in like

Page 296

1    ten months or so.  So here I am figuring things out on

2    my own.  You know, learning the industrial side of the

3    business, something I've never done in my life -- I've

4    worked with distributors -- and I just feel like his

5    expectations and the way he would talk to me is like

6    kind of made me look bad and set me up for failure.

7           Q.   How -- how would you base that on your race?

8           A.   Because Tamika, the -- my other black employee

9    on the team, she -- she expressed some uncomfortable

10   like conversations with him as well.  It's like they

11   hold you to a different standard, you know, than other,

12   you know, white employees in your performance and so

13   forth.  You know, you can do well but yet we're going to

14   find small things to pick at you about where there's

15   supposedly gaps.  And so as you can see even with this

16   case whenever managers and corporations have these

17   subjectivity racial prejudices on people's performance,

18   when the numbers indicate strong performance, bonuses,

19   but yet there's these prejudices where -- where even

20   HR's Kristia said, "Hey, man, your comments doesn't

21   indicate that his performance is not unacceptable."

22              So all this stuff it just underlies, you

23   know, like prejudice, racism, harsher treatment towards

24   people of color.  My numerous interactions with him they

25   were just -- they were tough.  I didn't feel like he had

Page 297

1   my back.  I didn't feel like I was supported.  You know,

2   he -- you know, he's from France.  I think he had some

3   cultural issues with Americans and, you know, and

4   especially African-Americans.  I don't know, I feel like

5   he needed some diversity and inclusion training or

6   something because, you know, he -- he's an ex-Pat,

7   right?  He didn't, you know, necessarily like Texas.

8   It's too hot and he's a European.  He's just different.

9   And I feel like he really had issues and biases,

10  conscious and unconscious.

11      Q.  Is it your opinion that Xavier treated

12  non-African-Americans more favorably compared to

13  African-Americans?

14      A.  Absolutely.

15      Q.  And what is your basis for that opinion?

16      A.  The way he would elevate them and highlight

17  them during our meetings and calls about their wins.

18  It's like, "Oh, Bob did this and this.  He's so

19  outstanding."  But then when he gets to Carl and Tamika

20  despite -- you know, the black employees despite our

21  achievements it wasn't highlighted and praised.  It's

22  like, you know, he had his favorites and they were the

23  white employees, the way he would elevate them,

24  recognize them.

25      Q.  And you would say that that type of treatment

Page 298

1   occurred from the -- from the day that he became your

2   manager or was there a certain time that --

3         A.   No, it was always that way.   It was always that

4   way.

5              And the other thing, you know, I would talk

6   to my other white counterparts about their interactions

7   with Xavier and they didn't have the same experiences

8   that I had and nor Tamika.   So he definitely had a

9   harsher treatment.

10        Q.   And who did -- and which -- who are you

11  referring to when you said you had those conversations?

12        A.   The other white employees about their

13  experiences with Xavier?

14        Q.   Yes.   What other white employees are you

15  referring to?

16        A.   The other team members.   Bob -- Bob McDonnell,

17  Gary Peterson.

18        Q.   What did they tell you that made you think

19  that was different treatment?

20        A.   Because their interactions with Xavier from

21  what they had said that they experienced was not

22  consistent with what I experienced and Tamika

23  experienced.   They would say stuff like, "You know,

24  Xavier can be a little pushy or ask for a lot but, you

25  know, overall he doesn't -- he let's me, you know, do my

Page 299

1    work and as long as I'm, you know, hitting my numbers,

2    you know, I don't have any issues with him."  It's just

3    like, "You know, he could be more personal, you know,

4    but he is who he is."  They would say stuff like that.

5    But outside of that, they didn't indicate that they were

6    having the issues and concerns and lack of trust and

7    support like I did and Tamika.

8         Q.  And so are you saying that Xavier was more

9    tedious in micro managing African-Americans more in

10   comparison to non-African-Americans?

11                 MS. JAMES:  Object to the form.

12                 THE WITNESS:  Absolutely.

13        Q.  (BY MR. HODGES) And what's your basis for that?

14        A.  Based upon engagements from -- and personal

15   experiences with him, with myself, Tamika, so I was able

16   to compare the experiences as two black employees on the

17   team versus the white counterparts.

18        Q.  Okay.  All right, Mr. Williams, I just

19   literally I'm basically done.  I just wanted to go over

20   some of defense exhibits because I'm going to go through

21   them briefly.  I just wanted to reopen them.

22                 So the first one I'm going to open up is

23   Defendant's Exhibit 8.  Let me share the screen.  This

24   was marked as Defendant's Exhibit 8.  Do you remember

25   this document?

Page 300

1      A.  Yes, sir.

2      Q.  And to clarify this document, when you state,

3    "I am accepting responsibility," was it your

4    understanding that you did something wrong?

5            MS. JAMES:  Object to the form.

6      Q.  (BY MR. HODGES)  You can answer if you

7    understand the question.  If you need me to rephrase,

8    just let me know.

9      A.  I recall addressing this earlier with Attorney

10   James and with this one there's no -- it's not that I

11   did something wrong, this e-mail was a collective phone

12   call with Jarrett -- Jarrett Enochs, Xavier and myself

13   that that particular engagement with O'Rourke could have

14   been better executed from Jarrett, the distributors

15   themselves if I'm being honest about their request for

16   support from me and myself like saying, you know, I

17   really -- I kind of trusted Jarrett being an experienced

18   employee and distributor.  I thought that they would be

19   clear on, you know, their support needs so I said I take

20   responsibility.  I take ownership of not -- I'm making

21   sure that I do all the checks and balances when it comes

22   to spending time with distributors and going out on

23   opportunities because, you know, Jarrett told me that,

24   "Hey, man, they need you.  You need to go out there

25   first of the year to support them."  And it was during

Page 301

1    the holidays so it was kind of hard to do a lot of

2    prepping and all that stuff, right, I mean over

3    Christmas.  And so, like I said, I wasn't going to point

4    the finger and say, "Well, Jarrett, you know, you could

5    have done a better job."  O'Rourke -- I mean, I just

6    feel like across the board there was just like a gap in

7    communication and preparation.  And it really befalls on

8    the distributor because it's their account.  It's their

9    business.  It's their marketplace.  I had never been to

10   West Texas, Midland-Odessa.  It was something like

11   different.  But...

12        Q.  So would you say that this e-mail doesn't

13   necessarily say that you were at fault in any way?

14        A.  No, no.  Yeah, this e-mail does not do that.

15   I'm just admitting to having kind of like a shared

16   responsibility as a employee to make sure that, you

17   know, working with distributors and my counterpart that

18   we're -- that we're doing the things we're supposed to

19   do.

20        Q.  And does this e-mail indicate that you were

21   underperforming?

22        A.  Absolutely not.

23        Q.  I'm going to open up Defendant's Exhibit 9.

24   And this is Defendant's Exhibit 9.  Sorry, actually,

25   actually, this is not it.  I'm sorry.  These numbers are

Page 302

1    messed up.  Actually, was it?  I think I got my numbers

2    mixed up.  Can you tell me about the Bates number for

3    Defendant's Exhibit 9?

4              MS. JAMES:  Let's see, let me find it in my

5    notes.  Just a second.  1068 through 71.

6              MR. HODGES:  Okay.  So that was it.

7              THE REPORTER:  Mr. Hodges, when you get a

8    second, I'm going to need a break.  I've been writing

9    for about three -- almost three and a half hours.

10             MR. HODGES:  I'm literally almost done.  I

11   have like two more questions left and we're going to be

12   done.  And if you could just hold -- give me like ten

13   minutes max.

14             MS. JAMES:  Yeah.  I'm going to have some

15   follow-up questions on the questions you asked.

16             THE REPORTER:  So we'll take a break on Ms.

17   James then.

18             MR. HODGES:  How much time do you have left

19   on your questioning.  If we go off the record I guess we

20   can figure that out off the record.

21             MS. JAMES:  Well, I'm -- I'm specifically

22   responding to your questions -- you know, follow-up

23   questions, the questions you asked.  So I think you've

24   opened the door for me to ask some of these questions.

25        Q.   MR. HODGES:  Okay.  Well, I just want to put on

Page 303

1    the record that you are out of time on your questioning

2    but if you want to follow up, you know, those questions

3    will be considered, you know, made out of time.  But

4    regardless of where we're at now I'm going to put the

5    exhibit back up.

6         Q.  So this was Defendant's Exhibit 9 and do you

7    remember this document, Mr. Williams?

8         A.  I haven't seen it all but it looks familiar.

9         Q.  And so this is dated the 29th of 2019.

10        A.  Yes.  Yes, I do.

11        Q.  And in this e-mail right here that you sent

12   were you sending this e-mail -- when you sent this

13   e-mail, did you have any notice of under performance?

14        A.  Absolutely not.  No, sir.

15        Q.  And then we're going to look at Defendant's

16   Exhibit 10.  Do you remember this document?

17        A.  Yes, sir.

18        Q.  And this document is referring to your

19   end-of-the-year comments?

20        A.  Yes.

21        Q.  And, again, does this document indicate to you

22   that you were under performing?

23        A.  Absolutely not.

24        Q.  I think -- who is -- who is Jarrett Enochs?

25        A.  He's the ICAM, the indirect channel account

Page 304

1    manager.  So he's responsible for the relationship --

2    the business aspect with like O'Rourke, with MidTex,

3    with some of the distributors that I support.  So he

4    like advises them on getting product, on logistics, on

5    inventory, pipeline development.  And I'm -- I'm just a

6    single account manager focused on helping him grow the

7    industrial line of business, execution in the field, but

8    he's more so on the business side working with the same

9    distributors that I supported.

10       Q.  And was he a subordinate of yours or are you

11   his manager?

12       A.  No, not at all.  We're peers but he support

13   (audio distortion.)  He didn't report to Xavier.

14            MR. HODGES:  Okay.  I have no further

15   questions.  I'll pass the witness.

16            THE REPORTER:  Before we continue, Mr.

17   Hodges, Exhibit 10, yeah, I need a Bates label because

18   you didn't mark it before.

19            MR. HODGES:  That was Defendant's Exhibit

20   10 and that was Bates-labeled document 00073.

21            THE REPORTER:  Thank you.

22            THE WITNESS:  I have a question.  So I

23   thought --

24            MR. HODGES:  Can we go off the record?

25            VIDEO OPERATOR:  Yes, we are off video

Page 305

1    record.  The time is 2:53 p.m.

2             (Recess taken from 2:53 p.m. to 3:09 p.m.)

3             VIDEO OPERATOR:  We are on the video

4    record.  It is 3:09 p.m.

5                       FURTHER EXAMINATION

6        Q.  (BY MS. JAMES)  Okay, Mr. Williams, your

7    attorney asked you some questions just before the break

8    and I just have a few follow-up questions about some of

9    the information you shared with him in response to those

10   questions.

11            You mentioned, Mr. Williams, that there

12   were nine customer accounts -- nine distributors that

13   were assigned to you when you first started working for

14   Shell.  Do you remember that?

15       A.  You said when I first started working?

16       Q.  Yes.

17       A.  That's -- that's not correct.  When I first --

18   no, there was a change.

19       Q.  So in response to questions that your attorney

20   was asking you, he asked you about customers that were

21   assigned to you and you explained to him that your

22   customers were distributors and that they were assigned

23   to you when you became employed by Shell.

24       A.  That's correct.  And what's the question?

25       Q.  So my question is this.  To your knowledge the

Page 306

1    distributors that were your customers while you were

2    employed, were they already doing business with Shell

3    prior to your employment?

4         A.   Yeah, all the distributors were, that's

5    correct.

6         Q.   Okay.  I'd like to show you Exhibit 2 which you

7    looked at with your attorney.  I believe it was 96 --

8    Equilon 96 and I just put it up in the Chat.

9              MR. HODGES:   That was Exhibit 1 and it was

10   97.

11        Q.   (BY MS. JAMES)  Okay, so your exhibit -- so

12   we'll make this -- I'm not sure what exhibit I left off

13   on, Wendy, but can we make this an exhibit for me,

14   Defendant's exhibit whatever the last one I left off

15   with which this is a -- a copy of -- a complete copy of

16   the document that Mr. Hodges showed you earlier which

17   was marked Exhibit 2.

18        A.   I'm sorry, so which one are you referring to?

19   I don't know what you're looking at.

20        Q.   Equilon 96 which is in the Chat.

21        A.   Equilon 96?

22        Q.   Yes.

23        A.   I'm not seeing that.  You didn't send it in the

24   Chat.

25        Q.   Oh, for some reason it only went to Tasha.

Page 307

1    Let's try it again.  Oh, sorry, it only went to Nate.

2    Okay.  I don't know why my Chat keeps switching over

3    just to him.

4              MR. HODGES:  Mine is downloading.

5              THE WITNESS:  It's taking awhile.  I don't

6    know why it's taking -- do you want to share your

7    screen?

8        Q.  (BY MS. JAMES)  I can.  So this is Exhibit --

9    this is Exhibit 2, Equilon 97, 98 and 99.  I guess it

10   goes through 102.

11       A.  I don't see the screen.

12       Q.  So your attorney showed you this earlier and he

13   marked it as Exhibit --

14       A.  I don't see your screen.

15       Q.  Oh, you don't see it?

16       A.  No, I do not see your screen.  I just see you.

17       Q.  Do -- do you see it now?

18       A.  No, ma'am.  Okay, now I can see it.

19       Q.  Do you recall your attorney showing you what's

20   marked as Equilon 97?

21       A.  Please zoom in, please.  A little bit more,

22   please.  Okay, I do recall seeing this document, yes.

23       Q.  Okay.  Your attorney marked this as Exhibit 2.

24              MR. HODGES:  Exhibit 1.

25              MS. JAMES:  This was marked as Plaintiff's

Page 308

1    1?

2              MR. HODGES:  For plaintiff, yes.

3              MS. JAMES:  Okay.

4         Q.  So your attorney marked this as Exhibit 1

5    earlier and I just want to confirm that what he showed

6    you as Exhibit 1 is part of this -- I mean, Eddie, for

7    completeness purposes are you putting in the whole

8    document or are you just putting in that single page

9    that's marked as 97?

10             MR. HODGES:  The whole document.

11             MS. JAMES:  So you have -- you have Equilon

12   96 as part of Exhibit 2?

13             MR. HODGES:  Yes, is that the cover page?

14   The cover page up until 102.  I think it's 96 to 102.

15             MS. JAMES:  Okay.  Okay, so, Wendy, this is

16   Plaintiff's 1 which is Equilon 96 through 102.  So I'm

17   not going to be introducing my own exhibit.

18        Q.  So, Mr. Williams, my question is this.  This

19   cover page indicates that Equilon 97 was something that

20   was -- was prepared in connection with a meeting; is

21   that correct?

22        A.  Yes.

23        Q.  Okay.  Is this -- this cover page, the date of

24   the meeting, July 10th through 11th, 2019?

25        A.  Yes.

Page 309

1          Q.  And so is Plaintiff's Exhibit 1 something that

2    you prepared in connection with the team meeting that

3    occurred on that date, July -- in July of 2019?

4          A.  Not -- I think this was compiled it might have

5    been by Xavier because we had our individual slides and

6    they might have taken my individual one and inserted it

7    into the presentation for everybody.

8          Q.  Okay.  And so this -- the second page of

9    Plaintiff's Exhibit 1, Equilon 97, you said that was --

10   that shows your business performance scorecard; is that

11   correct?

12         A.  That's correct.

13         Q.  Okay.  And it shows the volume of business that

14   you were producing through your distributors; is that

15   correct?

16         A.  Yes.

17         Q.  Okay.  And -- and it's the volume of business

18   for the period between January 1st of 2019 through June

19   30th of 2019; is that correct?

20         A.  Yes.

21         Q.  Okay.  And the KPI, that was -- what does that

22   stand for, Mr. Williams?

23         A.  Key performance indicators.

24         Q.  Okay.  And that's how Shell calculated your

25   bonus?

Page 310

1       A.  Yes.

2       Q.  Okay.  And I'm assuming there was some policy

3   or document that governed how the KPIs would be used to

4   determine what your bonus was?

5       A.  Yes, that's correct.

6       Q.  Earlier your attorney asked you about

7   Mr. Puvilland having monthly and weekly meetings during

8   your employment with Shell.  I just wanted to clarify.

9   I think you told me earlier that at first Mr. Puvilland

10   had monthly meetings, what he called MILOs, and then

11   later during your employment he started having weekly

12   meetings with business-development managers on his team

13   called WILOs, right?

14       A.  Yes, ma'am.

15       Q.  So first the meetings were monthly and then

16   later at some point they became weekly; is that correct?

17       A.  Yes, ma'am.

18       Q.  Okay.  Now, you said -- you mentioned earlier

19   that there were four industrial business-development

20   managers and I just want to make sure I have those names

21   correct.  Tamika Greer, yourself and then you said Bob

22   McDonnell and Gary.

23       A.  Yes.

24       Q.  And those were the four business-development

25   managers who were on the industrial side under Mr. --

Page 311

1  that worked under Mr. Puvilland?

2      A.  That's correct.

3      Q.  And Gary did you say his last name was

4  Peterson?

5      A.  I think so.

6      Q.  Okay.  And you said that Gary and Tamika you

7  believe that they had lower sales numbers than you did?

8      A.  No, I'd say they were comparable.

9      Q.  They were comparable.  How did you know that?

10      A.  Because Xavier would send out weekly --

11  monthly -- excuse me, monthly recent wins and sometimes

12  I would have some, sometimes Tamika would have some,

13  sometimes Gary would have some.

14      Q.  Okay.  So you're just basing that on what you

15  saw as far as what their wins were each month?

16      A.  Yeah, what all of our wins were as a team

17  because Xavier would send out a monthly saying this

18  is -- these are the wins for this month and we all would

19  get different highlights if we won, gained some business

20  for that month.

21      Q.  And you weren't -- you weren't privy to their

22  total sales numbers and what their bonus was, were you?

23      A.  Not -- not their bonus.  No, not their bonus

24  but I think we did have -- we did go over each other's

25  numbers like I think the distributor business.

Page 312

1      Q.  And you said Gary and Tamika both had numbers

2    that were comparable to yours?

3      A.  From -- from a wins standpoint.  I don't

4    remember their formulation, I don't know if their goals

5    were aggressive because if you -- if you look at my

6    scorecards, that plan that they set up, they had 178

7    percent allotted growth for new business.

8      Q.  Sure.  I'm just asking you though about Gary

9    and Tamika's numbers.

10     A.  Yes, I don't recall their exact numbers.

11     Q.  Okay.  Earlier you talked about a conversation

12   that you had with Mr. Puvilland within the month prior

13   to your termination about the incident with O'Rourke --

14     A.  Yes.

15     Q.  -- where you told him that -- was it Mr. Field

16   with O'Rourke who you believe had racial -- racial --

17   was demonstrating racial bias?

18     A.  Yes.

19     Q.  Okay.  And you said that you were basing that

20   on his behaviors?

21     A.  During that meeting.

22     Q.  He got mad at you for bringing up the name of

23   the other company that you brought up?

24     A.  Yes.

25     Q.  Did he ever use the word "boy"?

Page 313

1    A.  No.  No, he did not.

2    Q.  Okay.  So just to clarify, he told you you

3    crossed the line and he got loud with you and later

4    apologized but he never used the word "boy" with you,

5    did he?

6    A.  No, ma'am.

7    Q.  Did he use any other racially-derogatory, you

8    know, comments or names during that conversation?

9    A.  He didn't articulate a name but his tone was

10   very demeaning.

11   Q.  What was demeaning about his tone?

12   A.  The way he -- the way he talked.  I mean, do

13   you want me to give you an example?

14   Q.  Like his -- sure.  Like his tone of voice?

15   A.  Yeah, his tone of voice, the words he used, the

16   way he said it.  It was like, "Hold on now.  You crossed

17   the line.  Now, Carl, let me tell you, you know, this

18   is..." -- yeah, I mean --

19   Q.  So it was his tone of voice and he said, "Carl,

20   you crossed the line."  What -- was there anything else

21   about the conversation that you considered demeaning?

22   A.  Just -- just his whole approach, you know,

23   right there in front of his new employee.  It was just

24   really embarrassing and it caught me off guard because

25   Scott and I we've had numerous conversations.  We've

Page 314

1    been on calls together and it's almost like somebody

2    turning on you because it was like, "Oh, you crossed the

3    line."

4                    "What do you mean?  We're talking about

5    business."

6        Q.  But you don't dispute that he was -- that

7    Mr. Field was, you know, angry and upset about a comment

8    that you made?

9        A.  Correct.  And it wasn't just one comment.  I

10   mean, there's -- there's, you know, several things that

11   were discussed that Mr. -- but I guess overall he just

12   wasn't feeling -- I honestly thought he was having a bad

13   day.

14       Q.  Okay.  And you said Mr. Field with O'Rourke

15   reported the incident to Bob McDonnell.  That's a name

16   that you brought up with your attorney.

17       A.  No, ma'am, he reported it to his boss.  I think

18   his boss name may be Ryan Pearson.

19       Q.  Okay.

20       A.  Because Scott is the regional sales manager for

21   O'Rourke and he reports to I guess the Vice President of

22   Sales for O'Rourke named Ryan Pearson and then Ryan

23   Pearson called John McDonnell and John kind of manages

24   the relationship with distributors.

25       Q.  Okay.  So just to clarify for the record,

1  Mr. Williams, Ryan Pearson is an employee of O'Rourke

2  and John McDonnell would be a Shell employee?

3       A.  Yes, ma'am.

4       Q.  Okay.  And I think this is my last question,

5  Mr. Williams.  You said that Mr. Puvilland micromanaged

6  African-American employees, I believe.

7       A.  You said I said that he micro manages?

8       Q.  Yeah.  That's -- I just heard you say when you

9  were explaining why -- what behaviors you believe were

10 racially motivated by Mr. Puvilland you mentioned

11 micromanagement of the African-American employees.

12      A.  Yeah, I think I did say something along those

13 lines.  I definitely mentioned, you know, harsher

14 treatment, negative comments, no support.

15      Q.  When you say "micromanagement," what do you

16 mean by that?

17      A.  Well, like for my Caucasian counterparts he

18 would just let them go out and do their job and as long

19 as they're hitting their numbers they're good.  But

20 then -- but then like for myself, I mean, I can speak

21 specifically for me, despite you saw that I was doing

22 well with my numbers it was still like, "Oh, you need to

23 submit all these documents.  You need to submit this

24 report."  I mean, it seemed like there was -- I was

25 expected to be on the road in the field four days a week

1  every week and -- and just the administrative stuff that

2  he was asking for is very tedious, it was excessive, a

3  lot of late hours.

4      Q.  Yeah, so what -- what documents, reports or

5  administrative tasks do you believe you were assigned

6  that your Caucasian counterparts were not assigned?

7      A.  I mean, that's kind of speculation.  I don't

8  know know.  Like we're all supposed to update our sales

9  pipeline.  There's standard things that we have to do

10 but some of -- some of his deadlines and stuff were

11 unreasonable.  And, you know, I would be on the road all

12 day and, "Carl, I want this by tomorrow morning."  I'm

13 like, "Okay."

14     Q.  But you don't know of any instance where he

15 required you to submit a report that he didn't require

16 from the Caucasian counterparts, do you?

17     A.  Not specifically.  I haven't verified any of

18 that.

19     Q.  And you don't know about an occasion where he

20 required you to submit something within a tighter

21 deadline that he allowed your Caucasian counterpart, are

22 you?

23     A.  No, I'm not aware specifically.

24     Q.  Okay.  And isn't it true that --

25     A.  But -- but also to your question about, I

Page 317

1    guess, micromanagement because I don't think I really

2    addressed that fully, it's like it's an extra level of

3    support and like questioning your abilities and

4    competencies, you know, like I had to just do a lot more

5    explaining.  You know, it's like it's almost like

6    there's a lack of trust in executing a job.  So as --

7        Q.   What -- I mean, like, can you give me a

8    concrete example of a situation where Mr. Puvilland

9    provided support that was not provided to you to a white

10   counterpart?

11       A.   I don't know about him providing support

12   because my -- all the other BDMs expressed that, you

13   know, he's like a corporate guy, he's not technical.  I

14   mean, industrial sales we're talking about complex

15   machinery so --

16       Q.   Well, I'm just asking you about what your --

17   the comment you made.  You said there was a lack of

18   support for you.  Are you saying that he -- that

19   Mr. Puvilland provided support to a white counterpart

20   that he did not provide to you?

21       A.   I don't -- I don't think it was more so a lack

22   of support.  I don't know if you misunderstood what I

23   said or maybe I misquote but I was saying that he

24   gave -- gave them more free range to execute their

25   business.  For example, you know, he would be on a call

Page 318

1    with Gary and Gary would say, "Xavier, you know, this

2    week I'm going to go spend some time with Quality

3    Petroleum, I'm going to do a training with this customer

4    over here and then I'm going to do a site assessment and

5    this is what I plan to achieve for this week.  I think

6    it's going to help me with my numbers.

7                    And then like an example for me, you

8    know --

9        Q.  When -- and when did this call -- this

10   particular call happen?

11       A.  So these took place every week, the WILOs.

12       Q.  Okay.  But you weren't a party or -- to or

13   privy to Mr. McDonnell's WILOs with Xavier, right?

14       A.  Those are personal and individual.

15       Q.  Okay.  You were never privy --

16       A.  But my conversations -- I was not on there with

17   them but my conversations as we would talk amongst each

18   other -- because he was a new supervisor.  We all had

19   Eric Boydstun, all of us did, and then when Xavier came,

20   "Oh, my goodness.  Hold on now.  We can't..." -- we had

21   to practice saying his name.  Like it was just different

22   like.  So we all had to get, you know, used to him and,

23   you know, acclimated to his style.  But they all made

24   similar comments and most of them said, "Hey, you know,

25   Xavier has a different style but, you know, he lets me

Page 319

1  do my work."

2              And I'm like, "Ah, like without really

3  micromanaging them and, you know, having to try to tell

4  them how to do their job.  He lets them do it.

5              Okay, on my end, you know, I'm -- I'm

6  sorry, hold on.  On my end I would say that, you know, I

7  take, you know, ownership and so forth.  I share what

8  I'm doing with Xavier and what my plans are and then he

9  may try to change my plans and, you know, offer other

10  advice and I would, you know, send different documents.

11  It was like -- it was more so like he would question my

12  like competency.

13       Q.  Okay.  But your opinion and conclusion as to

14  that is based on comments that Mr. McDonnell and other

15  business-development managers made about their working

16  relationship with Mr. Puvilland?

17       A.  Yes.

18       Q.  Okay.  And, I mean, you mentioned about

19  Mr. Puvilland elevating other people's wins or

20  highlighting other people's wins I guess during team

21  meetings or in team announcements.  I mean, there were

22  instances I believe you testified earlier that

23  Mr. Puvilland mentioned certain wins -- business wins

24  that you had, correct?

25       A.  You said I said that or were you asking a

Page 320

1    question?

2         Q.  I'm asking a question.  I mean, there were

3    instances in which Mr. Puvilland highlighted wins by

4    you?

5         A.  Yes.  Yes, that's correct.  Via e-mail and

6    verbally.

7         Q.  Okay.

8         A.  Because he said I was making strong progress

9    and doing well.  But something that I think is very

10   important to mention that I forgot to interject earlier

11   is you know Mr. Lucas Kerley?  Correct, you remember

12   Mr. Lucas Kerley?

13        Q.  Yep.

14        A.  So he shared with me when I told him after I

15   was terminated, he said that I was wrongfully racially

16   terminated and he told me that I should sue Shell and he

17   said he saw another example with a white Shell employee

18   in California who had a similar issue with a distributor

19   and he said they simply reassigned him to work with

20   another distributor.

21        Q.  Do you know what was the name of the white

22   employee in California?

23        A.  I do not.  I do not remember the name.

24        Q.  Do you know who -- and I'm assuming this white

25   employee was not in your division with you reporting to

Page 321

1    Mr. Puvilland?

2         A.   Correct.  No, this is before.  Because Lucas

3    had been with Shell, I don't know, about five or six

4    years ago and he recalled very specifically working with

5    other BDMs like myself and there was an incident where a

6    distributor, you know, something didn't go well at a

7    meeting or, you know, they just said, "Hey, we don't

8    want to work with this guy."  Shell, you know, they made

9    arrangements to keep that employee employed and

10   supported and they just assigned him to another

11   distributor I believe and then he eventually got a

12   different role but there was no --

13        Q.   And this was -- was an employee in California

14   and this occurred prior to your employment?

15        A.   Yes.

16        Q.   And this is something that Mr. Kerley told you

17   about?

18        A.   Yes.

19        Q.   Did anyone else tell you about this situation?

20        A.   No, no.

21        Q.   Okay.  Did you ever have any conversations with

22   Shell management or see any documentation related to

23   this situation that you just mentioned?

24        A.   No, ma'am.

25        Q.   And you said you don't know the name of the

Page 322

1   white employee that was engaged in what you call similar

2   behavior?

3        A.  Correct.  Behavior?  More so it was the same

4   experience.  Similar experience.

5        Q.  Okay.

6            MR. HODGES:  Okay, we're at -- we're at

7   3:30 right now.  We're at 3:30 right now.  I'm not sure

8   how much longer you've got but --

9            MS. JAMES:  I've got a couple more

10  questions on what Mr. Williams just interjected and

11  raised here at the end.

12       Q.  Mr. Williams, you said you don't know the

13  employee's name.  Do you know any particulars about the

14  conduct that caused the distributor to not want to work

15  with the employee any longer?

16       A.  I do not.  I do not have -- I do not know

17  details.

18       Q.  And do you know how Mr. Kerley knows about the

19  situation involving this employee in California?

20       A.  I believe at the time because he supports --

21  he's a technical expert that spends times with BDMs like

22  myself so I don't want to speculate and say he supported

23  that rep but I know he had a relationship with the rep

24  and was familiar with what took place.

25       Q.  But you don't know specifically how he's

1    familiar with it?

2         A.  No, ma'am.

3         Q.  All right.

4         A.  I have one more thing.

5         Q.  Okay.  Well, it is 3:30 and if you're --

6         A.  This is the last one.  This is the last one.

7         Q.  I'm going to probably have questions about it

8    but go ahead.

9         A.  We're wrapping up finally.  So Mr. Xavier

10   Puvilland in that 1,400-page document there's some

11   comments in there where he agreed to implement -- so

12   when we would have -- when we started having our MILOs,

13   right, he would not send out an agenda.  We would just

14   get on a call, not know what we're going to talk about,

15   what we're going to do and I said, "Hey, Xavier.  Will

16   you please prepare an agenda so, you know, we'll know

17   what will be discussed.  Maybe we can prepare some

18   things.  I have some suggestions."  I said, "Will you

19   also allow us to do an around the horn where each person

20   will go around sharing best practices, what's going

21   well, what's not, what are they saying in the

22   marketplace."  And, you know, he implemented that.  So I

23   started to say I'm not sure like -- I don't know if he

24   like (indiscernible) for that or something but I'm like,

25   you know, he even, you know, took suggestions from me

Page 324

1   like I guess coaching him on how to conduct the call and

2   add structure to it and an agenda and he -- and he

3   implemented my suggestion.

4       Q.  And why do you think this is significant,

5   Mr. Williams?

6       A.  You know, it kind of relates to one of those

7   intangible almost performance type what you bring to a

8   company and a team and a manager and also it kind of

9   highlights many of my peers that are experienced with

10  Shell.  And the previous manager that -- I remember

11  Tamika's previous boss was a lady and Tamika had a

12  personal relationship with her and Xavier's peers I

13  guess the people before him the lady said -- she was a

14  manager, say he wasn't qualified.  She don't know how he

15  got the job.

16      Q.  You said that -- Xavier's predecessor in his

17  role?

18      A.  It was -- Tamika had a lady supervisor, I think

19  she was based out of Louisiana and -- I can't think of

20  her name -- but it was right before Xavier transitioned

21  into the role and I think it was like in the fall.  It

22  was either like 2019, I believe, or 2018 -- no, it was

23  on 2019 because I was with the company and the lady

24  transitioned to a different role but her previous

25  supervisor -- said I think it was -- but she mentioned

Page 325

1    that -- you know, because she was a manager, same role

2    that Xavier had assumed and they just said -- I mean,

3    there was like a common theme that that manager

4    expressed that other managers said they don't -- that

5    they didn't think he was qualified.

6         Q.  Okay.  So the statement -- or the belief that

7    Mr. Puvilland was not qualified, that's a statement that

8    was made by Tamika's former manager --

9         A.  Right.

10        Q.  -- to Tamika and Tamika relayed that statement

11   to you?

12        A.  Correct.

13        Q.  And the -- the -- the statement that he was not

14   qualified, did you interpret that to mean not qualified

15   to be (simultaneous speaking) --

16        A.  Doesn't have the skills to be a manager, not a

17   people person and even on my end, I mean, the guy didn't

18   even -- wasn't organized enough to have an agenda, you

19   know, on his monthly calls.  So I saw gaps in his own

20   competencies.

21        Q.  Okay.

22        A.  All right.  And that's it.

23        Q.  All right.

24             VIDEO OPERATOR:  That concludes our

25   deposition today.

Page 326

1                    MR. HODGES:  First, I just have one

2   question.  I think she passed the witness.  I just have

3   one question before you close.

4                    VIDEO OPERATOR:  Okay.

5                    MR. HODGES:  Are we still on?

6                       FURTHER EXAMINATION

7       Q.  (BY MR. HODGES)  Mr. Williams, you mentioned

8   that at a certain point in time that your MILO meetings

9   became WILO meetings from monthly to weekly.  Do you

10  know if that was the case for any other BDM?

11      A.  Yes, sir, these were standard for all of us.

12                   MR. HODGES:  Okay.  That's all my

13  questions.  I pass the witness.

14                   MS. JAMES:  No further questions.

15                   VIDEO OPERATOR:  That concludes our

16  deposition today.  It is 3:37 p.m. and we're off the

17  video record.

18                   (Deposition concluded at 3:37 p.m.)

19

20                   Reporter's Note:  According to Federal Rule

21  30(e)(1), the request for review of the deposition by

22  the witness is accomplished "on request by the deponent

23  or a party before the deposition is completed."

24                   Since this was not done, signature is

25  considered waived for this transcript.

Page 327

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION
 3
    CARL O. WILLIAMS,            )
 4                               )
              Plaintiff,         )
 5                               )
    VS.                          ) NO. 4:20-cv-04295
 6                               )
    SHELL OIL COMPANY,           )
 7                               )
              Defendant.         )
 8                               )
                                 )
 9
10                REPORTER'S CERTIFICATION
                DEPOSITION OF CARL O. WILLIAMS, JR.
11                    NOVEMBER 5, 2021
12        I, Wendy Schreiber, Certified Shorthand Reporter in
13   and for the State of Texas, hereby certify to the
14   following:
15        That the witness, CARL O. WILLIAMS, JR., was duly
16   sworn by the officer and that the transcript of the oral
17   deposition is a true record of the testimony given by
18   the witness;
19        That examination and signature of the witness to
20   the deposition transcript was waived by the witness and
21   agreement of the parties at the time of the deposition;
22        That the original deposition was delivered to
23   KINDALL C. JAMES, ESQ.;
24        That the amount of time used by each party at the
25   deposition is as follows:
```

Page 328

```
 1        KINDALL C. JAMES, ESQ. - 02 HOURS:32 MINUTE(S)
          EDDIE HODGES, JR., ESQ. - 01 HOURS:21 MINUTE(S)
 2
 3     That $_____ is the deposition officer's
 4  charges to the Party for preparing the original
 5  deposition transcript and any copies of exhibits;
 6     That pursuant to information given to the
 7  deposition officer at the time said testimony was taken,
 8  the following includes all parties of record:
 9  FOR THE PLAINTIFF:
10        EDDIE HODGES, JR., ESQ. (Appearing Remotely)
          KENNARD LAW, P.C.
11        5120 Woodway Drive
          Suite 10010
12        Houston, Texas 77056
          Phone: (210) 888-1393
13        eddie.hodges@kennardlaw.com
14  FOR THE DEFENDANT:
15        KINDALL C. JAMES, ESQ.  (Appearing Remotely)
          LISKOW & LEWIS
16        1001 Fannin, Suite 1800
          Houston, Texas 77002
17        Telephone: (713) 651-2945
          Facsimile: (713) 651-2908
18        KJames@liskow.com
19
20     That a copy of this certificate was served on all
21  parties shown herein on _____ and filed
22  with the Clerk pursuant to Rule 30(e)(1).
23     I further certify that I am neither counsel for,
24  related to, nor employed by any of the parties or
25  attorneys in the action in which this proceeding was
```

Page 329

1    taken, and further that I am not financially or

2    otherwise interested in the outcome of the action.

3        Certified to by me this 15th day of November, 2021.

4

5

_Wendy Schreiber_

6                        Wendy Schreiber, Texas CSR 9383

                        Expiration Date:  05/30/22

7                        MAGNA LEGAL SERVICES

                        Magna Registration No. 633

8                        7 Penn Center

                        1635 Market Street

9                        8th Floor

                        Philadelphia, Pennsylvania 19103

10   Job No. 765405      (214) 207-9657

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25